UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


J.H., BY AND THROUGH HIS NEXT
FRIEND TERINA GRAY, ON BEHALF OF HIMSELF

AND ALL PERSONS SIMILARLY SITUATED                PLAINTIFF

VS.                                  CIVIL NO. 3:11cv327DPJ-FKB

HINDS COUNTY, MISSISSIPPI                          DEFENDANT




MOTION FOR PRELIMINARY INJUNCTION




BEFORE THE HONORABLE DANIEL P. JORDAN III,
UNITED STATES DISTRICT JUDGE
JUNE 17, 2011
JACKSON, MISSISSIPPI



APPEARANCES:

FOR THE PLAINTIFF:      MR. JODY OWENS
                        MS. Corrie Cockrell

FOR THE DEFENDANT:      MS. LISA ROSS



REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____
245 E. Capitol Street, Room 120
Jackson, Mississippi  39201
(601) 965-4410



EXHIBIT
A

1          THE COURT:  Good afternoon.  We are here, of course,

2    on the plaintiff's, Disability Rights of Mississippi, motion

3    for preliminary injunction.  Before we dive in, let me ask

4    counsel, I've read the plaintiff's motion.  There was no

5    response from the defendant, and I'm unclear as to what the

6    issues are for this hearing.  The motion sought the right to

7    inspect Henley-Young Detention Center.  I don't know what

8    aspect of the motion is disputed.

9          I received a list of witnesses for this hearing.

10   There are 21 witnesses listed.  The reality is that while we

11   are in two courthouses, all of you have to be out at 5:30 or

12   you will spend the weekend here.  I don't know how we're going

13   to take 21 witnesses in the next hour and a half.  But I'm

14   wondering whether -- based on the motion that was filed, I'm

15   wondering whether any of those witnesses are necessary.

16         MR. OWENS:  May it please the court.  Your Honor, the

17   county and plaintiffs have been working to compromise.  We have

18   really finalized --

19         THE COURT:  Hold on a second.

20         (Short Pause)

21         THE COURT:  Go ahead.

22         MR. OWENS:  Your Honor, we have agreed to most of the

23   motion.  The county has three portions of the motion that are

24   still in dispute.  We would like the court's interpretation.

25   Is that correct, Ms. Ross?

1        MS. ROSS:  Yes, Your Honor.  In this particular case,

2    the plaintiffs have sought access to all residents in the

3    juvenile detention center, and we have some orders that they

4    have submitted in other cases.  It's our position that these

5    three acts that are in question, these three federal acts, are

6    really guided to protect people either with known disorders or

7    diseases, people with developmental disabilities, and residents

8    who have other disabilities.  And as a result of that, the

9    county has a right to come into our facility.  We agree with

10   that, that they have access to the facility.

11       It gets sticky after that when the DRMS wants to come

12   in and have access to every resident, and we're saying there

13   are situations where DRMS would have a right to have access to

14   every resident.  One, we say when DRS is conducting --

15       THE COURT:  Excuse for more interrupting.  Let me get

16   a list of what the issues are, and then we'll go back.  And I

17   think probably the appropriate way to proceed is to let the

18   plaintiff to make its motion and you can respond to it.  I kind

19   of want to start with a list of where the disagreement is.

20       MS. ROSS:  We agree what is covered by the act.

21       MR. OWENS:  Correct, Your Honor.

22       THE COURT:  The first dispute is whether or not there

23   can be access to all residents.

24       MR. OWENS:  We agree, Your Honor, and I think counsel

25   agrees that DRMS is the P&A authority, federal funded, and has

1  access to monitor per the federal mandate.

2          MS. ROSS:  The first issue, Your Honor, is all

3  residents.  Can they access -- under what circumstances can

4  they access all residents?

5          MR. OWENS:  Your Honor, I also think we agree that

6  DRMS has two particular purposes for which they can monitor,

7  one for investigation purposes --

8          THE COURT:  I've got that.  Your brief was well done.

9  I understand.  My question to you is:  Where is the

10  disagreement?

