**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| J.H., by and through his next friend, Terina Gray, on behalf of himself and all persons similarly situated; T.A., by and through his next friend, Alice Austin, on behalf of himself and all persons similarly situated; and DISABILITY RIGHTS MISSISSIPPI, <br><br> Plaintiffs, <br> v. <br><br> HINDS COUNTY, MISSISSIPPI, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    Case No. 3:11-CV-327 DPJ-FKB |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CONTEMPT**

**I.   INTRODUCTION**

In June 2011, Plaintiffs J.H. and T.A. filed a class action lawsuit against Hinds County challenging unconstitutional conditions at the Henley-Young Juvenile Justice Center (hereinafter "Henley-Young"), including unnecessary use of force, excessive cell confinement, and denial of rehabilitative treatment and services. Amended Complaint, June 6, 2011, ECF No. 5. After months of negotiation and following a fairness hearing before this Court, the parties entered into a settlement agreement (hereinafter "Settlement Agreement"), which this Court approved on March 28, 2012. Settlement Agreement, March 28, 2012, ECF No. 33. Pursuant to the Prison Litigation Reform Act ("PLRA"), this Court retained jurisdiction for monitoring and enforcement purposes. *Id.* at 3, ECF No. 33; Judgment, March 28, 2012, ECF No. 34.

In an effort to ensure compliance, this Court appointed Leonard Dixon to serve as an independent monitor to oversee implementation of the Settlement Agreement. Settlement

Agreement at 19. Mr. Dixon conducts site visits on a quarterly basis and submits monitoring reports to this Court following each official visit.[1] *Id.* The County's progress is measured by the following compliance code measurements: substantial compliance, partial compliance, beginning compliance, and non-compliance.[2] The monitoring reports that have been submitted to date reflect the County's minimal progress toward substantial compliance with the Settlement Agreement.[3] *See* First Monitor's Report, August 15, 2012, ECF No. 35; Second Monitor's Report, December 13, 2012, ECF No. 37; Third Monitor's Report, April 15, 2013, ECF No. 38; Fourth Monitor's Report, July 9, 2013, ECF No. 39; Fifth Monitor's Report, October 9, 2013, ECF No. 40. Specifically, the County has not reached substantial compliance with any of the 71 provisions set forth in the Settlement Agreement in the twenty-three months that the agreement has been in effect. The second report reflects that the County moved to beginning compliance in 12 provisions; however, in the 14 months that followed, the County moved from beginning to

---

[1] In addition to his scheduled visits, in 2013, Mr. Dixon conducted unannounced visits to the facility during the weeks of January 14, April 15, July 22, and November 4. During these visits, Mr. Dixon provided technical assistance to the director and Henley-Young staff on implementation of the Settlement Agreement and conducted trainings to staff of the detention center and youth court.

[2] **Substantial Compliance (SC)**: "Practices follow the county-approved policies, training materials or other documents; practices follow policy with rare exception and exceptions lead to corrective action; trained staff fill all positions and vacancies are filled within 3 months; the [C]ounty has completed work in an acceptable manner; policies, procedures and practice and training are operational and quality-assurance audited and audit exceptions lead to corrective action; outcomes meet or exceed agreement requirements."

**Partial Compliance (PC)**: "Policy and procedure is implemented in some but not all locations or times; staff are hired but not trained; the [C]ounty is working on implementation but tasks are not completed; system implemented at some but not all locations or times, outcomes meet or exceed agreement requirements some of the time and in certain area[s]."

**Beginning Compliance (BC)**: "Policy and procedure is written by the [C]ounty but not implemented; funding and hiring authority are approved by the County but positions are not filled; training materials prepared and approved by the [C]ounty but training not started."

**Non Compliance (NC)**: "No action taken and immediate steps needed to maintain schedule or prevent further delay. A policy may exist, but the policy may need significant revision or modifications and rarely translates into practice."

