# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF MISSISSIPPI
# JACKSON DIVISION
# HONORABLE DANIEL P. JORDAN III, U.S. DISTRICT JUDGE

## J.H., ET AL, VS HINDS COUNTY MISSISSIPPI
## 3:11-CV00327 DPJ-FKB

## Monitoring Compliance Report:

## Report Draft Date August 1, 2014
## Report Date August 11, 2014

**Submitted by**
**Leonard B. Dixon, MSPA**
**24420 Crescent Drive**
**Woodhaven, MI  48183**
**734 642-7412**
**Email home: lbdixon1@comcast.net**
**Email work: lbdixon4@co.wayne.mi.us**

# The
# Seventh Monitor's Report
# Henley-Young Juvenile Justice
# Leonard B. Dixon

## Background

On March, 28, 2012, Hinds County, Mississippi entered into a settlement agreement ordained and adjudged by Judge Daniel P. Jordan III, for the United States District Court Southern District of Mississippi, Jackson Division, regarding conditions of confinement at the Henley-Young Juvenile Justice Center, located in Jackson, Mississippi. According to the order the settlement agreement and its specifics requirements "shall apply to Henley-Young and any contractor that may provide services to Henley-Young in the future. The term "youth" herein often refers to individuals confined at Henley-Young. "The parties" understand that the requirements contained herein will be implemented without undue delay as soon as practicable. Unless otherwise indicated herein, the parties will collaborate to make all reasonable efforts to ensure that within 90 days of the effective date of the agreement, policies, and procedures consistent with the agreement are drafted, in the process of being implemented, and that all detention staff received training on the requirements. The parties agree and understand that the implementation will be an ongoing process that extends beyond the initial 90 days of the agreement. As part of the settlement agreement the defendant shall contract with Leonard Dixon, within 30 days of the court entry of this settlement agreement to serve as an expert who will be responsible for documenting the defendant's compliance with the terms of the agreement and for providing and/or arranging technical assistance and training regarding compliance with this settlement agreement. I will have full and complete access to detained youth, institutional files, medical files, mental health files, education files, video tapes, and youth, staff records and all other information and other reports by staff, grievances, incident reports, and other relevant documents and files maintained by Henley-Young.

All non-public information obtained by the expert shall be kept confidential, except that on a quarterly basis the expert shall file a report with the court documenting the progress of compliance. Neither party, nor any employee or agent of either party, shall have any supervisory authority over the expert's activities, reports, findings, or recommendations. The expert shall file with the Court and provide the parties with reports describing the Defendant's steps to implement this Settlement Agreement and evaluate the extent to which the Defendant has complied with each substantive provision of this agreement. Such reports shall be issued quarterly, unless the parties agree otherwise. The reports shall be provided to the parties in draft form for comment at least two (2) weeks prior to their submission to the Court. These reports shall be written with due regard for the privacy interests of individual youth and staff and the interest of the Defendant in protecting against disclosure of non-public information. The expert shall have a budget sufficient to allow him to fulfill the responsibilities described in this Settlement Agreement. Mr. Dixon may consult other experts or consultants retained by either party. All parties shall receive copies of all draft reports from the other experts to Mr. Dixon prior to the issuance of Mr. Dixon's report, and shall have the option of being present at briefings

from such experts to Mr. Dixon and Defendant. Mr. Dixon may initiate and receive ex parte communications with the parties and their respective experts and consultants.

**Recommendations based on findings, observations and interviews**
Result of visit on June 18, 2014 to June 21, 2014

**Documentation provided and reviewed**
Reviewed the 89 day program
Daily Rosters for February (missing sheets for dates – 1, 2, 3, 8, 9, 15, 16, 22 and 23)
Daily Rosters for March (missing sheets for dates – 1, 2, 25 and 29)
Daily Rosters for April (missing sheets for dates – 5, 12, 13, 19, 20, 26 and 27)
Daily Rosters for May (missing sheets for dates – 3, 4, 10, 11, 17, 18, 24, 25, 26 and 31)
Daily Rosters for June (missing sheets for dates – 1, 7, 8, 12, 13, 14, 15, 16 and 17)
Abuse complaint made by Southern Poverty Law Center re: Youth J. H. vs Officer Ferniece
       Galloway incident occurred on April 21, 2014
Henley Young Weekly Maintenance Reports from March 10, 2014 to June 13, 2014
Signed and Dated Policies:
       Emergency Release dated April 29, 2013
       Equal Access dated June 10, 2014
       Clothing & Bedding Exchange dated June 10, 2014
       Resident Hygiene dated June 10, 2014
       Mechanical Restraints dated June 10, 2014
       Resident Meal Service dated June 10, 2014
       Visiting Regulation dated June 10, 2014
       Suicide Precaution & Prevention dated June 10, 2014
       Employment Training & Staff Development dated June 11, 2014 (only 1st page)
       Unit Rules & Regulations dated June 11, 2014
       Security Searches dated June 11, 2014 (only 1st page)
       Intake & New Admission dated June 11, 2014
       Resident Telephone Calls dated June 10, 2014
       Recreation & Leisure Time dated June 10, 2014
Scheduled Phone Call Logs (Weekly for the months of February, March, April and May)
27 Requisitions and Purchase Orders dated from December 2013 to June 2014
4 Unit Schedules for summer
Food Service Menus in a 4 week rotation
Fire & Safety Drills Documentation:
       Fire Drill conducted on February 20, 2014
       Fire Drill conducted on February 27, 2014
       Tornado Drill conducted on March 20, 2014
       Fire Drill conducted on June 10, 2014
       Fire Drill conducted on June 11, 2014
Training Documentation:
       Policy review log
       2 Safety & Training sign in sheet
       5 CPI Training sign in sheet
Grievance Reports from 4 residents for the month of February 2014

Grievance Reports from 4 residents for the month of March 2014
Grievance Reports from 5 residents for the month of April 2014
Intake and  Medical Records on Residents D.S.; T.T.; J. M.; A.T.; J.M.; R.T.; Z.F.; A.J.; T.B.
and J.A.
HYJJC Resident Incident Report/Use of Force/Unusual Incident Reports
February 2014 – 39 Residents (including some witness statements and medical
reporting forms)
March 2014 – 85 Residents (including some witness statements, medical reporting forms)
April 2014 –115 Residents (including some witness statements, medical reporting forms
and a notice from the emergency room)
May 2014 – 58 Residents (including some witness statements, medical reporting forms)
June 2014 – 22 Residents (including some witness statements, medical reporting forms)
HYJJC Due Process Rights Reports:
Resident A. H. date of violation 4/19/2014
Resident A.H. date of violation 4/24/2014
Resident A.F. date of violation 6/16/2014
Resident J. A. date of violation 6/16/2014
Resident K. J. date of violation 6/16/2014
Resident M. B. date of violation 6/16/2014
Resident R. T. date of violation 6/15/2014 * missing nurses' report
Resident A. B. date of violation 6/14/2014
Resident D. H. date of violation 6/14/2014
Resident A. T. date of violation 6/14/2014
Resident J. R. date of violation 6/13/2014
Resident M. H. date of violation 6/12/2014
Resident A. F. date of violation 6/11/2014
Resident A. F. date of violation 6/7/2014
Resident A. M. date of violation 6/5/2014
Resident A. B. date of violation 6/5/2014
Resident T. B. date of violation 6/4/2014
Resident Q. P. date of violation 6/4/2014
Resident R. T. date of violation 6/4/2014
Resident W. E. date of violation 6/4/2014
Resident Q. M. date of violation 5/31/2014
Resident M. E. date of violation 5/25/2014
Resident Q. M. date of violation 5/23/2014
Resident R. T. date of violation 5/23/2014
Resident D. C. date of violation 5/23/2014
Resident D. C. date of violation 5/20/2014
Resident Q. M. date of violation 5/18/2014
Resident S. A. date of violation 5/9/2014
Resident Q. M. date of violation 5/8/2014
Resident A. M. date of violation 5/4/2014
Resident J. A. date of violation 5/4/2014
Resident U. H. date of violation 5/4/2014
Resident M. T. date of violation 5/4/2014

HYJJC Due Process Rights Reports continues:

Resident P. B. date of violation 5/2/2014
Resident J. C. date of violation 4/30/2014
Resident A. M. date of violation 4/30/2014
Resident K. J. date of violation 4/30/2014
Resident Q. M. date of violation 4/27/2014
Resident D. C. date of violation 4/27/2014
Resident K.J. date of violation 4/24/2014
Resident A. A. date of violation 4/22/2014
Resident D. C. date of violation 4/21/2014
Resident A. S. date of violation 4/21/2014
Resident K. E. date of violation 4/19/2014
Resident Q. M. date of violation 4/10/2014
Resident D. B. date of violation 4/10/2014
Resident A. B. date of violation 4/9/2014
Resident J. M. date of violation (not noted on form)
Resident S. A. date of violation 4/5/2014
Resident D. P. date of violation 4/5/2014
Resident J. R. date of violation 4/5/2014
Resident M. M. date of violation 4/5/2014
Resident Q. M. date of violation 4/4/2014
Resident O. F. date of violation 4/4/2014
Resident J. H. date of violation 4/2/2014
Resident J. L. date of violation 4/1/2014
Resident T. M. date of violation 3/31/2014
Resident D. C. date of violation 3/24/2014
Resident D. C. date of violation 5/22/2014
Resident S. A. date of violation 3/20/2014
Resident A. T. date of violation 3/24/2014
Resident T. W. date of violation 3/19/2014
Resident J. M. date of violation 3/19/2014
Resident O. F. date of violation 3/19/2014
Resident S. T. date of violation 3/17/2014
Resident M. L. date of violation 3/13/2014
Resident M. C. date of violation 3/12/2014
Resident M. C. date of violation 3/12/2014
Resident D. J. date of violation 3/12/2014
Resident I. R. date of violation 2/28/2014
Resident K. B. date of violation 2/28/2014
Resident M. L. date of violation 2/20/2014
Resident M. L. date of violation 2/24/2014
Resident M. L. date of violation 2/20/2014
Resident A. T. date of violation 2/19/2014
Resident S. L. date of violation 2/18/2014
Resident M. L. date of violation 2/18/2014
Resident A. T. date of violation 2/17/2014

HYJJC Due Process Rights Reports continues:
>Resident S. A. date of violation 2/17/2014
>Resident A. A. date of violation 2/15/2014
>Resident S. A. date of violation 2/13/2014
>Resident C. M. date of violation 2/1/2014
>Resident K. H. date of violation 2/1/2014

Quality Assurance Audit Flow Chart
Quality Assurance System Improvement Model Flow Chart
Quality Assurance Audit Reports:
>5 Resident Master File Audits on various residents charts
>C & D Unit Audit conducted on June 5, 2014
>A & B Unit Audit conducted on June 9, 2014
>Facility Walk Through conducted on February 11, 2014
>Facility Walk Through conducted on March 18, 2014
>Facility wide conducted on January 3, 2014
>Intake & Units conducted on February 20, 2014
>Facility wide conducted on February 20, 2014
>Units (WP & JFK) conducted on March 26, 2014
>Units (WP, OD, JFK) & Intake conducted on May 7, 2014

**Meeting with Judge Daniel P. Jordan III, Hinds County Administrative staff and attorneys and SPLC staff**

**Staff Interviewed**
Frank Bluntson, Consultant
Floyd Brown, Health Service Administration from Quality Choice Correctional Healthcare
Sandra Wilson RN, Nurse Practitioner
Wesley G. Keyser, Detention Officer
Andrew Roberts, Detention Officer
Santonio Longino, Detention Officer
Reginald Stewart, SR. Detention Officer
Kareen Hughes, Detention Officer
Emma Harris, Detention Officer
Vanessa Hamilton, Detention Officer

**Youth Interviewed**
Resident J. A. 15 years old
Resident D. S. 15 years old
Resident A. J. 13 years old
Resident J. M. 15 years old
Resident Z. F. 16 years old
Resident T. B. 16 years old
Resident R. C. T. 17 years old
Resident T. T. 14 years old
Resident A. T. 15 years old
Resident J. M. 15 years old

**Introduction**

This report is the result of my seventh official visit to the Henley-Young Juvenile Justice Center and an update from my previous visit.  I visited the facility from June 18, 2014 through June 21, 2014 for the purpose of an official inspection.  I would like to thank the Honorable Judge Daniel P. Jordan III for his visit and input as it relates to this process, and the facility staff and County Administration for their cooperation during my visit.  As stated in the meeting with Judge Jordan, there are areas of 'low hanging fruit' - provisions that during this process should be at substantial compliance.  I concurred that these areas should have been completed earlier in this process. At this time, I suggest that the facility concentrate on those areas as discussed.  There is a need for cultural development within the facility.

The language of a culture tends to define the culture whether a large group in a single ethnicity or a much smaller group such as the staff of a juvenile detention facility. When I read documents that refer to the residents as 'detainees or inmates' I recognize that the culture does not speak to a juvenile rehabilitative model. Terms such as 'ordering officer off the zone' rather than 'off the unit or out of the area', placing residents in their 'cells' or 'lock up' rather than in 'their rooms' are language used in an adult prison model. In the report writing, the discussions of 'hostile environments and riots', rather than 'disruptive behavior and acting out', sets the tone for how your changes are viewed internally and culturally. How can anyone be comfortable placing a child who is having a very stressful moment in a 'turtle suit?' Language is extremely relevant when trying to persuade someone to your position or convince others that what they are doing is or is not detrimental. In reading the reports and statements of the activities and incidents at the facility it is difficult to believe that the writers are speaking of situations in a juvenile facility. Language has to be appropriate for the situation and location and must define actual incidents and behaviors absent of emotional descriptors and personal attitudinal wording.

I guess the first question one should ask is what is the purpose of the Hinds County Henley Young Juvenile Justice Center? What is the mission, what are your benchmarks, and what is the ultimate goal? The next question is what does it take to succeed in this mission, how much will it take in time and resources? Once these questions are answered and only then can there be real productive change in the landscape and the environment of the facility. The low hanging fruit is a good place to start because small successes lead to great ones.

It should be noted that the facility is again in a transitional state as it relates to leadership.  The County has hired a new consultant, Frank Bluntson.  In my discussions with Mr. Bluntson, he explained that he will be working with the facility to assist with organizing and developing systems that would ensure compliance with the provisions of the consent decree.  However, in my professional opinion, the facility is again struggling for a sense of direction.  In my interviews with staff, they are confused and apprehensive about the direction the facility is going and wonders if there will be stable leadership in place.  According to Mr. Bluntson, he will be consulting with the facility for at least six months.  Although, Mr. Bluntson has worked previously in a juvenile facilities he would need to be brought up to date with current national juvenile detention standards.

As stated in my previous reports, the County Administrator has a vision for the facility. It is an attainable vision within reasonable parameters.  However, she must have the means and suitable resources for this facility.  Now, there appears to be a deficiency that exists as it relates to external control over operations of the facility.  In turn this has created enormous confusion and operational weakness in internal facility controls and compliances.  This was glaringly apparent during my visit when line officers were not aware of their own work schedules.  For example, a line officer was on leave and the supervisor did not schedule a replacement which created confusion on Saturday June 21, 2014.  This left the facility operating with a greater shortage of staff than was expected. In effect, it created a case of 'organizational whiplash' for the staff and the residents; and does not provide the stability needed to run an effective facility.  At some point the facility must become stabilized if it is to move forward.  According to the officers I interviewed, the staff did not know what was going on because of the transition in leadership again. One officer stated, "Progress has been stifled for the past few months." There was confusion as to who was in the leadership role at the facility.

**This is important enough to merit attention by those charged with governance.**

**It should be noted that the facility has moved 9 provisions to partial compliance and 6 provisions to substantial compliance. Although there is a lot more work to do, this is commendable. However, there was 1 provision that went from partial compliance back to beginning compliance.**

### Staffing
In my review of numerous documents, adequate staffing for Henley Young has moved to unacceptable.  The facility staffing has become so inadequate that in my review of youth grievances it is being mentioned.  In my discussion with staff members, the facility administration and my observation, this facility will not be able to move forward without sufficient staffing levels. After reviewing the due process records, I found that 80% of the incidents may not have occurred if the facility had adequate staffing and proper training.

During this visit residents were still locked in their rooms, residents were fed in sections on B pod and A pod, and residents were only allowed to take showers while other pods were locked down. Residents were not allowed to participate in outdoor activities, and all residents who did not participate in visitation were secured in their rooms without supervision. Too many residents were not properly and timely 'booked in' upon arrival to the facility.  Because of the lack of adequate staffing, residents booked into the facility were taken directly to units with no orientation or completed admitting procedures.  This creates a very dangerous environment for residents and staff.  On one occasion, a lighter was discovered on a resident (K.T.) housed on A pod that started a fire (see incident report March 29, 2014). This constant lack of staffing is placing the staff and residents at risk which continues to create a major liability for the County.

I would direct the County to review my previous reports especially regarding staffing, staffing levels and staff-to-resident ratios.  Not only is there a lack of direct care staff, there is also insufficient staffing as it relates to recreation, social work, mental health therapists, case managers, maintenance, and supervisory staff.

## Building cleanliness/environmental issues/maintenance

After a review of documents coupled with my observations, I found the facility continues to be in need of proper maintenance along with maintenance and skilled trades personnel to keep the building in good operational order, as I have discussed in each report.  Further, the facility is in need of a major cleaning and is again falling into great disrepair (see exhibits A-1 to A-8: note A-8 shows two residents in a stall together) also see previous report. See provision 11.6.

## Mental Health

As it relates to mental health, my review of documents revealed that there is an extraordinary need for on-going mental health services at Henley Young.  As discussed in prior reports, there is a major need for services.  Once a resident has been identified through the MAYSI-2 instrument, mental health services **must be** provided. An example of several residents needing mental health services are as follows:

- Resident D.A.  – self mutilation
- Resident Q.M. – attempted suicide
- Resident J.M. – attempted to harm himself several times in different areas of the building and stuck his head in the toilet
- Resident A.H. – attempted suicide
- Resident K.P. – attempted suicide

These are examples of a needed mental health system and services for the residents at Henley Young, please see previous report.

As stated in my previous report, the services, at a minimum, should include:

1) Appropriate and well-trained staff.
2) Treatment services on or off-site crisis intervention including short-term individual and group therapy follow-up, as needed and psychotropic medication management.
3) Mental health, medical, and substance abuse services that are sufficiently coordinated such that patient management is appropriately integrated, health needs are met, and the impact of any of these conditions on any resident is adequately addressed.
4) All aspects of the standard are addressed by written policy and defined procedures.

## Suicide Prevention

During this visit and my review of documents, I again found residents who were in need of mental health intervention (see above mental health).