11          MR. OWENS:  The disagreement on the first issue, Your

12  Honor, is DRMS's position is that obviously we have the

13  authority to access the facility to interview individuals

14  suffering from disabilities.  We also have the authority to

15  talk to individuals who are -- all residents of the facility

16  pursuant, Your Honor, to 45 CFR 1386.22 and also cited, Your

17  Honor, in the *Michigan Protection and Advocacy* case --

18          THE COURT:  I'm sorry.  Give me that code section

19  again.

20          MR. OWENS:  45 CFR 1386.22.

21          THE COURT:  All right.  So that -- so the first

22  disagreement is whether or not you have access to all.  So

23  what's the next disagreement?

24          MS. ROSS:  Your Honor, we've asked them to -- there is

25  also a question of who's an eligible resident, and we said the

1   eligible residents are those individuals who are protected by

2   the act.  And so that we don't have to keep coming before this

3   court because they will be down there carrying out their duties

4   and responsibility that we need to define who the eligible

5   residents are.

6          MR. OWENS:  Your Honor, I feel that that's kind of a

7   spinoff from the first issue, obviously, because it depends on

8   whether we are investigating or are we monitoring at that point

9   because we think our investigation authority allows us to talk

10  to residents who may not --

11         THE COURT:  I'm sorry.  Let me stop you.  I don't want

12  any argument right now.  I've read what you've presented.  I

13  want to know where the disagreements are.  That's all I want.

14  And then we're going to take them up one at a time.

15         MR. OWENS:  I think the county disagrees about who is

16  an eligible resident.

17         THE COURT:  That does sound like to me it's sort of

18  the same issue.

19         MS. ROSS:  Who is the eligible resident.

20         THE COURT:  All right.  What's the next area of

21  disagreement?

22         MS. ROSS:  Beg the court's indulgence one moment.

23         (Short Pause)

24         MS. ROSS:  Your Honor, also there's an issue as to

25  who's the final arbiter.  We say that they are the final

1    arbiter of probable cause as to whether one of these people who

2    fall under -- one of the individuals protected by the act, if

3    they have reason to believe that person is abused or neglected,

4    then they have probable cause to come in.  And they have used

5    this word "probable cause" without connecting it to anything.

6    So we disagree that they have the right to establish probable

7    cause on that.

8         MR. OWENS:  Is it a distinction that we have probable

9    cause to determine who is covered under the act or who has

10   disabilities?  Because our position is we do have probable

11   cause both to determine that an abuse has occurred and also who

12   is covered under the act.

13        MS. ROSS:  Your Honor, we don't disagree that they can

14   decide who is covered under the act, but they say under this

15   first order -- well, this most recent order that they presented

16   that they can come in and interview any resident to determine

17   if the resident has a disability.  And, you know, we have --

18   I've asked them to provide authority for that, and they have

19   pointed me to 42 USC -- I think they pointed me actually to

20   42 -- Section 51.42.  And we read that as saying one thing as

21   being guided by the people with mental disabilities or

22   developmental disabilities or other disabilities, and they read

23   it as "all residents."

24        So we are back down to who's covered, and I think that

25   is the driving issue, Your Honor.  Once we can determine whose

1    covered, whose protected by these acts and that will certainly

2    decide what kind of access they can have.

3              Your Honor, the county has provided --

4              THE COURT:  When you say "final arbiter" -- there's no

5    dispute that -- this is our first hearing in this courtroom.

6    It obviously has some kinks as y'all endured earlier.  But what

7    I -- what I think I hear you saying is there's no dispute under

8    the codes and under the CFRs that they are the final arbiter

9    with respect to probable cause.  But you're saying that they

10   should not be the final arbiter as to whether or not somebody

11   is actually covered by the act, whether they have a disability.

12             MS. ROSS:  When I've read the cases, Your Honor, I

13   have not seen one that said they are the final arbiter on that

14   determination.