[3] Mr. Dixon provided the parties with a draft of the sixth monitor's report on February 17, 2014. Plaintiffs rely on the compliance ratings in the draft report to determine Hinds County's compliance with the Settlement Agreement to date. *See* Exhibit 1, Excerpt from Draft of Sixth Monitor's Report, February 17, 2014.

partial compliance in only four of those 12 provisions and has failed to move at all on the remaining eight provisions. The County's progress has been slow, to say the least, further evidenced by its movement from non-compliance to beginning compliance in one provision in the three months between the fourth and fifth reports. Currently, the County is in non-compliance with 34 provisions and beginning compliance with 25. *See* Exhibit 1, Excerpt from Draft of Sixth Monitor's Report. The County is not in substantial compliance with any of the 71 provisions. *Id.*

## II. STATEMENT OF THE FACTS

Several provisions in the Settlement Agreement require action within 90 days; however, Hinds County did not take any take any steps toward implementing the Settlement Agreement in the months immediately after it went into effect. Thus, not surprisingly, the First Monitor's Report noted rampant constitutional violations in the "prison[-]like environment" which the monitor compared to an adult facility. First Monitor's Report at 6. Prior to his initial visit, Mr. Dixon reviewed numerous documents and, once at Henley-Young, interviewed the director, several key staff members, and youth. *See id.* at 4. Mr. Dixon also met with Hinds County officials and the youth court judge in an effort to assess the level of constitutional violations at Henley-Young. *Id.*

According to Mr. Dixon, the County's reliance on staff knowledgeable about law enforcement and adult corrections, rather than staff knowledgeable about "adolescent development delinquency theories and juvenile mental health services" has "contributed to a system that is unhealthy for juvenile rehabilitation." *Id.* at 7. In an effort to kick start implementation of the Settlement Agreement, Mr. Dixon provided the following specific measures that the County could take immediately to begin to change the culture at Henley-

Young: restoring light fixtures to working order, cleaning and painting, washing clothing, discarding torn and/or dingy clothing, developing a daily schedule, posting the rules and regulations on all housing units, creating/revising the grievance process, placing grievance boxes on the units, developing an appropriate due process/isolation system, providing hygiene kits, and revamping the visitation procedure to allow for contact visits. *Id.* at 8. Although the County implemented a few of Mr. Dixon's suggestions, including cleaning and painting the facility by the time Mr. Dixon submitted his second report, the majority have yet to be implemented, approximately 18 months later.

Moreover, as evidenced by the Fifth Monitor's report, the County appears to be backtracking in some of the areas where it had initially shown signs of improvement. *See* Fifth Monitor's Report at 7 (noting that "[t]he facility is dirty again and unkempt. The units have a strong odor of urine. There is also graffiti resurfacing in the rooms and on the units."). *See also* Third Monitor's Report at 40 (noting that the County purchased a new washer and dryer but youth were still provided clothing that is dirty, dingy, and torn).

In other areas it appears that the County has failed to follow-through with Mr. Dixon's recommendations. For example, although the County developed and posted a schedule of activities on the housing units, Mr. Dixon found that "it has not been put into operation" and "residents still do not spend enough time out of their cells . . . ." Second Monitor's Report at 24. *See also* Third Monitor's Report at 25, (noting that "[t]he facility has developed a daily schedule[;] however[,] because of inadequate staffing, the schedule is not followed."). Although the County reached beginning compliance with provision 11.5,[4] it has failed to develop policies

---

[4] Provision 11.5 provides that: Youth shall be provided with a clean, sanitary environment.

and procedures to follow-through with the recommendations outlined in the reports. *See* Third Monitor's Report at 43; Fourth Monitor's Report at 44; Fifth Monitor's Report at 56.

The County violated its own policy against the use of Tasers on December 25, 2012 after moving to beginning compliance for developing policies and procedures prohibiting the use of Tasers at Henley-Young. Third Monitor's Report at 33-34, 36. During the December 25 incident, instead of handling the situation without contacting law enforcement, the director called deputies from the Hinds County Sheriff's Department to provide assistance after a youth damaged County property and failed to comply with orders. *See* Third Monitor's Report at 6. Despite Henley-Young's policy against the use of Tasers, a Hinds County Deputy used a Taser on the youth shortly after arriving at Henley-Young. Third Monitor's Report at 34. The third report reflects the following: "there [was] no question that staff members should have appropriately engaged this youth through the use of crisis diffusion techniques[,] which were without question necessary. [T]here was no need for deputies from the Hinds County Sheriff's Department to enter the facility or to use a [T]aser to restrain [the] youth. There were not enough staff members available to handle the situation." *Id.* at 6. Mr. Dixon also noted that this incident is an example of what can happen when youth in need of access to structured mental health services do not receive those services while detained at Henley-Young. *See id.* at 48.