As stated in my previous report, a suicide prevention program must be developed which includes, at a minimum, the following:

1) A suicide prevention program includes the following outcomes:
    a) facility staff identify suicidal juveniles and immediately initiate precaution,

     b)  suicidal juveniles are evaluated promptly by the designated health professional who directs the intervention and ensures follow-up as needed,

     c)  actively suicidal juveniles are placed on constant observation;

     d)  and potentially suicidal juveniles should be monitored on an irregular schedule with no more than 15 minutes between two checks. If, however, the potentially suicidal juvenile is placed in isolation, constant observation is required.

2)  Key components of a suicide prevention program include the following:

     a)  training
     b)  identification
     c)  referral
     d)  evaluation
     e)  treatment
     f)  housing and monitoring
     g)  communication
     h)  intervention
     i)  notification
     j)  review
     k)  debriefing

3)  The use of other juveniles in any way (i.e. companions, suicide-prevention aides) is not a substitute for staff supervision.

4)  Treatment plans addressing suicidal ideation and its recurrence are developed, and patient follow-up occurs as clinically indicted.

5)  The responsible health authority approves the suicide prevention plan; training curriculum for staff, intake screening for suicide potential and referral protocols, and training for staff conducting the suicide screening at intake.

6)  All aspects of the standard are addressed by written policy and defined procedures.

7)  Appropriately well-trained staff.

**Behavior Management/Isolation**

Based on my review of documents, observation and interviews, the facility is still in need of an adequate facility-wide behavior management program. I repeat that the facility must follow the recommendations as stated below. This is a reiteration of my previous report. It should be noted that staff relationships with juveniles are the primary source of managing behavior. Behavior management is about getting juveniles to learn new appropriate behaviors and to be consistent in behaving properly. Juvenile behavior management consists of helping residents understand what is expected in the environment and also helps them modify their behaviors while in the facility. The staff at Henley-Young is still in need of training to ensure that they understand the distinctions between punishment and discipline. The facility also needs to develop a positive incentive program for controlling irresponsible behaviors. There are four main areas the facility must look at when developing their behavioral management programs and the difference between the following:

     1)  Consequence: The effect, result, or outcome of something occurring earlier;

     2)  Discipline: Training to act in accordance with rules, to learn self-control;

     3)  Punish: To subject to pain, loss or confinement as a penalty for some offense, transgression or fault;

4) Rewards: positive outcomes from positive behaviors.

The facility must also develop a point or level system that allows juveniles who exhibit positive behaviors to gain points and move to the next level in the facility. The juveniles should be able to trade points for special privileges (i.e. extra phone calls, extended visits, name brand deodorants, etc). Officers should be responsible for awarding points based on the resident's behavior, their functioning in school, hygiene, building cleanliness to name a few. The supervisors should ensure the program is operating as designed to make sure there is no abuse by staff or residents of the program. My document review and observations indicate that residents are being locked-down too much at this facility. This has become a common practice due to a shortage of staff. In conclusion, de-escalation techniques are critical to the implementation and directing of any good behavioral management program as stated above.

## Activities/Recreation/Programming
Based on my most recent visit, I found that the facility continues to not have structured recreation activities and programming. This is an area that must be addressed. As stated in my previous report, the County should hire recreational staff that will be solely responsible for implementing programs and activities for residents. This program design should include activities for girls and boys inside and outside of their housing units. It should be noted that the facility has resurfaced the basketball courts. Since this is completed recreational staff should be hired so that various activities can be implemented. There must also be adequate staff to ensure proper supervision during activities. Please review my last report.

## Medical, Medication Review & Disposal
During this visit, I met with both registered nurses from Quality Choice Correctional Healthcare (QCCH) and Floyd Brown, Health Service Administrator.  Although, the County has hired QCCH services, they are not fully operational and are in the process of developing policies and procedures for the health service area.  This should not preclude QCCH from providing health care services on an as needed basis. It will take time to complete policies and procedures however there are medical protocols as to the degree of services needed in most medical situations.

As stated in my previous report (6) there is still the need for a pharmacist doctor (Pharm D) or pharmacist to come in to review and/or discard any medications that are left at the facility and over the counter medications that have expired. In addition, the Pharm D can assist in providing information regarding medication and possible side effects and reactions for the staff as well as assist with policies, procedures and protocols for medication administration. Again, there must also be routine reviews of pharmaceutical services that can lead to a risk factor of sub optical provisions which include not having a medication administration report (MAR) completed properly or reflect accurate information (not giving medication on time; not sending medication home to complete course; or improper storage).

During this visit I also found that the facility does not have a system in place for biohazard waste (i.e. sharp containers, any soiled material that contains blood and body fluids). These services should be provided by an outside contractor specializing in disposal of biohazard materials. The red bags should be placed inside a biohazard container once ready for pick up.

These things should be picked up on either a biweekly or weekly schedule based on the amount. It should be placed in a designated area and locked.

Also I found during this visit that the facility still does not have complete first aid kits available (see exhibit B). It is very important that the first aid kits are complete because the facility does not have 24 hour medical staffing. The first aid kits need to be stocked accordingly to the list requirements (see exhibit B).

As discussed in my previous report as it relates to residents' physicals, the forms should be revised to state "nursing assessment and history" which will be for nursing staff to complete. This would include a system for a head-to-toe assessment which is completed by the nurse. The "physical examinations" forms are to be completed by a medical doctor, physician, nurse practitioner or physician assistant. Another alternative is for the County to send the nursing staff to obtain certification to complete physical examinations. Based on my review of the documents and interviews with nurses, there is no testing for HIV, Hepatitis, STI, TB or pregnancy. With all the tattoos the residents are receiving, Hepatitis is becoming more prevalent. In addition, due to no testing of STI's undiagnosed cases of Chlamydia which is known as a silent disease because of no symptoms; can lead to sterility in youth. In addition, there should be a nurse with mental health training to understand the mental health lingo because there is a difference in their training; this nurse will be able to know when there is a risk for suicide or self-mutilation, behavioral problems, depression, etc. When the facility hires a nurse that is familiar with the mental health procedures, they will be better equipped to deal with situations that involve residents who continuously complain about headaches, stomachaches and backaches which could be signs of depression. In addition, there is also a need for a sick call system to be in place. I am recommending that a sick call system be developed where there is a set schedule for completion of these medical requests (also known as "kites"). Kites should be picked up and addressed on a regular basis at least twice a day (morning and afternoon). This information should also be documented in the resident's medical files.

As stated in my previous report, the facility must ensure that medical files are properly maintained and secured. I would direct the County to purchase the files that were suggested previously to assist the medical services area in developing an adequate filing system. This filing system should be used to control how information is separated, stored and retrieved. Without a good filing system, information placed in a storage area would be one large body of information with no way to tell where one piece of information stops and the next begins. In addition, these files should be placed in a locked filing cabinet and only retrieved as needed and by authorized personnel. Once files are completed, they should be returned to the secured area from which they were taken.

As it relates to medication the following should be addressed at a minimum:
   A. Storage Monitoring
      1. All medications that require refrigeration will be stored in a clean, secure refrigerator with the appropriate temperature.
      2. Refrigerator temperature monitoring will occur daily and documented on a log.

   3. Inspection of medication storage sites will be done at least monthly by a licensed pharmacist. Special attention will be paid to orderliness and cleanliness. A written report will be provided to the Director or designee.
   4. Identification and disposal of expired medications will occur at least monthly.
   5. Ultimate disposal will be provided by a company licensed by the State of Mississippi for the purposes of medical waste disposal.
B. Audits
   1. A formal pharmacy audit will be done by a licensed pharmacist at least quarterly to evaluate compliance with the State of Mississippi Pharmaceutical Regulations.
   2. A report will be delivered to the to the Director or designee
      i. A corrective action plan will be completed for review by the Director or designee at least quarterly
      ii. The Pharm D or designee will discuss audit reports at the Joint Staff meeting. All staff will participate in the corrective action plan development.

As stated in my previous report, I am recommending at a minimum the following protocols be put in place as it relates to **universal precautions**:

   1) Common sense hygienic practices:
      ➢ Wash your hands frequently, before and after handling any and all potentially infectious materials
      ➢ Wash your hands after removing gloves.
      ➢ Be sure to wash, as soon as feasible, any part of the body after an inadvertent contact with another person's blood or body fluids.
   2) Wear proper protective clothing, where feasible when faced    with a potential exposure situation.
   3) Wear latex/vinyl disposable gloves:
      ➢ Subsequent to any searches, a visual search shall be conducted by conducting a physical search of any room, closet, etc.
      ➢ When handling any potentially contaminated materials/subjects.
      ➢ When handling sharps.
   4) Replace gloves if torn, punctured, contaminated, or if their ability to function as a barrier is compromised. Never wash or decontaminate disposable gloves for reuse.
      ➢ Wear protective outerwear such as a gown, mask, booties, surgical cap or hoods, etc.
      ➢ When large volumes of blood and or body fluids are expectorated or inadvertently can occur.
      ➢ When cleaning any potential contaminated site.
   5) Wear protective outerwear such as masks, eye protection and face shield.
      ➢ Whenever splashes, spray, spatter or droplets of blood or other potentially infectious materials may be generated.
      ➢ Whenever the eye, nose or the mouth contamination can be anticipated.

6)   Remove immediately or as soon as feasible any garment contaminated by blood or other potentially infectious materials (OPIM), in such a way as to avoid contact with the outer surface.

7)   Have change of clothing available.

For further assistance, I would direct the facility to review the Mississippi Pharmacy Practice regulations part 3001. This would provide a structure and assist the facility with compliance.

## Food Service

Based on this visit and my review of documents, the food service program is developing. However, residents continue to complain about not having enough food.  In addition, there were numerous complaints about the food being cold.  I observed the food process during this visit and found that the residents were correct as it relates to not enough food and that the temperature of the food was unacceptable, which means that the food was below the federal food standard requirements.  I also observed residents being served at different times on each unit.  The scheduled time of serving was approximately 1 hour to a 1 hour and 15 minutes after the food was delivered to the kitchen.  According to Ms. Frelix, meals are in the process of being prepared onsite which should reduce the serving time and resident complaints.  I would concur with the administration, that meals being prepared at the facility would be a step in the right direction. This in no way means that the residents should be responsible for food preparation or service. The facility must hire professional food handlers etc. to carry out this process.

Also, I would still recommend that a major cleaning of the kitchen be done for sanitation purposes. For example the warming ovens, (see exhibit C). In addition, I recommend the menus be dated.

During this visit, I still found that the food service schedule was not being followed. For example, each day during this visit, food was served at different times, specifically the evening meals (4:30 p.m., 5:00 p.m. and 5:30 p.m.). There must be consistency in the time residents receive their meals to ensure that meals are provided at regular times during each 24 hour period with no more than 14 hours between evening meals and breakfast. Each resident has the opportunity to have at least 20 minutes of dining time for each meal.

I am again reiterating that food service is an important part of institutional life (see previous report #6).

## 89 day program/Juvenile Court

Again as discussed in my previous reports, the 89 day concept is a very admirable idea. Again, I reiterate, for this court program to function or to operate successfully, there are major changes needed as it relates to programming and staffing. At this point, the program is more a revocation program than a therapeutic, treatment program that was intended. As I have stated in my previous reports, for this program to be effective and successful, the following areas must be incorporated in the program:

- Sufficient staff

- Target appropriate juveniles for the program (i.e. medium to high-risk)
- Target risk factors for delinquent behavior that are responsive to intervention
- ensure they are individualized and family based, and delivered in community settings when discharged
- Programming based on a particular treatment model
- well-trained staff and a program director who strongly supports the program outside of the facility's director
- Deliver a sufficient amount of treatment
- Adhere to a program design
- Monitor juveniles' progress on an ongoing basis and modify the program as needed
- Provide aftercare services
- Individual treatment plan (ITP) that reflects why the juvenile is in the program and what goals juvenile should accomplish during his stay. Also mentioned in the ITP is the juvenile's individual education plan (IEP), which specifies how to accomplish the juvenile's educational goals.
- Develop cognitive behavioral programs that confront juvenile's thinking errors and teach juveniles to overcome their thinking errors as a means of behavioral change.
- Develop positive peer culture (PPC) that teaches juveniles to assume responsibility for helping one another. It is based on the belief that the most powerful influence on a resident's behavior is peer pressure. PPC's goal is to teach basic values related to caring for others. PPC is centered on frequent meetings of small groups of juveniles (6-12) and one or two staff leaders. The juveniles are encouraged to help each other.
- Develop strength based practices that help juveniles to become accountable for their actions and responsible for their behaviors. Accountability is realized when a juvenile admits to the wrong and changes his/her behavior. When juveniles get into trouble, the care worker will initiate more behavior changes in juveniles by having them focus on how to solve their problems.

To ensure that there is an accountability case management in the 89 day program, I am recommending the following model be implemented:

- specifying troublesome behaviors
- identifying need(s)
- setting goal(s)
- evaluation

|  |  |
|---|---|
| **Need** | physiological, social, psychological requirement(s) for the well being of an individual |
| **Goal** | behavioral statement of how the individual will be at the end of a specified period of time |
| **Service Action** | behavioral statement of what the case manager plans and does to assist the individual(s) in achieving the goal |

**Evaluation** systematic collection of information on goal indicators and/or service action(s) for the purpose of decision making and planning

In addition, the court has to determine what therapeutic programs they will be using. An example of these programs would be psychoanalytic therapy, behavioral therapy, rationale emotive therapy, persons centered therapy, reality therapy, etc. It should be noted that I found in my review of documents, observations, and discussion with staff and residents no difference in the 89 day program than in the general detention program. One staff put it quite profoundly by stating "when these youths get a long term sentence through the 89 day program they don't care and they are causing most of the problems.  Detention is a short termed program and they are getting long term sentences."

**School**
The school is in the process of hiring a new Educational Director therefore I am suggesting that the recommendations mentioned in my previous report regarding the school be followed. **In addition, as it relates to the school, since there has not been an evaluation of the school, I would recommend an external audit by a qualified educational consultant.** During this visit, I found that during the week-long testing period students were being individually tested, which was fine, however there were only several students being tested while the other students were being supervised on the units by the direct care staff. Therefore, I would recommend during these testing periods that the school follow the system developed by Rankin County where students being tested are tested away from the regular school programming and all other students are still in class receiving educational programming.

There are many conflicts between the mandates of the court, the school and the facility. Students who have court are not allowed to return to the classroom after their appearances, teachers suspend students from school based on their needs rather than the parameter of the detention facility and an already stretched staff becomes more stretched. These types of issues create problems that the line staff cannot surmount. There has to be one set of rules that are all encompassing for the facility that makes for a safe and secure environment and complies with the need for order within the facility.

The school should review their staffing to ensure that it is meeting the needs of the educational program (i.e. need physical educational staff and an additional GED teacher).

I am still recommending that the school and the facility review the policy of not allowing residents to return to school after court.

Further, the following areas should be addressed based on my interviews from my previous report with school staff:

A. "policy and procedure"
B. "everyone needs to know what to do"
C. "the expectations should be written even kids should know them"
D. "policy and procedure should be based on detention standards"

E.      "everyone should have the tools to do their job"
F.      "proper staffing is needed"
G.      "staff should be well trained to deal with this population"

These are areas that should also be addressed as I have discussed in my previous reports. The school should use small portable classrooms (which can be placed on the grounds of the facility within the security fencing) to help alleviate the congestion for students and teachers who are now forced to teach class in a storage closet. This is below any standard, educationally or detention and is not conducive to learning. Again below are my recommendations from my previous reports.

Recommended School Plan:
    A.  The Henley-Young Facility will create and implement a plan to provide all of the following services and programs within their control related to the aspects of residents' education:
        a. maintain an adequate physical facility for education,
        b. provide adequate security and support in the classroom,
        c. establish an in-school points system based on rewards and consequences for behavior,
        d. establish and implement a schedule for transporting residents to and from school that assures that residents will have the opportunity to receive the required hours of educational services mandated by law.
    B.  Develop policies and procedures for all of the areas discussed above.

Solution/Plan
    1.   The Henley-Young Facility will make every effort to develop and formalize an interagency agreement between the Jackson Public School System and the HYC that:
        a. Provides adequate security within the school premises (including classrooms) for all residents including those residents requiring protective services or other special needs.
        b. Residents requiring protective services or other special needs shall have the same or equivalent educational services as other residents.
        c. Create an alternative educational plans for residents removed from the classroom for medical or behavioral issues.
        d. Provides a schedule for transporting residents to and from school that ensures that residents will have the opportunity to receive the hours of educational services mandated by law.
        e. Outline a cross training curriculum for HYC school employees and detention employees, which include an orientation and a safety curriculum and mandatory annual refreshment training for employees of the school.
        f. Ensure trainings will provide educational staff with appropriate facility policies that relate to or overlap with the school's operations to include the policies regarding rules, discipline and the behavior management program.
        g. Include development of a plan and appropriate materials for various educational levels, to be distributed and explained to residents in the health

        care unit, in room confinement or otherwise unable to participate in normal school classroom activities.

h. Ensure the class schedules are driven by the security of the facility and that the school looks toward developing individual learning plans for each student in the school.

2. The Facility Director or designee shall review the circumstances surrounding the placement of all residents who are in isolation or seclusion, or residents who do not attend school for medical reasons and other behavioral maintenance processes to assess the feasibility of an early release to attend school each day.

a. A list of the residents that are not allowed to attend school and the reasons for the administrative restriction shall be documented and distributed to the Principal of the HYC School.

b. The Facility Director shall designate a liaison to interact with school daily and the JPS Administration should create a position for Compliance Administrator to review the progress of the school on a weekly basis.

c. All instances in which school activities are suspended by the facility due to incidents or other extraordinary circumstances shall be reported to the Compliance Administrator within 24 hours.

When the School Principal or designee is having issues, whether of a safety nature or any other problems, they should be reported to the compliance administrator and the facility Director or designee immediately. **I am recommending again that the Jackson Public School system (JPS) hire a compliance officer to ensure that the school educational standards are being met.**

Below are the compliance ratings and summary of ratings that will be used in this report. Please be reminded that though most are in Non-Compliance, policy development is most important and the start of this process. However, as stated above the facility has made progress on some provisions which moved them from Non-Compliance to beginning compliance.

**Please note that many of the comments and recommendations in the provisions are restatements of previous reports because in those areas little movement has been made. The new Director should use these comments as a road map to developing a successful facility plan. She must also develop a comprehensive corrective action plan for guidance. That plan should have the following:**

    **A. Clearly state the problem or weakness, including the root cause**

    **B. List the individuals who will be accountable for the results of the corrective action plan**

    **C. Create simple, measurable solutions that address the root cause**

    **D. Each solution should have a person that is accountable for it**

**E.  Set achievable deadlines**

**F.  Monitor the progress of the plan**

Henley Young Juvenile Justice Center
Seventh Monitoring Compliance Report
August 11, 2014

The graph has been included to show the progress made thus far on the 71 provisions:



**Compliance Code Measurements**

**Substantial Compliance (SC)**: Practices follow the county-approved policies, training materials or other documents; practices follow policy with rare exception and exceptions lead to corrective action; trained staff fill all positions and vacancies are filled within 3 months; the County has completed work in an acceptable manner; policies, procedures and practice and training are operational and quality-assurance audited and audit exceptions lead to corrective action; outcomes meet or exceed agreement requirements.