15             THE COURT:  That's the issue you have.

16             MS. ROSS:  That's one issue that we have.  Because we

17   have minors there, Your Honor, that we say -- not everybody has

18   a disability.

19             THE COURT:  So that's two issues.  I think, Mr. Owens,

20   you said there were three?

21             MR. OWENS:  Yes, Your Honor.  I think the spinoff is I

22   think the county is agreeing that we have access to individuals

23   with disabilities, by where it stands past that.  I think

24   that's all the issue.

25             MS. ROSS:  Your Honor, to narrow it down even further,

```
1    we have told them that we believe that they have access to
2    individuals who don't have disabilities when they are there to
3    conduct an investigation involving a person who has a
4    disability or who is mentally ill or who is developmentally
5    disabled.
6          If they are conducting an investigation because they
7    received a report that one of those people have been injured --
8    abused or neglected, then to the extent that a nondisabled
9    resident has information, then they will be permitted access.
10   And if they want to interview a nonresident -- a nondisabled
11   resident as a part of their probable cause, then they can have
12   access.  But this carte blanche access to come in whenever you
13   want to talk to them about whatever, we are saying the statute
14   is not that broad.
15         THE COURT:  All right.  Mr. Owens, why don't you go
16   ahead and argue your motion.  I guess start by telling me how
17   your position differs from the defendants.  In other words,
18   Ms. Ross has just told me that she agrees that your client
19   should have access essentially to anybody at the facility as
20   long as it's in conjunction with investigation or monitoring of
21   somebody who has a disability.
22         MR. OWENS:  I think the distinction is Ms. Ross --
23   Ms. Cockrell is going to make the argument, Your Honor.  But I
24   think the distinction is monitoring the investigation.
25   Ms. Ross is making a distinction of what gives us what access.
```

1    We can determine the investigating through the monitoring.

2    That's the distinction.  Your Honor, Ms. Cockrell is going to

3    give you some background information on that.

4              MS. COCKRELL:  You want me to give you the background

5    on how we got to this point or go straight to that?

6              THE COURT:  If it's something that's in your brief,

7    I've read it.

8              MS. COCKRELL:  Okay.  May it please the court, we have

9    access to juvenile detention centers around this state, and the

10   P&A, protection and advocacy system, has access to similar

11   detention center, training schools around country based on the

12   protection and advocacy rights -- laws that are in set up by

13   Congress.  Congress designated two distinct bases for access to

14   the facilities and residents within those facilities, and one

15   is to investigate allegations of abuse or neglect, and the

16   second one is to monitor the facility and the treatment of the

17   residents in that facility.

18             DRNS's rights are codified in three separate but

19   related statutes, and they are the Protection and Advocacy for

20   Individuals with Mental Illness Act of 1986 and is often

21   referred to as the PAIMI Act.  That's P-A-I-M-I.  And if Your

22   Honor is okay with that, I'll refer to it as PAIMI.

23             The second one is the Developmental Disabilities

24   Assistance -- Developmental Disability Assistance and Bill of

25   Rights Act of 2000.  And that is often referred to as the PADD

1    ACT.   That is P-A-D-D.

2            And the third statute is the Protection and Advocacy

3    of Individual Rights Program, and that is often referred to as

4    PAIR P-A-I-R.

5            Each of these acts cover individuals who live with

6    developmental mental illnesses or they fall into a catch-all

7    category which would be the PAIR statute.   And so I'm going

8    discuss each one of them separately.

9            The first one, PAIMI, covers individuals who live with

10   mental illnesses such as bipolar, substance abuse, depression,

11   not limited to those things, but those are just examples.

12   PAIMI requires the P&A's to have authority to access facilities

13   in the state which provide care and treatment to mentally ill

14   individuals, and that is per 42 USC Section 1085 -- I'm sorry,

15   10805, subsection 3.