The monitoring reports outline numerous instances where youth have been subjected to dangerous, unconstitutional conditions. In particular, the Second Monitor's Report indicates that youth are left unsupervised for significant periods of time and are frequently locked in their cells because of insufficient staff. Second Monitor's Report at 18, 23. The report notes that several girls were left unsupervised for 30 to 40 minutes on September 27, 2012 because the staff member who was watching them was called to another housing unit. *Id.* at 23. *See also* Fourth

Monitor's Report at 25 (finding that situations when youth are left unsupervised are "extremely dangerous because youth who are angry, more impulsive and without supervision have the potential to harm themselves and other youth."). In another instance where a sufficient number of staff members were not working, two staff members were each charged with supervising 19 youth on two separate units. *Id.* at 18.

As further documented, *see* Fourth Monitor's Report at 16 (finding that youth who "exhibit an immediate need for behavioral modification therapy" do not receive such therapy, which resulted in a youth being "placed on a unit with no concern for his suicidal ideations" and without receiving one-on-one supervision); *Id.* at 37 (incident was not accurately reported where a female youth was bitten by a staff member during a restraint); Third Monitor's Report at 36 (staff members not only failed to use verbal de-escalation techniques prior to using physical force on a youth, but also "inappropriately physically managed him."); Fourth Monitor's Report at 50 (finding that "mental health counseling is inadequate to the needs of mentally ill youth in both frequency and content."); *Id.* ("My review of [the] records reveals no evidence of any counseling or use of any treatment plans or strategies."); Fifth Monitor's Report at 11 (noting that a staff member instructed a youth to clean up another youth's blood without being provided proper protective gear). *Id.* at 12-13 (youth are served food that is cold and out of line with nutritional guidelines); *Id.* at 27 ("no documentation of Henley-Young purchasing prescription medication for residents confined at the facility."); *Id.* at 58 (the medical filing system is inadequate, youths' files are not separated).

In addition to the training and technical assistance provided by Mr. Dixon, Carol Cramer-Brooks, the director of the National Center for Youth in Custody and chief operating officer of the National Partnership for Juvenile Services provided training and gave specific

recommendations to Henley-Young staff on November 13 and 14, 2013.  *See* Exhibit 2, Summary of Training and Recommendation for Next Steps from C. Cramer-Brooks, December 6, 2013.  The training was based on the National Partnership for Juvenile Services Detention Careworker Curriculum and Corrections Carework Curriculum.  *Id.* at 2.  Ms. Brooks noted the following issues that require immediate attention: (1) "inadequate staffing levels was often raised as a reason during the training for not being able to implement the concepts we were training them on and for having a negative impact on the safety of youth and staff in the facility;" (2) "[s]taff has not received physical restraint training in over three years;" (3) "[s]taff is being put on the pods to work with no training;" (4) staff did not know what to do when a youth threatened "suicide by tying his coat around his neck" and; (5) "[s]taff do not know policy and the contents/requirements of the consent decree have not been shared with them."  *Id.* at 3.  As reflected above, the County has not corrected the violations noted by Ms. Brooks or Mr. Dixon.

In almost two years, the County has not reached substantial compliance with any of the provisions in the Settlement Agreement.  The County's woeful non-compliance has resulted in numerous children being subjected to unconstitutional conditions on a daily basis and provides Plaintiffs with absolutely no assurance that it will remedy the rampant constitutional violations at Henley-Young absent a finding of contempt and continued oversight by this Court.[5]

## III.   ARGUMENT

In a civil contempt proceeding in the Fifth Circuit, the movant must establish by clear and convincing evidence: "that (1) a court order was in effect, (2) the order required specified

---

[5] In anticipation of the upcoming March 28, 2014 deadline, Plaintiffs contacted Hinds County at the beginning of January in the hope that Defendant would voluntarily extend the agreement due to its lack of compliance.  Plaintiffs agreed to draft a joint motion for extension and a proposed order; however, Defendant later declined to enter into the voluntary agreement and requested that Plaintiffs revise/amend the order that "is narrowly tailored to the existing issues."  *See* Exhibit 3, Letter from P. Teeuwissen, Attorney for the Hinds County Board of Supervisors, to C. Cockrell (January 22, 2014).  In light of Defendant's non-compliance, Plaintiffs found Defendant's request implausible and declined to submit a revised order.  *See* Exhibit 4, Letter from C. Cockrell to P. Teeuwissen, Attorney for Hinds County Board of Supervisors (January 31, 2014).