**Partial Compliance (PC)**: Policy and procedure is implemented in some but not all locations or times; staff are hired but not trained; the County is working on implementation but tasks are not completed; system implemented at some but not all locations or times, outcomes meet or exceed agreement requirements some of the time and in certain area.

**Beginning Compliance (BC)**: Policy and procedure is written by the county but has not been implemented; funding and hiring authority are approved by the County but positions are not filled; training materials prepared and approved by the county but training has not started.

**Non-Compliance (NC)**: No action taken and immediate steps needed to maintain schedule or prevent further delay. A policy may exist, but the policy may need significant revision or modifications and rarely translates into practice.

| Provision | Intake | 4th Report | 5th Report | 6th Report | 7th Report |
|---|---|---|---|---|---|
| 1.(1) | All Residents Admitted to Henley Young | NC | NC | NC | NC |
| 1.(2) | MAYSI-2 Mental Health Screening | NC | NC | NC | NC |
| 1.(3) | Prescription Medications | NC | NC | NC | NC |
| 1.(4) | Meal Compliance | NC | NC | BC | PC |
| 1.(5) | Telephone Usage | BC | BC | BC | PC |
| 1.(6) | Strip Search Policy | BC | BC | BC | BC |
|  |  |  |  |  |  |
| **Provision** | **Staffing and Overcrowding** |  |  |  |  |
| 2.(1) | Direct Care Staff Ratio | NC | NC | NC | NC |
| 2.(2) | Maximum Capacity Adjustment | BC | BC | PC | SC |
| 2.(3) | One-Person Cell | BC | BC | PC | SC |
|  |  |  |  |  |  |
| **Provision** | **Cell Confinement** |  |  |  |  |
| 3.(1) | Structured, Rehabilitative & Educational Programming | NC | NC | NC | NC |
| 3.(2) | Appropriate Access to Living Unit | NC | NC | NC | NC |
| 3.(3) | Dangerous Residents | NC | NC | NC | NC |
| 3.(4) | Isolation | NC | NC | NC | NC |
| 3.(5) | Direct Care Staff on Units | BC | BC | BC | BC |

| Provision | Structured Programming | 4th Report | 5th Report | 6th Report | 7th Report |
|---|---|---|---|---|---|
| 4 | Educational, Rehabilitative, and/or Recreational Programs | NC | NC | NC | NC |
| | | | | | |
| Provision | **Individualized Treatment Plans/Treatment Program for Post-Disposition Residents** | | | | |
| 5.(1) | Residents Access to Adequate Rehabilitative Services | NC | NC | NC | NC |
| 5.(2) | Health and/or Substance Abuse Treatment | NC | NC | NC | NC |
| 5.(3) | Treatment Plans | NC | NC | NC | NC |
| 5.(4) | Review of Individual Treatment Plans | NC | NC | NC | NC |
| 5.(5) | Evening and Weekend Programs and Activities | NC | NC | NC | NC |
| 5.(6) | Quality Assurance Program | NC | NC | BC | PC |
| | | | | | |
| Provision | **Disciplinary Practices and Procedures** | | | | |
| 6.(1) | Implement a Discipline Policy and Practice | NC | NC | NC | NC |
| 6.(2) | Policy for Residents Violations | NC | NC | NC | NC |
| | | | | | |
| Provision | **Use of Restraints** | | | | |
| 7.(1) | Mechanical Restraints | BC | BC | BC | BC |
| 7.(2) | Mechanical Restraints – Transportation | BC | BC | PC | BC |
| 7.(3) | Misuse of Mechanical Restraints | BC | BC | BC | PC |
| 7.(4) | Mental Health – Use of Mechanical Restraints | NC | NC | BC | BC |
| 7.(5) | No Restraint Chairs, Chemical Restraints and/or Tasers | BC | BC | SC | SC |
| 7.(6) | No Hogtying in Facility | BC | BC | SC | SC |
| 7.(7) | Mechanical Restraints – One-On-One Supervision | BC | BC | PC | PC |
| 7.(8) | Mechanical Restraints – Notice to Medical Professional | BC | BC | BC | BC |
| 7.(9) | No Electronic Restraints | BC | BC | PC | SC |
| 7.(10) | No Firearms in Facility | BC | BC | SC | SC |
| | | | | | |
| Provision | **Use of Force** | | | | |
| 8.(1) | No Misuse of Use of Force | NC | NC | NC | NC |
| 8.(2) | Notice to Medical Professional After Use of Force | NC | NC | BC | PC |
| | | | | | |
| Provision | **Meals and Nutrition** | | | | |
| 9.(1) | All Meals and Snacks Must Be Nutritional | BC | BC | PC | PC |
| 9.(2) | Comply with Nutrition Guidelines | BC | BC | BC | BC |
| 9.(3) | Provide Drinking Water Throughout the Day | BC | BC | BC | PC |
| | | | | | |
| Provision | **Clothing** | | | | |
| 10 | Provide Basic Clothing Items | BC | BC | BC | PC |

| Provision | Hygiene and Sanitation | 4th Report | 5th Report | 6th Report | 7th Report |
|---|---|---|---|---|---|
| 11.(1) | Provide Appropriate Hygiene Products | BC | BC | BC | PC |
| 11.(2) | Provide Sleeping Mats and Blankets | BC | BC | PC | PC |
| 11.(3) | No Deprivation of Mats and Blankets | BC | BC | PC | PC |
| 11.(4) | Sufficient Sanitary Mats and Blankets | BC | BC | PC | SC |
| 11.(5) | Clean and Sanitary Environment | BC | BC | BC | BC |
| 11.(6) | Fire Safety, Weather Emergencies, Sanitation Practices, Food Safety, and Provide Safe Environment | NC | NC | BC | BC |
| 11.(7) | Clean Drinking Glasses and Eating Utensils | BC | BC | PC | PC |
|  |  |  |  |  |  |
| Provision | Medical Care |  |  |  |  |
| 12.(1) | Provide Residents With Adequate Medical Care | NC | NC | NC | NC |
| 12.(2) | Provide Medical Professional When Needed | NC | NC | NC | NC |
| 12.(3) | Implement a Sick Call Policy to Ensure  24 Hour Services | NC | NC | NC | NC |
| 12.(4) | Prescription Medications Only Dispensed by Medical Staff | NC | NC | NC | NC |
| 12.(5) | Provide Medical and Mental Health Services | NC | NC | NC | NC |
| 12.(6) | Proper Monitoring Residents Who Require Individualized Attention | NC | NC | NC | NC |
|  |  |  |  |  |  |
| Provision | Mental Health Care |  |  |  |  |
| 13.(1) | Provide Adequate Mental Health Care | NC | NC | NC | NC |
| 13.(2) | Residents and Psychotropic Medications | NC | NC | NC | NC |
| 13.(3) | Within 72 Hours of Admittance Complete an Individual Mental Health Treatment Plan | NC | NC | NC | NC |
| 13.(4) | Implement Policies and Procedures for Referrals | NC | NC | NC | NC |
| 13.(5) | Sufficient Psychiatric Services | NC | NC | NC | NC |
| 13.(6) | Psychiatrist and/or Counselors to Record Review to Ensure Proper Care | NC | NC | NC | NC |
|  |  |  |  |  |  |
| Provision | Suicide Prevention |  |  |  |  |
| 14.(1) | Multi-tiered Suicide Prevention Policy | BC | BC | BC | BC |
| 14.(2) | Evaluate Highest Level of Suicide Watch Every 12 Hours by Medical Professional | BC | BC | BC | BC |
| 14.(3) | Closely Monitor Suicide Watch Residents During All Activities | BC | BC | BC | BC |
| 14.(4) | Court Shall be Notified Within 24 Hours of Any Residents on Suicide Watch | BC | BC | BC | BC |
|  |  |  |  |  |  |
| Provision | Family Support and Interaction |  |  |  |  |
| 15.(1) | Visitation Shall Not Be Restricted or Withheld | BC | BC | PC | PC |
| 15.(2) | Provide Accommodations for Contact Visits | BC | BC | PC | SC |

| Provision | Family Support and Interaction (cont.) | 4th Report | 5th Report | 6th Report | 7th Report |
|---|---|---|---|---|---|
| 15.(3) | Visitation Shall be Regularly Scheduled | BC | BC | PC | SC |
| 15.(4) | Phone Calls Shall be Allowed Based on Policy | BC | BC | BC | PC |
| | | | | | |
| **Provision** | **Miscellaneous Provisions** | | | | |
| 16.(1) | Provide Equal Access To All Services | BC | BC | BC | BC |
| 16.(2) | Provide the Opportunity To Participate In Large Muscle Exercise Every Day | NC | NC | NC | NC |
| 16.(3) | Prohibit the Use of Profanity in the Presence of Residents | BC | BC | BC | BC |
| 16.(4) | Provide Adequate Grievance Policy | BC | BC | BC | BC |
| 16.(5) | Provide Residents of All Ages With the Opportunity to See Their Attorney and/or Residents Court Counselor | BC | BC | BC | BC |

**The following are my observations and recommendations specific to the provisions of this agreement.**

### 1. Intake

| | |
|---|---|
| Provision1.1 Intake | All residents admitted to Henley-Young shall receive a health screening, within 1 hour of admission or as soon as possible as reasonably thereafter, by appropriately trained staff as required by Mississippi Code Annotated § 43-21-321. Information obtained during the screening shall include, but shall not be limited to, the juvenile's: (a) Mental health; (b) Suicide risk; (c) Alcohol and other drug use and abuse; (d) Physical health; (e) Aggressive behavior; (f) Family relations; (g) Peer relations; (h) Social skills; (i) Educational status; and (j) Vocational status." Mississippi Code Ann. § 43-21-321(1). During this screening, Henley-Young shall obtain information regarding the resident's educational status by having the residents or intake officer complete an education screening form developed and provided by the Jackson Public School District. |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance based on my June visit. The facility should continue to work on addressing the above mentioned areas. Please see recommendations below |
| Recommendations | 1. Fully develop admitting policies and procedures to reflect provision<br>2. The court should provide staffing for intake purposes<br>3. The facility should provide enough staff to fully cover the care and custody issues in the facility<br>4. Ensure all staff who admit residents are properly trained<br>5. Develop training records<br>6. Provide documentation in a organized way on residents being screened/admitted (files)<br>7. Ensure all residents' records are available for my review with all areas of the provisions placed in the resident's file |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 1.2 Intake | All residents shall receive a MAYSI-2 mental health screening upon admission, as required by Mississippi Code Annotated § 43-21-321. The screening will be conducted in private by appropriately trained staff of Henley-Young. If the screening indicates that the residents is in need of emergency medical care or mental health intervention including, but not limited to, major depression, suicidal ideation, withdrawal from drugs or alcohol, or trauma, the detention staff shall refer those juveniles to the proper health care facility or community mental health service provider for further evaluation immediately or as soon as reasonably possible. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Although the facility continues to screen using the MAYSI-2, there is still no follow-up as a result of the information revealed by the screening. Further, there should be constant mental health follow-up as it relates to residents that have been identified with warning and caution signs regarding their behaviors.  In addition, the facility still needs to develop adequate policy and procedures for this provision which is very difficult without having a mental health program in place.  As stated in my last report (6th), the facility needs first to answer the following questions below; then follow the recommendations. | |
| | A. What are the program objectives for mental health screening? | |
| | B. What are the characteristics or common traits the program wants to identify for emergency or follow-up clinical consultation? | |
| | C. What MAYSI-2 scores will the facility use as the signal for the program staff to obtain clinical consultation or services? | |
| | D. What mental health follow-up services are available when the resident's MAYSI-2 score indicates that they are needed? | |
| | E. In what way will the facility develop a database that creates a profile of mental health needs in the population and program decisions and adjustments needed to improve mental health services for the residents? | |
| | It should be noted that during this visit there were several residents who did not receive the MAYSI-2 screening upon entering the facility.  This was due in part to inadequate staffing and lack of training.  On several occasions, residents were accepted into the facility with minimum processing and taken directly to housing units because no staff officers were available to correctly complete these duties. | |
| Recommendations | 1.  Develop comprehensive policy and procedures for this provision. <br> 2.  Develop resident files that are organized and arranged properly <br> 3.  Develop training and provide documentation of training <br> 4.  Identify person or person(s) whose responsibility is to score the instrument | |

|  |  |
|---|---|
|  | 5.  Provide documentation on who reviews the  instrument and note what services are provided for the residents in the facility and what services should continue when the residents leave the facility<br>6.  Develop process whereby facility staff and court employees develop a system for the sharing of information and reviewing of residents' files which are centrally located and accessible to detention staff. |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 1.3 Intake | Prescription medications will be secured for all residents who have a valid, current prescription within 8 hours of admission, if possible, but in no case, longer than 24 hours after admission, including weekends and holidays. If during a resident's detention, a medical professional either prescribes a new medication or renews a resident's previous prescription medication, Henley-Young will secure the prescription medication within 8 hours of receiving the prescription, if possible, but in no case, longer than 24 hours after receiving the new prescription, including weekends and holidays. Henley-Young shall procure and/or purchase all prescription medications prescribed to confined residents. |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance based on document review, interviews and observations.  I reviewed several residents' files and their medical/mental health needs are still not being met. Specifically, training of **universal precautions** is sorely needed. It should be noted that based on the fact that the medical program is not in place and files are in disarray, determining whether or not residents are receiving new prescriptions or if prescriptions are received within 24 hours is problematic at this time. This should be a part of the new medical policies, procedures and protocols once the new medical contract is in place.<br><br>The facility should continue to follow the recommendations below which are the same as in the previous report. The initial intake/admission process is a critical part of residents' transition when they are entering the facility. During my review I found that because of the lack of staffing, it was very difficult for staff to really get a firm understanding of residents when they entered the facility. On one occasion during my visit, staff members were pulled from the Master Control area to ensure that a resident was admitted.<br><br>Having two RNs is a major improvement in the medical services however there is still a need for a physician to direct medical care. The nurses cannot prescribe medications, perform invasive evaluations, and when needed, write standing medical orders. Further they cannot perform complete physicals on residents when they enter the facility. It should be noted, residents are not receiving physicals as required based on minimal juvenile detention standards and the |

| | |
|---|---|
| | Mississippi Youth Court code (43-21-321). In addition, there is no Pharm D to oversee medication administration and dosage. I saw no biomedical hazard receptacles, which implies that the facility has no contract with a waste removal company. |
| | The first aid kits are still incompletely stocked and stocked with out-dated equipment (see exhibit B). While the facility is soliciting a medical provider to carry out medical services it still has the responsibility to maintain medical/medication and all other medical needs to the residents. Based on my review of documents and observation, over the past two years no doctor, physician's assistant or practitioner has been hired. Also, there are no policies, procedures or protocols to guide these nurses. Therefore I am reiterating that the suggested actions and recommendations from my previous report be reviewed and put into action. |
| Recommendations | 1. Hire a Medical Doctor to direct medical care. 2. Develop written policy and procedures or protocol for this provision 3. Document staff training on distribution and side effects of medication 4. Provide documentation on efforts to obtain prescription drugs |
| Evidentiary Basis | Document review, observation, interviews |
| Provision 1.4 Intake | Upon admission to Henley-Young, all residents shall be offered a snack or meal in compliance with the United States Department of Agriculture's School Meals Program standards. |
| Status | **Partial Compliance** |
| Discussion | The facility has moved to partial compliance on this provision based on my observation, interviews and review.  During my review of documents and interviews with residents, I found that the facility has created a checkpoint that provides snacks upon resident arrival at the facility. I reviewed nine files and found that eight residents were offered snacks upon their arrival (Resident T.B. on May 7, 2014 was not offered snacks). However, during my interviews of ten residents, two advised that they did not receive snacks upon admission.  This means that approximately 90% of the residents entering the facility were offered snacks upon their admission. Therefore the facility must continue to follow the below recommendations. |
| Recommendations | 1. Continue in the development of policies and procedures for this provision. 2. Procedures should be part of intake/admission procedure. 3. Ensure there are snacks or sandwiches available for residents being admitted between 6 pm and 5 am. 4. Ensure enough staff members are available to fully comply with the policies and procedures. |

| Evidentiary Basis | Document review, observation, interviews |
|---|---|

| Provision 1.5 Intake | Upon admission to Henley-Young, all residents shall be permitted to telephone a parent or legal guardian free of charge and to take a shower before being placed on the pod. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The facility has moved to partial compliance on this provision, based on my observation and review.  I did review the scheduled telephone call log sheets and the admission intake checklist along with interviews with youths and found that the facility at this time has advanced to partial compliance.  The facility should ensure that the below recommendations are continuously followed to advance to substantial compliance. | |
| Recommendations | 1. If officers have been trained on this policy, they may need retraining.<br>2. Develop a consistent way to document the intake process that shows that a phone call and shower were completed.<br>3. Develop policy and procedure for this provision.(executed)<br>4. Train staff and document this training. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 1.6 Intake | Within 60 days of the date of this agreement, Henley-Young shall develop and implement policies that limit strip searches to instances where Henley-Young staff has an articulable suspicion that a resident may possess weapons or contraband. Anytime a strip search is conducted, Henley-Young staff must document, in writing, their suspicion, obtain permission from a supervisor, and conduct the search in a manner that minimizes the intrusion into the resident's privacy. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  Based on my interviews with residents and review of documentation, there is a lot of contraband coming into the facility that needs to be addressed.  This amount of contraband is creating a dangerous environment which is evident by cigarettes and a lighter found on Resident R. T.  (incident report dated May 23, 2014.) and Resident K.T.  (incident report dated May 29, 2014) was a found with a lighter, cigarette and proceeded to start a fire in his room.  This incident sparked an evacuation of residents from the unit.  In addition, see provision 11.6.