16           And also PADD is related to individuals who have

17   developmental disabilities.   It specifically refers to

18   individuals with developmental disabilities, and it

19   specifically provides that people with disabilities that occur

20   before the age of 22 and includes mental and physical

21   impairments or a combination of both.   And also if there is a

22   substantial limitation in three or more of the major life

23   activities such as self-care, expressive or receptive language.

24   Learning disabilities fall within that category as well.

25   Subdirection capacity for individual independent living.   So

1    children that will fall -- people that will fall into that

2    category will be children who are born with fetal alcohol

3    syndrome or behavior -- who have developed any type

4    behavior issues.

5              THE COURT:  I'm going stop you.  What you're telling

6    me is in the brief, which I've read.  I understand it.  I

7    understand the setup.  I think what I've heard is that there's

8    a very narrow issue that I'm being asked to consider.  That

9    narrow issue, as I understand it, is the extent to which your

10   client can have access to individuals who are not themselves

11   covered by the acts.

12             MS. COCKRELL:  Right.

13             THE COURT:  Somebody who's not disabled.

14             MS. COCKRELL:  Yes, sir.

15             THE COURT:  So that's what I need for you to address.

16             MR. OWENS:  Your Honor, with respect to access, there

17   are two -- each provision deals with access, as Ms. Cockrell

18   cited.  Each provision has an access component.  Particularly I

19   want to point the court's attention, as I stated earlier, to 45

20   CFR 1386.22 that states, "After Section F where it speaks to

21   the access to individual disabilities, Section G, the system

22   and all of its authorized agents shall unaccompanied access to

23   all residents of a facility at reasonable times, which at a

24   minimum shall include normal working hours, visiting hours --

25   and visiting hours."

1       Also in addition, Your Honor, 42 CFR 5142 also

2  addresses another one of the PADD acts, access to facilities.

3       THE COURT:  B.  You're going to B.

4       MR. OWENS:  "The P&A system shall have reasonable

5  unaccompanied access to public and private facilities and

6  program in the state which render the care and treatment for

7  individual's mental illness and to all areas in the facilities

8  which are used by the residents or are accessible to the

9  residents."

10      Your Honor, finally in our brief we cite the *Cotton*

11  case, a Fifth Circuit case that's the authority -- I think

12  counsel opposite points that the *Cotton* case deals where we

13  only have a mental health facility.  But the *Miller* case that's

14  also in our brief, which is 849 F. Supp. 1202, a 1994 decision,

15  deals with a mental health care facility in which access was

16  attempted to be limited to a detention center.  And

17  particularly the court found that denying full access prevents

18  the advocacy organization for bringing in their own mental

19  health professionals to ascertain whether any residents do, in

20  facts, suffer from mental the illnesses.

21      Your Honor, our positions is pretty simple.  We feel

22  that the facility determines who has mental illnesses or fall

23  into this umbrella that there is an inherent conflict of

24  interest.  We think federal act intended for the DRMS and the

25  P&A authorities throughout the country to have that assess to

 1   make a determination.  If the center themselves has the

 2   authority to determine who can be interviewed or who suffers

 3   from a disability, they would limit the federal authority.

 4   It's our belief, Your Honor, that Congress did not intend and

 5   case law to support the same.

 6          THE COURT:  Do you have any authority that addresses

 7   that issue?  The cases that you cited are talking about

 8   different issues.  I understand you're saying that they are

 9   analogous.  Do you have a case that's on point?

10          MR. OWENS:  There is no case directly on point.  We

11   think the *Cotton* case is only Fifth Circuit authority that we

12   have been able to find that talks about the facility's attempt

13   to limit the access and how it's a violation of the law.

14          THE COURT:  All right.  Thank you.

15          MR. OWENS:  At this time, Your Honor, if you'd like to

16   hear any witnesses, we can show the disabilities and how we

17   actually evaluated and determine individuals with disabilities.

18   Or after Ms. Ross finished her argument, we'd be happy to

19   provide the court with the same.