conduct by the respondent, and (3) the respondent failed to comply with the court's order." *U.S. v. Jackson*, 359 F.3d 727, 731 (5th Cir. 2004) (citing *American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000)).  A finding that a party violated a court's order willfully or in bad faith is generally required in the Fifth Circuit.  *See KeyBank Nat. Ass'n. v. Perkins Rowe Assocs., Inc.*, CIV. 09-497-JJB-SCR, 2011 WL 2222192, at *2 (M.D. La. June 7, 2011) (citing *J.D. v. Nagin,* Civil Action No. 07-9755, 2009 WL 363456, at *5 (E.D. La. Feb. 11, 2009)).  "A consent order, while founded on the agreement of the parties, is nevertheless a judicial act, enforceable by sanctions including a citation for contempt."   *Whitfield v. Pennington,* 832 F.2d 909, 913 (5th Cir. 1987) (citing *U.S. v. Miami,* 664 F.2d 435, 439-40 (5th Cir. 1981) (en banc)).  Moreover, "the moving party bears the burden of proving by 'clear and convincing' evidence that the alleged contemnor was aware of and violated a 'definite and specific order requiring him to perform or refrain from performing a particular act or acts.'" *Shafer v. Army and Air Force Exch. Serv.,* 376 F.3d 386, 396 (5th Cir. 2004) (quoting *Travelhost v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995)).  Plaintiffs easily satisfy all of the requirements.

    **A.**    **Elements of Civil Contempt**

        **1.**    **A Court Order is in Effect**

We note at the outset that, per the Prison Litigation Reform Act (PLRA), the agreement reached by the parties, although called a settlement agreement, is a consent decree.  The PLRA defines a private settlement agreement as "an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled."  18 U.S.C.A. § 3626 (g)(6).  In contrast, a consent decree is defined as "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlement agreements."  18 U.S.C.A. § 3626 (g)(1).  *See*

*also Davis v. Jackson Fire Dep't.*, 399 F.Supp.2d 753, 755 (S.D. Miss. Nov. 22, 2005) (citing *Buckhannon Bd. & Care Home, Inc. v. West Vir. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001) (finding that "a consent decree has two characteristics that distinguish it from a private settlement: (1) judicial approval; and (2) judicial oversight."); *U.S. v. Miami*, 664 F.2d 435, 439-40 (5th Cir. 1981) (noting that consent decrees differ from settlement agreements because consent decrees can be enforced through contempt proceedings).

After several months, and with assistance from the magistrate judge, the parties reached an agreement and agreed to the following stipulation: "the remedies contained in this document are necessary to correct an ongoing violation of a federal right, extend no further than necessary to correct the violation of a federal right, and that the prospective relief is narrowly drawn and is the least intrusive means to correct the violations." *See* Settlement Agreement at 2.  This Court approved the agreement upon finding it "fair, reasonable, and adequate" with "no obvious deficiencies."  Agreed Order Granting Approval of Settlement Agreement and Certifying Settlement Class, March 28, 2012, ECF No. 32.

There can be no question that the parties intended for the Court to retain jurisdiction for monitoring and enforcement purposes.  *See* Settlement Agreement at 3, ECF No. 33; Judgment, March 28, 2012, ECF No. 34.  It is well settled that "district courts have wide discretion to enforce decrees and to implement remedies for decree violations," as consent decrees are judicial orders.  *U.S. v. Alcoa, Inc.*, 533 F.3d 278, 286 (5th Cir. 2008).  Thus, this Court has the authority to hold Hinds County in contempt for failing to implement the agreement.  Because it is clear that this Court's Agreed Order is currently in effect, Plaintiffs have satisfied the first element.

## 2. The Order Requires Specified Conduct from Hinds County

During the months of negotiation, the parties carefully considered each of the 71 provisions of the Agreement, resulting in a comprehensive agreement necessary to correct the following constitutional violations at Henley-Young related to: intake, staffing and overcrowding, cell confinement, structured programming, individualized treatment plans/program for post-disposition youth, disciplinary practices and procedures, use of restraints, use of force, meals and nutrition, clothing, hygiene and sanitation, medical care, mental health care, suicide prevention, and family support and interaction. *See* Settlement Agreement 3-18.

Defendant agreed to the provisions in the Settlement Agreement to resolve the litigation. The agreement requires Hinds County to take specific action to ensure that youth are not subjected to unconstitutional conditions while detained at Henley-Young. Moreover, the monitoring reports provide a detailed roadmap of how Hinds County can reach compliance with each provision of the Settlement Agreement.