As it relates to proper intake and safety and security in a secured environment, the following must exist. Security (secured) is defined as "being free from danger or risk of loss: safe, fear from fear or doubt, anything that gives or assures safety".  Security is an intricate and essential component of a juvenile detention facility.  The process for admitting a resident to detention is extremely important. There is an art to getting residents fully and smoothly involved in the detention program.  The admission process is what it called the "critical hour" because it is the first encounter with the resident.  It is the first impression, sets the tone and it establishes the 'flavor' for the entire stay in detention.  Detention is a complex situation, placing troubled residents together in a confined environment with high levels of uncertainty.  The risk for problems is very high for both residents and staff. Good detention facilities supply staff with a substantial amount of information at admission. Since the first moments are critically important because it sets the tone it is important to have the best staff assigned to admissions .In addition, It is very important staff understand that youth are coming off the street based on being arrested and the staff are not aware of where these youth are coming from and if they were properly search by the admitting police officer and there are natural consequence when this process is not completed correctly. Therefore, to be clear the following should apply to residents being searched upon entering the facility.     When staff are authorized to conduct a strip search, these guidelines should be observed for the staff's protection:
<ul><li>a strip search should occur only after staff have had training on how to conduct a strip search</li><li>strip searches should be conducted in a private area of the detention facility</li><li>staff must maintain a professional demeanor throughout the process</li></ul> |

30

- the resident should be asked to remove all of their clothing, and staff should refrain from inappropriate comments and staring
- staff should not touch a resident during a normal strip search
- staff are only permitted to conduct a strip search on a resident who is of the same sex

Drug-related offenses, violent offenses, and serious felony offenses do constitute a reasonable suspicion to conduct a strip search. Additionally, the frisk search at admission and the inventory search of property may uncover contraband that creates a reasonable suspicion to conduct a strip search. Staff should be advised to conduct a strip search on all juveniles at admission. ACA recommends completing a strip search as part of the admission process. In the absence of case law on the subject, conducting a strip search as a routine part of the admission process is advisable. Body-cavity searches are to be conducted by a licensed health care provider with the authorization from the responsible physician and facility administrator; staff should never conduct a body-cavity search. Specific reference is made to a visual, manual, or instrument search of a residents' anus and/or vagina. (Desktop Guide for Good Juvenile Detention)[1]

Based on the above, additional staff is required and the intake area must be stabilized as it relates to permanent and trained staff in the area. During my observation of the area, the facility continues to move staff in and out of the area which does not provide adequate coverage. Again, staff is being pulled throughout the building to complete the admission process. Therefore the statement below still stands.

Based on my observations and review, as stated in my last report, the facility does have policy and procedures for this provision. During my interview with residents I found no residents who acknowledged there was inappropriate intrusion during the search process upon their admission to the facility. I did review the process, and to become further compliant with this provision there must be documentation of the policy and documentation of staff training on this procedure. Although this is an area of concern, strip searching is necessary to ensure no contraband enters the facility. As long as searches are conducted in a humane manner by an officer of the same sex as the resident, no resident's rights are being violated. My greatest concern was that in my interviews I learned that some of the residents reported that they were not searched before being placed on a unit. The process I observed was very loose and not well structured. It is important that the officers follow the policies and procedures as

[1] Although, this provision may need modification, I understand that Hinds County has ceased its practice of strip searching residents during the admission process at Henley-Young unless there is an articulable suspicion that a resident possesses weapons, drugs, or contraband and is in the process of implementing a policy that complies with the consent decree.

| | they direct this process. Failure to follow these procedures presents the possibility of having a very dangerous situation in the facility. The facility must follow its policies and procedures to provide a safe and secure environment. Continue to comply with this provision. |
|---|---|
| Recommendations | 1. Staff must be provided with the necessary training with information stating the trainer, name of the training class/course, time, date and location of training.<br>2. This documentation should be kept and logged in facility records<br>3. Provide enough staff for adequate coverage 24/7. |
| Evidentiary Basis | Document review, observation, interviews |

## 2  Staffing and Overcrowding

| Provision 2.1 Staffing and Overcrowding | Within 90 days of the date of this agreement, Henley-Young shall operate with a direct care staff to resident ratio of 1:8 from the hours of 6:00 a.m. until 10:00 p.m. and a ratio of 1:10 from the hours of 10:00 p.m. to 6:00 a.m. |
|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Please see my introduction as it relates to inadequate staffing.  I am concerned that without appropriate staffing levels this provision will not be able to advance.   Even though the County has hired new direct care staff, because of **turnover** it becomes a sum zero gain. In addition, the seven staff interviewed, six were new hires with the longest being there three months.  Inadequate staffing continues to place the facility in a liable state.  Nothing in the below statement from my last report (6th) has changed.<br><br>Therefore my statements below still stand.<br><br>In my interviews with staff and my review of the documents the facility is still falling short of the needed staff to properly run the facility. In the introduction I addressed the fact that the facility is hiring staff. However, attrition is negating the value of the new staff. Staffing continues to be a challenge at the facility. Although the County has allocated funding for several new positions, there are still times when residents are left unsupervised or the ratio far exceeds the staffing. According to the residents and staff "they are always short. And we must lock the residents down for safety."<br><br>Based on my previous review, I am again reiterating that although the facility is not overcrowded it still suffers from staff shortages. Since the facility is short on staff, the staff members are under pressure to keep the peace at all cost. Several officers I interviewed during this visit continued to express concerns regarding their ability to do their jobs, citing staffing as the problem. One |

officer stated that staff members avoid conflict with the residents by "letting things slide."

This is another indication that when there is not sufficient staff available, officers have a tendency to not engage residents on their inappropriate behavior, which in turn affects any structured programming. Again, the Henley-Young officers are compelled to react to minor misbehaviors, out of fear that small situations will become big ones. As stated in my last report, they are locking down residents that present potential conduct issues so other residents will be safe. Further, the officers are not equipped to handle residents with mental health problems. This thinking only exacerbates a resident's misbehavior when they are outside their rooms because they have nothing to lose because their misbehavior only gets them a return to their rooms. The approach is counter-productive and not in line with good juvenile detention practices. Because there are no qualified mental health professionals at Henley-Young, residents are isolated and their needs are not being met. This situation places direct care staff in a quandary on how to handle these residents. Without regular access to mental health professionals, children often deteriorate and staff members become apprehensive regarding their next step, so isolation becomes the norm. This should be addressed by the new director.

During this visit my observations and my record review revealed that because of the inadequate staffing levels there are no consistent security checks of residents who are placed on behavior management or isolation. There were residents placed on behavioral management and isolation without the appropriate documentation on the doors. This indicates that the residents are not being properly observed during this period, and that no records are being made of the residents' behavior while in behavior management or isolation. Therefore, there is a need for major training as it relates to behavior management and isolation of residents at Henley-Young.

| Recommendations | Units | Day Shift | Evening Shift | Night Shift | Total |
|---|---|---|---|---|---|
| | A officer | 3 | 3 | 2 | 8 |
| | B officer | 3 | 3 | 2 | 8 |
| | C officer | 3 | 3 | 2 | 8 |
| | D officer | 3 | 3 | 2 | 8 |
| | Intake | 1 | 1 | 1 | 3 |
| | Master Control | 1 | 1 | 1 | 3 |
| | Staff for Court Transportation | 2 | 2 | | 4 |
| | Internal Transportation | 2 | 2 | | 4 |
| | Laundry | 2 | 2 | | 4 |
| | *Director | 1 | | | |
| | *Deputy Director | 1 | | | |
| | *Operation Manager | 1 | | | |
| | Supervisors | 3 | 3 | 2 | 8 |
| | | 26 | 23 | 12 | 61 |

**Duty Post Staffing/Administration**

61 Direct care/supervisor/laundry staffing X 1.5 Relief Factor—Total staff needed to effectively operate the facility—91.5
1 to 8 Awake —1 to 10 Sleep

Misc. post coverage
Medical/MH Hospital Runs
One on One MH/Medical
Visitation
*Administration
*Maintenance

| Evidentiary Basis | Document review, observation, interviews |
|---|---|

| Provision 2.2 Staffing and Overcrowding | If the staff-to-residents ratio falls below the requirements of section 2.1 for longer than two (2) days, the Director or his assignee shall immediately identify residents accused of nonviolent offenses who are eligible for less restrictive alternatives to secure detention and request an emergency release for eligible residents from the appropriate Residents Court. The maximum capacity of Henley-Young shall be calculated by determining how many direct care staff members can supervise residents in accordance with section 2.1. The current maximum capacity of Henley-Young is 84. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility has moved to substantial compliance on this provision based on my review of documents, interviews and observations.  The facility does have policies and procedures in place signed by the Court Administrator, the YC Judge and the Executive Director.<br><br>Although the facility has not reached its maximum capacity of 84 there is a procedure in place to ensure steps are taken for releasing of residents who meet the criteria. | |
| Recommendations | Continue to provide training to ensure that everyone is aware of the new policy and prepared for implementation should the need arise. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 2.3 Staffing and Overcrowding | No more than one resident shall be placed in a one-person cell. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility has moved to substantial compliance on this provision. I found no indication that the facility had more than one resident in a room.<br><br>The facility has developed policies and procedures for this provision. | |
| Recommendations | 1. Develop and provide adequate training for this provision.<br>2. All training shall be documented. | |
| Evidentiary Basis | Document review, observation | |

35

### 3   Cell Confinement

| Provision 3.1 Cell Confinement | Residents shall be engaged in structured, rehabilitative, and educational programming outside of their cells during the hours of 7:00 a.m. to 9:00 p.m. each day, including weekends and holidays. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance therefore the facility should still follow the recommendations below.<br><br>Therefore my statements below still stand.  In addition, as it relates to the school, since there has not been an evaluation of the school, I would be recommending an external audit by a qualified educational consultant.<br><br>During this visit, I still found no indication that structured rehabilitative and educational programming was occurring. There was no posting of activities within the facility and I found no documentation.<br><br>Please review the introduction as it pertains to activities, recreation and programming. As to the school I direct you to read the introduction and I further recommend that the school be fully evaluated. My review of the files showed that there is no case management within the facility as a whole. According to the residents, their basic recreation consists of playing cards and dominoes. They are allowed to go outside but there are no scheduled activities. Other than sitting on the bleachers and playing basketball for those who are engaged in that sport, there was nothing for residents to do. There are no positive behavioral management programs within the facility. | |
| Recommendations | 1. Develop policies and procedures for this provision.<br>2. Review the schedules to be sure that they adequately reflect all daily activities.<br>3. Develop positive behavior management systems with rewards and consequences.<br>4. Remove the dark film from the Plexiglas in towers on unit which would allow staff to view the unit without there being visual obstruction (when lights on). **Executed**<br>5. Develop monthly recreation schedule.<br>6. See all of the recommendations for recreation activities and programming and for the school in the introduction. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 3.2 Cell Confinement | Except when residents are in protective custody or confined subject to section 3.3 of this Settlement Agreement, residents placed in the Suicide or Booking cells shall be allowed to spend the hours of 7:00 a.m. to 9:00 p.m. on the appropriate living unit and to have the opportunity to engage in structured, rehabilitative, and educational programming, unless medically counter-indicated. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non- compliance.  Based on my review of documents, interviews with residents and staff, and observations, residents are still being held in the booking area when they are placed out of school for behavior issues.  Also, I found no structured rehabilitation or education programs for residents when they were out of the general population.  It should be noted that because there is a lack of appropriate staffing, residents are being held in cells in the intake area as a means of housing and behavior management.  This is counterproductive to any rehabilitation efforts and is creating major stress for staff and residents.  The stress is being created because there is no adequate and/or structured programming available when residents are placed in this area of the facility.  Therefore the statement from my previous report (6th) stands.

My review of documents and observations showed that the facility still has not developed policy and procedures for this provision. During my review, I found residents on the unit living area still not being supervised. Again, as stated in my introduction, there were residents who were not allowed to attend school for the remainder of the day after returning from court. This is an issue that needs to be addressed immediately. I observed one female resident who wanted to return to school but was not allowed. As stated previously, I recommend that students who are disruptive in the classroom and are removed from the classroom receive either behavioral management or are written up and receive due process. However, they should continue to be a part of the educational process. The school needs to revise any policies they may have regarding suspension of students from a school within a controlled environment. A student cannot be suspended from school in a detention facility therefore the school needs to develop a better behavioral management system. If a resident is removed from school due to behavioral problems that resident should never be placed in the booking area.

The facility still needs to develop data collection tools to use to determine and identify who is placed on units, time, length etc. when they are placed out of school. The facility remains non-compliant with this provision, therefore I am reiterating that the suggested actions and recommendations from my previous report be reviewed and put into action. | |

| Recommendations | 1. Follow recommendations as set forth in section 3.1.<br>2. Develop adequate policies and procedures for this provision.<br>3. Develop data collection for residents who are placed in protective custody or confinement.<br>4. Residents who are removed from school should be placed in a designated living area. |
|---|---|
| Evidentiary Basis | Document review, observation, interviews |

| Provision 3.3<br>Cell Confinement | Residents who pose an immediate, serious threat of bodily injury to others may be confined in their cells for no longer than 12 hours at a time without administrative approval. Residents who are placed on cell confinement for this reason shall be released from their cells daily to attend school, maintain appropriate personal hygiene and to engage in one hour of large muscle exercise. Staff must perform visual checks on residents who are subject to cell confinement every 15 minutes. Staff must document all instances of cell confinement in writing and must document the justification for determining that a resident poses an immediate, serious threat of bodily injury. |
|---|---|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents, interviews with residents and staff and observation, residents are still being confined in their cells for long periods of time without any documentation.  During this visit, I found residents in their rooms due to the lack of adequate staff at the facility.  Even in my document review, staff are complaining that there is not 'enough staff' and that they 'have to rotate residents in and out' of their cells for meals and any outside recreation that they can. During this visit, I also found residents locked in their rooms that were not in school; there were five on A pod and 12 on B pod with only one staff attempting to monitor both pods.  In addition, residents that finished their court cases were also locked down on the units. According to one officer, the residents are locked down because "we have very little for corrective actions and that we need more staff" and "bring the place to at least the 19[th] century".<br><br>Therefore the statements below from my previous report (6th) still stand.<br><br>During this visit, I did find that the facility has developed a system for procedural due process for facility violations. However, I did not find any indication of 15 minute checks performed while residents were confined to their rooms. The facility still needs to develop policy and procedures and train staff on the process. In my interviews with staff, I learned that they are unfamiliar with any due process isolation policies and procedures. As stated in my previous report I did review the new forms developed, they are aligned with best practices, however they are not being appropriately used. |

| | |
|---|---|
| | See my discussion of this matter in the introduction. Though processes on a few provisions have begun, it is vitally important that policy and procedures are developed to ensure a consistent, comprehensive, and standardized way of running the facility. |
| Recommendations | 1. Develop adequate policies and procedures for this provision. <br> 2. For residents placed in their rooms, develop forms that indicate the time residents will be in their rooms and post it on their doors. <br> 3. Ensure that supervisors sign off on the form in 15 minute staggered visual checks when residents are placed in their rooms. <br> 4. Develop a system of major and minor consequences for behavior. <br> 5. Develop form for 15 minute checks and include in policy. |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 3.4 <br> Cell Confinement | Residents shall not be automatically subjected to cell confinement and/or isolation upon their admission to Henley-Young unless he or she would be subject to cell confinement under section 3.3. |
| Status | **Non-Compliance** |
| Discussion | This status of this provision remains as non-compliance, therefore my discussion below still stands. <br><br> As I address this provision, I must first state that the violation of this provision is directly associated with the lack of staff to properly admit residents to the Henley-Young facility. The facility is still coordinating this provision with provision 3.3 and policies and procedure are still in developmental stages. Once completed training and documentation will need to be addressed. However, during my visit on several occasions, I observed residents that were placed in their rooms and locked down because there was a lack of staff, with no orientation and no freedom to move about the unit. This can only be addressed when there is enough staff. No residents should be gratuitously subject to lock down. Please review my introduction. |
| Recommendations | 1. Develop adequate policies and procedures for this provision. <br> 2. Ensure all staff is trained and document training. <br> 3. See provision 3.3 |
| Evidentiary Basis | Document review, observation |

| Provision 3.5 Cell Confinement | At all times between the hours of 7:00 a.m. to 10:00 p.m., at least one direct care staff shall be stationed on any living unit where two or more residents are placed, and direct care staff shall be actively engaged with residents. From 10:00 p.m. to 7:00 a.m., staff shall conduct visual checks on residents every 15 minutes. Henley-Young shall ensure that every cell has an operating intercom that allows residents to communicate with staff at all times. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance, therefore my discussion below still stands.<br><br>The facility has developed a policy and procedures regarding this provision. Again due to the lack of staff, it is very difficult for the facility to address this provision. During this visit I found residents were left unsupervised as stated in my previous reports and this continues to happen. Residents were still left alone on the unit; residents were locked down on A unit while B unit residents were out (see exhibits D-1 to D-3). Basically the facility was rotating residents out on living units to accommodate the shortage of staff. Again, residents were on the unit without supervision although one staff was in the tower. There were doors opened on the unit which also allows for serious things to happen between residents. This is a major area of concern and must be addressed. It continues to make me uneasy as it has during my previous visits. Review of documentation and direct observation reveals that staffing continues to be a major problem at Henley-Young. The facility remains non-compliant with this provision, therefore I am reiterating that the suggested actions and recommendations from my previous report be reviewed and put into action. Since a policy has been developed this provision remains in beginning compliance, **see introduction.** | |
| Recommendations | 1. Develop adequate policies and procedures for this provision.<br>2. Provide adequate staffing.<br>3. Provide adequate staff supervision. | |
| Evidentiary Basis | Document review, observation, interviews | |

**4   Structured Programming**

| Provision 4 Structured Programming | Henley-Young shall administer a daily program, including weekends and holidays, to provide structured educational, rehabilitative, and/or recreational programs for residents during all hours those residents shall be permitted out of their cells, pursuant to section 3.1. Programming shall include: |
|---|---|
| | a. activities which are varied and appropriate to the ages of the residents; |
| | b. structured and supervised activities which are intended to alleviate idleness and develop concepts of cooperation and sportsmanship; and |
| | c. Supervised small group leisure activities, such as a wide variety of card and table games, arts and crafts, or book club discussions. |
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand. |
| | The residents continue to play cards, play basketball and watch television. The problem is that there are no formalized, regulated, scheduled, daily activities. When a facility operates in this type of chaotic fashion it leads to upheavals in the residents' behavior and confusion for the staff. Because there is no one dedicated specifically to recreation the present recreation program is little to none. |
| | The facility had developed a daily schedule however because of inadequate staffing, the schedule is not followed. During this visit, there were no arts and crafts programs and no structured or supervised activities. The schedule that was once posted no longer exists. The facility still needs to develop this provision. It remains non-compliant with this provision, therefore I am reiterating that the suggested actions and recommendations from this report be reviewed and put into action. |
| Recommendations | 1. Continue to develop adequate policies and procedures for this provision. |
| | 2. Provide adequate schedules for weekdays and weekend programming and act on it. |
| | 3. Develop an adequate monthly recreation schedule with age appropriate games and programs. |
| | 4. The facility need to hire an officer dedicated to developing and monitoring recreational programs. |
| Evidentiary Basis | Document review, observation, interviews |

## 5.  Individualized Treatment Plans Treatment For Post-Disposition Residents

| Provision 5.1 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall ensure that residents have access to adequate rehabilitative services. Henley-Young shall ensure that children placed in the facility post-disposition will receive constitutionally compliant rehabilitative services. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand.<br><br>See the discussion of the 89 day program in the introduction.<br><br>Since there is no structured programming outside of individual counseling, the County may want to hire case managers to provide initial and ongoing case management services (i.e. treatment planning, family assessments, educational assessments, referrals for mental health or health services). Also the case manager will identify indicators of goals achieved, specify the person responsible for implementing the resident's and family's treatment goals; update treatment plans; and develop discharge plans with recommendations. In addition, the facility needs counselors who are responsible for a resident's safe adjustment to secure confinement. | |
| Recommendations | 1. Develop adequate policy and procedures to meet this provision.<br>2. Either fund properly or discontinue the 89 day program.<br>3. Review light weight residents in program (i.e. disturbing the family peace) and find alternative placement for them.<br>4. Fund appropriate staffing to develop individualized treatment plans for residents in 89 day program.<br>5. Develop and fund alternative community programming for residents in 89 day program that can be serviced in community.<br>6. Hire 3 case managers who are assigned and work for the facility director. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 5.2 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall ensure that residents in need of mental health and/or substance abuse treatment and/or who are in the facility post disposition shall have appropriate treatment plans developed and implemented in accordance with generally accepted professional standards of practice for mental health and rehabilitative services. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand.