20          MS. ROSS:  Your Honor, just briefly, I would call the

21   court's attention to Exhibit B that was -- it's Exhibit B to a

22   case that Judge Lee had involving the Disability Rights

23   Mississippi.  And some of the things that we simply asked them

24   to do in the order is to state who is disabled.

25          For example, in the Lauderdale County case that was

1   before Judge Lee, in the agreed order after they saw the

2   preliminary injunction in that case, what they asked them to do

3   was to -- the facility to do was to come up with a list of

4   children who had -- or people in the facility who were

5   developmentally disabled or had a mental illness, and they said

6   that they would be able to go in and interview those children.

7        I think that's a concession that you don't get a right

8   to go in and interview everybody unless they fall into -- as we

9   said earlier, Your Honor, if they are there for an

10  investigation of an individual who is covered by these acts,

11  then to the extent they are investigating abuse and neglect,

12  then they have a right to come in.

13       But imagine, Your Honor, Parchman has people who are

14  mentally disabled.  The Yazoo County FCI has people who are

15  mentally disabled.  That gives them the right to have access to

16  those individuals up there who are mentally disabled.  But can

17  they just go to FCI tomorrow and say, "Because you have

18  residents who are disabled, we can interview every inmate in

19  this facility"?

20       We're saying Congress did not intend that.  Congress

21  wanted to protect a certain class of individuals, and that's

22  why they have given them access, and we don't -- we don't even

23  argue with that, Your Honor.  We have allowed them to come into

24  the facility for the last two years, almost unfettered access.

25  And they then have access maybe to residents who they were

1   not -- who we contend now they were not supposed to have access
2   to.

3          Looking at this act, these acts that they cited, they
4   are geared to three protected classes, people with other
5   disabilities that don't fall into the categories of
6   developmentally disabled or mentally disabled.  And we're
7   asking the court just to confine the perimeters under which
8   they can go in.

9          Yes, they, can go in and monitor, Your Honor.  We have
10  told them they can go in and monitor.  They can pass out
11  pamphlets.  They want to make announcements.  I don't know.
12  Once you pass out pamphlets and let everybody know what their
13  rights are, then anybody who comes to the lobby or is in a
14  living quarters will see what their rights are.  They are free
15  to call them.

16         They have said we should provide private confidential
17  phone calls.  I don't know how the county -- are we to build a
18  new room to provide confidential phone calls?  We can't stop a
19  child now if they are entitled to a phone call from calling
20  DRMS or Southern Poverty Law Center.

21         The problem we have encountered, Your Honor, and the
22  reason we are here today is because this is disruptive.  The
23  facility has been disrupted by their presence.  We want to
24  accommodate them; but if they are able to go in and talk to any
25  resident about any thing, then, you know, we're saying that's

```
 1    too far outside of what Congress intended to do.

 2             THE COURT:  Let me make sure now that I've -- I think

 3    I've got it framed in my mind.  Under 42 CFR 51.42, the P&A

 4    system has the right to have reasonable unaccompanied access to

 5    residents at all times necessary to conduct a full

 6    investigation of an incident of abuse and neglect.  They also

 7    have monitoring rights.  It says, "This authority shall include

 8    the opportunity to interview any facility, service recipient,

 9    employee, or other persons, including the person thought to be

10    the victim of the abuse."  So on the one hand, you're not --

11             MS. ROSS:  We don't bicker with that at all.

12             THE COURT:  You're not disputing that.  If they are

13    there to monitor, if they are there to investigate, then they

14    essentially have unfettered access to anybody there.

15             MS. ROSS:  Who have information related to their

16    investigation.  Yes, Your Honor.

17             THE COURT:  Or their monitoring.

18             MS. ROSS:  Or their monitoring.

19             THE COURT:  The issue, if I understand you correctly,

20    is that they shouldn't be permitted to come in for the purpose

21    of interviewing all the residents to determine who has a

22    disability.  Am I hearing you correctly?

23             MS. ROSS:  That's right.  If they have reason to

24    believe that somebody has a disability, Your Honor, there are

25    steps that they can take.  But to say that we have to open the
```