## 3. Hinds County has failed to Comply with the Court's Order

As outlined above, all of the six monitoring reports clearly show that Hinds County has yet to reach substantial compliance with any of the 71 provisions. Even more concerning is Defendant's inability to maintain its efforts in some of the areas where it has shown signs of improvement. Despite Mr. Dixon's technical assistance, training, and recommendations, it cannot be disputed that the County remains in woeful non-compliance with this Court's order.

**B.   Requested Relief**

The Settlement Agreement provides that it will terminate after two years unless "the Court makes written findings based on the record that prospective relief remains necessary after two years to correct a current and ongoing violation of federal right . . . ." Settlement Agreement

at 2.  In a similar case involving unconstitutional conditions at a juvenile detention facility in Mississippi, the district court entered an amendment to a consent decree that included an extension of the termination date of the agreement.  *See U.S. v. Mississippi*, 3:03-cv-01354-HTW-JCS, Order to Amend Consent Decree, ECF No. 158.  The court stated the following in its order, "[t]his Agreement shall terminate when the State is in substantial compliance with each provision of this Agreement and has maintained such substantial compliance for a period of six (6) months.  However, nothing herein shall be deemed to waive any right or protection possessed by the State, including but not limited to any rights or protections under the Prison Litigation Reform Act, 18 U.S.C. § 3626."  *Id.* at 4.  The court also stated that the burden shall be on the defendant to show compliance.  *Id.*

Plaintiffs respectfully request that Hinds County be held in contempt for its failure to comply with the Settlement Agreement.  Like the court in *U.S. v. Mississippi*, we ask that this Court enter an order finding that the agreement shall terminate in two years or when Hinds County is in substantial compliance with each provision of the Settlement Agreement and has maintained substantial compliance for six months.  Plaintiffs also ask this Court to make written findings that prospective relief remains necessary to correct the current and ongoing violations at Henley-Young identified in the monitoring reports.  *See* 18 U.S.C.S. §3626(b)(3).

## IV.   ATTORNEYS' FEES AND COSTS

Courts only award attorneys' fees in actions involving prison conditions, pursuant to 42 U.S.C. 1983, in limited circumstances.  Attorneys' fees must be "directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title . . . ."  42 U.S.C.A. §1997e

(d)(1)(A). The attorneys' fees must also be "directly and reasonably incurred in enforcing the relief ordered for the violation." *Id.* at (d)(1)(B)(ii).

The Fifth Circuit has found that "[i]n ordering the award of attorneys' fees . . . the court is merely seeking to insure that its original order is followed." *Alcoa*, 533 F.3d at 287 (citing *Cook v. Oshner Found. Hospital*, 559 F.2d 270 (5th Cir. 1977)). Moreover, it is imperative that courts have "the inherent authority to enforce their judicial orders and decrees in cases of civil contempt. Discretion, including the discretion to award attorneys' fees, must be left to a court in the enforcement of its decrees." *Id.* at 272.

This Court should not only exercise its authority to hold Hinds County in contempt for its failure to comply with the Settlement Agreement, it should also grant Plaintiffs' request for attorneys' fees. Hinds County has not taken the necessary steps to correct the serious constitutional violations that currently exist and have existed at Henley-Young for several years. Plaintiffs have incurred expenses in investigating, preparing, and presenting their contempt motion and asked to be reimbursed for these expenses.

## V.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for contempt and extend the termination date of the Settlement Agreement.

Respectfully submitted, this the 27th day of February, 2014.

>/s/ Corrie W. Cockrell
>CORRIE W. COCKRELL, MS Bar No. 102376
>corrie.cockrell@splcenter.org
>JODY E. OWENS, II, MS Bar No. 102333
>jody.owens@splcenter.org
>Southern Poverty Law Center
>111 E. Capitol St., Suite 280
>Jackson, MS 39201
>601-948-8882 (telephone)
>601-948-8885 (fax)

          Wendy White, MS Bar No. 100409
          wwhite@drms.ms
          Disability Rights Mississippi
          210 E. Capitol Street, Suite 600
          Jackson, MS 39201
          601-986-0600 (telephone)
          601-968-0665 (fax)

          Counsel for Plaintiffs.

## **CERTIFICATE OF SERVICE**

I, Corrie W. Cockrell, hereby certify that a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all parties by the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

SO CERTIFIED, this 27th day of February, 2014.

/s/ Corrie W. Cockrell
CORRIE W. COCKRELL, MS Bar No. 102376