Based on my review of documents and observation, services are not in place and are still not being provided for this provision. I am reiterating the action and recommendation from my previous report below.

Residents entering the facility pre or post disposition (89-day program) still have no treatment plan as it relates to mental health although some residents are being seen by Hinds Behavioral Health counselors. Once a resident enters the facility and the screening shows evidence and warning signs of suicidal ideations, traumatic experiences, depressed moods, and/or somatic complaints etc. that are indicated by the MAYSI-2, the residents should be evaluated and have a treatment plan developed.

There is no documentation to show that treatment was provided to residents based on identified warning signs; there are no treatment plans available, and there is no mental health staff available to implement the treatment plans. Also, I found no treatment plans for residents that were currently at the facility or post treatment plans for residents leaving Henley -Young. Interviews with staff showed they were very frustrated with the lack of mental health services at the facility. In addition, there is no functional system in place to address residents with mental health issues or exhibiting mental health behaviors. Also, residents having problems within the school should at least have an IEP to determine whether they are in need of placement within the special education program over and above any need for mental health services. At this point, there is no indication that any mental health services, beyond the MAYSI-2 are being provided other than those services provided by Hinds Behavioral Health which is limited at best. However, I found no documentation of any services provided to residents at Henley-Young (i.e., treatment plans, screenings or evaluations .etc), see introduction. | |
| Recommendations | 1. Develop adequate policies and procedures for this provision.
2. See recommendations under (5.1). | |
| Evidentiary Basis | Document review, observation, interviews | |

| | |
|---|---|
| Provision 5.3 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall implement policies and procedures for the required content of treatment plans, which shall include; <br><br> a. That the treatment plan be individualized; <br> b. An identification of the mental and/or behavioral health and/or rehabilitative issues to be addressed; <br> c. A description of any mental health, medication or medical course of action to be pursued, including the initiation of psychotropic medication; <br> d. A description of planned activities to monitor the efficacy of any medication of the possibility of side effects; <br> e. A description of any behavioral management plan or strategies to be undertaken; <br> f. A description of any counseling or psychotherapy to be provided; <br> g. A determination of whether the type or level of treatment needed can be provided in the resident's current placement; and <br> h. A plan for monitoring the course of treatment, and if necessary, for revising the treatment plan. <br> i. A description of the precise terms the of the facility's long-term and short-term objectives for the residents, the full range of services to be provided, and procedures, and timetables and staff assignments for the implementation of such treatment plan; <br> j. A plan for regularly engaging the family in the resident's treatment  plan; <br> k. A comprehensive re-entry plan that will assist the residents re-enroll in their home school and access medical, mental health, Vocational and rehabilitative services based in the community. |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand. <br><br> The facility still has not developed policy and procedures for this provision. Please see previous report. As stated in provision 5.1, the facility still needs to develop the appropriate program structure with adequate staffing, adequate therapeutic treatment, supervision, education, etc. Henley-Young is still non-compliant as it relates to this provision. Because there has been no movement on this provision, I am reiterating the actions and recommendations from my previous report below. See introduction. |
| Recommendations | 1. Develop comprehensive policies and procedures for this provision that includes the contents (A-K). <br> 2. The County/Court shall define the criteria for the program <br>     a. It is important that post dispositional programs in other facilities be reviewed. <br>     b. Often seeing what is being done in other facilities provides insight into how to develop and operate these programs. |

|  | 3. Provide dedicated staff to manage program.<br>4. Provide intensive training to these staff members.<br>    a. Train staff in various treatment modalities i.e. cognition, behavioral modification, modeling, psychotherapy, reality therapy, group therapy and group dynamics and other skills required to successfully facilitate the goals of the 89 day program.<br>    b. Create treatment teams<br>    c. Develop case planning and program development<br>    d. Assessment of the program to determine if it meets the needs of the court placed residents.<br>    e. Assessment tool to regularly monitor the success or lack of success of all residents in the program.<br>5. Provide auxiliary training to all other direct care staff. |
|---|---|
| Evidentiary Basis | Document review, observation, interviews |

| Provision 5.4 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall institute a program of periodic staff reviews every three weeks and evaluations of each resident's progress under his/her individualized treatment plan and of the appropriateness of the plan itself and Henley-Young's plan for such review. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand.<br><br>Based on my review of documents and observation, services are still not in place and are not being provided for this provision. I am reiterating the actions and recommendations from my previous report below. Please see the previous report and provisions 5.1 and 5.3, take note of the discussion of these issues in the introduction. | |
| Recommendations | 1. Develop comprehensive policies and procedures for this provision.<br>2. Provide training to all staff.<br>3. Identify roles and responsibilities of direct care, treatment and educational staff as it relates to the staffing for 89 day program through policies and procedures and adequate funding and staffing. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 5.5 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall develop and implement a program that provides for evening and weekend programs and activities that allow residents to engage in meaningful activities. |
|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand.<br><br>Based on my review of documents and observation, services are not in place and are still not being provided for this provision. I am reiterating the actions and recommendations from my previous report below. The programming of the facility is at a standstill as it relates to this provision. There are very few activities on weekends therefore there is no meaningful programmatic, structured activities except for card playing and dominoes. Take note of the discussion of these issues in the introduction. |
| Recommendations | 1. Develop comprehensive policies and procedures to meet the needs for this provision.<br>2. Provide adequate staffing for this program.<br>3. Develop a monthly recreational program with activities.<br>4. Keep records of activities provided and note those that were not provided and why.<br>5. Purchase board games etc.<br>6. Hire recreational staff. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 5.6 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall develop and implement an adequate quality assurance program. |
|---|---|
| Status | **Partial  Compliance** | |
| Discussion | The facility has moved to partial compliance on this provision.  A review of documents and interviews with the QA staff reveals that they are moving in the right direction. However, they will need support from the administration to ensure that there is follow through on their recommendations. The data |

| | |
|---|---|
| | that the QA managers are collecting is on the right path to fulfilling this provision.  However, I will continue to offer technical assistance to ensure that the data is used to achieve effective outcome measures and assist with development of policies, procedures, protocols and training.  In addition, the outcome measures should be quantifiable (measurable), events, occurrences, conditions and behaviors. This data should be collected continuous and analyzed periodically. In addition, the QA coordinators are being pulled away from their assigned duties to provide occasional supervision and direct care work based on my review of documents and observations.  This again creates a cycle of staff whiplash because there is a lack of focus, structured working environment. <br><br> As it relates to due process it is important that the hearing officers are well versed in the ACA standards as to the handing out of disciplinary consequences for charges during hearings. There are specified ranges for major and minor offenses. Also, there is no place for cumulative discipline, because part of the due process is to deter negative behavior at its first occurrence. Also, many residents are placed on isolation with no due process, to the point that it appears to have become a behavior program. There is no record of the time, or the reason for these actions. It concerns me that this is another example of creative action when there is not enough staff or enough programming to better address these issues. <br><br> Therefore my statements below still stands at it relates to the treatment program. <br><br> The facility's policies and procedures for an individualized treatment program for post disposition residents have not been presented or approved. <br><br> It should be noted that the courts must also be involved in the development of the quality assurance program. There must be a system in place to evaluate the 89-day program when residents are assigned to it. In addition, data should be collected and retained to determine if the program is achieving its expected outcomes. It is very difficult to develop an effective treatment program or individualize treatment plans without an adequate review of the processes in place. |
| Recommendations | 1. Develop comprehensive policies and procedures to meet the needs for this provision for the facility, school program and SICU program. <br> 2. Health Care: continuously assess the quality and adequacy of the health services provided, accurately evaluate the performance of staff providing health services and address identified deficiencies. <br> 3. Recreation and Social programs: continuously assess the quality and adequacy of social and recreational programming provided; accurately evaluate the performance of staff in providing these |

|  |  |
|---|---|
|  | programs. |
|  | 4. Environmental Health and Safety: continuously assess the quality and adequacy of environmental health and safety, accurately evaluate the performance of staff in providing a safe and healthy environment and properly address identified deficiencies. |
|  | 5. Discipline and order: continuously monitor use of discipline and promptly address misuse or over use of discipline and other identified deficiencies. |
|  | 6. The facility must continue to develop monthly performance measures to indicate achievement in the desired area. |
|  | 7. Review State of Florida Quality Assurance Model and for assistance in developing contact CJCA Performance Based Standard for Juvenile Detention Programs, also use ACA standards to establish policy guidelines. |
|  | 8. Develop data collection system |
| Evidentiary Basis | Document review, observation, interviews |

## 6   Due Process/Isolation/Disciplinary Practices and Procedures

| Provision 6.1 Disciplinary Practices and Procedures | Henley-Young shall implement a discipline policy and practice that incorporates positive behavior interventions and supports. This policy shall include guidelines for imposing graduated sanctions for rule violations and positive incentives for good behavior. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance. I reviewed all of the due process hearings submitted to me from February to June, 2014. I found many problems with them. First there are too many reporting forms. The County needs to develop a single reporting form to be used by all persons reporting on any single accident. Second, the facility needs to train all staff members on how to write a report, what it should provide, and how it is to be developed; (the who, what, when, where and how of the incident). This is one of the places that language is extremely relevant. Reports should be written in first person with the writer only identifying themselves once. They should be reviewed by a supervisor for succinctness, accuracy and clarity, edited by writer if needed then approved upon submission.

Therefore my statements below still stand.

This is a critical component of the disciplinary and behavioral management process to ensure residents are treated fair, humane and that there is no misuse of the isolation and disciplinary process (review the introduction regarding this matter). The facility is implementing a due process behavior system which is partially complete. Based on my review of the documents | |

48

|  | the facility has initiated due process hearings, however staff officers are not adequately trained and the residents are not aware of the infractions and consequences because that have not received proper orientation to the program. The bottom line is there is no adequate orientation for entering the facility. There is still no positive incentive program for good behavior and sanctions for rule violation. Based on my review of documents and observation, positive behavioral intervention and supports are not in place and are still not being provided for this provision. I reiterate, the suggested actions and recommendations from my previous report. The facility should continue to follow the recommendations from the previous report. The facility is making improvement on the due process isolation and practice procedures. Although processes on a few provisions have begun, it is vitally important that policy and procedures are developed to ensure a consistent, comprehensive, and standardized method of running the facility. |
|---|---|
| Recommendations | 1. Develop adequate policies and procedures for this provision.<br>2. Develop new resident handbook. Residents are to receive these handbooks during orientation.<br>   a) They shall include resident's rights, major and minor rule violations and the grievance policy.<br>   b) The handbook will explain to residents in their own language the rules and shall also be explained by staff that will have them sign and date a form indicating that both processes have occurred.<br>   c) These rules shall be posted on each unit.<br>3. Due process rules shall be posted on each unit.<br>4. Develop positive behavior intervention programs.<br>5. Assign and train an independent person(s) to handle due process isolation hearings. The person(s) must be independent of the unit staff.<br>6. Ensure residents who are in isolation are provided recreation and education services. |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 6.2 Disciplinary Practices and Procedures | Residents who violate major rules may be subject to cell confinement for up to 24 hours for a single rule violation. An occasion in which a resident is alleged to have contemporaneously violated multiple major rule violations shall count as a single rule violation for the purposes of this section. No residents shall be confined to a cell for longer than 8 hours for a single rule violation without receiving written notification of the alleged rule violation and the occurrence of a disciplinary review/due process hearing before an impartial staff member, which includes participation by the accused residents. Under no circumstances shall residents be subjected to involuntary cell confinement for longer than 24 hours for disciplinary purposes. Residents who are placed on cell confinement shall be released daily from their cells to attend school, maintain appropriate personal hygiene, and to engage in one hour of large muscle exercise. |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand.

Based on my review of documents and observation, adequate disciplinary practices and procedures are not in place and are still not being provided for this provision. I am reiterating that the suggested actions and recommendations from my previous report be put into action and restated in the introduction.

During this visit, I did find residents who were placed in their rooms based on a due process hearing. However, there was no documentation placed on their door to determine why the residents were in their rooms for any length of time. Staff appeared to be placing residents in their rooms randomly without any supervisory approval. This should be addressed as soon as possible.

As it relates to a due process hearing, residents that commit major rule violations should be referred for a due process hearing based on the incident reporting process. When residents are accused of a major rule violation, they should be provided with a notice of the violation and an explanation of their right to have a hearing in which they are able to present their side of the event, call witnesses on their behalf and ask for staff representation if it is requested. The hearing officer is required to interview the resident and any parties that observed the incident. Residents who require a due process hearing who are on the mental health case load should have a qualified mental health professional determine whether being placed in isolation could cause a decline in functioning or any other relapse. The hearing officer may impose a variety of sanctions including the lost of privileges, restrictions, or isolation. The hearing officer may credit the resident for any time serve in behavior management isolation pending the hearing. The |

|  | residents have the right to appeal the decision of the hearing officer to the Director. My review of documents and interviews with staff and residents revealed the need for additional training to take place regarding this process. The staff and residents were unfamiliar on how the process works; therefore it is critical for the facility administration to review their policy and procedure on due process. It should also be noted that residents must see the process as fair. |
|---|---|
| Recommendations | 1. Develop policies and procedures for this provision.<br>2. Develop sheets to place on door of any residents in confinement that identifies the reason for confinement and is review and signed by supervisor.<br>3. Ensure residents in confinement receive education and recreation services.<br>4. See 6.1 recommendations.<br>5. Provide training for all staff on these policies and procedures. |
| Evidentiary Basis | Document review, observation, interviews |

### 7. Use of Restraints

| Provision 7.1<br>Use of Restraints<br>Mechanical | Mechanical restraints shall not be used to punish residents or for the convenience of staff. Mechanical restraints shall only be used to prevent self-harm and/or harm to others, subject to section 7.4, and for transportation to and from court, subject to section 7.2. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance, even though the facility does have a policy and procedure as stated in my previous report (6th). However, based on my review of the documents and my observations during my visit to the facility, I have noticed a substantial increase in the usage of mechanical restraints from previous visits and document reviews. During this visit, I observed staff carrying around handcuffs on their person. This is an area that was discussed during my initial visits to the facility at which time handcuffs were taken from staff and deemed to be used only as a last resort.  During my most recent visit, the staff is back to carrying handcuffs, and in reviewing the most recent documents, handcuffs are again being used as a substitute for de-escalation techniques.  In my review of documents, I also found that incident reports were not fully reflective of what occurred as it relates to the use of restraints.  An example would be one officer would document the use of restraint in an incident however another officer would not mention the use of restraints in their report on the same incident.  Therefore, incident reports from all involved should | |

| | |
|---|---|
| | accurately reflect what occurred as it relates to the incident.  The administration should review what has happened for staff to revert back to carrying handcuffs as this was previously addressed at the beginning of this process. |
| Recommendations | 1. Officers shall receive training on policy and procedures.<br>2. Officers shall be trained on when it is appropriate to use mechanical restraints.<br>3. All training shall be documented.<br>4. The policy will require the documentation of any use of mechanical restraint and use of force incidents.<br>5. Restraint log should be implemented. |
| Evidentiary Basis | Document review, observation |

| | |
|---|---|
| Provision 7.2<br>Use of Restraints<br>Mechanical | Nothing in this section shall prohibit mechanical restraints from being placed on residents who are being transported to and from court or out of the facility, if staff have reason to believe that a residents presents a flight risk or is an imminent danger to the residents or others, or will engage in violent behavior. However, mechanical restraints should be removed immediately after the resident is placed in a cell and at no time shall a resident be placed in a cell wearing mechanical restraints. |
| Status | **Beginning Compliance** |
| Discussion | The facility has reverted back to beginning compliance on this provision. As stated in the above provision 7.1, in review of numerous documents handcuffs and shackles are being used more frequent then in the past. For this reason the provision has been moved back to beginning compliance. The question that must be answered is why this is occurring and is there data to support the increase usage of handcuffs and shackles. The answer is yes in your due process incident reports and other records of these actions. As stated in my previous report I find no evidence of a de-escalation process used prior to placing residents in mechanical restraints. For example the issue with resident A.H. on April 19, 2014 in which the resident was not only placed in a room with handcuffs on but he was able to remove them. He was again handcuffed. This resident was again able to remove the handcuffs and threw them at the officers while he was in the room. It was discovered that the resident had a key to the shackles! Resident A.H was handcuffed a third time while in the room. In another incident dated March 13, 2014, I viewed Resident J.F. on a video that showed he was handcuffed inside his room for approximately 45 minutes. Because there is not enough staff available and not enough programs in which to place troubled residents, the officers have resorted to creative solutions to address these problems – solutions that are harmful to residents and violate the consent decree. |

| | There must be a major training on the use of de-escalation techniques and a serious need for mental health services at Henley Young.  It appears in reading documents that restraints and handcuffs have become a normal practice at the facility.  There also must be adequate supervision of staff to ensure mechanical restraints are not misused. |
|---|---|
| Recommendations | 1. Develop and provide remedial training for this provision. <br> 2. All training shall continue to be documented. <br> 3. The policy will require the documentation of any use of mechanical restraint and use of force incidents. <br> 4. Operationalize the edicts of this provision. <br> 5. Additional supervision needed to ensure mechanical restraints are not misused. |
| Evidentiary Basis | Document review, observation |