1    doors up and say, "Come interview all of these children and

2    I'll determine which one of them has disabilities," I don't

3    think they have that authority.  And there certainly isn't any

4    Fifth Circuit authority.

5         Your Honor, when you're framing your order in this

6    case, think about the floodgates that this will open, that

7    jails throughout -- and detention centers throughout this state

8    because it becomes who's running the jails.  And we want to

9    protect and see that these people are protected too, Your

10   Honor.  That's why we have given them the access that they have

11   had, and we're not even arguing about that.  But it has to be

12   some limit.

13        THE COURT:  Do I have the issue framed correctly?

14   Your concern is they shouldn't be able to come in for the sole

15   purpose to conducting interviews designed to determine who has

16   a disability.

17        MS. ROSS:  Yes.

18        THE COURT:  Otherwise, if they are coming in to

19   investigate, they are coming in to monitor, they have

20   unfettered access to anybody.

21        MS. ROSS:  Well, in monitoring -- what is monitoring?

22   If they are coming in -- for example, Your Honor, they said

23   that they want to take pictures, you know, inside the facility,

24   which they have a right to photograph the facility, but we

25   don't think they have a right to take a picture of any resident

| | |
|---|---|
| 1 | because you get into other privacy issues. |
| 2 | MR. OWENS:  That point is agreed and we concede, Your |
| 3 | Honor.  We have never taken pictures of the residents. |
| 4 | THE COURT:  Let me ask you the same question that I |
| 5 | asked Mr. Owens.  Do you have any authority supporting your |
| 6 | position? |
| 7 | MS. ROSS:  The position that -- |
| 8 | THE COURT:  They should not be allowed to come in the |
| 9 | facility to conduct interviews to determine whether or not |
| 10 | somebody is disabled. |
| 11 | MS. ROSS:  Your Honor, I have found no case law that |
| 12 | gives them that right, and the statute doesn't say that.  I've |
| 13 | not read the statute as saying that.  So in the absence of |
| 14 | that, I say there is no authority for them to do what they are |
| 15 | requesting to do. |
| 16 | THE COURT:  But on the flip side, you didn't find any |
| 17 | supporting your position either. |
| 18 | MS. ROSS:  No.  I would say that the courts have -- |
| 19 | usually these cases have mostly come up, Your Honor, when they |
| 20 | have just been denied records related to a person who was |
| 21 | disabled.  You know, that's not the case here.  So this issue |
| 22 | has never really been before a court or answered in the Fifth |
| 23 | Circuit. |
| 24 | THE COURT:  All right.  Anything else, Ms. Ross? |
| 25 | MS. ROSS:  No. |

 1           MR. OWENS:  For proper context purposes, I feel it is

 2    necessary to clarify some things that Ms. Ross indicated to the

 3    court.  In particular, Ms. Ross cites the Lauderdale County

 4    order that was entered on this same issue that allowed DRMS to

 5    have access.

 6           Your Honor, their order did not limit DRMS's access.

 7    It dealt specifically with individuals with disabilities, but

 8    the DRMS and their agents were still allowed to interview

 9    residents to determine if they were suffering from

10    disabilities.

11           In addition, when Ms. Ross speaks about disrupting the

12    facility, we think it's telling, Your Honor, that not only are

13    we currently occupying seven facilities in the state, but we

14    also on our witness list have brought with us directer Tony

15    Best of the Harrison County facility who can testify to our

16    measures that we -- and the extent that we go to avoid any

17    interference with the facility.  In particular, Henley-Young --

18    most of these facilities have schools for kids during the

19    school year.  So we don't even go to Henley-Young until after

20    school hours.

21           I think it's also telling that we did have, as

22    Ms. Ross said, carte blanche access to the facility until we

23    filed the conditions lawsuit.  At that point, as the record

24    indicates, we were told we can no longer access the facility.