| Provision 7.3 Use of Restraints | Restraints shall not be used to secure residents to a fixed object such as a restraint chair, bed, post, or chair. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The facility has moved to partial compliance on this provision. During my interviews with residents, document reviews and observations, I found no indication that residents were being secured to fixed objects in the facility. However, to move past partial compliance the facility still needs to follow the recommendations (2, 3 and 4) below. | |
| Recommendations | 1. Complete the comprehensive policies and procedures for this provision. <br> 2. Provide training for staff within the facility as described above on this provision and provide documentation of training. <br> 3. Develop and use a mechanical restraint log. <br> 4. Provide training on de-escalation techniques to try to use mechanical restraints only as a regular part of facility transport. <br> 5. Additional supervision needed to ensure mechanical restraints are not misused. | |
| Evidentiary Basis | Interviews, observation and document review | |

| Provision 7.4<br>Use of Restraints | No residents shall be restrained for longer than 15 minutes, unless restraints are approved by a mental health professional or if determined to be necessary under section 7.2 or as reasonably necessary to prevent the residents from engaging in acts of self-harm or harm to others. If a residents must be restrained for longer than 15 minutes in order to prevent self-harm, that residents shall, as quickly as possible, be evaluated by a mental health professional or transported to a mental health facility. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance; again, as stated in my previous report, policies and procedures have been developed as it relates to this provision. However, the facility still needs adequate mental health professionals to help and enhance the development of these policies and procedures as they are the authorities in this area. This provision should be included in policy and procedure development once a mental health professional or agency is retained. (Please review the introduction.) | |
| Recommendations | 1. Continue to develop comprehensive policy and procedures for this provision with mental health professionals.<br>2. Provide training for staff on policy and procedures and document training.<br>3. Provide training on de-escalation techniques.<br>4. Develop Mental Health protocols for this provision.<br>5. Hire mental health professional or agency. | |
| Evidentiary Basis | Document review | |

| Provision 7.5<br>Use of Restraints | Henley-Young shall not use, or allow on the premises, restraint chairs, chemical restraints and/or tasers. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | I would like to commend the facility on maintaining substantial compliance with this provision. Based on my most recent visit and my observations and review of documents, the facility continues to stay in substantial compliance as it relates to this provision. The facility should still ensure that below recommendations continues to be followed. | |
| Recommendations | 1. Ensure staff is following policies and procedures as it relates to this provision.<br>2. Document all training provided to all staff.<br>3. Ensure firearms and tasers are secured in a lockbox prior to entering secured area.<br>4. Retrain staff when deemed necessary. | |
| Evidentiary Basis | Document review, observation, video | |

| Provision 7.6<br>Use of Restraints | Henley-Young shall not subject residents to "hogtying," which is the practice of placing a resident's face down on a bed, floor, or other surface, and securing the resident's hands to his feet. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | I would like to commend the facility on maintaining substantial compliance with this provision. Based on my most recent visit and my observations and review of documents, the facility continues to stay in substantial compliance as it relates to this provision.   The facility should still ensure that below recommendations continues to be followed. | |
| Recommendations | 1.  Provide on-going training for staff on policies and procedures.<br>2.  Continue to document all training provided to all staff. | |
| Evidentiary Basis | Observation, document review and interviews | |

| Provision 7.7<br>Use of Restraints | When a resident is placed in mechanical restraints, staff must provide one-on-one supervision for the duration of the restraint, except when mechanical restraints are deemed to be necessary for the reasons specified in section 7.2. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The status of this provision remains as partial compliance. Based on my review of documents, I found several incidents where residents were placed in mechanical restraints and there were no one-on-one supervision.  As stated in the previous provisions the facility has increased its usage of mechanical restraints and staff is again carrying restraints on their person. This in term sends a message to residents that the first response to a situation will be the application of mechanical restraints.  It also reduces the staff willingness to use other de-escalation techniques.  Just the visual impact of mechanical restraints can trigger residents behavior (i.e. aggressiveness, physical acting out etc.) | |
| Recommendations | 1.  Provide on-going training for staff on policies and procedures.<br>2.  Continue to document all training provided to all staff.<br>3.  Ensure that residents who are placed in mechanical restraints are seen by a medical professional.<br>4.  Restraint log should be implemented<br>5.  Additional supervision needed to ensure mechanical restraints are not misused. | |
| Evidentiary Basis | Document review | |

| Provision 7.8 Use of Restraints | Henley-Young shall notify a medical professional whenever a resident is placed in mechanical restraints for reasons other than those specified in section 7.2. A medical professional shall examine the residents as soon as possible after restraints are removed, except when the residents was restrained for the reasons specified in section 7.2. |
|---|---|
| Status | **Beginning Compliance** |
| Discussion | The status of this provision remains as beginning compliance. My review of documents reveals that youths are being seen by medical professionals after the use of mechanical restraints.  However, based on my observations and review of documents, I am reiterating that although policies and procedures are developed, there must be adequate training and instruction to ensure that staff complies with policies and procedures. In addition, incident reports must be reviewed by the supervisors to ensure that accurate information is being provided. There is a strong need for accurate and consistent reporting of incidents. When incidents are not reported correctly, the integrity of the reporting system falls into question. This is also a training issue, see provision 7.7.  As I have stated previously in my reports there must be a single matching reporting system used by all facility staff including the school. Based on my review, the school uses a different reporting system than the facility.  This must be addressed to ensure consistency in the process. |
| Recommendations | 1. Develop comprehensive policies and procedures for this provision.(Executed)<br>2. Provide training on policies and procedures.<br>3. Document all training provided to all staff.<br>4. Ensure that residents who are placed in mechanical restraints are seen by a medical professional.<br>5. Ensure that information being reported is accurate and consistent.<br>6. A single matching reporting system for the entire facility. |
| Evidentiary Basis | Document review |

| Provision 7.9 Use of Restraints | Hinds County does not currently and shall not in the future allow officers to enter the secure detention area of the facility with any electronic restraints, including, but not limited to tasers. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility has moved to substantial compliance on this provision based on my most recent visit and my observations and review of documents. The facility should still ensure that below recommendations continues to be followed. | |
| Recommendations | 1. Provide training for staff on policy.<br>2. Document all training provided to all staff. | |

| Evidentiary Basis | Document review |
|---|---|

| Provision 7.10 Use of Restraints | Henley-Young is required to ensure that no officer enters the secure detention area of the facility with a firearm. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | I would like to commend the facility on maintaining substantial compliance with this provision.  Based on my most recent visit and my observations and review of documents, the facility continues to stay in substantial compliance as it relates to this provision.  The facility should still ensure that below recommendations continues to be followed.  Also see provision 7.9 as it relates to tasers. | |
| Recommendations | 1. Provide on-going training for staff on these policies and procedures.<br>2. Continue to document all training provided to all staff.<br>3. Have signs displayed at all entrances for securing firearms and tasers.<br>4. Staff needs to remain vigilant in ensuring this provision is followed and ensure that all **persons** entering the facility are screened and no firearms on their person entering a secured area of the building. | |
| Evidentiary Basis | Document review, Observation | |

### 8.  Use of Force

| Provision 8.1 Use of Force | Physical force shall not be used to punish residents. Staff shall only use physical force to stop residents from causing serious physical injury to self or others or to prevent an escape. If physical force is necessary, staff must use the minimum amount required to safely contain the residents. Whenever possible, staff shall avoid the use of force by first attempting verbal de-escalation techniques. Staff shall be required to fully document in writing every instance of use of force. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance. The facility still needs to develop policies and procedures for this provision. Based on my review of documents, use of force appears to be escalating and this is basically due to lack of training, staffing and staff/supervision.  In reviewing documents and video recordings, staff is making decisions regarding use of force based on instinct and without proper or procedural training. An indication of the extent of this lack of training was evident during an incident on June 7, 2014 when an officer retrieved a blanket from the laundry room while other staff where engaged in a verbal altercation with a resident A.F. and threw the blanket over the resident's head which in turned completely covered the resident.  An officer then grabbed the | |

resident around her waist with the blanket and the resident was wrapped inside the blanket and threw the resident on the ground.  Then all three officers proceeded to secure the resident by placing handcuffs on her.  The resident was handcuffed and shackled and transported back to her unit. On another occasion (4-16-14) youth D.A. had taken her socks off and fashioned them into a noose. After the socks were confiscated, a decision was made to take her clothes and bedding and place her in a suicide prevention suit.  According to the report, in order to get her under control, she was placed in handcuffs and a blanket was placed over her so officers could take her bra and pants. First of all, the resident needed mental health services. Secondly, placing a blanket over the resident while she was handcuffed appears to be part of a culture that must be eliminated.   Third, the report shows that the Operations Administrator sanctioned the above mentioned practices since he was involved in the restraint.  These are examples of staff making decisions based on instinct and not following proper policies and procedures.   It also appears as though there is no direction as it relates to the use of force at Henley Young and that anyone entering the facility can provide direction without training or a full understanding of processes. An example would be on May 14, 2014 an incident occurred where residents were placed in a cell in the booking area based on a court employees' directive because there were visitors with the court employee.  It is important to understand there must be a chain of command that enforces protocols, policies and procedures. As stated in my introduction, this type of interaction between Henley Young staff and outside forces creates this management whiplash I discussed. Also staff continues to make reference in their reports that 'minimal force' was used however there is no explanation of the force and handcuffs and shackles are not considered 'minimal force' therefore the statements are contradictory in action and practice. To reiterate handcuffs and shackles are to be used only as the last resort.

Therefore my statements below still stand.

Based on my review of documents, the facility still needs to develop policies and procedures for this provision. In my review of incident reports, I found that there have been incidents of use of force. However I found no indication that any de-escalation techniques were used. Although officers are doing reports, they are not accurately recording information. When officers are captioning information, it should be truthful, accurate and detailed enough so they can testify on their observations two years from now if needed. It still appears from reviewing documents that report writing training is needed. Also there is a major need for de-escalation and proper restraint training and accurate documentation of incidents. In addition, reports must be legible, in plain English, and specific behavioral terms should be used.

|  |  |
|---|---|
|  | Regardless of how accurate and useful an observation may be, it has no value to others unless it is recorded legibly. Police and other juvenile detention facilities have addressed the legibility problem by typing their reports. Most agencies are completely computerized, and some are experimenting with laptop computers. Computerized records may eliminate legibility problems for this facility. Some reports are still written in flowing script (cursive) and on various forms .There should be one facility wide form used to capture information. This has been stated in my previous reports. In addition, there is a major need for data collection as it relates to use of force. This was also stated in my previous reports. There is a need for good data point keeping regarding, medical and mental health, education, social services and all other operational services provided to the resident. Good data will assist the facility in determining answers to some of the following examples:<br><br>    A.  The location of use of force<br>    B.  The number of use of force incidents<br>    C.  The number of use of force requiring mechanical restraints<br>    D.  The type of restraint used<br>    E.  Grievances<br>    F.  The number of incidents requiring chemical agents<br>    G.  The number of incidents involving non lethal security devices (i.e. batons, tasers, etc.)<br>    H.  The number of use of force incidents resulting in injury to residents or staff<br>    I.  Plan of action to address each incident (i.e. disciplinary action, staff training or remedial training, resident's isolation, resident's behavior management, resident's mental health screening or evaluation etc.)<br><br>Please review my previous report .These same issues should be addressed. |
| Recommendations | 1. Develop policy and procedures for this provision.<br>2. Provide training for on policies and procedures<br>3. Document all training provided to all staff.<br>4. Adapt an appropriate curriculum for training staff on the use of verbal de-escalation skill and safe use of physical restraints or mechanical restraints.<br>5. Revise form to distinguish between physical and mechanical restraints.<br>6. Contact the National Partnership for Juvenile Justice for recommendations on training program in this area.<br>7. Document and file report when there is use of force.<br>8. Ensure any time use of force is used residents are seen by a medical professional<br>9. Follow the facility's chain of command which will reduce staff confusion. |

| Evidentiary Basis | Document review, interviews | |
|---|---|---|
| Provision 8.2
Use of Force | Henley-Young shall notify a medical professional, including but not limited to the licensed practical nurse on duty whenever physical force is used against a resident. A medical professional shall examine a resident immediately after the use of physical force. | |
| Status | **Partial Compliance** | |
| Discussion | The facility has moved to partial compliance on this provision based on my review of documents, interviews with residents and observations. However, additional medical protocols still need to be developed for the medical area. There is still nursing services available from 6:00 a.m. to 8:00 p.m. Monday through Friday and Saturday and Sunday for a minimum of four hours. Based on my discussion with the County Administrator, the facility is still in the process of procuring a contract for additional medical services. | |
| Recommendations | 1. Complete procurement of services as quickly as possible.
2. Continue to develop comprehensive policies and procedures for this provision.
3. Provide on-going training to staff on policies and procedures.
4. Continue to document all training provided to all staff.
5. Review nursing schedule and provide more hours at facility.
6. Provide written documentation of examination of residents by medical professional in every instance.
7. Provide additional medical services after hours and on weekends. (executed)
8. Document and file in resident's records when there is use of force. | |
| Evidentiary Basis | Document review, interviews, observation | |

### 9.  Meals and Nutrition

| Provision 9.1
Meals and Nutrition | Residents shall be provided three meals and a snack daily. If a residents misses a meal because he or she is attending court, or some other appointment, he or she shall receive the missed meal upon his or her return to detention. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The status of this provision remains as partial compliance.  During this visit, I observed meals, interviewed residents and reviewed documentation. It should be noted that meals still were not served in a timely manner and food was cold once it arrived to housing units.  Based on my discussion with the Carmen Davis, County Administrator, the food service is in the process of returning to the facility for preparation and distribution.  During my document review, I also found that residents were being served late in | |

addition to being served one unit at a time because of the lack of staffing. This only compounds the timeliness of meals being served.

Therefore my statements below still stand.

The residents still have **major** complaints regarding food service. In addition I found that there is no set schedule for food service. Although the food was better prepared, and more aesthetically pleasing, it was still cold. This was due to the meals not being served in a timely manner, with one meal not being served until 6:00 p.m. There must be consistency in the times residents receive their meals to ensure that meals are provided at regular times during each 24 hour period with no more than 14 hours between evening meals and breakfast. Each resident must have the opportunity to take at least 20 minutes of dining time for each meal. During a normal review of any institution there is an expectation that residents will make complaints regarding the food. However, each resident interviewed at Henley-Young had major complaints about the food, the portions, and the presentation of the food. During this review I observed the food and the distribution of the food.

Food service is an important part of institutional life. A comprehensive food service program must be developed if the facility is to meet the unique needs of its juvenile population. Juvenile health, nutrition, and morale in this environment are all directly related to the effectiveness of the food service program. Meals served to incarcerated juveniles must be nutritionally balanced and calorically adequate. They must be tasty, appealing, and served in an aesthetically acceptable manner to avoid conduct and behavior problems. If juveniles believe the facility's staff and management have maximized their efforts to provide a healthy and appealing food program, conduct can and will improve.

Juveniles typically have less than desirable eating habits. Nutritional guidelines for juveniles are extrapolations from the recommendations for children and adults. Recommended dietary allowances relate to the general time and rate of the juvenile's growth spurt is very important. Therefore I am recommending a meal pattern that provides nutritionally balanced meals with food items selected from various food components listed below:
- Breads, cereal, and other grain products (including several servings a day of whole-grain products)
- Fruit
- Vegetables (includes all types with dark green leafy vegetables and dry beans and peas used several times per week)
- Meat, poultry, fish and alternatives (5 to 7 ounces, lean per serving)
- Milk, cheese, yogurt, etc.

|  |  |
|---|---|
|  | • Fats and sweets (at a minimum)<br><br>The meals I observed did not meet the above mentioned meal patterns. There has been a decline in food service at Henley-Young. |
| Recommendations | 1. Continue to review portions to ensure residents receive enough food during meals.<br>2. Develop policy and procedures for this provision.(executed)<br>3. Continue to provide training for kitchen staff and all other staff members involved with handling food and preparing meals.<br>4. Continue to document compliance with this provision.<br>5. Food should be served in a timely manner and consistent with facility schedule once developed.<br>6. Review the National Food Service Management Institute from the University of Mississippi that details "Food Safety Facts". |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 9.2 Meals and Nutrition | All meals and snacks served to residents at Henley-Young shall, at a minimum, comply with the nutrition guidelines set forth in the United States Department of Agriculture's School Meals Program standards. |
|---|---|
| Status | **Beginning Compliance** |
| Discussion | The status of this provision remains as beginning compliance.  As stated provision 9.1 and in my introduction, residents continue to complain that they are not receiving enough to eat and that the food is still cold when it arrives on the units.<br><br>Therefore my statements below still stand.<br><br>It should be noted that I have not seen any training records or had the opportunity to meet with the nutritionist. The nutritionist should be made available upon my next visit. |
| Recommendations | 1. Develop policy and procedures for this provision(executed)<br>2. Provide training for kitchen staff and all other staff members involved with handling food and preparing meals. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 9.3 Meals and Nutrition | Residents shall be provided access to drinking water throughout the day. |
|---|---|
| Status | **Partial Compliance** |

| Discussion | The facility has moved to partial compliance on this provision. Based on my discussion with residents, documentation review, observations, and interviews the facility has been providing water during the day.  Even though there are still some complaints from residents not receiving water during the evening shift.  However, the facility has moved to partial compliance.<br><br>Therefore my below statements from my previous report (6th) should still be addressed.<br><br>Repairing the water fountains would reduce complaints. |
|---|---|
| Recommendations | 1. Contact County or State Environmental office to conduct test on water system. (executed)<br>2. Ensure residents receive water during school and recreational periods and at night.<br>3. Develop a policy for incidents regarding water quality and procedures to address them.<br>4. Repair inoperable drinking fountains. |
| Evidentiary Basis | Document review, observation, interviews |

### 10. Clothing

| Provision 10 Clothing | Henley-Young shall provide basic clothing items for residents at all times. These items must include, at a minimum, socks, underwear, uniform, shoes, and undershirts. For girls, these items must also include a brassiere. When appropriate, Henley-Young shall also provide residents with a coat, hat, and gloves. Residents must be provided with a clean uniform, socks, undershirt, underwear, and brassiere, if applicable, upon intake and at least once per day. No residents shall be deprived of these basic clothing items for any reason, including, but not limited to, as a punishment, because these items are being washed, or due to overcrowding. | |
|---|---|---|
| Status | **Partial  Compliance** | |
| Discussion | The facility has moved to partial compliance on this provision. Based on my most recent review and observation, the facility needs to order non colored underwear.  This would allow the facility to sanitize the under clothing and sheets by using a more potent cleaner.  In addition, as stated in my previous report there is a need hire staff dedicated to the laundry and care of the residents' clothing.  These persons would be responsible for the discarding of torn or wear-worn clothing, based on the system agreed upon by the facility. I am still recommending that clothing be prewashed as this would loosen the soil in the clothing in particular white clothing (i.e. undergarments). | |

| Recommendation | 1. Check washer and dryer to ensure they are working properly.<br>2. Ensure that girls and boys are equally involved in cleaning and folding clothes.<br>3. Hire 2 laundry staff to ensure clothing is handled properly.<br>4. Ensure that all staff and residents wear protective material (smocks and gloves) when handling chemicals and clothing.<br>5. Discard clothing that is torn, dingy and in poor condition.<br>6. Develop a system for replacing clothing on a regular and consistent basis.<br>7. Develop schedule for distribution.<br>8. Develop a system for prewashing clothing (i.e. undergarments etc.) |
|---|---|
| Evidentiary Basis | Document review, observation, interviews, photographs |