25           Lastly, Your Honor, with respect to individuals with

1   disabilities, we interrupt this order, this act, to allow us to

2   interview individuals to determine if they have a disability.

3   Our practice is that if they do not have a disability, we no

4   longer talk to them.  But if we witness an abuse of the

5   individual with a disability, then we speak to them.  There is

6   systemic abuse in the Henley-Young facility in which we have

7   documented and which we've also provided Ms. Ross and her

8   clients over the last six months.  An example for the court

9   would be 23 hour cell lockdown.  We are not arguing the merits

10  of the lockdown here, Your Honor, but I am just giving the

11  example that the other residents, of course, know that no one

12  is leaving their cell.  So as part of our investigation, we

13  determine if everyone is saying this.  That's why some of the

14  provisions of the act allow us to see what other residents have

15  seen.  Thank you, Your Honor.

16          THE COURT:  All right.

17          MS. ROSS:  Your Honor, I would like to present the

18  court with the Lauderdale County order.

19          MR. OWENS:  It is part of the record, Your Honor.  All

20  of the orders in the state that we have --

21          MS. ROSS:  And also if they had access to all

22  residents, I don't see it in this order from Judge Lee.

23          THE COURT:  I think Mr. Owens attached it to his

24  memoranda.  In other words, I think it is already docketed in

25  the record.

```
1             MS. ROSS:  I ask that you look at that, Your Honor.

2             THE COURT:  I will.  I'm not going tell anybody that

3    they can't put on evidence that they want to put on.  I will

4    tell you that there's going to be -- if we run over, we're

5    going to have to come back Monday because there is -- again

6    there's a time limit on when the court is open.  So, Mr. Owens,

7    if you want to put on evidence, this is your hearing.  You can

8    proceed as you like.

9             I tell you what I don't need though.  I don't need

10   testimony that goes to the merits of your lawsuit, whether

11   there's abuse at the facility, because that is not a part of

12   your motion today.  Your motion today deals strictly with

13   access, as I understand it.  So if you have witnesses that you

14   want to call with respect to the access issue, then this is

15   your opportunity to do that.

16            MR. OWENS:  Court's indulgence, please.

17            THE COURT:  Yes, sir.

18            (Short Pause)

19            MR. OWENS:  Your Honor, we have no witnesses.

20            THE COURT:  Ms. Ross?

21            MS. ROSS:  No witnesses, Your Honor.

22            THE COURT:  Let me ask both sides, obviously there's a

23   specific standard that applies to preliminary injunctions.  Is

24   there any other aspect of the motion that either side wants to

25   address?  I understand the substantive legal issue now.  Is
```

 1   there anything else that needs to be addressed?

 2              MS. ROSS:  Not from -- beg the court's indulgence.

 3              (Short Pause)

 4              MS. ROSS:  Nothing from the county, Your Honor.

 5              MR. OWENS:  Nothing from the plaintiff, Your Honor.

 6              THE COURT:  All right.  The plaintiff's memoranda does

 7   a nice job of laying out sort of the framework of the statutes.

 8   I don't think that there's anything in the memoranda that's

 9   necessarily in dispute, and the issue that we talked about

10   today is not addressed in that document.  That's not an issue

11   that I thought about before I came up here because it wasn't

12   presented to me.  I'm not in a position to rule on an issue

13   without looking at it.  So I will -- I'm going to take it under

14   advisement.  I'll look at it first of next week, and then I'll

15   issue my ruling on it.

16              MS. ROSS:  And, Your Honor, will we have an

17   opportunity to provide the court with any case law?