### 11. Hygiene and Sanitation

| Provision 11.1 Hygiene and Sanitation | Residents shall be provided with the means to maintain appropriate hygiene, including soap and shampoo for showers, which will occur at least once daily, soap for washing hands after each time the residents uses the toilet, and toothpaste and a toothbrush for tooth brushing, which will occur at least twice daily, a comb and brush, that if shared, shall be sterilized between uses by residents. Girls must be provided with panty liners on a daily basis and other feminine products as needed. Residents will be issued a comb and brush upon entering the facility; however, if residents are issued a recycled comb or brush or a comb or brush that has been used by another residents, Henley-Young shall ensure that the comb and brush is sterilized and in good condition. |
|---|---|
| Status | **Partial  Compliance** |
| Discussion | The facility has moved to partial compliance on this provision. Based on my most recent review and observation, residents were receiving toothbrush, toothpaste and other hygiene products which were provided in individual hygiene kits. |
| Recommendations | 1. Ensure that hygiene kits are properly labeled and **residents are not** sharing each other's hygiene products or items.<br>2. Ensure items such as hair brushes, if shared, are sterilized and in good condition.<br>3. Provide training for staff on these policies and procedures.<br>4. Ensure that clean face towels are available for residents.<br>5. Develop a schedule for distribution of hygiene kits. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 11.2 Hygiene and Sanitation | Residents shall be provided with sleeping mats and blankets that are clean and odorless sleeping mats shall be sanitized between uses by residents, and residents shall receive clean blankets weekly. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The status of this provision remains as partial compliance. Based on my review of documents and observation, the facility needs to continue to ensure that mattresses and blankets are discarded properly.  During this visit, I found blankets with holes and several mattresses on the female units that should have been discarded.  In addition, because of the needed maintenance to the facility residents are using blankets to mop the floor (see exhibit E) and as an entryway to the shower stalls (see exhibit A-7).  In addition, there were two residents in the same shower stall (see exhibit A-8) without staffing being aware.  Although nothing occurred as I watched, the issue is that poor maintenance creates safety and security issues.  These maintenance issues must be addressed as soon as possible.<br>Therefore my statements below from my previous report (6th) still stand.<br><br>Policies and procedures have been developed. The facility has provided training to ensure that the process outlined in the policies and procedures is followed. The facility needs to continue to monitor the condition of the blankets and mattresses for signs of holes and tattering The facility needs now to follow the recommendations below. | |
| Recommendations | 1. Continue to discard all blankets and mattresses that are tattered and have holes in them.<br>2. Clean and maintain laundry area in orderly fashion.<br>3. Develop forms or system of documentation for distribution and inventory<br>4. Label and designate an area for towels, sheets, clothing etc. | |
| Evidentiary Basis | Document review, observation | |

| Provision 11.3 Hygiene and Sanitation | Under no circumstances shall residents be deprived of mats and blankets. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The status of this provision remains as partial compliance. See provision 11.2.<br><br>Therefore my statements below still stand.<br><br>The facility administration needs to be vigilant regarding staff adhering to | |

| | |
|---|---|
| | the process outlined in the policy and procedures regarding the issuing and maintenance of mats and blankets. |
| Recommendations | 1. Provide training to staff on policy and procedures.<br>2. Develop system for inventory and distribution |
| Evidence | Observation, and document review |

| Provision 11.4 Hygiene and Sanitation | Henley-Young shall maintain a sufficient number of clean, sanitary mats and blankets that correspond with the facility's maximum capacity. | |
|---|---|---|
| Status | **Substantial  Compliance** | |
| Discussion | The facility has moved to substantial compliance, as I found no indication based on my observation and documents review that residents were being denied of mattresses and blankets.  There were enough blankets and mattresses.  As stated in provisions 11.3, the facility administration needs to be vigilant regarding staff adhering to the process outlined in the policy and procedures regarding the issuing and maintenance of mats and blankets. | |
| Recommendations | 1.  Develop policies and procedures for this provision. (executed)<br>2.  Provide training to staff on policy and procedure.<br>3.  Provide an inventory of mats and blankets. | |
| Evidentiary Basis | Observation and document review | |

| Provision 11.5 Hygiene and Sanitation | Residents shall be provided with a clean, sanitary environment. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance. During this visit, I found that the facility is in need of major physical plant maintenance; showers needed repair, toilets were filthy, blankets are being used in place of showers doors, , soap scum was in all of the showers, the shower heads were leaking, there was mold in showers, the units smelled of urine and shower stalls were rusting.  In addition, there were holes in several of the shower stall walls.<br><br>Therefore my statements below still stand.<br><br>Building maintenance is an ongoing and continuous process. Please review the introduction. | |
| Recommendations | 1.  Develop policies and procedures for this provision. (executed) | |

|  |  |
|---|---|
|  | 2. See areas in discussion that should be addressed.<br>3. Develop housekeeping and cleaning schedule.<br>4. Develop checklist or inspection report for each unit and area of building.<br>5. Develop work order system to ensure that when problem arise they are addressed.<br>6. Develop corrective action plans as needed.<br>7. Provide training for staff on policy and procedures.<br>8. Ensure delivered food items are dated and rotated from old to new. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 11.6<br>Hygiene and<br>Sanitation | Hinds County shall ensure that Henley-Young complies with relevant law regarding fire safety, weather emergencies, sanitation practices, food safety, and the elimination and management of environmental toxins. |
|---|---|
| Status | **Beginning Compliance** |
| Discussion | The status of this provision remains as beginning compliance. During my review of documents, I discovered the facility had a fire on March 29, 2014. According to the incident report the resident room A109 was completely filled with smoke and there were large flames going up the back wall. According to the report, the staff attempted multiple times to unlock the residents' door but was unsuccessful. It should be noted that the resident was still in the room. During this incident, no fire sprinkles were activated. In addition, there were no fire extinguishers readily available in the unit tower. During this incident, the A pod officer had to radio another officer to open the door automatically from the tower. According to the incident report, one of the senior officers noticed a lighter in the residents' hand. As it relates to the lighter, I am concerned that residents are not being searched properly during the intake process and contraband has been evident in numerous reports I have reviewed.<br><br>That being said, for sprinkler systems not to work and doors not open places the facility in a very dangerous and liable situation. The sprinkler system must comply with national fire protection standards. Again, although the facility has policies or procedures regarding fire safety it begs the question, has the facility been evaluated by a Fire Marshall that is licensed and certified by the State of Mississippi? Additionally, the facility must have operational fire extinguishers available throughout the facility. There should be internal monthly checks and maintenance annually and in the event the fire extinguisher is used it must be replaced or recharged by a certified company. The facility now needs to have a full review of the fire system. |
| Recommendations | 1. Develop policies and procedures and plans for fire safety, |

| | |
|---|---|
| | evacuation etc. (executed)<br>2. Develop adequate staff training regarding fire safety.<br>3. Properly maintain and repair fire equipment.<br>4. Ensure intercom systems are operating properly.<br>5. Ensure all mattresses used by residents are fire resistant.<br>6. Routinely test all fire equipment and system.<br>7. Ensure that all electrical outlets, wires and equipment (lights) are properly working.<br>8. Develop work order system to ensure items are repaired.<br>9. Ensure that all areas in this provision are addressed by a certified professional.<br>10. Review entire fire safety program/system |
| Evidentiary Basis | Document review, observation |

| Provision 11.7<br>Hygiene and<br>Sanitation | Residents shall be provided with clean drinking glasses and eating utensils. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The status of this provision remains as partial compliance. Based on review of documents and interviews with residents, I found no indication that drinking glasses and eating utensils were not cleaned. However, in my review of the kitchen, the kitchen equipment is in need of a major cleaning, (see exhibit C) as stated in my previous report (6th). | |
| Recommendations | 1. Develop policies and procedures for this provision. (executed)<br>2. Provide a thorough cleaning of the kitchen and all equipment and Utensils | |
| Evidentiary Basis | Document review, observation and interviews | |

### 12.  Medical Care

| Provision 12.1<br>Medical Care | The parties agree, however, that henceforth, Henley-Young shall provide residents with adequate medical care, including: prompt screenings; a full physical exam within 72 hours after their detention hearing or disposition order, as applicable; access to medical professionals and/or prescription medications when needed; and prompt transportation to a local hospital in the case of a medical emergency.  Hinds County is responsible for procuring and/or paying for all medications provided to residents. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on interviews and observations and document reviews, the County has hired | |

| | two contract Registered Nurses who cover the facility from 6 a.m. to 8 p.m. Monday through Friday and for four hours on Saturdays and Sundays. However there is still a need for policies, procedures, or protocols in place for the facility. The County has the responsibility to maintain medical care and provide medication and all other needs for residents. On this provision, I am still reiterating that the actions and recommendations from my previous report should be reviewed and followed. The County must look at the medical filing system in place at this point and change it to meet contemporary medical standards, see additional discussion in the sections 1.2 and 1.3. |
|---|---|
| Recommendations | 1. Develop policies, procedures and protocols for this provision.<br>2. Develop policies and procedures and protocols based on standards for Health Services in Juvenile Detention and Confinement facilities.<br>3. Provide training for staff members who administer medication to residents on proper usage and possible side effects. Also, train the staff on emergency protocols if side effects occur.<br>4. Have a licensed medical professional review and sign off on policy, procedures and protocols.<br>5. Have a licensed health professional periodically review and provide supervision to the nurse at facility.<br>6. Develop forms to coincide with provision.<br>7. Remove medication from bags and place them in secure, organized areas and develop forms to determine what medications are present in the facility at all times.<br>8. Hire or have on contract a physician to review medical area.<br>9. Ensure that residents receive vision exams, dental screenings, mental health screenings, hearing tests, etc.<br>10. Order folders with 2 dividers, end tab, classification folders in letter size with 2 prongs for medical charts. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 12.2<br>Medical Care | Henley-Young shall ensure that a medical professional is available to examine residents confined at the facility to identify and treat medical needs, when necessary. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance. Based on my review of documents and observation, the provision that states, "Henley-Young shall ensure that a medical professional is available to examine residents confined at the facility to identify and treat medical needs, when necessary", is not in place and is still not being provided for this provision. The facility still has the responsibility of maintaining medical care and | |

|  | medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed, (see the introduction.) |
|---|---|
| Recommendations | 1. Hire qualified medical professional for nights and weekend care.<br>2. Develop policies, procedures and protocols for this provision.<br>3. Provide training for staff on this provision. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 12.3 Medical Care | Henley-Young shall implement its sick call policy and practice which ensures that confined residents who request non-emergency medical attention are examined by a medical professional within 24 hours of a residents placing him or herself on sick call, excepting weekends and holidays. |
|---|---|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance based on my interviews, documents review and observation.<br><br>Therefore my below statements still stand.<br><br>Although the facility has 14 hour nursing service daily during the week and four hours on Saturday and Sunday there is still no policy, procedures and protocols as to how sick-calls should be administered to residents. The facility must develop the processes, and practices for this provision. The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (see introduction.). |
| Recommendations | 1. Develop policies, procedures and protocols for this provision.<br>2. Place a kite box on each unit.<br>3. Provide training for staff on this provision.<br>4. Nurse or designated person, making daily rounds to retrieve kites (Request for Medical Service Forms). |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 12.4 Medical Care | Prescription medications shall only be distributed by licensed medical staff or Henley-Young staff who has been trained by licensed medical personnel. |
|---|---|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance based on my interviews, documents review and observation. |

|  | Therefore my statements below still stand.<br><br>The facility has two registered nurses who are licensed to distribute medications to the residents. The problem is that the facility has no policies, procedures or protocols in place to direct this distribution. The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (see introduction.). |
|---|---|
| Recommendations | 1. Develop policies, procedures and protocols to address this provision.<br>2. These policies, procedures and protocols must include the appointment of a medication administration protocol.<br>3. There must be a medication record of all medicines administered.<br>   a. One record to reflect all medicines leaving the pharmacy;<br>   b. An additional record kept in each resident's case file.<br>4. Ensure that the training is comprehensive make certain that all medical contingencies are considered.<br>5. The staff should be trained on what side effects to look for drugs commonly prescribed to residents with mental health needs.<br>6. Provide training to staff on the policy, procedures and protocols for this provision.<br>7. All training should be documented and conducted annually. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 12.5 Medical Care | Medical and mental health services shall be provided in a manner that ensures the confidentiality of resident's health information. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance based on my interviews, documents review and observation.<br><br>Therefore my statements below still stand.<br><br>The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (see introduction.). | |
| Recommendations | 1. Develop policies, procedures and protocols to address this provision.<br>2. Get HIPAA requirements and institute them the facility.<br>3. Designate the persons who have access to the resident's medical records within the facility and outside of the facility, but within the juvenile justice system. | |

|  | 4. Provide training to staff on policies, procedures and protocols.<br>5. Provide training to staff on HIPAA requirements, and document training.<br>6. Designate a HIPPA Privacy Officer. |
|---|---|
| Evidentiary Basis | Document review, observation, interviews |

| Provision 12.6 Medical Care | Henley-Young shall develop procedures for monitoring residents who require individualized attention because of medical issues that do not involve requiring the residents to sleep on a mat in the visitation room. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance based on my interviews, documents review and observation.<br><br>The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (see introduction.). | |
| Recommendations | 1. Develop policies, procedures and protocols to address this provision.<br>2. Develop processes of continuous monitoring residents with stable medical issues, i.e. the care for diabetic residents who are on an insulin regiment.<br>   a. What are the medical requirements of the residents who need monitoring?<br>   b. Who is responsible for the monitoring?<br>   c. How are the records kept of the monitoring?<br>3. Provide training to staff on the policies, procedures and protocols for this provision.<br>4. Annual competency training. | |
| Evidentiary Basis | Document review, observation and interviews | |

## 13. Mental Health Care

| Provision 13.1 Mental Health Care | Henley-Young's contractor, Hinds Behavioral Health Services, shall provide adequate mental health services to all confined residents with a mental health diagnosis or serious mental health need, as indicated by the MAYSI-2. This shall include, but is not limited to, the provision of individual and group counseling sessions upon the request of a residents or the resident's parent/guardian, access to a mental health professional at the detention center, and the distribution and medical monitoring of psychotropic medications by a medical professional. |
|---|---|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. The only changes to this provision, is the residents' names have changed.  I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. It is without question that there are residents entering this facility that need access to structured mental health services (i.e. Resident D.A.  – self-mutilation; Resident Q.M. – attempted suicide; Resident J.M. – attempted to harm himself several times in different areas of the building and stuck his head in toilet; Resident A.H. – attempted suicide; Resident K.P. – attempted suicide). There are still inadequate mental health services at this facility. Generally accepted professional standards require that mental health counseling be provided frequently and consistently enough to provide meaningful intervention for residents. Although residents may be seen by Hinds Behavioral Health Services, there is no documentation that indicates the needs of the residents or any planned strategies for the residents once they return to the facility. The Henley-Young mental health counseling is inadequate to the needs of mentally ill residents in both frequency and content. My review of records reveals no evidence of any counseling or use of any treatment plans or strategies. It should be noted that treatment planning, including identifying symptoms and behaviors is a critical part of effective treatment for residents with mental health illness or problems. An effective program should communicate treatment plans for mentally ill residents to all staff involved in the management of the residents in this detention facility and services should be coordinated prior to their implementation. Although some residents who are in need of mental health services are in the 89-day program and are assigned case managers, these individuals have no mental health training and they serve primarily as liaisons between the facility and the courts rather than focusing on coordinating care at the facility for mentally ill residents. |
| Recommendations | 1. Ensure that the facility has a Standardized Assessment Tool i.e. the MAYSI-2 to use during the intake process.<br>2. Develop policies and procedures to address this provision.<br>3. Provide training to staff on policies and procedures and provide documentation of training. |

|  | 4. Develop documentation that will track resident's progress during their stay at facility. |
|--|---------------------------------------------------------------------------------------------|
|  | 5. Ensure there is communication between Hines Behavioral Health Services, Juvenile Court Case Managers and Facility Staff on residents receiving mental health services. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 13.2 Mental Health Care | Residents who are confined for longer than thirty (30) continuous days and who are prescribed psychotropic medications, shall be evaluated by a psychiatrist every thirty (30) days. Such evaluations may be performed by and through employees of Hinds Behavioral Health. |
|-----------------------------------|------------------------------------------------------------------------------------------|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed, please review the introduction. |
| Recommendations | 1. Develop policies and procedures to address this provision.<br>2. Provide training to staff on policies and procedures. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 13.3 Mental Health Care | Within 72 hours of a resident's admission to the facility, staff shall develop individual mental health treatment plans for residents who are under the care of a mental health provider. Treatment plans shall emphasize continuity of care and shall ensure that whenever possible, residents are transported to appointments with their regular mental health provider, whether the appointments are standing or made after the resident's initial detention. |
|-----------------------------------|------------------------------------------------------------------------------------------|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed, please review introduction. |
| Recommendations | 1. Develop policies and procedures to address this provision.<br>2. Provide training to staff on policies and procedures.<br>3. Policies and procedures shall be reviewed and signed by a licensed mental health professional (psychiatrist, etc.). |

| Evidentiary Basis | Document review, observation, interviews |
|---|---|

| Provision 13.4 Mental Health Care | Henley-Young shall develop and implement policies and procedures for referring residents in need of psychiatric services to a licensed psychiatrist for a timely mental health evaluation. Such services may be provided by and through employees of Hinds Behavioral Health. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed please review introduction. | |
| Recommendations | 1.  Develop policies and procedures to address this provision.<br>2.  Provide and document training to staff on policies and procedures. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 13.5 Mental Health Care | Hinds County shall employ or contract for sufficient psychiatric services to permit a psychiatrist to fulfill the following functions:<br>   a.  conduct needed psychiatric evaluations prior to placing residents on psychotropic medications;<br>   b.  Monitor, as appropriate, the efficacy and side effects of psychotropic medications;<br>   c.  Participate in treatment team meetings for residents under the psychiatrist's care;<br>   d.  Provide individual counseling and psychotherapy when needed;<br>   e.  Evaluate and treat in a timely manner all residents referred as possibly being in need of psychiatric services; and<br>   f.  Provide adequate documentation of treatment.<br>   g.  All evaluations and services outlined above may be performed and/or provided by and through employees of Hinds Behavioral Health or any other duly qualified Mental Health agency. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed please review introduction. | |
| Recommendations | 1.  Develop policies and procedures to address this provision.<br>2.  Provide training to staff on policy and procedures and document | |

| | |
|---|---|
| | training. |
| Evidentiary Basis | Document review, observation |

| Provision 13.6 Mental Health Care | The psychiatrist and/or counselors shall review, if necessary, incident reports, disciplinary reports, suicide watch logs, and lockdown logs of residents under their care to determine whether their treatment is working and, if not, how it should be modified. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed please review introduction. | |
| Recommendations | 1. The mental health of the residents in the custody of the facility needs to be closely monitored at all times.<br>2. The facility needs to develop policies and procedures to address this provision.<br>3. Provide and document training to staff on policies and procedures and document training.<br>4. Facility needs documentation from a mental health organization on plan of action for residents receiving a mental health services. | |
| Evidentiary Basis | Document review, observation | |