18              THE COURT:  I'm happy to give you an opportunity to

19   brief the issues, if you'd like.  I've kind of got a sense from

20   both of you that you had already looked, and there's no

21   authority.  But --

22              MS. ROSS:  I want to really try to find -- and we have

23   talked a whole lot about who resident is and to see if Congress

24   or somebody somewhere defined resident.  That may clear the

25   whole issue up.

```
 1              THE COURT:  I'm more than happy to let you do the
 2    research instead of me.  How much time would you like to submit
 3    briefs?
 4              MR. OWENS:  Your Honor, we have briefed it fully.  How
 5    much time do you need?
 6              MS. ROSS:  Five days.
 7              MR. OWENS:  Five days is fine.
 8              THE COURT:  Why don't I ask both parties to submit
 9    briefs by 5:00 next Friday.
10              MR. OWENS:  Your Honor, as I understand it, I think it
11    is only on the point of access to residents.  Individuals
12    without disabilities --
13              THE COURT:  Well, tell me if I'm wrong.  I thought the
14    issue was whether or not -- whether or not the plaintiffs were
15    allowed access for the purpose of determining whether somebody
16    has a disability.  Ms. Ross has already agreed with you that
17    you have access to anybody that relates to investigation, and
18    that's clearly the case under everything I've read.
19              So the more refined question is:  Can you go in for
20    the sole purpose of determining -- I'm sorry.  Can you go in
21    and meet with individuals that you don't know to have a
22    disability for the sole purpose of determining whether or not
23    they have a disability.  I think that's the argument I was
24    hearing.
25              MS. ROSS:  Also, Your Honor, on monitoring, just
```

1    monitoring the facility, do they have access to all

2    individuals.  You know, I know they are going pass by them, see

3    them.  But access where they can come in and conduct

4    confidential interviews for the purpose of monitoring.  So

5    we'll address that.

6              THE COURT:  That will be a second issue.  Those are

7    the two issues.  So 5:00 Friday.  I won't ask for rebuttal.  I

8    can research myself.

9              MR. OWENS:  To make sure I have the second issue, how

10   are you wording that?

11             THE COURT:  Let me make sure I understand.  I think

12   what I hear her saying is whether or not your client can have

13   access to individuals who do not -- who are not known to have

14   disabilities for the purpose of monitoring.

15             MR. OWENS:  To determine that they have disability?

16             THE COURT:  That's the first question.

17             MS. ROSS:  That's the first one.

18             MR. OWENS:  The purpose of monitoring.

19             THE COURT:  That's the second one.  The first one is

20   whether or not you can interview them to determine whether or

21   not they have a disability.  That's the issue number one.

22   Issue number two is whether or not you can interview these

23   individuals as part of your role in monitoring the facility.

24             MS. ROSS:  In the absence of an investigation and

25   probable cause, Your Honor.

```
 1              THE COURT:  Right.
 2              MR. OWENS:  I'm a little perplexed about monitoring.
 3    Monitoring I understand we go into the facility and ask them do
 4    they have disability or --
 5              THE COURT:  I'm not saying she's right.  I'm saying
 6    that's what she's arguing.
 7              MR. OWENS:  Thank you, Your Honor.
 8              THE COURT:  I'll give you an opportunity to brief it.
 9              MR. OWENS:  Yes, Your Honor.
10              THE COURT:  Anything further?
11              MS. ROSS:  That's it, Your Honor.
12              THE COURT:  Thank you, we're adjourned.
13         (Recess)
14
15
16
17
18
19
20
21
22
23
24
25
```

1                        CERTIFICATE OF REPORTER

2

3          I, CHERIE GALLASPY BOND, Official Court Reporter, United

4     States District Court, Southern District of Mississippi, do

5     hereby certify that the above and foregoing pages contain a

6     full, true and correct transcript of the proceedings had in the

7     aforenamed case at the time and place indicated, which

8     proceedings were recorded by me to the best of my skill and

9     ability.

10         I certify that the transcript fees and format comply

11    with those prescribed by the Court and Judicial Conference of

12    the United States.

13

14         This the 19th day of June, 2011.

15

16                   s/ *Cherie G. Bond*
                     Cherie G. Bond
17                   Court Reporter

18

19

20

21

22

23

24

25