## 14. Suicide Prevention

| Provision 14.1 Suicide Prevention | Henley-Young shall develop a multi-tiered suicide prevention policy that has at least three stages of suicide watch. Suicide watch shall not be used as punishment. The "suicide cell" shall be reserved for residents for whom the "suicide cell" is deemed necessary in conjunction with this suicide prevention policy. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.   The facility has developed policy and procedures for this provision. Now the facility must develop training programs to ensure that staff learn and adhere to the policy and procedures. Further, staff must become familiar with the process. Once the facility hires a new mental health provider, they must ensure that the suicide prevention policy is included in the overall mental health program, **please review introduction**. | |
| Recommendations | 1. Develop policies and procedures to address this provision. | |

| | |
|---|---|
| | (executed)<br>2. Provide and document training for staff on policy and procedure.<br>3. Facility needs to ensure that the suicide prevention policy is included in the overall mental health program. |
| Evidentiary Basis | Document review, observation |

| | |
|---|---|
| Provision 14.2<br>Suicide Prevention | Any residents placed on the highest level of suicide watch shall be evaluated by a mental health professional, ideally within 12 hours, but in no case longer than 24 hours of his or her placement on suicide watch. If a resident on the highest level of suicide watch is not evaluated by a mental health professional within 24 hours, the residents shall immediately be transported to a local mental health facility or emergency room for evaluation and/or treatment. |
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  The facility has developed policy and procedures for this provision. Now, there must be training programs developed to ensure that staff members adhere to the policy and procedures and that they are familiar with the process. Once the facility hires a new mental health provider, they must ensure that the suicide prevention policy is included in the overall mental health program, **please review introduction.** |
| Recommendations | 1. Develop policies and procedures to address this provision. (Executed)<br>2. The facility needs mental health professionals to help and enhance the development of these policies and procedures as they are the authorities in this area.<br>3. Provide training for staff on policies and procedures and document training.<br>4. Identify a mental health agency to help develop policies, procedures and protocols.<br>5. Facility needs to ensure that the suicide prevention policy is included in the overall mental health program. |
| Evidentiary Basis | Document review, observation |

| | |
|---|---|
| Provision 14.3<br>Suicide Prevention | Residents on suicide watch shall participate in recreation, school, and any other structured programming. Residents shall not be required to wear a "suicide gown" unless locked in a cell. Staff shall closely monitor residents on suicide watch, which includes logging activities every 15 minutes. |
| Status | **Beginning Compliance** | |

| Discussion | The status of this provision remains as beginning compliance.  A training program still needs to be developed to ensure that staff members adhere to the policy and procedures and that they are familiar with the process. Once the facility hires a new mental health provider, they must ensure that the suicide prevention policy is included in the overall mental health program, **please review introduction.** |
|---|---|
| Recommendations | 1. Develop policies and procedures to address this provision with the assistance of a mental professional. (executed) <br> 2. Provide and document training for staff on policies and procedures. <br> 3. Facility needs to ensure that the suicide prevention policy is included in the overall mental health program. <br> 4. The facility needs mental health professionals to help and enhance the development of these policies and procedures as they are the authorities in this area. |
| Evidentiary Basis | Document review, observation |

| Provision 14.4 Suicide Prevention | When a resident is placed on any level of suicide watch, a report shall be made within 24 hours to the resident's court, as well as to the resident's guardian, and his or her defense attorney. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  A training program still needs to be developed to ensure that staff members adhere to the policy and procedures and that they are familiar with the process. Once the facility hires a new mental health provider, they must ensure that the suicide prevention policy is included in the overall mental health program, **please review introduction.** | |
| Recommendations | 1. Develop policies and procedures for making and distributing the reports in this provision. (executed) <br> 2. Provide training for staff on policies and procedures and document training. <br> 3. Facility needs to ensure that the suicide prevention policy is included in the overall mental health program <br> 4. The facility needs mental health professionals to help and enhance the development of these policies and procedures as they are the authorities in this area. | |
| Evidentiary Basis | Document review, observation | |

### 15.    Family Support and Interaction

| Provision 15.1 Family Support and Interaction | Visitation shall not be restricted or withheld from residents unless the detention center director determines that a visit will violate the security of Henley-Young or will endanger the safety of residents, visitors, or staff. Visitation should not be restricted as a form of punishment. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The status of this provision remains as partial compliance.  During this visit I found that visitation was still being conducted in the multi-purpose room. As stated in my previous report, the facility must ensure that there is proper staffing available to provide for the visitation process to maintain reliability in it. Please review the staffing section of the introduction. | |
| Recommendations | 1. Provide and document training for staff on policies and procedures. (executed)<br>2. Provide and document training for staff on policies and procedures.<br>3. Ensure that there is proper staffing availability to maintain reliability. | |
| Evidentiary Basis | Document review, observation and interviews | |

| Provision 15.2 Family Support and Interaction | Within 90 days of the effective date of this Settlement Agreement, Henley-Young shall provide accommodations that allow residents to have contact visits with their families. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility has moved to substantial compliance. Based on my most recent visit. I found that the facility continues to allow contact visits. The facility should continue to ensure that proper staffing is available to make certain that this continues. The visitation program should be incorporated into the overall facility program that will help with providing a better structure, please review introduction. | |
| Recommendations | 1. Develop policies and procedures to address this provision. (executed)<br>2. Identify area where contact visitation will take place.<br>3. Provide and document training for staff on policies and procedures.<br>4. Ensure that there is proper staffing availability to maintain reliability.<br>5. Ensure that visitation program is included in the overall facility program. | |

| Evidentiary Basis | Document review, observation  and interviews |
|---|---|

| Provision 15.3 Family Support and Interaction | Visitation shall be regularly scheduled at least three times per week, which shall include evening and/or weekend visitation times in order to encourage family visitation. Henley-Young shall permit the minor siblings of confined residents to participate in visitation, as long as the minors' parent or guardian is present during the visit and the siblings are not harmful to the residents who are detained at Henley-Young. Henley-Young shall also permit a confined resident's own child (ren) to participate in visitation |
|---|---|
| Status | **Substantial Compliance** |
| Discussion | The facility has moved to substantial compliance on this provision.   The facility must continue to follow the recommendations below. |
| Recommendations | 1. Develop policies and procedures and practices to address this provision. (executed)<br>2. Provide and document training for staff on policies and procedures.<br>3. Ensure that there is proper staffing availability to maintain reliability.<br>4. Ensure that visitation program is included in the overall facility program. |
| Evidentiary Basis | Document review, observation and interviews |

| Provision 15.4 Family Support and Interaction | Residents may receive phone calls from their attorneys. At the discretion of the Director or assignee, in emergency situations, residents may receive phone calls from parents, primary caretakers, or legal guardians. Emergency phone calls and phone calls from attorneys should not be restricted as a form of punishment. |
|---|---|
| Status | **Partial Compliance** |
| Discussion | The facility has moved to partial compliance on this provision. Based on my most recent visit and document review. However, there is no indication that residents are allowed to mail letters as part of access to supportive relationships that residents have with families and others in the community. This (mail) is a major part of the rehabilitative process. Staff now needs to be trained on policies and procedures and the facility should ensure that policy and procedures are being followed. |
| Recommendations | 1. Develop policies and procedures and practices to address this provision. (Executed)<br>2. Provide and document training for staff on policies and procedures.<br>3. Ensure that there is proper staffing availability to maintain reliability. |

80

| | 4. Ensure that residents are allowed to mail letters.(County will pay for postage) |
|---|---|
| Evidentiary Basis | Document review, observation and interviews |

### 16. Miscellaneous Provisions

| Provision 16.1 Miscellaneous Provisions | Male and female residents shall be provided with equal access to educational and rehabilitative services, medical care, and indoor and outdoor recreation. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  During my most recent visit, the basketball courts have been resurfaced and repaired. However female residents are still complaining that they have no outside recreation activities and are assigned to the laundry as detailed. In addition, according to the female residents I interviewed, they rarely participate in outside activities and, when they do, it consists mostly of sitting on the bleachers because the male residents were using the basketball court and they are not allowed on the court while the males were outside using it. However, there were still no schedules posted or documents showing equal programming for male and female residents. | |
| Recommendations | 1. Develop policies and procedures and practices for this provision. (Executed)<br>2. Cease in the designation of female residents as being solely responsible for laundry; this is a duty male residents can perform as well as females.<br>3. Develop monthly recreational schedules.<br>4. Develop comprehensive facility schedules.<br>5. Provide training for staff on policies and procedures and document training.<br>6. Ensure that there is proper staffing availability to maintain reliability.<br>7. Repair court and goal area.<br>8. Posting of schedule on units. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 16.2 Miscellaneous Provisions | The parties agree, however, that henceforth:  All residents shall have the opportunity to engage in at least one hour of large muscle exercise a day. | |
|---|---|---|
| Status | **Non-Compliance** | |

| Discussion | The status of this provision remains as non-compliance.  Based on my most recent review of documents, interviews with the residents and observation residents are still not engaging in 1 hour of large muscle exercise daily. As stated previously, residents are placed in their rooms when there is not enough staff available. In addition, on the weekends, residents are still only allowed out when there is enough staff available. In addition, I also found that because there was a lack of staff, residents were only out of their rooms on a rotating basis. There still is no schedule of recreational or program activities and when residents were allowed out it was random with no schedule being followed. There must be a schedule in place and adhered to which will ensure that residents are receiving the required time out of their units and rooms and that structured activities are available, unless a resident has been placed on behavior management or isolation. However, even residents who are placed in a behavior management program must be allowed the required time out of the unit and room for recreational and large muscle exercise. |
|---|---|
| Recommendations | 1. Develop policies and procedures and implement practices to address the needs of this provision.<br>2. Develop and implement programming and recreational schedules.<br>3. Provide and document training for staff on policies and procedures.<br>4. Ensure that there is proper staffing availability so that residents are not unnecessarily "locked" in their cells. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 16.3 Miscellaneous Provisions | Henley-Young shall implement a policy which prohibits staff from insulting residents or calling them names, and using profanity in the presence of residents | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  Based on my most recent review of documents, interviews with residents they still complained about the staff's use of profanity. Although some residents said that "it's not as bad as it used to be" another resident explained that "staff respects us as long as we respect them".  In addition, during my document review, I found even staff members complain of other staff using inappropriate language towards residents (see incident report dated March 28, 2014).  Since the policy has been developed for this provision, the facility administration must train staff and ensure staff adheres to the policy. In addition, the facility administration should ensure that there is a constant vigilance that promotes positive language by residents and staff. Please see introduction. | |
| Recommendations | 1. Develop policies and procedures and practices to address the needs of this provision. (Executed) | |

| | |
|---|---|
| | 2. Provide training to staff in the proper de-escalation techniques of residents.<br>3. Administration must provide enough supervision to reduce or eliminate insulting behavior by staff.<br>4. Discipline and retrain staff as needed.<br>5. Provide training for staff on policies and procedures and document training.<br>6. Hire an independent person to investigate allegations of abuse or complaints regarding staff by residents. (Executed) |
| Evidentiary Basis | Document review, observation and interviews |

| Provision 16.4 Miscellaneous Provisions | Henley-Young shall implement an adequate grievance policy that is accessible to all residents regardless of literacy levels, and that provides residents with the opportunity to appeal facility level determinations. Residents shall obtain the grievance forms from the school liaison. |
|---|---|
| Status | **Beginning Compliance** |
| Discussion | The status of this provision remains as beginning compliance.  Based on my most recent review of documents and my interviews with residents, residents still do not have confidence in the grievance process. Most residents said they were not aware of the grievance process and some residents advised that they never file a grievance. As stated in my previous reports, the mark of a good grievance system is that residents do file grievances. Most juvenile facilities have a resident's grievance system in place to allow residents to seek a resolution to problems that they may be having while at the facility. Typically, juveniles use the grievance system to attempt to resolve issues they may have with the application of facility rules, concerns about living conditions or food, problems with missing property, conflicts with other residents or staff, or seeking some sort of other assistance. All grievances should be tracked by the grievance coordinator to assure that a response is given. The nature, topic or presenting problem should be categorized and tabulated. The grievance coordinator should provide his/her supervisor, the facility director and other key staff, a summary grievance report each month. The report should include, at a minimum, the number of grievances filed, the living units from which the grievances were filed, the nature and final outcome of the grievances. A system should also be established to ensure that grievance resolutions are actually implemented. The grievance system should be viewed as an important tool for staff to communicate with the residents. The system should enhance the regular programming activities and not be viewed as an impediment. The administration should use cumulative data gathered from grievances as a tool to assist in monitoring what is going on within the institution. Such data can indicate where the program is functioning well and where there may be potential problems. In addition, in |

| | my review of some grievances, one resident filed a grievance then later retracted the grievance. There must be as part of the grievance process a component that the residents has the ability to retract the grievance and not the staff advising that the residents retract his/her grievance. The facility must now make certain that staff is trained properly and that residents are made fully aware of the grievance process. |
|---|---|
| Recommendations | 1. Place grievance boxes on each unit and school, residents should not be required to request a grievance form.<br>2. Provide training for staff on policies and procedures and document training.<br>3. Provide training for residents on policies and procedures and document training.<br>4. Ensure that residents are adequately familiarized with the grievance process during their orientation into the facility<br>5. Add a place on the Resident's Grievance Resolution Report for a resident to request an appeal and place for the Director's resolution.<br>6. Ensure Resident's Grievance Resolution Reports are provided to the resident for their signature and their response to the outcome. If the resident disagrees with the resolution the resident has the right to appeal the decision to the director.<br>7. Any retractions of grievances should be done by residents and not by staff. |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 16.5 Miscellaneous Provisions | Hinds County denies that Henley-Young does not currently have an adequate policy whereby residents can request to see their attorney and/or Residents Court counselor. The parties agree, however, that henceforth: Henley-Young shall develop and implement an adequate policy that allows residents of all ages and literacy levels with the opportunity to request to see their attorney and/or Residents Court counselor. Residents shall obtain the form requesting a visit from his/her counselor from the school liaison. Henley-Young agrees to collaborate with the Plaintiffs to design and implement a comprehensive juvenile justice pre-service and in-service training program for detention center staff. Training shall include, but is not limited to, the mandatory reporting requirements for direct care workers, the requirements of the Prison Rape Elimination Act, verbal de-escalation techniques, adolescent brain development and developmental issues, effective communication with adolescents, effective documentation, appropriate use of force and restraint, and best practices for detention center administration. |
| Status | **Beginning Compliance** | |

| Discussion | The status of this provision remains as beginning compliance.  Based on my most recent visit and review of documents, residents are still complaining that they have not had the opportunity to speak with their attorneys.  Also, in my review of the records, there was no indication that attorneys had been visiting. However, court counselors were present in the facility and seeing the residents. Additionally, I found no forms for requesting visits from counselors, attorneys or school liaisons. And I found no training on the mandatory reporting requirements for direct care workers, the requirements of the Prison Rape Elimination Act, verbal de-escalation techniques, adolescent brain development and developmental issues, effective communication with adolescents, effective documentation, appropriate use of force and restraint, and best practices for detention center administration. Even though facility has developed a policy and procedures for this provision. |
|---|---|
| Recommendations | 1. Develop policies and procedures and practices for this provision. (Executed)<br>2. Provide and document training for staff on policies and procedures.<br>3. Develop single form and system for incident reporting.<br>4. Develop system for receiving and mailing privileged and non privileged mail for residents. |
| Evidentiary Basis | Observation, interviews |

**Conclusion**

This is my seventh official visit to the Henley-Young Juvenile Justice Facility. As stated in my previous reports, the facility continues to make incremental (small positive) improvements. There are several provisions that have moved to either partial or substantial compliance which is good and should keep the facility moving in the right direction.  These improved areas are part of the "low hanging fruit" (provisions) that Judge Jordan discussed.  Although the facility still has a ways to go, they should be commended.

As stated in my introduction, the facility is in transition again as it relates to leadership for the facility.  At some point, a stable leadership team with a comprehensive understanding of contemporary juvenile detention knowledge must be in place.  It is without question, that the County Administrator has a vision of the needs of the facility. However, she must be provided with the resources and unilateral control to ensure the success of this facility.  The facility is without question understaffed and under resourced and staff lacks the training to perform their duties.  Staff is making decisions based on instinct and not based on policies and procedures.  This type of decision making increases liability to the County.   The staff is doing the best they can without the tools needed to perform their job in a professional manner.  Although, there is a ways to go in this process, the QA unit should be commended for their direction in developing data that will help the facility measure for outcomes.  The data that is being collected, if used properly by the facility administration, will assist in providing a greater understanding of the operations.

I would like to again thank the Honorable Judge Jordan III, Attorney Anthony Simon, County Administrator and the director for their assistance and cooperation. This is a monumental task and they should continue moving forward.

LEONARD DIXON

Exhibit A - 1



Henley Young Juvenile Justice Center
Seventh Monitoring Compliance Report
August 11, 2014

Exhibit A – 2



Henley Young Juvenile Justice Center
Seventh Monitoring Compliance Report
August 11, 2014

Exhibit A – 3



Exhibit A – 4



Exhibit A – 5



Exhibit A - 6



Henley Young Juvenile Justice Center
Seventh Monitoring Compliance Report
August 11, 2014

Exhibit A – 7



Exhibit A – 8 (Note: two residents in stall together)



Exhibit B



Exhibit C





Henley Young Juvenile Justice Center
Seventh Monitoring Compliance Report
August 11, 2014

Exhibit D - 1



Exhibit D - 2



Henley Young Juvenile Justice Center
Seventh Monitoring Compliance Report
August 11, 2014

Exhibit D - 3





Exhibit E

