# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION
## HONORABLE DANIEL P. JORDAN III, U.S. DISTRICT JUDGE


## J.H., ET AL, VS HINDS COUNTY MISSISSIPPI
## 3:11-CV00327 DPJ-FKB


## Monitoring Compliance Report:

## Report Draft Date January 19, 2015
## Report Date January 28, 2015


## Submitted by
## Leonard B. Dixon, MSPA
## 24420 Crescent Drive
## Woodhaven, MI  48183
## 734 642-7412
## Email home: __lbdixon1@comcast.net__
## Email work: __lbdixon4@co.wayne.mi.us__

# The
# Eighth Monitor's Report
# Henley-Young Juvenile Justice
# Leonard B. Dixon

## Background

On March, 28, 2012, Hinds County, Mississippi entered into a settlement agreement ordained and adjudged by Judge Daniel P. Jordan III, for the United States District Court Southern District of Mississippi, Jackson Division, regarding conditions of confinement at the Henley-Young Juvenile Justice Center, located in Jackson, Mississippi. According to the order the settlement agreement and its specifics requirements "shall apply to Henley-Young and any contractor that may provide services to Henley-Young in the future. The term "youth" herein often refers to individuals confined at Henley-Young. "The parties" understand that the requirements contained herein will be implemented without undue delay as soon as practicable. Unless otherwise indicated herein, the parties will collaborate to make all reasonable efforts to ensure that within 90 days of the effective date of the agreement, policies, and procedures consistent with the agreement are drafted, in the process of being implemented, and that all detention staff received training on the requirements. The parties agree and understand that the implementation will be an ongoing process that extends beyond the initial 90 days of the agreement. As part of the settlement agreement the defendant shall contract with Leonard Dixon, within 30 days of the court entry of this settlement agreement to serve as an expert who will be responsible for documenting the defendant's compliance with the terms of the agreement and for providing and/or arranging technical assistance and training regarding compliance with this settlement agreement. I will have full and complete access to detained youth, institutional files, medical files, mental health files, education files, video tapes, and youth, staff records and all other information and other reports by staff, grievances, incident reports, and other relevant documents and files maintained by Henley-Young.

All non-public information obtained by the expert shall be kept confidential, except that on a quarterly basis the expert shall file a report with the court documenting the progress of compliance. Neither party, nor any employee or agent of either party, shall have any supervisory authority over the expert's activities, reports, findings, or recommendations. The expert shall file with the Court and provide the parties with reports describing the Defendant's steps to implement this Settlement Agreement and evaluate the extent to which the Defendant has complied with each substantive provision of this agreement. Such reports shall be issued quarterly, unless the parties agree otherwise. The reports shall be provided to the parties in draft form for comment at least two (2) weeks prior to their submission to the Court. These reports shall be written with due regard for the privacy interests of individual youth and staff and the interest of the Defendant in protecting against disclosure of non-public information. The expert shall have a budget sufficient to allow him to fulfill the responsibilities described in this Settlement Agreement. Mr. Dixon may consult other experts or consultants retained by either party. All parties shall receive copies of all draft reports from the other experts to Mr. Dixon prior to the issuance of Mr. Dixon's report, and shall have the option of being present at briefings from such experts to Mr. Dixon and Defendant. Mr. Dixon may initiate and receive ex parte

communications with the parties and their respective experts and consultants.  It should be noted that on April 25, 2014 the settlement agreement was extended as set forth by the court.

**Recommendations based on findings, observations and interviews**
Result of visit on December 3, 2014 to December 8, 2014

**Documentation provided and reviewed**
Master file audit conducted by QA on September 10, 2014 of 19 residents charts
Master file audit conducted by QA on August 13, 2014 of 19 out of 20 residents charts
Facility audit conducted by QA on August 26, 2014 (pictures attached)
Safety drills (Disaster/Fire) Documentation:
      Tornado drill conducted on September 24, 2014
      Tornado drill conducted on September 29, 2014
      Tornado drill conducted on October 9, 2014
      Tornado drill conducted on October 13, 2014
      Tornado drill conducted on November 30, 2014
      Fire drill conducted on August 17, 2014
      Fire drill conducted on August 28, 2014
      Fire drill conducted on September 18, 2014
      Fire drill conducted on September 22, 2014
      Fire drill conducted on October 28, 2014
      Fire drill conducted on November 24, 2014
Scheduled Phone Call Logs (Weekly for the months of March (1 day), June (2 days), July, August, September, October and November)
Memos dated from July 7, 2014 to December 2, 2014
QA Memos dated from August 14, 2014 to November 6, 2014
Budget/Job Analysis FY 2014-2015
Food Service Certification:
      ServSafe certification for staff Kevin Lewis
      Certified School Food Service Program Manager for Jenifer C. Stevens
Inspection Reports:
      Hi-Tek Fire Sprinklers dated April 30, 2014
      Fire Inspection dated September 17, 2014
      American Fire Sprinkler dated December 23, 2013
Grievance Report Graph from January 2014 to October 2014
Grievance Resolution report from 2 residents for the month of August 2014
Grievance Resolution report from 1 resident for the month of October 2014
Training Documentation:
      New employee orientation schedule
      OTJT form
      Various memos listing staff to attend training
      3 Policy review log sign in sheets
      2 New employee orientation sign in sheets for a week
      2 Strip search policy review sign in sheets
      Policy review training sign in sheet
Henley Young Juvenile Justice Center Organization Chart

QA Statistical Data:
>     Monthly Incidents for months of August 2014 to November 2014
>     Due Process Isolation Logs for months of August 2014 to November 2014
>     Graphs showing use of force incidents and incidents by shifts for months of August 2014
>         to November 2014

HYJJC Due Process Rights Reports:
>     Resident M.M. date of violation 8/14/2014
>     Resident M.M. date of violation 10/20/2014
>     Resident M.M. date of violation 10/2/2014
>     Resident M.M. date of violation 8/7/2014
>     Resident K.B. date of violation 11/5//2014
>     Resident K.B. date of violation 10/18 & 10/19/2014
>     Resident K.B. date of violation 10/13/2014
>     Resident K.B. date of violation 10/2/2014
>     Resident K.B. date of violation 11/6/2014
>     Resident J.B. date of violation 11/13/2014
>     Resident T.A. date of violation 11/13/2014
>     Resident J.M. date of violation 8/12/2014
>     Resident J.M. date of violation 8/7/2014
>     Resident G.M. date of violation 11/5/2014
>     Resident J.M. date of violation 11/11/2014
>     Resident M.M. date of violation 11/5/2014
>     Resident Z.K. date of violation 11/13/2014
>     Resident L.H. date of violation 8/5/2014
>     Resident M. F. date of violation 10/20/2014
>     Resident M. E. date of violation 11/3/2014
>     Resident M.E. date of violation 9/24/2014
>     Resident M.E. date of violation 9/13/2014
>     Resident E.D. date of violation 8/14/2014
>     Resident B.D. date of violation 9/23/2014
>     Resident R.C. date of violation 8/27/2014
>     Resident D.C. date of violation 11/13/2014
>     Resident D.C. date of violation 11/11/2014
>     Resident J.C. date of violation 11/11/2014
>     Resident J.C. date of violation 11/3/2014
>     Resident J.C. date of violation 9/26/2014
>     Resident D.B. date of violation 11/6/2014
>     Resident A.B. date of violation 10/10/2014
>     Resident A.B. date of violation 9/24/2014
>     Resident T.B. date of violation 11/22/2014
>     Resident T.B. date of violation 11/11/2014
>     Resident T.B. date of violation 10/1/2014
>     Resident T.B. date of violation 9/25/2014
>     Resident C.W. date of violation 9/23/2014
>     Resident C.W. date of violation 8/14/2014
>     Resident M.W. date of violation 10/1/2014

Resident M.W. date of violation 9/18/2014
Resident T.W. date of violation 8/14/2014
Resident L.T. date of violation 10/10/2014
Resident A.T. date of violation 11/19/2014
Resident O.S. date of violation 11/22/2014
Resident A.S. date of violation 9/26/2014
Resident J.S. date of violation 9/26/2014
Resident K.S. date of violation 8/29/2014
Resident M.S. date of violation 9/24/2014
Resident M.S. date of violation 9/10/2014
Resident A.S. date of violation 9/23/2014
Resident G.R. date of violation 8/21/2014
Resident G.R. date of violation 8/14/2014
Resident T.R. date of violation 10/31/2014
Resident N.P. date of violation 10/10/2014
Resident N.P. date of violation 9/26/2014
Resident D.P. date of violation 9/30/2014
Resident Q.P. date of violation 11/22/2014
Resident Q.P. date of violation 10/18/2014
Resident Q.P. date of violation 10/16/2014
Resident Q.P. date of violation 9/25/2014
Resident M.P. date of violation 9/26/2014
Resident J.M. date of violation 8/6/2014


HYJJC Resident Incident Report/Use of Force/Unusual Incident Reports
  July 2014 – 53 Residents (including some witness statements and medical
        reporting forms)
  August 2014 – 43 Residents (including some witness statements and medical
        reporting forms)
  September 2014 – 39 Residents (including some witness statements and medical
        reporting forms)
  October 2014 – 60 Residents (including some witness statements and medical
        reporting forms)
  November 2014 – 50 Residents (including some witness statements and medical
        reporting forms)


Recreation Schedule:
  For months September 2014 to November 2014
  Yearly activity & tournament planning
Visitation Logs:
  Counselor Authorization for Resident D.J.
  Counselor Authorization for Resident G.M.
  Counselor Authorization for Resident D.H.
  Counselor Authorization for Resident C.M.
  Counselor Authorization for Resident J.C.
  Counselor Authorization for Resident V.S.

Counselor Authorization for Resident V.S.
Counselor Authorization for Resident L.L.
For months of September 2014, October 2014 and November 2014 (includes 10 blanks sheets)
Vault Sheet dated November 30, 2014
Vault Sheet dated December 1, 2014
8 Requisitions and Purchase Orders dated from July 2014 to November 2014
File on Resident S.T.
File on Resident L.T.
Daily Rosters for January (missing sheets for dates – 3,4,5,11,12,17,18,19,23,25,26)
Daily Rosters for February (missing sheets for dates – 1, 2, 8, 9, 12, 15, 16, 22 and 23)
Daily Rosters for March (missing sheets for dates – 1, 2, 25, 26, and 29)
Daily Rosters for April (missing sheets for dates – 5, 12, 13, 15, 19, 20, 25, 26 and 27)
Daily Rosters for May (missing sheets for dates – 2, 3, 4, 10, 11, 15, 17, 18, 21, 24, 25, 26, 27 and 31)
Daily Rosters for June (missing sheets for dates – 1, 6, 7, 8, 9, 10, 12, 14, 15, 21, 22, 28 and 29)
<u>Daily Rosters for July (missing sheets for dates 1, 4, 5, 6, 12, 13, 19, 20, 26, 27)</u>
<u>Daily Rosters for August (missing sheets for dates 2, 3, 9, 10, 16, 17, 19, 20, 23, 24, and 30)</u>
<u>Daily Rosters for September (missing sheets for dates 1, 6, 7, 13, 14, 19, 20, 21, 27 and 28)</u>
<u>Daily Rosters for October (missing sheets for dates 4, 5, 7, 8, 9, 10, 11, 12, 13, 18, 19, 25 and 26)</u>
<u>Daily Rosters for November (missing sheets for dates 1, 2, 8, 9, 11, 15, 16, 22, 23, 27, 28, 29 and 30)</u>
<u>Daily Rosters for December (missing sheets for dates 3, 5, 6, 7, and 8)</u>

**Staff Interviewed**
Verna Toumer, Laundry Officer
Ferniece Galloway, Intake Counselor
Ray Stewart, Manager ABL
Alison Span, Cook
Tiara Myles, Detention Officer
Brenda Felix, Interim Operation Manager
Andrew Roberts, Detention Care Worker (Officer)
Janet McCoy, Training Coordinator
Samuel Dotson, Recreation Coordinator
Debbie Johnson-Williams, RN
Sandra Rochelle Wilson, APRN
John Coleman, Interim School Director
Tabetha Bouldin, Sr. Detention Officer
Mary Street, Detention Officer/Central Control
Vivian Thompson, Detention Officer
Kiara Neil, Detention Officer
Jeanette Davis, Detention Officer/Laundry Worker
Alan Hines, Detention Officer

**Youth Interviewed**
Resident D.C. 16 years old
Resident C.B. 17 years old
Resident Q.P. 16 years old
Resident M.F. 16 years old
Resident T.K. 17 years old
Resident K. R. 17 years old
Resident D.M. 14 years old

**Introduction**
This report is the result of my eighth official visit to the Henley-Young Juvenile Justice Center and an update from my previous visit.  I visited the facility from December 3 through December 8, 2014 for the purpose of an official inspection/review.  This report is the findings from my visit which are based on my observations, interviews, and document reviews including video and audio reviews.  I would like to thank the staff, facility administration and the Hinds County attorneys for their continued cooperation in this process.

**It should be noted that the facility has moved 2 additional provisions to beginning compliance, 1 provision moved to partial compliance and 5 additional provisions moved to substantial compliance. This is commendable and they are moving in the right direction.**

However, as stated in my previous reports the 'language of a culture' defines the culture whether a large group in a single ethnicity or a much smaller group such as the staff of a juvenile detention facility. When I read documents that refer to the residents as 'detainees or inmates' I recognize that the culture does not speak to a juvenile rehabilitative model. Terms such as 'ordering officer off the **zone**' rather than 'off the unit or out of the area', placing residents in their '**cells**' or '**lock up**' rather than in 'their rooms' are terms indicative of an adult prison model. In the report writing, the discussions of 'hostile environments and riots', rather than 'disruptive behavior and acting out', sets the tone for how your changes are viewed internally and culturally. It becomes the fabric of the facility. How can anyone be comfortable placing a child who is having a very stressful moment in a 'turtle suit?' Language is extremely relevant when trying to persuade someone to your position or convince others that what they are doing is or is not detrimental. In reading the reports and statements of the activities and incidents at the facility, it is difficult to believe that the writers are speaking of situations in a juvenile facility. Language has to be appropriate for the situation and location and must define actual incidents and behaviors absent of emotional descriptors and personal attitudinal wording. It must be an imperative of the facility administration and all of the supervisors and quality assurance staff to promote a more juvenile specific environment; which was stated in my previous report as it relates to language used. Based on my review of documents the above mentioned statements still stand and must be addressed.

## Facility and Operational Culture

During this past monitoring visit I reviewed a media report and listened to and viewed an audio/video tape in which an officer of the court used inappropriate language and made threats in the presence of a youth.  This is a major concern for me because it contributes to a culture that will manifest itself in the interactions with line staff and youth.  This raises a concern as it relates to provision 16.3 contained in the monitoring reports that discusses inappropriate language by staff.  In the past, staff has been disciplined for the use of inappropriate language around residents and in the facility.  In my review of documents, I found that on numerous occasions residents were placed on isolation for "being disrespectful, using profanity, and being loud and boisterous throughout the shift".  Again, residents mirror the behavior of the adults around them.  This in itself sends a message that staff and youth react too.

In my own facility, such language is prohibited by leadership and our state licensing rules.  The use of such language is deemed humiliating and inappropriate.  I expect that the detention center administration and court will get together to ensure that behavior of this sort is discouraged by everyone including all leadership within the justice center complex and that an environment of mutual respect among staff and youths is promoted.  In addition, I would hope that the political issues which appear to be creating such a disheartening environment for staff and youth will be worked out for the betterment of the facility.

It is widely known that people often conform or comply because they are afraid (i.e. of losing their job, criticized, rejected, etc.).  In this situation, staff is subjected to standards of behaviors that are unhealthy and send a message (spoken and unspoken) that conformity and respect are not required.  As a result the pressure to conform will result in negative consequences for not only the staff, but for the youth in custody as well.  In situations like this the staff is responding to the power structure, e.g. the Judge.  It is extremely important to note that the tone of an organization is set at the top and it is important to lead by example.  In this center, the Judge is at the top and based on the tone that is set, a culture whether good or bad will be developed.  I would hope that the political issues will be addressed positively so the focus will be more on the youth that are being served in this facility.

The statement above is very important because juvenile institutions/detention facilities are like cities and cultures are developed based on who operates that 'city' (i.e. mayors, city councils, police departments etc.).  As it relates to Henley-Young, the Director, the Judge and the supervisors represents that group. During my visit, the political atmosphere I witnessed became so toxic that several staff members at the detention portion of the facility were not allowed to enter certain areas of the building, which is used for meetings etc.  In addition, one of these administrator's entry card to enter the building was deactivated so that administrative staff could not enter the building.  These things are important because the focus is not on children but on what  appears to be personal agendas.  It is my professional opinion that this hurts youth, staff and the facility because there is a level of 'fear' and unprofessional behavior that permeates the facility.  I am sure there will be some discussion as to why this is in this report.  I am including this because it is a cultural aspect that affects the way children are cared for and the environment in which they live.  Culture reflects the customs, habits, and traditions of a group.  If the customs are to disrespect one another and continue in these the habits, (the actions or

8

patterns of behaviors that are repeated so often that it becomes typical of somebody, although he or she may be unaware of it) this creates an environment not conducive to rehabilitation.

This is not the first time I have addressed 'culture' in my reports.  However, at this point based on my observation and document review it must be addressed so that this facility can accomplish the provisions set forth in the consent decree.  The bottom line is someone has to say "enough is enough" and focus on these already vulnerable youth.  At this point the staff is floundering because they are unaware of who is in charge of this facility. It should be strongly noted that all parties must adhere to this settlement agreement/consent decree.  In my previous reports there were provisions that were violated by outside entities (i.e. the tasers used in the facility by outside law enforcement which was a violation of this agreement). It was also stressed in previous reports that weapons are not allowed in the secured area and should be placed in a secure lock box before entering the secured areas.  The point is that this consent decree does not only pertain to Henley-Young staff; it pertains to all parties that have contact with Henley-Young.

Based on my technical assistance visit in November with Board of Supervisors and attorneys, there is good news. The Supervisors have enacted a clear understanding of what juvenile detention and corrections is and passed a resolution dictating guidelines for operating a contemporary juvenile detention facility.  The Board of Supervisors have also increased the budget for the facility which should assist in completing the provisions as set forth by the consent decree.

As stated in my technical assistance report to the court dated November 19, 2014, the County has moved in the right direction as it relates to funding. In addition the County has also moved in the right direction as it relates to reducing the population.   As stated in my technical assistance report only youth who are in need of detention services should be held at the facility.    As was made clear to the County leadership, youth detention serves three purposes:

1.  holding youth for court appearances
2.  protection of the community
3.  the beginning of the rehabilitation process (i.e. evaluation/assessments etc.)

Furthermore, I recommend to the Board that services must be provided to youth as required by the settlement agreement/consent decree.  In addition, the new budget adopted by the Board of Supervisors for Henley Young must be preserved to allow the facility to work towards satisfying the elements of the settlement agreement/consent decree.  Additionally, I recommend that some funding be allocated to ensure that programming such as recreation, staff development and educational services are part of the overall facility development.  Lastly, it was agreed that the attorneys for Hinds County and several of their staff will visit Wayne County Juvenile Detention Facility and several other detention facilities.

**Again, this is important enough to merit attention by those charged with governance.**

## Staffing

Based on my facility update/technical assistance report dated November 24, 2014, it should be noted that the County has increased its budget for staffing. The Hinds County Board of Supervisors has allocated $3,734,652.95 to the juvenile detention budget which is an increase by $1,238,363.64. This increase would allow for 21 additional detention officers, a recreation coordinator, onsite skilled maintenance, and a mental health professional. Additionally it will allow for salary shift differential. With this allocation, the hiring of the above mentioned staff and the population reduction, Henley Young will be in a position to meet the provisions of the settlement agreement/consent decree. However, the County must still hire a **leadership team** and ensure that there are adequate **case management** services provided by the facility. Correspondingly, protection from harm, facility medical services and appropriate mental health services are vital for compliance with the settlement agreement/consent decree. This would be a huge step towards a successful facility.

## Building Cleanliness/Environmental Issues/Maintenance

After a review of documents coupled with my observations, I found the facility continues to be in need of proper maintenance along with maintenance and skilled tradesmen to keep the building in good operational order, as I have discussed in each report. Further, the facility is in need of a major cleaning and is again falling into great disrepair (see Exhibits A-1 to A-4) also see previous report. See provision 11.6.

It should be noted that the kitchen is still in need of major cleaning and repairs (see Exhibits A-1 to A-4). Shower stalls on units need doors repaired and electrical circuit receptacles in youth rooms need safety covers. Also there are holes in walls in youths' rooms that should be repaired to ensure it is not used as a storage place for contraband and other items (Exhibits B-1 to B-4). In addition, light fixtures on the units need to be repaired and mold needs to be removed from the shower areas (see Exhibits C-1 to C-3). As stated previously the facility needs to have a facility maintenance schedule that is reviewed by the administration to ensure items in need of repair are being completed in a timely manner.

## Mental Health

As it relates to mental health, my review of documents revealed that there is still an extraordinary need for on-going mental health services at Henley Young. As discussed in prior reports, there is a major need for services. Once a resident has been identified through the MAYSI-2 instrument, mental health services **must be** provided. An example of several residents needing mental health services are as follows:

> Resident J.N. (suicidal behavior)
> Resident J.C. (attempted suicide)
> Resident S.T.(several suicide attempts)
> Resident L.T.(several suicide attempts)

These services continue to be examples of a needed mental health system and services for the residents at Henley Young (please see previous report).

As stated in my previous report, the services, at a minimum, should include:

1) Appropriate and well-trained staff.
2) Treatment services, on or off-site crisis intervention including short-term individual and group therapy follow-up, as needed, and psychotropic medication management.
3) Mental health, medical, and substance abuse services that are sufficiently coordinated such that patient management is appropriately integrated, health needs are met, and the impact of any of these conditions on any resident is adequately addressed.
4) All aspects of the standard are addressed by written policy and defined procedures.

**Suicide Prevention**

During this visit and my review of documents, I again found residents who were in need of immediate mental health intervention (see above section on mental health).

As stated in my previous report, a suicide prevention program must be developed which includes, at a minimum, the following:

1) A suicide prevention program includes the following outcomes:
   a) facility staff identify suicidal juveniles and immediately initiate precaution,
   b) suicidal juveniles are evaluated promptly by the designated health professional who directs the intervention and ensures follow-up as needed,
   c) actively suicidal juveniles are placed on constant observation; and
   d) potentially suicidal juveniles should be monitored on an irregular schedule with no more than 15 minutes between two checks. If, however, the potentially suicidal juvenile is placed in isolation, constant observation is required.
2) Key components of a suicide prevention program include the following:
   a) training
   b) identification
   c) referral
   d) evaluation
   e) treatment
   f) housing and monitoring
   g) communication
   h) intervention
   i) notification
   j) review
   k) debriefing
3) The use of other juveniles in any way (i.e. companions, suicide-prevention aides) is not a substitute for staff supervision.
4) Treatment plans addressing suicidal ideation and its recurrence are developed, and patient follow-up occurs as clinically indicted.
5) The responsible health authority approves the suicide prevention plan; training curriculum for staff, intake screening for suicide potential and referral protocols, and training for staff conducting the suicide screening at intake.
6) All aspects of the standard are addressed by written policy and defined procedures.
7) Appropriately well-trained staff.

**Behavior Management/Isolation**

11

Based on this review of documents, observation and interviews, the facility is **still in need** of an adequate facility-wide behavior management program. I repeat that the facility must follow the recommendations as stated below. This is a reiteration of my previous report. It should be noted that staff relationships with juveniles are the primary source of managing behavior. Behavior management is about getting juveniles to learn new appropriate behaviors and to be consistent in behaving properly. Juvenile behavior management consists of helping residents understand what is expected in the environment and also helps them modify their behaviors while in the facility. The staff at Henley-Young is still in need of training to ensure that they understand the distinctions between punishment and discipline. The facility also needs to develop a positive incentive program for controlling irresponsible behaviors. There are four main areas the facility must look at when developing their behavioral management programs and the difference between the following:

1) Consequence: The effect, result, or outcome of something occurring earlier;
2) Discipline: Training to act in accordance with rules, to learn self-control;
3) Punish: To subject to pain, loss or confinement as a penalty for some offense, transgression or fault;
4) Rewards: positive outcomes from positive behaviors.

The facility must **still develop a point or level system** that allows juveniles who exhibit positive behaviors to gain points and move to the next level in the facility. The juveniles should be able to trade points for special privileges (i.e. extra phone calls, extended visits, name brand deodorants, etc,). Officers should be responsible for awarding points based on the resident's behavior, their functioning in school, hygiene, building cleanliness to name a few. The supervisors should ensure the program is operating as designed to make sure there is no abuse by staff or residents of the program. My document review and observations indicate that residents are being locked-down too much at this facility. This has become a common practice due to a shortage of staff. In conclusion, de-escalation techniques are critical to the implementation and directing of any good behavioral management program as stated above.

## Activities/Recreation/Programming

I am pleased to note that the facility has hired two recreational staff persons.  This is a major accomplishment because an adequate recreational program creates a structure that enhances and reflects a rehabilitative model.  It should be noted that the facility has hired two recreational staff and they are in the process of developing a comprehensive recreational schedule.  It should also be noted that recreation is only a part of programming - education, religion, group treatment mental health, and medical care are a part of the overall programming structure for the facility.  During my review, I found no activity schedule posted so youth and staff can have a clear structure of daily activities. This is a tool that any proficient facility structure would provide.  Also as stated in my technical assistance report dated November19, 2014, the recreational staff, although new are in need of equipment.  I have provided the administration and new recreational staff with access to the recreational staff at my facility for further assistance in developing a structured program.

## Medical, Medication Review & Disposal

As stated in the 7th Monitor's Report, there is still the need for a pharmacist doctor (Pharm D) or pharmacist to come in to review and/or discard any medications that are left at the facility and over the counter medications that have expired. In addition, the Pharm D can assist in providing information regarding medication and possible side effects and reactions for the staff as well as assist with policies, procedures and protocols for medication administration. Again, there must also be routine reviews of pharmaceutical services that can lead to a risk factor of sub optical provisions which include not having a medication administration report (MAR) completed properly or reflect accurate information (not giving medication on time; not sending medication home to complete course; or improper storage).

During this visit I also found that the facility does not have a system in place for biohazard waste (i.e. sharp containers, any soiled material that contains blood and body fluids). These services should be provided by an outside contractor specializing in disposal of biohazard materials. The red bags should be placed inside a biohazard container once ready for pick up. These things should be picked up on either a biweekly or weekly schedule based on the amount. It should be placed in a designated area and locked.

During this visit, I found the first aid kits completed. However, there is a need for staff training as it relates to the cut down tool (suicide tool).  This review found that staff were not aware of the location of the tools and when requested it took several minutes to locate. Although it was found in a cabinet, this essential tool must be readily accessible in the event of a possible suicide attempt.  The documents I reviewed indicated that there have been several residents who have engaged in suicide gestures or attempts, therefore this is a critical area that should be addressed and as stated earlier the tool should be kept in an easily accessible location.  I would recommend that the facility develop "Pod Condition Report" that would be used during shift change (see Exhibit D).

As discussed in my previous report as it relates to residents' physicals, the forms should be revised to state "nursing assessment and history" which will be for nursing staff to complete. This would include a system for a head-to-toe assessment which is completed by the nurse. The "physical examinations" forms are to be completed by a medical doctor, physician, nurse practitioner or physician assistant. Another alternative is for the County to send the nursing staff to obtain certification to complete physical examinations. Based on my review of the documents and interviews with nurses, there is no testing for HIV, Hepatitis, STI, TB or pregnancy. With all the tattoos the residents are receiving, Hepatitis is becoming more prevalent. In addition, due to no testing of STI's undiagnosed cases of Chlamydia which is known as a silent disease because of no symptoms; can lead to sterility. In addition, there should be a nurse with mental health training to understand the mental health lingo because there is a difference in their training; this nurse will be able to know when there is a risk for suicide or self-mutilation, behavioral problems, depression, etc. When the facility hires a nurse that is familiar with the mental health procedures, they will be better equipped to deal with situations that involve residents who continuously complain about headaches, stomachaches and backaches which could be signs of depression. In addition, there is also a need for a sick call system to be in place. I am recommending that a sick call system be developed where there is a set schedule for completion of these medical requests (also known as "kites").  Kites should be picked up and addressed on a regular basis at least twice a day

(morning and afternoon). This information should also be documented in the resident's medical files.

As stated in my previous reports, the facility must ensure that medical files are properly maintained and secured. I would direct the County to purchase the files that were suggested previously to assist the medical services area in developing an adequate filing system. This filing system should be used to control how information is separated, stored and retrieved. Without a good filing system, information placed in a storage area would be one large body of information with no way to tell where one piece of information stops and the next begins. In addition, these files should be placed in a locked filing cabinet and only retrieved as needed and by authorized personnel. Once files are completed, they should be returned to the secured area from which they were taken.

As it relates to medication the following should be addressed at a minimum:
    A. Storage Monitoring
        1. All medications that require refrigeration will be stored in a clean, secure refrigerator with the appropriate temperature.
        2. Refrigerator temperature monitoring will occur daily and documented on a log.
        3. Inspection of medication storage sites will be done at least monthly by a licensed pharmacist. Special attention will be paid to orderliness and cleanliness. A written report will be provided to the Director or designee.
        4. Identification and disposal of expired medications will occur at least monthly.
        5. Ultimate disposal will be provided by a company licensed by the State of Mississippi for the purposes of medical waste disposal.
    B. Audits
        1. A formal pharmacy audit will be done by a licensed pharmacist at least quarterly to evaluate compliance with the State of Mississippi Pharmaceutical Regulations.
        2. A report will be delivered to the to the Director or designee
            i. A corrective action plan will be completed for review by the Director or designee at least quarterly
            ii. The Pharm D or designee will discuss audit reports at the Joint Staff meeting. All staff will participate in the corrective action plan development.

As stated in my previous report, I am recommending at a minimum the following protocols be put in place as it relates to **__universal__ __precautions__**:

    1) Common sense hygienic practices:
        &#10148; Wash your hands frequently, before and after handling any and all potentially infectious materials
        &#10148; Wash your hands after removing gloves.
        &#10148; Be sure to wash, as soon as feasible, any part of the body after an inadvertent contact with another person's blood or body fluids.

2) Wear proper protective clothing, where feasible when faced     with a potential exposure situation.

3) Wear latex/vinyl disposable gloves:
   ➢ Subsequent to any searches, a visual search shall be conducted by conducting a physical search of any room, closet, etc.
   ➢ When handling any potentially contaminated materials/subjects.
   ➢ When handling sharps.

4) Replace gloves if torn, punctured, contaminated, or if their ability to function as a barrier is compromised. Never wash or decontaminate disposable gloves for reuse.
   ➢ Wear protective outerwear such as a gown, mask, booties, surgical cap or hoods, etc.
   ➢ When large volumes of blood and or body fluids are expectorated or inadvertently can occur.
   ➢ When cleaning any potential contaminated site.

5) Wear protective outerwear such as masks, eye protection and face shield.
   ➢ Whenever splashes, spray, spatter or droplets of blood or other potentially infectious materials may be generated.
   ➢ Whenever the eye, nose or the mouth contamination can be anticipated.

6) Remove immediately or as soon as feasible any garment contaminated by blood or other potentially infectious materials (OPIM), in such a way as to avoid contact with the outer surface.

7) Have change of clothing available.

For further assistance, I would direct the facility to review the Mississippi Pharmacy Practice regulations part 3001. This would provide a structure and assist the facility with compliance.

**Food Service**

Based on this visit and my review of documents, the food service program is developing. However, residents still continue to complain about not having enough food and that the food is tasteless.  In addition, there were still numerous complaints about the food being cold and not being appealing (see Exhibit E).  I observed the food process during this visit and found that the residents were correct as it relates to not enough food which is below the federal food standard requirements, and the temperature of the food was unacceptable.

However, during this visit, I found that food was being served in a timely manner and that the cooks were preparing food onsite.  See provision 9.

I am still recommending that a major cleaning of the kitchen be done for sanitation purposes (see Exhibits A-1 to A-4). In addition, I am still recommending the menus be dated.

I am again reiterating that food service is an important part of institutional life (see previous report #7).

**89 day program/Juvenile Court**

During this visit, I again interviewed staff and residents as it relates to this program.  From a detention perspective, treatment perspective and correctional perspective "this program" serves very little purpose other than holding youths in detention for 89 days.  Please see my facility update/technical assistance report submitted to the Court on November 24, 2014 where I explained the differences between juvenile detention and juvenile correctional facilities.  Additionally, the resolution passed by the Hinds County Board, de facto eliminates the 89 day program in statement and this should be adhered to. With this in mind, please see previous reports.

Again as discussed in my previous reports, the 89 day concept is a very admirable idea. Again, I reiterate, for this court program to function or to operate successfully, there are major changes needed as it relates to programming and staffing. At this point, the program is more a revocation program than a therapeutic, treatment program that was intended. As I have stated in my previous reports, for this program to be effective and successful, the following areas must be incorporated in the program:

- Sufficient staff
- Target appropriate juveniles for the program (i.e. medium to high-risk)
- Target risk factors for delinquent behavior that are responsive to intervention
- ensure they are individualized and family based, and delivered in community settings when discharged
- Programming based on a particular treatment model
- well-trained staff and a program director who strongly supports the program outside of the facility's director
- Deliver a sufficient amount of treatment
- Adhere to a program design
- Monitor juveniles' progress on an ongoing basis and modify the program as needed
- Provide aftercare services
- Individual treatment plan (ITP) that reflects why the juvenile is in the program and what goals juvenile should accomplish during his stay. Also mentioned in the ITP is the juvenile's individual education plan (IEP), which specifies how to accomplish the juvenile's educational goals.
- Develop cognitive behavioral programs that confront juvenile's thinking errors and teach juveniles to overcome their thinking errors as a means of behavioral change.
- Develop positive peer culture (PPC) that teaches juveniles to assume responsibility for helping one another. It is based on the belief that the most powerful influence on a resident's behavior is peer pressure. PPC's goal is to teach basic values related to caring for others. PPC is centered on frequent meetings of small groups of juveniles (6-12) and one or two staff leaders. The juveniles are encouraged to help each other.
- Develop strength based practices that help juveniles to become accountable for their actions and responsible for their behaviors. Accountability is realized when a juvenile admits to the wrong and changes his/her behavior. When

juveniles get into trouble, the care worker will initiate more behavior changes in juveniles by having them focus on how to solve their problems.

To ensure that there is an accountability case management in the 89 day program, I am recommending the following model be implemented:

- specifying troublesome behaviors
- identifying need(s)
- setting goal(s)
- evaluation

| | |
|---|---|
| **Need** | physiological, social, psychological requirement(s) for the well being of an individual |
| **Goal** | behavioral statement of how the individual will be at the end of a specified period of time |
| **Service Action** | behavioral statement of what the case manager plans and does to assist the individual(s) in achieving the goal |
| **Evaluation** | systematic collection of information on goal indicators and/or service action(s) for the purpose of decision making and planning |

In addition, the court has to determine what therapeutic programs they will be using. An example of these programs would be psychoanalytic therapy, behavioral therapy, rationale emotive therapy, persons centered therapy, reality therapy, etc. It should be noted that I found in my review of documents, observations, and discussion with staff and residents no difference in the 89 day program than in the general detention program. One staff put it quite profoundly by stating, "When these youths get a long term sentence through the 89 day program they don't care and they are causing most of the problems. **Detention is a short termed program and they are getting long term sentences."**

<u>**School**</u>
The school has hired a new Acting Principal.  This is the fourth principal since this agreement started. However during this visit as stated in previous reports, youths continue to be placed out of school for behavioral issues however they are not receiving educational services during those times.  In addition, as stated in previous reports, youths who attend court hearings are not placed back in school but taken to their units without any educational services being provided.  It is very clear through research and basic common sense that these youths are behind in their educational progress for the most part and are in need of every educational resource available.  In my previous reports it was recommended that the school be evaluated.  At this point it appears the Jackson Public School District is stone walling!! This is a simple task which must be done to determine the needs in the areas laid out below.

As stated in all my previous reports, I reiterate as it relates to the school, since there has not been an evaluation of the school, I would continue to recommend an external audit by a qualified educational consultant**.**  I would also continue to recommend that during testing periods that the school follow the system developed by Rankin County where students being

tested are tested away from the regular school programming and all other students are still in class receiving educational programming.

There are many conflicts between the mandates of the court, the school and the facility. Students who have court are not allowed to return to the classroom after their appearances, teachers suspend students from school based on their needs rather than the parameter of the detention facility and an already stretched staff becomes more stretched. These types of issues create problems that the line staff cannot surmount. There has to be one set of rules that are all encompassing for the facility that makes for a safe and secure environment and complies with the need for order within the facility.

The school should review their staffing to ensure that it is meeting the needs of the educational program (i.e. need physical educational staff and an additional GED teacher).

I am still recommending that the school and the facility review the policy of not allowing residents to return to school after court.

Further, the following areas should be addressed based on my interviews from my previous report with school staff:

- A.     "policy and procedure"
- B.     "everyone needs to know what to do"
- C.     "the expectations should be written even kids should know them"
- D.     "policy and procedure should be based on detention standards"
- E.     "everyone should have the tools to do their job"
- F.     "proper staffing is needed"
- G.     "staff should be well trained to deal with this population"

These are areas that should also be addressed as I have discussed in my previous reports. The school should use small portable classrooms (which can be placed on the grounds of the facility within the security fencing) to help alleviate the congestion for students and teachers who are now forced to teach class in a storage closet. This is below any standard, educationally or detention and is not conducive to learning. Again below are my recommendations from my previous reports.

Recommended School Plan:
A. The Henley-Young Facility will create and implement a plan to provide all of the following services and programs within their control related to the aspects of residents' education:
   a. maintain an adequate physical facility for education,
   b. provide adequate security and support in the classroom,
   c. establish an in-school points system based on rewards and consequences for behavior,
   d. establish and implement a schedule for transporting residents to and from school that assures that residents will have the opportunity to receive the required hours of educational services mandated by law.

B.  Develop policies and procedures for all of the areas discussed above.

Solution/Plan

1.  The Henley-Young Facility will make every effort to develop and formalize an interagency agreement between the Jackson Public School System and the HYC that:

   a.  Provides adequate security within the school premises (including classrooms) for all residents including those residents requiring protective services or other special needs.

   b.  Residents requiring protective services or other special needs shall have the same or equivalent educational services as other residents.

   c.  Create an alternative educational plans for residents removed from the classroom for medical or behavioral issues.

   d.  Provides a schedule for transporting residents to and from school that ensures that residents will have the opportunity to receive the hours of educational services mandated by law.

   e.  Outline a cross training curriculum for HYC school employees and detention employees, which include an orientation and a safety curriculum and mandatory annual refreshment training for employees of the school.

   f.  Ensure trainings will provide educational staff with appropriate facility policies that relate to or overlap with the school's operations to include the policies regarding rules, discipline and the behavior management program.

   g.  Include development of a plan and appropriate materials for various educational levels, to be distributed and explained to residents in the health care unit, in room confinement or otherwise unable to participate in normal school classroom activities.

   h.  Ensure the class schedules are driven by the security of the facility and that the school looks toward developing individual learning plans for each student in the school.

2.  The Facility Director or designee shall review the circumstances surrounding the placement of all residents who are in isolation or seclusion, or residents who do not attend school for medical reasons and other behavioral maintenance processes to assess the feasibility of an early release to attend school each day.

   a.  A list of the residents that are not allowed to attend school and the reasons for the administrative restriction shall be documented and distributed to the Principal of the HYC School.

   b.  The Facility Director shall designate a liaison to interact with school daily and the JPS Administration should create a position for Compliance Administrator to review the progress of the school on a weekly basis.

   c.  All instances in which school activities are suspended by the facility due to incidents or other extraordinary circumstances shall be reported to the Compliance Administrator within 24 hours.

When the School Principal or designee is having issues, whether of a safety nature or any other problems, they should be reported to the compliance administrator and the facility Director or designee immediately. **I am recommending again that the Jackson Public**

19

**School system (JPS) hire a compliance officer to ensure that the school educational standards are being met (Is the new principal the compliance officer?).**

Below are the compliance ratings and summary of ratings that will be used in this report. Please be reminded that though most are in Non-Compliance, policy development is most important and the start of this process. However, as stated above the facility has made progress on some provisions which moved them from Non-Compliance to beginning compliance.

**Please note that many of the comments and recommendations in the provisions are restatements of previous reports because in those areas little movement has been made. The new Director should use these comments as a road map to developing a successful facility plan. He must also develop a comprehensive corrective action plan for guidance. That plan should have the following:**

    **A. Clearly state the problem or weakness, including the root cause**

    **B. List the individuals who will be accountable for the results of the corrective action plan**

    **C. Create simple, measurable solutions that address the root cause**

    **D. Each solution should have a person that is accountable for it**

    **E. Set achievable deadlines**

    **F. Monitor the progress of the plan**

**The graph has been included to show the progress made thus far on the 71 provisions:**



**Compliance Code Measurements**

**Substantial Compliance (SC)**: Practices follow the county-approved policies, training materials or other documents; practices follow policy with rare exception and exceptions lead to corrective action; trained staff fill all positions and vacancies are filled within 3 months; the County has completed work in an acceptable manner; policies, procedures and practice and training are operational and quality-assurance audited and audit exceptions lead to corrective action; outcomes meet or exceed agreement requirements.

**Partial Compliance (PC)**: Policy and procedure is implemented in some but not all locations or times; staff are hired but not trained; the County is working on implementation but tasks are not completed; system implemented at some but not all locations or times, outcomes meet or exceed agreement requirements some of the time and in certain area.

**Beginning Compliance (BC)**: Policy and procedure is written by the county but has not been implemented; funding and hiring authority are approved by the County but positions are not filled; training materials prepared and approved by the county but training has not started.

**Non-Compliance (NC)**: No action taken and immediate steps needed to maintain schedule or prevent further delay. A policy may exist, but the policy may need significant revision or modifications and rarely translates into practice.

| Provision | Intake | 5th Report | 6th Report | 7th Report | 8th Report |
|---|---|---|---|---|---|
| 1.(1) | All Residents Admitted to Henley Young | NC | NC | NC | NC |
| 1.(2) | MAYSI-2 Mental Health Screening | NC | NC | NC | NC |
| 1.(3) | Prescription Medications | NC | NC | NC | NC |
| 1.(4) | Meal Compliance | NC | BC | PC | SC |
| 1.(5) | Telephone Usage | BC | BC | PC | SC |
| 1.(6) | Strip Search Policy | BC | BC | BC | BC |
| | | | | | |
| Provision | Staffing and Overcrowding | | | | |
| 2.(1) | Direct Care Staff Ratio | NC | NC | NC | NC |
| 2.(2) | Maximum Capacity Adjustment | BC | PC | SC | SC |
| 2.(3) | One-Person Cell | BC | PC | SC | SC |
| | | | | | |
| Provision | Cell Confinement | | | | |
| 3.(1) | Structured, Rehabilitative & Educational Programming | NC | NC | NC | BC |
| 3.(2) | Appropriate Access to Living Unit | NC | NC | NC | NC |
| 3.(3) | Dangerous Residents | NC | NC | NC | NC |
| 3.(4) | Isolation | NC | NC | NC | NC |
| 3.(5) | Direct Care Staff on Units | BC | BC | BC | BC |

| Provision | Structured Programming | 5th Report | 6th Report | 7th Report | 8th Report |
|---|---|---|---|---|---|
| 4 | Educational, Rehabilitative, and/or Recreational Programs | NC | NC | NC | BC |
| | | | | | |
| Provision | Individualized Treatment Plans/Treatment Program for Post-Disposition Residents | | | | |
| 5.(1) | Residents Access to Adequate Rehabilitative Services | NC | NC | NC | NC |
| 5.(2) | Health and/or Substance Abuse Treatment | NC | NC | NC | NC |
| 5.(3) | Treatment Plans | NC | NC | NC | NC |
| 5.(4) | Review of Individual Treatment Plans | NC | NC | NC | NC |
| 5.(5) | Evening and Weekend Programs and Activities | NC | NC | NC | NC |
| 5.(6) | Quality Assurance Program | NC | BC | PC | PC |
| | | | | | |
| Provision | Disciplinary Practices and Procedures | | | | |
| 6.(1) | Implement a Discipline Policy and Practice | NC | NC | NC | NC |
| 6.(2) | Policy for Residents Violations | NC | NC | NC | NC |
| | | | | | |
| Provision | Use of Restraints | | | | |
| 7.(1) | Mechanical Restraints | BC | BC | BC | BC |
| 7.(2) | Mechanical Restraints – Transportation | BC | PC | BC | PC |
| 7.(3) | Misuse of Mechanical Restraints | BC | BC | PC | PC |
| 7.(4) | Mental Health – Use of Mechanical Restraints | NC | BC | BC | BC |
| 7.(5) | No Restraint Chairs, Chemical Restraints and/or Tasers | BC | SC | SC | SC |
| 7.(6) | No Hogtying in Facility | BC | SC | SC | SC |
| 7.(7) | Mechanical Restraints – One-On-One Supervision | BC | PC | PC | PC |
| 7.(8) | Mechanical Restraints – Notice to Medical Professional | BC | BC | BC | BC |
| 7.(9) | No Electronic Restraints | BC | PC | SC | SC |
| 7.(10) | No Firearms in Facility | BC | SC | SC | SC |
| | | | | | |
| Provision | Use of Force | | | | |
| 8.(1) | No Misuse of Use of Force | NC | NC | NC | NC |
| 8.(2) | Notice to Medical Professional After Use of Force | NC | BC | PC | PC |
| | | | | | |
| Provision | Meals and Nutrition | | | | |
| 9.(1) | All Meals and Snacks Must Be Nutritional | BC | PC | PC | PC |
| 9.(2) | Comply with Nutrition Guidelines | BC | BC | BC | BC |
| 9.(3) | Provide Drinking Water Throughout the Day | BC | BC | PC | SC |
| | | | | | |
| Provision | Clothing | | | | |
| 10 | Provide Basic Clothing Items | BC | BC | PC | PC |

| Provision | Hygiene and Sanitation | 5th Report | 6th Report | 7th Report | 8th Report |
|---|---|---|---|---|---|
| 11.(1) | Provide Appropriate Hygiene Products | BC | BC | PC | PC |
| 11.(2) | Provide Sleeping Mats and Blankets | BC | PC | PC | PC |
| 11.(3) | No Deprivation of Mats and Blankets | BC | PC | PC | SC |
| 11.(4) | Sufficient Sanitary Mats and Blankets | BC | PC | SC | SC |
| 11.(5) | Clean and Sanitary Environment | BC | BC | BC | BC |
| 11.(6) | Fire Safety, Weather Emergencies, Sanitation Practices, Food Safety, and Provide Safe Environment | NC | BC | BC | BC |
| 11.(7) | Clean Drinking Glasses and Eating Utensils | BC | PC | PC | PC |
|  |  |  |  |  |  |
| Provision | Medical Care |  |  |  |  |
| 12.(1) | Provide Residents With Adequate Medical Care | NC | NC | NC | NC |
| 12.(2) | Provide Medical Professional When Needed | NC | NC | NC | NC |
| 12.(3) | Implement a Sick Call Policy to Ensure  24 Hour Services | NC | NC | NC | NC |
| 12.(4) | Prescription Medications Only Dispensed by Medical Staff | NC | NC | NC | NC |
| 12.(5) | Provide Medical and Mental Health Services | NC | NC | NC | NC |
| 12.(6) | Proper Monitoring Residents Who Require Individualized Attention | NC | NC | NC | NC |
|  |  |  |  |  |  |
| Provision | Mental Health Care |  |  |  |  |
| 13.(1) | Provide Adequate Mental Health Care | NC | NC | NC | NC |
| 13.(2) | Residents and Psychotropic Medications | NC | NC | NC | NC |
| 13.(3) | Within 72 Hours of Admittance Complete an Individual Mental Health Treatment Plan | NC | NC | NC | NC |
| 13.(4) | Implement Policies and Procedures for Referrals | NC | NC | NC | NC |
| 13.(5) | Sufficient Psychiatric Services | NC | NC | NC | NC |
| 13.(6) | Psychiatrist and/or Counselors to Record Review to Ensure Proper Care | NC | NC | NC | NC |
|  |  |  |  |  |  |
| Provision | Suicide Prevention |  |  |  |  |
| 14.(1) | Multi-tiered Suicide Prevention Policy | BC | BC | BC | BC |
| 14.(2) | Evaluate Highest Level of Suicide Watch Every 12 Hours by Medical Professional | BC | BC | BC | BC |
| 14.(3) | Closely Monitor Suicide Watch Residents During All Activities | BC | BC | BC | BC |
| 14.(4) | Court Shall be Notified Within 24 Hours of Any Residents on Suicide Watch | BC | BC | BC | BC |
|  |  |  |  |  |  |
| Provision | Family Support and Interaction |  |  |  |  |
| 15.(1) | Visitation Shall Not Be Restricted or Withheld | BC | PC | PC | SC |
| 15.(2) | Provide Accommodations for Contact Visits | BC | PC | SC | SC |

| Provision | Family Support and Interaction (cont.) | 5th Report | 6th Report | 7th Report | 8th Report |
|---|---|---|---|---|---|
| 15.(3) | Visitation Shall be Regularly Scheduled | BC | PC | SC | SC |
| 15.(4) | Phone Calls Shall be Allowed Based on Policy | BC | BC | PC | PC |
|  |  |  |  |  |  |
| **Provision** | **Miscellaneous Provisions** |  |  |  |  |
| 16.(1) | Provide Equal Access To All Services | BC | BC | BC | BC |
| 16.(2) | Provide the Opportunity To Participate In Large Muscle Exercise Every Day | NC | NC | NC | NC |
| 16.(3) | Prohibit the Use of Profanity in the Presence of Residents | BC | BC | BC | BC |
| 16.(4) | Provide Adequate Grievance Policy | BC | BC | BC | BC |
| 16.(5) | Provide Residents of All Ages With the Opportunity to See Their Attorney and/or Residents Court Counselor | BC | BC | BC | BC |

**The following are my observations and recommendations specific to the provisions of this agreement.**

### 1. Intake

| | |
|---|---|
| Provision1.1 Intake | All residents admitted to Henley-Young shall receive a health screening, within 1 hour of admission or as soon as possible as reasonably thereafter, by appropriately trained staff as required by Mississippi Code Annotated § 43-21-321. Information obtained during the screening shall include, but shall not be limited to, the juvenile's: (a) Mental health; (b) Suicide risk; (c) Alcohol and other drug use and abuse; (d) Physical health; (e) Aggressive behavior; (f) Family relations; (g) Peer relations; (h) Social skills; (i) Educational status; and (j) Vocational status." Mississippi Code Ann. § 43-21-321(1). During this screening, Henley-Young shall obtain information regarding the resident's educational status by having the residents or intake officer complete an education screening form developed and provided by the Jackson Public School District. |
| Status | **Non-Compliance** |
| Discussion | During this visit and based on my previous visits, the County still needs to comply with the above mentioned Intake provisions.  As stated in my previous reports the facility stills need to develop policies and procedures, practices and protocols that comply with this provision.  Since this is a key provision, the school, the facility, mental health and medical should be involved in developing these policies, procedures and protocol.   Please see recommendations below: |
| Recommendations | 1. Fully develop admitting policies and procedures to reflect provision<br>2. The court should provide staffing for intake purposes<br>3. The facility should provide enough staff to fully cover the care and custody issues in the facility<br>4. Ensure all staff who admit residents are properly trained<br>5. Develop training records<br>6. Provide documentation in a organized way on residents being screened/admitted (files)<br>7. Ensure all residents' records are available for my review with all areas of the provisions placed in the resident's file |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 1.2 Intake | All residents shall receive a MAYSI-2 mental health screening upon admission, as required by Mississippi Code Annotated § 43-21-321. The screening will be conducted in private by appropriately trained staff of Henley-Young. If the screening indicates that the residents is in need of emergency medical care or mental health intervention including, but not limited to, major depression, suicidal ideation, withdrawal from drugs or alcohol, or trauma, the detention staff shall refer those juveniles to the proper health care facility or community mental health service provider for further evaluation immediately or as soon as reasonably possible. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  However, the County has provided funding to hire a mental health professional for the facility.  Once this person has been obtained, policies, procedures and protocols should be put in place to comply with this provision.  Although the facility continues to screen using the MAYSI-2, there is still no follow-up as a result of the information revealed by the screening. Further, there should be constant mental health follow-up as it relates to residents that have been identified with warning and caution signs regarding their behaviors.  In addition, the facility still needs to develop adequate policy and procedures for this provision which is very difficult without having a mental health program in place. In my review of documents, the following continues to apply as it relates to this provision.  During my review of documents, there were several incidents dated 8/5/14, 8/27/14, 9/23/14, 10/5/14, 11/19/14, and 11/24/14 that revealed residents who were engaged in suicide attempts, gestures and thoughts.  As stated in my last report (7th), the facility needs first to answer the following questions below; then follow the recommendations.

A.  What are the program objectives for mental health screening?

B.  What are the characteristics or common traits the program wants to identify for emergency or follow-up clinical consultation?

C.  What MAYSI-2 scores will the facility use as the signal for the program staff to obtain clinical consultation or services?

D.  What mental health follow-up services are available when the resident's MAYSI-2 score indicates that they are needed?

E.  In what way will the facility develop a database that creates a profile of mental health needs in the population and program \decisions and adjustments needed to improve mental health services for the residents?

During this visit, I observed several residents that were admitted to the facility and although the MAYSI-2 was completed on these residents it was done so in a manner in which there was a "rush" to complete the instrument and the computer was down therefore it had to be done manually.  By | |

| | rushing the process, there is a high probability that residents would not be assessed accurately; leaving them at risk for inadequate treatment or no treatment at all.  This leaves the facility vulnerable to legal actions due to the potential harm, inadequate services poses to the residents that you seek to serve. |
|---|---|
| Recommendations | 1.  Develop comprehensive policy and procedures for this provision.<br>2.  Develop resident files that are organized and arranged properly<br>3.  Develop training and provide documentation of training<br>4.  Identify person or person(s) whose responsibility is to score the instrument<br>5.  Provide documentation on who reviews the  instrument and note what services are provided for the residents in the facility and what services should continue when the residents leave the facility<br>6.  Develop process whereby facility staff and court employees develop a system for the sharing of information and reviewing of residents' files which are centrally located and accessible to detention staff. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 1.3 Intake | Prescription medications will be secured for all residents who have a valid, current prescription within 8 hours of admission, if possible, but in no case, longer than 24 hours after admission, including weekends and holidays. If during a resident's detention, a medical professional either prescribes a new medication or renews a resident's previous prescription medication, Henley-Young will secure the prescription medication within 8 hours of receiving the prescription, if possible, but in no case, longer than 24 hours after receiving the new prescription, including weekends and holidays. Henley-Young shall procure and/or purchase all prescription medications prescribed to confined residents. |
|---|---|
| Status | **Non-Compliance** |
| Discussion | As stated in my previous reports, the status of this provision remains as non-compliance based on document review, interviews and observations.  I reviewed several residents' files and their medical/mental health needs are still not being met.  Specifically, training of **universal precautions** is sorely needed. It should be noted that based on the fact that the medical program is not in place and files are in disarray, determining whether or not residents are receiving new prescriptions or if prescriptions are received within 24 hours is problematic at this time. This should be a part of the new medical policies, procedures and protocols once the new medical contract is in place.<br><br>The facility should continue to follow the recommendations below which are the same as in the previous report. The initial intake/admission process is a critical part of residents' transition when they are entering the facility. During |

|  |  |  |
|---|---|---|
|  | my review I found that because of the lack of staffing, it was very difficult for staff to really get a firm understanding of residents when they entered the facility.<br><br>Having two RNs is a major improvement in the medical services however there is still a need for a physician to direct medical care. The nurses cannot prescribe medications, perform invasive evaluations, and when needed, write standing medical orders. Further they cannot perform complete physicals on residents when they enter the facility. It should be noted, residents are not receiving physicals as required based on minimal juvenile detention standards and the Mississippi Youth Court code (43-21-321). In addition, there is no Pharm D to oversee medication administration and dosage. I saw no biomedical hazard receptacles, which implies that the facility has no contract with a waste removal company.<br><br>Again, based on my review of documents and observation, over the past two and a half years no doctor, physician's assistant or practitioner has been hired. Also, there are no policies, procedures or protocols to guide these nurses. Therefore I am reiterating that the suggested actions and recommendations from my previous report be reviewed and put into action. I did meet with the current medical providers and they are in agreement that policies, procedures and protocols are needed. In addition, it should be noted that the company that is providing the medical services is a temporary staffing agency therefore there is a strong need for a licensed medical doctor, physician's assistant or a practitioner must be involved in developing the medical department. |  |
| Recommendations | 1. Hire a Medical Doctor, physician's assistant or a practitioner. This person must be involved in developing the medical department and to direct medical care.<br>2. Develop written policy and procedures or protocol for this provision<br>3. Document staff training on distribution and side effects of medication<br>4. Provide documentation on efforts to obtain prescription drugs |  |
| Evidentiary Basis | Document review, observation, interviews |  |
| Provision 1.4<br>Intake | Upon admission to Henley-Young, all residents shall be offered a snack or meal in compliance with the United States Department of Agriculture's School Meals Program standards. |  |
| Status | **Substantial Compliance** |  |
| Discussion | The facility has moved to substantial compliance on this provision based on my observation, interviews and review. Therefore the facility must continue to follow the recommendations below. |  |
| Recommendations | 1. Continue in the development of policies and procedures for this provision.<br>2. Procedures should be part of intake/admission procedure. |  |

| | |
|---|---|
| | 3. Ensure there are snacks or sandwiches available for residents being admitted between 6 pm and 5 am.<br>4. Ensure enough staff members are available to fully comply with the policies and procedures. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 1.5<br>Intake | Upon admission to Henley-Young, all residents shall be permitted to telephone a parent or legal guardian free of charge and to take a shower before being placed on the pod. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility has moved to substantial compliance on this provision, based on my observation and review.  Therefore the facility must continue to follow the recommendations below. | |
| Recommendations | 1. If officers have been trained on this policy, they may need retraining.<br>2. Develop a consistent way to document the intake process that shows that a phone call and shower were completed.<br>3. Develop policy and procedure for this provision.(executed)<br>4. Train staff and document this training. | |
| Evidentiary Basis | Document review, observation, interviews | |

| | |
|---|---|
| Provision 1.6<br>Intake | Within 60 days of the date of this agreement, Henley-Young shall develop and implement policies that limit strip searches to instances where Henley-Young staff has an articulable suspicion that a resident may possess weapons or contraband. Anytime a strip search is conducted, Henley-Young staff must document, in writing, their suspicion, obtain permission from a supervisor, and conduct the search in a manner that minimizes the intrusion into the resident's privacy. |
| Status | **Beginning Compliance** |
| Discussion | The status of this provision remains as beginning compliance.  Based on my interviews with residents and review of documentation, there is a lot of contraband still coming into the facility that needs to be addressed.<br><br>This amount of contraband continues to create a dangerous environment which is evident by contraband discovered on 9/27/14, 10/10/14, 10/21/14, 10/28/14 and 11/19/14.  During my review of documents, I found that on several occasions, cigarette lighters, matches and cigarettes were found in the resident's rooms to the point where several fires were started and created smoked filled rooms.  This is a very dangerous and hazardous situation that must be addressed therefore my recommendations below still stands.<br><br>Although there is an agreement between the Board and SPLC regarding strip searches, I disagree with this as does the ACA as stated below.<br>As it relates to proper intake and safety and security in a secured environment, the following must exist. Security (secured) is defined as "being free from danger or risk of loss: safe, fear from fear or doubt, anything that gives or assures safety".  Security is an intricate and essential component of a juvenile detention facility.  The process for admitting a resident to detention is extremely important. There is an art to getting residents fully and smoothly involved in the detention program.  The admission process is what is called the "critical hour" because it is the first encounter with the resident.  It is the first impression, sets the tone and it establishes the 'flavor' for the entire stay in detention.  Detention is a complex situation, placing troubled residents together in a confined environment with high levels of uncertainty.  The risk for problems is very high for both residents and staff. Good detention facilities supply staff with a substantial amount of information at admission. Since the first moments are critically important because it sets the tone it is important to have the best staff assigned to the admissions area. In addition, it is very important staff understand that youth are coming off the street based on being arrested and they are not  aware of the circumstances surrounding the arrest or if the youth  were properly searched by the arresting police officer.  There are natural consequences when this process is not completed correctly. Therefore, to be clear the following should apply to residents being searched upon entering the facility.  When staff are authorized to conduct a strip search, these guidelines should be observed for the staff's protection: |

- a strip search should occur only after staff have had training on how to conduct a strip search
- strip searches should be conducted in a private area of the detention facility
- staff must maintain a professional demeanor throughout the process
- the resident should be asked to remove all of their clothing, and staff should refrain from inappropriate comments and staring
- staff should not touch a resident during a normal strip search
- staff are only permitted to conduct a strip search on a resident who is of the same sex

Drug-related offenses, violent offenses, and serious felony offenses do constitute a reasonable suspicion to conduct a strip search. Additionally, the frisk search at admission and the inventory search of property may uncover contraband that creates a reasonable suspicion to conduct a strip search. Staff should be advised to conduct a strip search on all juveniles at admission.[1] ACA recommends completing a strip search as part of the admission process. In the absence of case law on the subject, conducting a strip search as a routine part of the admission process is advisable. Body-cavity searches are to be conducted by a licensed health care provider with the authorization from the responsible physician and facility administrator; staff should never conduct a body-cavity search. Specific reference is made to a visual, manual, or instrument search of a residents' anus and/or vagina. (Desktop Guide for Good Juvenile Detention)

Based on the above, additional staff is required and the intake area must be stabilized as it relates to permanent and trained staff in the area. During my observation of the area, the facility continues to move staff in and out of the area which does not provide adequate coverage. Again, staff is being pulled throughout the building to complete the admission process. Therefore the statement below still stands.

Based on my observations and review, as stated in my last report, the facility does have policy and procedures for this provision. During my interview with residents I found no residents who acknowledged there was inappropriate intrusion during the search process upon their admission to the facility. I did review the process, and to become further compliant with this provision there must be documentation of the policy and documentation of staff training on this procedure. Although this is an area of concern, strip searching is necessary to

[1] Although, this provision will need modification, I understand that Hinds County has ceased its practice of strip searching residents during the admission process at Henley-Young unless there is an articulable suspicion that a resident possesses weapons, drugs, or contraband and is in the process of implementing a policy that complies with the consent decree.

|  |  |  |
|---|---|---|
|  | ensure no contraband enters the facility. As long as searches are conducted in a humane manner by an officer of the same sex as the resident, no resident's rights are being violated. My greatest concern was that in my interviews I learned that some of the residents reported that they were not searched before being placed on a unit. The process I observed was very loose and not well structured. It is important that the officers follow the policies and procedures as they direct this process. Failure to follow these procedures presents the possibility of having a very dangerous situation in the facility. The facility must follow its policies and procedures to provide a safe and secure environment. Continue to comply with this provision. |  |
| Recommendations | 1. Staff must be provided with the necessary training with information stating the trainer, name of the training class/course, time, date and location of training.<br>2. This documentation should be kept and logged in facility records<br>3. Provide enough staff for adequate coverage 24/7. |  |
| Evidentiary Basis | Document review, observation, interviews |  |

## 2      Staffing and Overcrowding

| Provision 2.1 Staffing and Overcrowding | Within 90 days of the date of this agreement, Henley-Young shall operate with a direct care staff to resident ratio of 1:8 from the hours of 6:00 a.m. until 10:00 p.m. and a ratio of 1:10 from the hours of 10:00 p.m. to 6:00 a.m. |  |
|---|---|---|
| Status | **Non-Compliance** |  |
| Discussion | The status of this provision remains as non-compliance.  However, the County has allocated additional funding to hire 21 additional detention officers, a recreation coordinator, onsite skilled maintenance and a mental health professional.<br><br>Please see my introduction as it relates to staffing.   Nothing in the statement below from my last report (7th) has changed.<br><br>Based on my previous review, I am again reiterating that although the facility is not overcrowded and the average population  has been 36.8 based on a five month analysis of Henley-Young records it still suffers from staff shortages, Until the additional staff are hired and trained this problem will continue. Again, since the facility is short on staff, the staff members are under pressure to keep the peace at all cost. Several officers I interviewed during this visit again continued to express concerns regarding their ability to do their jobs, citing staffing as the problem.  According to the residents I interviewed they are out of their rooms more than before however on the weekends there still continues to be a problem with residents being secured in their rooms when they should be out. |  |

As stated above there are still many conflicts between the mandates of the court, the school and the facility. Students who have court still are not allowed to return to the classroom after their appearances, teachers still suspend students from school based on their needs rather than the parameter of the detention facility and an already stretched staff becomes more stretched. These types of issues create problems that the line staff cannot surmount.

This is another indication that when there is not sufficient staff available, officers have a tendency to not engage residents on their inappropriate behavior, which in turn affects any structured programming. Again, the Henley-Young officers are compelled to react to minor misbehaviors, out of fear that small situations will become big ones. As stated in my last report, they are locking down residents that present potential conduct issues so other residents will be safe. Further, the officers are not equipped to handle residents with mental health problems. This thinking only exacerbates a resident's misbehavior when they are outside their rooms because they have nothing to lose because their misbehavior only gets them a return to their rooms. The approach is counter-productive and not in line with good juvenile detention practices. Because there are no qualified mental health professionals, at Henley-Young, residents are isolated and their needs are not being met. This situation places direct care staff in a quandary on how to handle these residents. Without regular access to mental health professionals, children often deteriorate and staff members become apprehensive regarding their next step, so isolation becomes the norm. This should be addressed by the new director.

During this visit my observations and my record review revealed that because of the inadequate staffing levels there are no consistent security checks of residents who are placed on behavior management or isolation. There were residents placed on behavioral management and isolation without the appropriate documentation on the doors (i.e. supervisors' signature see Exhibit F). This indicates that the residents are not being properly observed during this period, and that no records are being made of the residents' behavior while in behavior management or isolation. Therefore, there is a need for major training as it relates to behavior management and isolation of residents at Henley-Young.

Based on the resolution by the Hinds County Board of Supervisors dated November 3, 2014 and my review of data for a five month period, the population of the facility should average no more than 32 residents.  In addition, in looking at five months of data the average number of bed days for residents who are charged with domestic violence was 736 bed days. In addition, youth who are placed in the SIU/89 day program had a bed day usage of 932 bed days.  These numbers revealed that domestic violence and 89 day residents who are being held in detention should have a different arrangement than utilizing the more expensive detention beds. (Please review my technical

| | |
|---|---|
| | report dated November 24, 2014 submitted to the court.) With the reduction in population, the hiring of additional direct care staff the matrix below will reduce the needed direct care staffing which was discussed with the facility and board attorneys based on my technical assistance visit.  However, the County must still ensure there are adequate case management services provided by the facility.  Correspondingly, protection from harm, facility medical services and appropriated mental health services are vital for compliance with the settlement agreement/consent decree.  It should also be noted that there is a need for adequate supervisory staff to be available on each shift as discussed with the Board attorneys and facility administration. |

| - Recommendations | Units | Day Shift | Evening Shift | Night Shift | Total |
|---|---|---|---|---|---|
| | A officer | 3 | 3 | 2 | 8 |
| | B officer | 3 | 3 | 2 | 8 |
| | C officer | 3 | 3 | 2 | 8 |
| | D officer | 3 | 3 | 2 | 8 |
| | Intake | 1 | 1 | 1 | 3 |
| | Master Control | 1 | 1 | 1 | 3 |
| | Staff for Court Transportation | 2 | 2 | | 4 |
| | Internal Transportation | 2 | 2 | | 4 |
| | Laundry | 2 | 2 | | 4 |
| | *Director | 1 | | | |
| | *Deputy Director | 1 | | | |
| | *Operation Manager | 1 | | | |
| | Supervisors | 3 | 3 | 2 | 8 |
| | | 26 | 23 | 12 | 61 |

**Duty Post Staffing/Administration**

61 Direct care/supervisor/laundry staffing X 1.5 Relief Factor—Total staff needed to effectively operate the facility—91.5
1 to 8 Awake —1 to 10 Sleep

Misc. post coverage
Medical/MH Hospital Runs
One on One MH/Medical
Visitation
*Administration
*Maintenance

| Evidentiary Basis | Document review, observation, interviews |
|---|---|

| Provision 2.2<br>Staffing and<br>Overcrowding | If the staff-to-residents ratio falls below the requirements of section 2.1 for longer than two (2) days, the Director or his assignee shall immediately identify residents accused of nonviolent offenses who are eligible for less restrictive alternatives to secure detention and request an emergency release for eligible residents from the appropriate Residents Court. The maximum capacity of Henley-Young shall be calculated by determining how many direct care staff members can supervise residents in accordance with section 2.1. The current maximum capacity of Henley-Young is 84. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility continues to be in substantial compliance on this provision based on my review of documents, interviews and observations.  The facility does have policies and procedures in place signed by the Court Administrator, the YC Judge and the Executive Director.<br><br>Although the facility has not reached its maximum capacity of 84 there is a procedure in place to ensure steps are taken for releasing of residents who meet the criteria. | |
| Recommendations | Continue to provide training to ensure that everyone is aware of the new policy and prepared for implementation should the need arise. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 2.3<br>Staffing and<br>Overcrowding | No more than one resident shall be placed in a one-person cell. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility continues to be in substantial compliance on this provision. I found no indication that the facility had more than one resident in a room.<br><br>The facility has developed policies and procedures for this provision. | |
| Recommendations | 1. Develop and provide adequate training for this provision.<br>2. All training shall be documented. | |
| Evidentiary Basis | Document review, observation | |

### 3   Cell Confinement

| Provision 3.1 Cell Confinement | Residents shall be engaged in structured, rehabilitative, and educational programming outside of their cells during the hours of 7:00 a.m. to 9:00 p.m. each day, including weekends and holidays. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision has moved to beginning compliance, based on my review of documents, discussion and observations, residents are out of their rooms during weekdays however the County must work on creating programming and supplying enough staff on the weekends so that residents are engaged in structured rehabilitative programming. In addition, as stated in my introduction as it relates to the school, the courts and the facility residents who are placed out of school for behaviors or court should be either in school or provided educational services despite the fact that they are placed on the units. The facility should still follow the recommendations below.<br><br>Therefore my statements below still stand.  In addition, as it relates to the school, since there has not been an evaluation of the school, I would be recommending an external audit by a qualified educational consultant.<br><br>During this visit, I still found very limited indications that structured rehabilitative and educational programming was occurring.  There was no posting of activities within the facility and I found limited documentation detailing any activities or programming.  The new recreational leader has developed a limited schedule which he is in the process of implementing which I will review on my next visit.<br><br>Again, please review the introduction as it pertains to activities, recreation and programming. As to the school I direct you to read the introduction and I further recommend that the school be fully evaluated. My review of the files showed that there is no case management within the facility as a whole. According to the residents, their basic recreation consists of playing cards and dominoes. They are allowed to go outside but there are no scheduled activities. Other than sitting on the bleachers and playing basketball for those who are engaged in that sport, there was nothing for residents to do. There are no positive behavioral management programs within the facility. | |
| Recommendations | 1. Develop policies and procedures for this provision.<br>2. Review the schedules to be sure that they adequately reflect all daily activities.<br>3. Develop positive behavior management systems with rewards and consequences.<br>4. Remove the dark film from the Plexiglas in towers on unit which would allow staff to view the unit without there being visual | |

|  | obstruction (when lights on). **Executed**<br>5. Develop monthly recreation schedule.<br>6. See all of the recommendations for recreation activities and programming and for the school in the introduction. |
| --- | --- |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 3.2<br>Cell Confinement | Except when residents are in protective custody or confined subject to section 3.3 of this Settlement Agreement, residents placed in the Suicide or Booking cells shall be allowed to spend the hours of 7:00 a.m. to 9:00 p.m. on the appropriate living unit and to have the opportunity to engage in structured, rehabilitative, and educational programming, unless medically counter-indicated. |
| --- | --- |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents, interviews with residents and staff, and observations, residents are still being held in the booking area when they are placed out of school for behavior issues. Students are also being held out of school after court hearings.  Again, this should be addressed by the facility and the court.  Students should be returned to the educational program after court. As it relates to structured rehabilitative programming, the hiring of the two recreation officers should assist in the development of scheduled structured activities for residents that are productive and rehabilitative. This should help to reduce stress for staff and residents.   For this reason I will reiterate my statements from my previous report (7th).<br><br>My review of documents and observations showed that the facility still has not developed policy and procedures for this provision. During my review, I found residents on the unit living area still not being supervised (see Exhibit G). Again, as stated in my introduction, there were residents who were not allowed to attend school for the remainder of the day after returning from court. This is an issue that needs to be addressed immediately. This visit, I observed eight residents who wanted to return to school but were not allowed. As stated previously, I recommend that students who are disruptive in the classroom and are removed from the classroom receive either behavioral management or are written up and receive due process. However, they should continue to be a part of the educational process. The school needs to revise any policies they may have regarding suspension of students from a school within a controlled environment. A student cannot be suspended from school in a detention facility therefore the school needs to develop a better behavioral management system. If a resident is removed from school due to behavioral problems that resident should never be placed in the booking |

| | |
|---|---|
| | area. |
| | The facility still needs to develop data collection tools to use to determine and identify who is placed on units, time, length etc. when they are placed out of school. The facility remains non-compliant with this provision, therefore I am reiterating that the suggested actions and recommendations from my previous report be reviewed and put into action. |
| Recommendations | 1. Follow recommendations as set forth in section 3.1.<br>2. Develop adequate policies and procedures for this provision.<br>3. Develop data collection for residents who are placed in protective custody or confinement.<br>4. Residents who are removed from school should be placed in a designated living area. |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 3.3<br>Cell Confinement | Residents who pose an immediate, serious threat of bodily injury to others may be confined in their cells for no longer than 12 hours at a time without administrative approval. Residents who are placed on cell confinement for this reason shall be released from their cells daily to attend school, maintain appropriate personal hygiene and to engage in one hour of large muscle exercise. Staff must perform visual checks on residents who are subject to cell confinement every 15 minutes. Staff must document all instances of cell confinement in writing and must document the justification for determining that a resident poses an immediate, serious threat of bodily injury. |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents, interviews with residents and staff and observation, residents are still being confined in their cells for long periods of time without appropriate documentation.  During this visit, I also found eight residents, although they were not locked in their rooms, they were on the units without being engaged in any meaningful programming or activities because they were placed out of school.  Staff was still in the towers and not interacting with the residents on the unit.  I have discussed this in my previous reports stressing that there must be enough staff in order for the staff and the residents to be engaged and for the  safety and security while residents are on their units.  Supervising residents from the tower fails in the face of good supervision and rehabilitation.<br><br>Therefore the statements below from my previous report (7th) still stand.<br><br>During this visit, I did find that the facility has developed a system for |

|  | procedural due process for facility violations. However, there are no supervisory checks to the process which are critical to ensure that staff are following the policies and procedures and not just placing residents in their rooms discriminatorily.  As stated in my previous reports the facility has developed policies and procedures and the QA department is doing a good job however there still needs to be adequate training to ensure everyone is following the process.   As stated in my previous report I did review the new forms developed, they are aligned with best practices, however they are not being appropriately used. See my discussion of this matter in the introduction. Though processes on a few provisions have begun, it is vitally important that policy and procedures are developed to ensure a consistent, comprehensive, and standardized way of running the facility. |
|---|---|
| Recommendations | 1. Develop adequate policies and procedures for this provision.<br>2. For residents placed in their rooms, develop forms that indicate the time residents will be in their rooms and post it on their doors.<br>3. Ensure that supervisors sign off on the form in 15 minute staggered visual checks when residents are placed in their rooms.<br>4. Develop a system of major and minor consequences for behavior.<br>5. Develop form for 15 minute checks and include in policy. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 3.4<br>Cell Confinement | Residents shall not be automatically subjected to cell confinement and/or isolation upon their admission to Henley-Young unless he or she would be subject to cell confinement under section 3.3. |
|---|---|
| Status | **Non-Compliance** |
| Discussion |  This status of this provision remains as non-compliance, therefore my discussion below still stands.<br><br>As I address this provision, I must first state that the violation of this provision is directly associated with the lack of staff to properly admit residents to the Henley-Young facility. The facility is still coordinating this provision with provision 3.3 and policies and procedure are still in developmental stages. Once completed training and documentation will need to be addressed. However, during my visit on several occasions, I observed residents that were placed in their rooms and locked down because there was a lack of staff, with no orientation and no freedom to move about the unit. This can only be addressed when there is enough staff. No residents should be gratuitously subject to lock down. Please review my introduction. |
| Recommendations | 1. Develop adequate policies and procedures for this provision.<br>2. Ensure all staff is trained and document training.<br>3. See provision 3.3 |

| Evidentiary Basis | Document review, observation |
|---|---|

| Provision 3.5 Cell Confinement | At all times between the hours of 7:00 a.m. to 10:00 p.m., at least one direct care staff shall be stationed on any living unit where two or more residents are placed, and direct care staff shall be actively engaged with residents. From 10:00 p.m. to 7:00 a.m., staff shall conduct visual checks on residents every 15 minutes. Henley-Young shall ensure that every cell has an operating intercom that allows residents to communicate with staff at all times. |
|---|---|
| Status | **Beginning Compliance** |
| Discussion | The status of this provision remains as beginning compliance, therefore my discussion below still stands.<br><br>The facility has developed a policy and procedures regarding this provision. Again due to the lack of staff, it is very difficult for the facility to address this provision. During this visit I found residents were left unsupervised as stated in my previous reports and this continues to happen. Again, residents were on the unit without supervision although one staff was in the tower. There were doors opened on the unit which also allows for serious things to happen between residents. This is a major area of concern and must be addressed. It continues to make me uneasy as it has during my previous visits. Review of documentation and direct observation reveals that staffing continues to be a major problem at Henley-Young. The facility remains non-compliant with this provision, therefore I am reiterating that the suggested actions and recommendations from my previous report be reviewed and put into action. Since a policy has been developed this provision remains in beginning compliance (**see Introduction).** |
| Recommendations | 1. Develop adequate policies and procedures for this provision.<br>2. Provide adequate staffing.<br>3. Provide adequate staff supervision. |
| Evidentiary Basis | Document review, observation, interviews |

## 4  Structured Programming

| | |
|---|---|
| Provision 4 Structured Programming | Henley-Young shall administer a daily program, including weekends and holidays, to provide structured educational, rehabilitative, and/or recreational programs for residents during all hours those residents shall be permitted out of their cells, pursuant to section 3.1. Programming shall include: <br> a. activities which are varied and appropriate to the ages of the residents; <br> b. structured and supervised activities which are intended to alleviate idleness and develop concepts of cooperation and sportsmanship; and <br> c. Supervised small group leisure activities, such as a wide variety of card and table games, arts and crafts, or book club discussions. |
| Status | **Beginning Compliance** |
| Discussion | The status of this provision has been moved to beginning compliance. <br><br> The facility's new recreation supervisor has developed a daily schedule and is in the process of implementing the program.  I reviewed the documentation and it revealed that the facility has developed a recreational schedule. However, it should be reviewed by the administration to ensure that it is being followed.  My review of the documents showed that visitation is only twice a week when the facility's policy dictates visitation should be three times a week.  It should be noted that in my interviews with residents and staff, visitation is three times a week however for consistency purposes and new employees, the schedule must reflect what actually occurs.  In my discussion with the new recreational supervisor, he is moving in the right direction however there is a need for adequate equipment for structured games and activities. <br><br> I have noted that weekend activities are missing from the program which suggests that residents are being confined to their units/rooms as they indicated in my interviews.   The facility should continue this development of this provision, the facility administration should continue to support the program being implemented and provide the resources necessary for its implementation, it is moving in the right direction.  Therefore I am reiterating that the suggested actions and recommendations from this report be reviewed and put into action. |
| Recommendations | 1. Continue to develop adequate policies and procedures for this provision. <br> 2. Provide adequate schedules for weekdays and weekend programming and act on it. <br> 3. Develop an adequate monthly recreation schedule with age appropriate games and programs. |

| | |
|---|---|
| | 4. The facility need to hire an officer dedicated to developing and monitoring recreational programs. |
| Evidentiary Basis | Document review, observation, interviews |

### 5. Individualized Treatment Plans Treatment For Post-Disposition Residents

| Provision 5.1 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall ensure that residents have access to adequate rehabilitative services. Henley-Young shall ensure that children placed in the facility post-disposition will receive constitutionally compliant rehabilitative services. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand.<br><br>See the discussion of the 89 day program in the Introduction.<br><br>Since there is no structured programming outside of individual counseling, the County may want to hire case managers to provide initial and ongoing case management services (i.e. treatment planning, family assessments, educational assessments, referrals for mental health or health services). Also the case manager will identify indicators of goals achieved, specify the person responsible for implementing the resident's and family's treatment goals; update treatment plans; and develop discharge plans with recommendations. In addition, the facility needs counselors who are responsible for a resident's safe adjustment to secure confinement. | |
| Recommendations | 1. Develop adequate policy and procedures to meet this provision.<br>2. Either fund properly or discontinue the 89 day program.<br>3. Review light weight residents in program (i.e. disturbing the family peace) and find alternative placement for them.<br>4. Fund appropriate staffing to develop individualized treatment plans for residents in 89 day program.<br>5. Develop and fund alternative community programming for residents in 89 day program that can be serviced in community.<br>6. Hire 3 case managers who are assigned and work for the facility director. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 5.2 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall ensure that residents in need of mental health and/or substance abuse treatment and/or who are in the facility post disposition shall have appropriate treatment plans developed and implemented in accordance with generally accepted professional standards of practice for mental health and rehabilitative services. |
|---|---|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand. See the technical assistance provided to the court dated November, 2014.<br><br>Based on my review of documents and observation, services are not in place and are still not being provided for this provision. I am reiterating the action and recommendation from my previous report below.<br><br>Residents entering the facility pre or post disposition (89-day program) still have no treatment plan as it relates to mental health although some residents are being seen by Hinds Behavioral Health counselors. Once a resident enters the facility and the screening shows evidence and warning signs of suicidal ideations, traumatic experiences, depressed moods, and/or somatic complaints etc. that are indicated by the MAYSI-2, the residents should be evaluated and have a treatment plan developed.<br><br>There is no documentation to show that treatment was provided to residents based on identified warning signs; there are no treatment plans available, and there is no mental health staff available to implement the treatment plans. Also, I found no treatment plans for residents that were currently at the facility or post treatment plans for residents leaving Henley -Young. Interviews with staff showed they were very frustrated with the lack of mental health services at the facility. In addition, there is no functional system in place to address residents with mental health issues or exhibiting mental health behaviors. Also, residents having problems within the school should at least have an IEP to determine whether they are in need of placement within the special education program over and above any need for mental health services. At this point, there is no indication that any mental health services, beyond the MAYSI-2 are being provided other than those services provided by Hinds Behavioral Health which is limited at best. However, I found no documentation of any services provided to residents at Henley-Young (i.e., treatment plans, screenings or evaluations, etc.). See Introduction. |
| Recommendations | 1. Develop adequate policies and procedures for this provision.<br>2. See recommendations under (5.1). |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 5.3 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall implement policies and procedures for the required content of treatment plans, which shall include; <br> a. That the treatment plan be individualized; <br> b. An identification of the mental and/or behavioral health and/or rehabilitative issues to be addressed; <br> c. A description of any mental health, medication or medical course of action to be pursued, including the initiation of psychotropic medication; <br> d. A description of planned activities to monitor the efficacy of any medication of the possibility of side effects; <br> e. A description of any behavioral management plan or strategies to be undertaken; <br> f. A description of any counseling or psychotherapy to be provided; <br> g. A determination of whether the type or level of treatment needed can be provided in the resident's current placement; and <br> h. A plan for monitoring the course of treatment, and if necessary, for revising the treatment plan. <br> i. A description of the precise terms the of the facility's long-term and short-term objectives for the residents, the full range of services to be provided, and procedures, and timetables and staff assignments for the implementation of such treatment plan; <br> j. A plan for regularly engaging the family in the resident's treatment  plan; <br> k. A comprehensive re-entry plan that will assist the residents re-enroll in their home school and access medical, mental health, Vocational and rehabilitative services based in the community. |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand. See the technical assistance provided to the court dated November, 2014. <br><br> The facility still has not developed policy and procedures for this provision. Please see previous report. As stated in provision 5.1, the facility still needs to develop the appropriate program structure with adequate staffing, adequate therapeutic treatment, supervision, education, etc. Henley-Young is still non-compliant as it relates to this provision. Because there has been no movement on this provision, I am reiterating the actions and recommendations from my previous report below. See introduction. |
| Recommendations | 1. Develop comprehensive policies and procedures for this provision that includes the contents (A-K). <br> 2. The County/Court shall define the criteria for the program <br>     a. It is important that post dispositional programs in other facilities be reviewed. |

|  |  |
|---|---|
|  |     b.  Often seeing what is being done in other facilities provides insight into how to develop and operate these programs.<br>3.  Provide dedicated staff to manage program.<br>4.  Provide intensive training to these staff members.<br>    a.  Train staff in various treatment modalities i.e. cognition, behavioral modification, modeling, psychotherapy, reality therapy, group therapy and group dynamics and other skills required to successfully facilitate the goals of the 89 day program.<br>    b.  Create treatment teams<br>    c.  Develop case planning and program development<br>    d.  Assessment of the program to determine if it meets the needs of the court placed residents.<br>    e.  Assessment tool to regularly monitor the success or lack of success of all residents in the program.<br>5.  Provide auxiliary training to all other direct care staff. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 5.4 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall institute a program of periodic staff reviews every three weeks and evaluations of each resident's progress under his/her individualized treatment plan and of the appropriateness of the plan itself and Henley-Young's plan for such review. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand. See the technical assistance provided to the court dated November, 2014.<br><br>Based on my review of documents and observation, services are still not in place and are not being provided for this provision. I am reiterating the actions and recommendations from my previous report below. Please see the previous report and provisions 5.1 and 5.3, take note of the discussion of these issues in the Introduction. | |
| Recommendations | 1.  Develop comprehensive policies and procedures for this provision.<br>2.  Provide training to all staff.<br>3.  Identify roles and responsibilities of direct care, treatment and educational staff as it relates to the staffing for 89 day program through policies and procedures and adequate funding and staffing. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 5.5 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall develop and implement a program that provides for evening and weekend programs and activities that allow residents to engage in meaningful activities. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand. See the technical assistance provided to the court dated November, 2014.<br><br>Based on my review of documents and observation, services are not in place and are still not being provided for this provision. I am reiterating the actions and recommendations from my previous report below. The programming of the facility is at a standstill as it relates to this provision. There are very few activities on weekends therefore there is no meaningful programmatic, structured activities except for card playing and dominoes. Take note of the discussion of these issues in the introduction. | |
| Recommendations | 1. Develop comprehensive policies and procedures to meet the needs for this provision.<br>2. Provide adequate staffing for this program.<br>3. Develop a monthly recreational program with activities.<br>4. Keep records of activities provided and note those that were not provided and why.<br>5. Purchase board games etc.<br>6. Hire recreational staff. (executed) | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 5.6 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall develop and implement an adequate quality assurance program. | |
|---|---|---|
| Status | **Partial  Compliance** | |
| Discussion | The facility has remains at partial compliance on this provision. | |

A review of documents and interviews with the QA staff reveals that they are moving in the right direction. However, they still need support from the administration to ensure that there is follow through on their recommendations. The data that the QA managers are collecting is on the right path to fulfilling this provision.  My review of documents reveals that the QA unit is auditing areas however there is a lack of follow up by the administration once the audit has been conducted.  There must be corrective action plans completed and follow up to ensure that they are in compliance with the facility's policies and procedures.  An example will be memo dated 9/29/2014 regarding feeding procedure and visitation.  In reviewing the documents I found no corrective action or administrative follow up based on the QA audit.  In reviewing the memo from 8/14/2014, there were 12 areas cited however I saw no corrective action or administrative follow up based on the QA audit.  As it relates to statistical data, I would work with the facility upon my next visit to improve on their data collection.  An example of statistical data improvements would be due process isolation log:

    a.  what are violations
    b.  were there any appeals
    c.  types of incidents residents involved in
    d.  computerizing the daily rosters to ensure better accuracy
    e.  average length of stay
    f.  age
    g.  zip code
    h.  average bed days
    i.  average daily population
    j.  the number of days individual resident have been in facility
    k.  computerize jail log and document book
    l.  the number of major and minor infractions (see Exhibit H)

These are just a few areas we will work on as we develop the QA unit more.

However, I will continue to offer technical assistance to ensure that the data is used to achieve effective outcome measures and assist with development of policies, procedures, protocols and training.  In addition, the outcome measures should be quantifiable (measurable), events, occurrences, conditions and behaviors. This data should be collected continuous and analyzed periodically. In addition, the QA coordinators are being pulled away from their assigned duties to provide occasional supervision and direct care work based on my review of documents and observations.  This again creates a cycle of staff whiplash because there is a lack of focus, structured working environment.

As it relates to due process it is important that the hearing officers are well versed in the ACA standards as to the handing out of disciplinary

| | |
|---|---|
| | consequences for charges during hearings. There are specified ranges for major and minor offenses. Also, there is no place for cumulative discipline, because part of the due process is to deter negative behavior at its first occurrence. Also, many residents are placed on isolation with no due process, to the point that it appears to have become a behavior program. There is no record of the time, or the reason for these actions. It concerns me that this is another example of creative action when there is not enough staff or enough programming to better address these issues.<br><br>Therefore my statements below still stand at it relates to the treatment program.<br><br>The facility's policies and procedures for an individualized treatment program for post disposition residents have not been presented or approved.<br><br>It should be noted that the courts must also be involved in the development of the quality assurance program. There must be a system in place to evaluate the 89-day program when residents are assigned to it. In addition, data should be collected and retained to determine if the program is achieving its expected outcomes. It is very difficult to develop an effective treatment program or individualize treatment plans without an adequate review of the processes in place. |
| Recommendations | 1. Develop comprehensive policies and procedures to meet the needs for this provision for the facility, school program and SICU program.<br>2. Health Care: continuously assess the quality and adequacy of the health services provided, accurately evaluate the performance of staff providing health services and address identified deficiencies.<br>3. Recreation and Social programs: continuously assess the quality and adequacy of social and recreational programming provided; accurately evaluate the performance of staff in providing these programs.<br>4. Environmental Health and Safety: continuously assess the quality and adequacy of environmental health and safety, accurately evaluate the performance of staff in providing a safe and healthy environment and properly address identified deficiencies.<br>5. Discipline and order: continuously monitor use of discipline and promptly address misuse or over use of discipline and other identified deficiencies.<br>6. The facility must continue to develop monthly performance measures to indicate achievement in the desired area.<br>7. Review State of Florida Quality Assurance Model and for assistance in developing contact CJCA Performance Based Standard for Juvenile Detention Programs, also use ACA standards to establish policy guidelines. |

| | 8. Develop data collection system |
|---|---|
| Evidentiary Basis | Document review, observation, interviews |

### 6   Due Process/Isolation/Disciplinary Practices and Procedures

| Provision 6.1 Disciplinary Practices and Procedures | Henley-Young shall implement a discipline policy and practice that incorporates positive behavior interventions and support. This policy shall include guidelines for imposing graduated sanctions for rule violations and positive incentives for good behavior. |
|---|---|
| Status | **Non-Compliance** | |
| Discussion | Again, the status of this provision remains as non-compliance. The County still needs to develop a single reporting form to be used by all persons reporting on any single incident including witness reports. Second, the facility needs to train all staff members on how to write a report, what it should provide, and how it is to be developed; (the who, what, when, where and how of the incident). This is one of the places that language is extremely relevant. Reports should be written in first person with the writer only identifying themselves once. They should be reviewed by a supervisor for succinctness, accuracy and clarity.  Additionally they should be edited by writer if needed before approved for submission. Third, the facility still needs to develop graduated sanctions, positive behavior interventions and support into their system.  In my review of documents, I found no indications, that positive behavior interventions or incentives for behavior modifications were present (i.e. counseling, early bed, loss of privileges, mediations, etc.).  Based on my review residents are being sanctioned to only days in isolation.

Therefore my statements below still stand.

This is a critical component of the disciplinary and behavioral management process to ensure residents are treated fair, humane and that there is no misuse of the isolation and disciplinary process (review the introduction regarding this matter). The facility is implementing a due process behavior system which is partially complete. Based on my review of the documents the facility has initiated due process hearings, however staff officers are not adequately trained and the residents are not aware of the infractions and consequences because that have not received proper orientation to the program. The bottom line is there is no adequate orientation for entering the facility. There is still no positive incentive program for good behavior and sanctions for rule violation. Based on my review of documents and observation, positive behavioral intervention and supports are not in place and are still not being provided for this provision. I reiterate, the suggested actions and recommendations from my previous report. The facility should |

|  | continue to follow the recommendations from the previous report. The facility is making improvement on the due process isolation and practice procedures. Although processes on a few provisions have begun, it is vitally important that policy and procedures are developed to ensure a consistent, comprehensive, and standardized method of running the facility. |
|---|---|
| Recommendations | 1. Develop adequate policies and procedures for this provision. <br> 2. Develop new resident handbook. Residents are to receive these handbooks during orientation. <br>    a) They shall include resident's rights, major and minor rule violations and the grievance policy. <br>    b) The handbook will explain to residents in their own language the rules and shall also be explained by staff that will have them sign and date a form indicating that both processes have occurred. <br>    c) These rules shall be posted on each unit. <br> 3. Due process rules shall be posted on each unit. <br> 4. Develop positive behavior intervention programs. <br> 5. Assign and train an independent person(s) to handle due process isolation hearings. The person(s) must be independent of the unit staff. <br> 6. Ensure residents who are in isolation are provided recreation and education services. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 6.2 Disciplinary Practices and Procedures | Residents who violate major rules may be subject to cell confinement for up to 24 hours for a single rule violation. An occasion in which a resident is alleged to have contemporaneously violated multiple major rule violations shall count as a single rule violation for the purposes of this section. No residents shall be confined to a cell for longer than 8 hours for a single rule violation without receiving written notification of the alleged rule violation and the occurrence of a disciplinary review/due process hearing before an impartial staff member, which includes participation by the accused residents. Under no circumstances shall residents be subjected to involuntary cell confinement for longer than 24 hours for disciplinary purposes. Residents who are placed on cell confinement shall be released daily from their cells to attend school, maintain appropriate personal hygiene, and to engage in one hour of large muscle exercise. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand. <br><br> Based on my review of documents and observation, adequate disciplinary practices and procedures are not in place and are still not being provided for | |

| | |
|---|---|
| | this provision. I am reiterating that the suggested actions and recommendations from my previous report be put into action and restated in the introduction.<br><br>During this visit, I did find residents who were placed in their rooms based on a due process hearing. However, there was no documentation placed on their door to determine why the residents were in their rooms for any length of time. Staff appeared to be placing residents in their rooms randomly without any supervisory approval. This should be addressed as soon as possible.<br><br>As it relates to a due process hearing, residents that commit major rule violations should be referred for a due process hearing based on the incident reporting process.  In one case I reviewed documentation where the hearing officer was the same person involved in the incident that led to the hearing. In that case the hearing officer should not be the same person conducting the hearing.  When residents are accused of a major rule violation, they should be provided with a notice of the violation and an explanation of their right to have a hearing in which they are able to present their side of the event to an unbiased party, call witnesses on their behalf and ask for staff representation if it is requested. The hearing officer is required to interview the resident and any parties that observed the incident. Residents who require a due process hearing who are on the mental health caseload should have a qualified mental health professional determine whether being placed in isolation could cause a decline in functioning or any other relapse. The hearing officer may impose a variety of sanctions including the loss of privileges, restrictions, or isolation. The hearing officer may credit the resident for any time served in behavior management isolation pending the hearing. The residents have the right to appeal the decision of the hearing officer to the Director. My review of documents and interviews with staff and residents revealed the need for additional training to take place regarding this process. The staff and residents were unfamiliar on how the process works; therefore it is critical for the facility administration to review their policy and procedure on due process. It should also be noted that residents must see the process as fair. |
| Recommendations | 1. Develop policies and procedures for this provision.<br>2. Develop sheets to place on door of any residents in confinement that identifies the reason for confinement and is review and signed by supervisor.<br>3. Ensure residents in confinement receive education and recreation services.<br>4. See 6.1 recommendations.<br>5. Provide training for all staff on these policies and procedures. |
| Evidentiary Basis | Document review, observation, interviews |

### 7. Use of Restraints

| Provision 7.1<br>Use of Restraints<br>Mechanical | Mechanical restraints shall not be used to punish residents or for the convenience of staff. Mechanical restraints shall only be used to prevent self-harm and/or harm to others, subject to section 7.4, and for transportation to and from court, subject to section 7.2. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance. Even though the facility does have a policy and procedure as stated in my previous report (7th), based on my review of the documents and my observations during my visit to the facility, I have noticed a substantial increase in the usage of mechanical restraints from previous visits and document reviews. During this visit, I found that staff has returned to the practice of carrying mechanical restraints on their persons as stated in my previous report. This is an area that was discussed during my initial visits to the facility at which time handcuffs were taken from staff and deemed to be used only as a last resort. Therefore, I am reiterating that, when restraints are used, incident reports should accurately reflect what occurred as it relates to the incident. The administration should review what has happened that has caused staff to revert to carrying handcuffs, since this issue was addressed at the beginning of this process. Since this provision has been irregular throughout this process and appears to be off track again, the facility will remain at beginning compliance until my next review. It should be noted that well run facilities only use mechanical restraints for transportation or exigent circumstances which may arise at any facility under supervisory approval. | |
| Recommendations | 1. Officers shall receive training on policy and procedures.<br>2. Officers shall be trained on when it is appropriate to use mechanical restraints.<br>3. All training shall be documented.<br>4. The policy will require the documentation of any use of mechanical restraint and use of force incidents.<br>5. Restraint log should be implemented. | |
| Evidentiary Basis | Document review, observation | |

| Provision 7.2 Use of Restraints Mechanical | Nothing in this section shall prohibit mechanical restraints from being placed on residents who are being transported to and from court or out of the facility, if staff have reason to believe that a residents presents a flight risk or is an imminent danger to the residents or others, or will engage in violent behavior. However, mechanical restraints should be removed immediately after the resident is placed in a cell and at no time shall a resident be placed in a cell wearing mechanical restraints. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The facility has moved to partial compliance on this provision.  A review of documents and video recordings revealed that although mechanical restraints are used they were removed once a resident was placed in their cell.  However, there still must be a major training on the use of de-escalation techniques and a serious need for mental health services at Henley Young.  There also must be adequate supervision of staff to ensure mechanical restraints are not misused.  See provision 7.1. | |
| Recommendations | 1. Develop and provide remedial training for this provision.<br>2. All training shall continue to be documented.<br>3. The policy will require the documentation of any use of mechanical restraint and use of force incidents.<br>4. Operationalize the edicts of this provision.<br>5. Additional supervision needed to ensure mechanical restraints are not misused. | |
| Evidentiary Basis | Document review, observation, video recordings and discussion with residents | |

| Provision 7.3 Use of Restraints | Restraints shall not be used to secure residents to a fixed object such as a restraint chair, bed, post, or chair. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The facility has remained at partial compliance on this provision. During my interviews with residents, document reviews and observations, I found no indication that residents were being secured to fixed objects in the facility.  However, to move past partial compliance the facility still needs to follow the recommendations (2, 3 and 4) below. | |
| Recommendations | 1. Complete the comprehensive policies and procedures for this provision.<br>2. Provide training for staff within the facility as described above on this provision and provide documentation of training.<br>3. Develop and use a mechanical restraint log.<br>4. Provide training on de-escalation techniques to try to use mechanical restraints only as a regular part of facility transport. | |

| | 5. Additional supervision needed to ensure mechanical restraints are not misused. |
|---|---|
| Evidentiary Basis | Interviews, observation and document review |

| Provision 7.4 Use of Restraints | No residents shall be restrained for longer than 15 minutes, unless restraints are approved by a mental health professional or if determined to be necessary under section 7.2 or as reasonably necessary to prevent the residents from engaging in acts of self-harm or harm to others. If a residents must be restrained for longer than 15 minutes in order to prevent self-harm, that residents shall, as quickly as possible, be evaluated by a mental health professional or transported to a mental health facility. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance; again, as stated in my previous report, policies and procedures have been developed as it relates to this provision. However, the facility still needs adequate mental health professionals to help and enhance the development of these policies and procedures as they are the authorities in this area. This provision should be included in policy and procedure development once a mental health professional or agency is retained. (**Please review the Introduction.**) See provision 7.1. | |
| Recommendations | 1. Continue to develop comprehensive policy and procedures for this provision with mental health professionals. 2. Provide training for staff on policy and procedures and document training. 3. Provide training on de-escalation techniques. 4. Develop Mental Health protocols for this provision. 5. Hire mental health professional or agency. | |
| Evidentiary Basis | Document review | |

| Provision 7.5 Use of Restraints | Henley-Young shall not use, or allow on the premises, restraint chairs, chemical restraints and/or tasers. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | I would like to continue to commend the facility on maintaining substantial compliance with this provision. Based on my most recent visit and my observations and review of documents, the facility continues to stay in substantial compliance as it relates to this provision. The facility should still ensure that below recommendations continues to be followed. | |
| Recommendations | 1. Ensure staff is following policies and procedures as it relates to this provision. | |

|  | 2. Document all training provided to all staff.<br>3. Ensure firearms and tasers are secured in a lockbox prior to entering secured area.<br>4. Retrain staff when deemed necessary. |
|---|---|
| Evidentiary Basis | Document review, observation, video |

| Provision 7.6<br>Use of Restraints | Henley-Young shall not subject residents to "hogtying," which is the practice of placing a resident's face down on a bed, floor, or other surface, and securing the resident's hands to his feet. |
|---|---|
| Status | **Substantial Compliance** |
| Discussion | I would like to continue to commend the facility on maintaining substantial compliance with this provision. Based on my most recent visit and my observations and review of documents, the facility continues to stay in substantial compliance as it relates to this provision.   The facility should still ensure that below recommendations continues to be followed. |
| Recommendations | 1. Provide on-going training for staff on policies and procedures.<br>2. Continue to document all training provided to all staff. |
| Evidentiary Basis | Observation, document review and interviews |

| Provision 7.7<br>Use of Restraints | When a resident is placed in mechanical restraints, staff must provide one-on-one supervision for the duration of the restraint, except when mechanical restraints are deemed to be necessary for the reasons specified in section 7.2. |
|---|---|
| Status | **Partial Compliance** |
| Discussion | The status of this provision remains as partial compliance. Based on my review of documents, I found several incidents where residents were placed in mechanical restraints and there was no one-on-one supervision.  In addition staff continues to carry restraints on their person.  This in turn sends a message to residents that the first response to a situation will be the application of mechanical restraints. As stated in my previous report (7th) it also reduces the staff's willingness to use other de-escalation techniques. Just the visual impact of mechanical restraints can trigger residents' behavior (i.e. aggressiveness, physical acting out etc.)<br><br>In my review of documents, although incidents of mechanical restraints use has minimally decreased, the facility still must provide staff with training on de-escalation techniques as discussed above. |
| Recommendations | 1. Provide on-going training for staff on policies and procedures.<br>2. Continue to document all training provided to all staff. |

|  | 3. Ensure that residents who are placed in mechanical restraints are seen by a medical professional.<br>4. Restraint log should be implemented<br>5. Additional supervision needed to ensure mechanical restraints are not misused. |
|---|---|
| Evidentiary Basis | Document review |

| Provision 7.8<br>Use of Restraints | Henley-Young shall notify a medical professional whenever a resident is placed in mechanical restraints for reasons other than those specified in section 7.2. A medical professional shall examine the residents as soon as possible after restraints are removed, except when the residents was restrained for the reasons specified in section 7.2. |
|---|---|
| Status | **Beginning Compliance** |
| Discussion | The status of this provision remains as beginning compliance. My review of documents reveals that youths are being seen by medical professionals after the use of mechanical restraints.  However, based on my observations and review of documents, I am reiterating that although policies and procedures are developed, there must be adequate training and instruction to ensure that staff complies with policies and procedures. In addition, incident reports must be reviewed by the supervisors to ensure that accurate information is being provided. There is a strong need for accurate and consistent reporting of incidents. When incidents are not reported correctly, the integrity of the reporting system falls into question. This is also a training issue, see provision 7.7.  As I have stated previously in my reports there must be a single matching reporting system used by all facility staff including the school. Based on my review, the school uses a different reporting system than the facility.  This must be addressed to ensure consistency in the process. |
| Recommendations | 1. Develop comprehensive policies and procedures for this provision.(Executed)<br>2. Provide training on policies and procedures.<br>3. Document all training provided to all staff.<br>4. Ensure that residents who are placed in mechanical restraints are seen by a medical professional.<br>5. Ensure that information being reported is accurate and consistent.<br>6. A single matching reporting system for the entire facility. |
| Evidentiary Basis | Document review |

| Provision 7.9<br>Use of Restraints | Hinds County does not currently and shall not in the future allow officers to enter the secure detention area of the facility with any electronic restraints, including, but not limited to tasers. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility has remained at substantial compliance on this provision based on my most recent visit and my observations and review of documents. The facility should still ensure that below recommendations continues to be followed. | |
| Recommendations | 1.  Provide training for staff on policy.<br>2.  Document all training provided to all staff. | |
| Evidentiary Basis | Document review | |

| Provision 7.10<br>Use of Restraints | Henley-Young is required to ensure that no officer enters the secure detention area of the facility with a firearm. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | I would like to continue to commend the facility on maintaining substantial compliance with this provision.  Based on my most recent visit and my observations and review of documents, the facility continues to stay in substantial compliance as it relates to this provision.  The facility should still ensure that below recommendations continues to be followed.  Also see provision 7.9 as it relates to tasers.  I would also reiterate under NO circumstances will any staff, anyone connected to the facility, and law enforcement etc. shall have firearms on the premises especially in secure areas.  All weapons must be secured in appropriate locked areas of the building. | |
| Recommendations | 1.  Provide on-going training for staff on these policies and procedures.<br>2.  Continue to document all training provided to all staff.<br>3.  Have signs displayed at all entrances for securing firearms and tasers.<br>4.  Staff needs to remain vigilant in ensuring this provision is followed and ensure that all **persons** entering the facility are screened and no firearms on their person entering a secured area of the building. | |
| Evidentiary Basis | Document review, Observation | |

**8.  Use of Force**

| Provision 8.1 Use of Force | Physical force shall not be used to punish residents. Staff shall only use physical force to stop residents from causing serious physical injury to self or others or to prevent an escape. If physical force is necessary, staff must use the minimum amount required to safely contain the residents. Whenever possible, staff shall avoid the use of force by first attempting verbal de-escalation techniques. Staff shall be required to fully document in writing every instance of use of force. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance. The facility still needs to develop policies and procedures for this provision. Based on my review of documents, I found very little de-escalation used and/or documented in incident reports.  Due to the lack of structured programming, inadequate mental health services, behavioral modification (level or token economy systems) the use of force appears to be escalating.   In reviewing documents and video recordings, staff are still making decisions regarding use of force based on instinct and without proper or procedural training.<br><br>Therefore my statements below still stand.<br><br>Based on my review of documents, the facility still needs to develop policies and procedures for this provision. In my review of incident reports, I found that there have been incidents of use of force. However I found no indication that any de-escalation techniques were used. Although officers are doing reports, they are not accurately recording information. When officers are captioning information, it should be truthful, accurate and detailed enough so they can testify on their observations two years from now if needed. It still appears from reviewing documents that report writing training is needed. Also there is a major need for de-escalation and proper restraint training and accurate documentation of incidents. In addition, reports must be legible, in plain English, and specific behavioral terms should be used.<br><br>Regardless of how accurate and useful an observation may be, it has no value to others unless it is recorded legibly. Police and other juvenile detention facilities have addressed the legibility problem by typing their reports. Most agencies are completely computerized, and some are experimenting with laptop computers. Computerized records may eliminate legibility problems for this facility. Some reports are still written in flowing script (cursive) and on various forms. There should be one facility wide form used to capture information. This has been stated in my previous reports. In addition, there is a major need for data collection as it relates to use of force. This was also stated in my previous reports. There is a need for good data point keeping regarding, medical and mental health, education, social services and all other operational services provided to the resident. | |

| | |
|---|---|
| | Good data will assist the facility in determining answers to some of the following examples:<br>    A.  The location of use of force<br>    B.  The number of use of force incidents<br>    C.  The number of use of force requiring mechanical restraints<br>    D.  The type of restraint used<br>    E.  Grievances<br>    F.  The number of incidents requiring chemical agents<br>    G.  The number of incidents involving non lethal security devices (i.e. batons, tasers, etc.)<br>    H.  The number of use of force incidents resulting in injury to residents or staff<br>    I.  Plan of action to address each incident (i.e. disciplinary action, staff training or remedial training, resident's isolation, resident's behavior management, resident's mental health screening or evaluation etc.)<br>Please review my previous report. These same issues should be addressed. |
| Recommendations | 1.  Develop policy and procedures for this provision.<br>2.  Provide training for on policies and procedures<br>3.  Document all training provided to all staff.<br>4.  Adapt an appropriate curriculum for training staff on the use of verbal de-escalation skill and safe use of physical restraints or mechanical restraints.<br>5.  Revise form to distinguish between physical and mechanical restraints.<br>6.  Contact the National Partnership for Juvenile Justice for recommendations on training program in this area.<br>7.  Document and file report when there is use of force.<br>8.  Ensure any time use of force is used residents are seen by a medical professional<br>9.  Follow the facility's chain of command which will reduce staff confusion. |
| Evidentiary Basis | Document review, interviews |
| Provision 8.2<br>Use of Force | Henley-Young shall notify a medical professional, including but not limited to the licensed practical nurse on duty whenever physical force is used against a resident. A medical professional shall examine a resident immediately after the use of physical force. |
| Status | **Partial Compliance** |
| Discussion | The facility has remained at partial compliance on this provision based on my review of documents, interviews with residents and observations. However, additional medical protocols still need to be developed for the medical area. There is still nursing services available from 6:00 a.m. to 8:00 |

|  | p.m. Monday through Friday and Saturday and Sunday for a minimum of four hours. |
|---|---|
| Recommendations | 1. Complete procurement of services as quickly as possible.<br>2. Continue to develop comprehensive policies and procedures for this provision.<br>3. Provide on-going training to staff on policies and procedures.<br>4. Continue to document all training provided to all staff.<br>5. Review nursing schedule and provide more hours at facility.<br>6. Provide written documentation of examination of residents by medical professional in every instance.<br>7. Provide additional medical services after hours and on weekends. (executed)<br>8. Document and file in resident's records when there is use of force. |
| Evidentiary Basis | Document review, interviews, observation |

### 9. Meals and Nutrition

| Provision 9.1<br>Meals and<br>Nutrition | Residents shall be provided three meals and a snack daily. If a residents misses a meal because he or she is attending court, or some other appointment, he or she shall receive the missed meal upon his or her return to detention. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The status of this provision remains as partial compliance.<br><br>It should be noted that during this visit food is being prepared at the facility and served in a more timely manner.  However, residents still complain about the portions they are receiving and the presentation (see Exhibit E). In addition of the food service area there is a need for maintenance, repair and cleanliness.<br><br>As stated in my previous reports, food service is an important part of institutional life. A comprehensive food service program must be developed if the facility is to meet the unique needs of its juvenile population. Juvenile health, nutrition, and morale in this environment are all directly related to the effectiveness of the food service program. Meals served to incarcerated juveniles must be nutritionally balanced and calorically adequate. They must be tasty, appealing, and served in an aesthetically acceptable manner to avoid conduct and behavior problems. If juveniles believe the facility's staff and management have maximized their efforts to provide a healthy and appealing food program, conduct can and will improve. | |

|  | Juveniles typically have less than desirable eating habits. Nutritional guidelines for juveniles are extrapolations from the recommendations for children and adults. Recommended dietary allowances relate to the general time and rate of the juvenile's growth spurt is very important. Therefore I am recommending a meal pattern that provides nutritionally balanced meals with food items selected from various food components listed below:<br><br>• Breads, cereal, and other grain products (including several servings a day of whole-grain products)<br>• Fruit<br>• Vegetables (includes all types with dark green leafy vegetables and dry beans and peas used several times per week)<br>• Meat, poultry, fish and alternatives (5 to 7 ounces, lean per serving)<br>• Milk, cheese, yogurt, etc.<br>• Fats and sweets (at a minimum)<br><br>The meals I observed did not meet the above mentioned meal patterns. There has been a decline in food service at Henley-Young. |
|---|---|
| Recommendations | 1. Continue to review portions to ensure residents receive enough food during meals.<br>2. Develop policy and procedures for this provision.(executed)<br>3. Continue to provide training for kitchen staff and all other staff members involved with handling food and preparing meals.<br>4. Continue to document compliance with this provision.<br>5. Food should be served in a timely manner and consistent with facility schedule once developed.<br>6. Review the National Food Service Management Institute from the University of Mississippi that details "Food Safety Facts".<br>7. Food service area is in need for maintenance, repair and cleanliness. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 9.2 Meals and Nutrition | All meals and snacks served to residents at Henley-Young shall, at a minimum, comply with the nutrition guidelines set forth in the United States Department of Agriculture's School Meals Program standards. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  As stated provision 9.1 and in my introduction, residents continue to complain that they are not receiving enough to eat and that the food is still cold when it arrives on the units.<br><br>Therefore my statements below still stand. | |

| | |
|---|---|
| | It should be noted that I have not seen any training records or had the opportunity to meet with the nutritionist. The nutritionist should be made available upon my next visit. |
| Recommendations | 1. Develop policy and procedures for this provision(executed)<br>2. Provide training for kitchen staff and all other staff members involved with handling food and preparing meals. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 9.3 Meals and Nutrition | Residents shall be provided access to drinking water throughout the day. |
|---|---|
| Status | **Substantial Compliance** |
| Discussion | The facility has moved to substantial compliance on this provision. Based on my discussion with residents, documentation review, observations, and interviews the facility has been providing water during the day. Although the facility has moved to substantial compliance in this provision the recommendations below that the County should repair the water fountains should continue.  This would allow the facility to discard the use of water coolers.<br><br>Therefore my below statements from my previous report (7th) should still be addressed. |
| Recommendations | 1. Contact County or State Environmental office to conduct test on water system. (executed)<br>2. Ensure residents receive water during school and recreational periods and at night.<br>3. Develop a policy for incidents regarding water quality and procedures to address them.<br>4. Repair inoperable drinking fountains. |
| Evidentiary Basis | Document review, observation, interviews |

**10. Clothing**

| | |
|---|---|
| Provision 10 Clothing | Henley-Young shall provide basic clothing items for residents at all times. These items must include, at a minimum, socks, underwear, uniform, shoes, and undershirts. For girls, these items must also include a brassiere. When appropriate, Henley-Young shall also provide residents with a coat, hat, and gloves. Residents must be provided with a clean uniform, socks, undershirt, underwear, and brassiere, if applicable, upon intake and at least once per day. No residents shall be deprived of these basic clothing items for any reason, including, but not limited to, as a punishment, because these items are being washed, or due to overcrowding. |
| Status | **Partial  Compliance** |
| Discussion | The facility has remained in partial compliance on this provision. Based on my most recent review and observation, the facility has hired two laundry staff members that are doing a very good job cleaning the clothing.  In my discussion with residents there were no complaints about stains, cleanliness, or clothes being tattered.  The area I reviewed is more organized and functional.  The staff I interviewed only required minimum technical assistance and were amenable to the recommendations I made regarding organizing certain items by size.  The facility still needs to develop a system for replacing clothing on a regular and consistent basis. This is a far improvement from my last visit and upon my next visit; I will review this area for substantial compliance.<br><br>I am still recommending the facility to order non colored underwear and undergarments.  This would allow the facility to sanitize the under clothing and sheets by using a more potent cleaner. |
| Recommendation | 1.  Check washer and dryer to ensure they are working properly.<br>2.  Ensure that girls and boys are equally involved in cleaning and folding clothes.<br>3.  Hire 2 laundry staff to ensure clothing is handled properly. (executed)<br>4.  Ensure that all staff and residents wear protective material (smocks and gloves) when handling chemicals and clothing.<br>5.  Discard clothing that is torn, dingy and in poor condition.<br>6.  Develop a system for replacing clothing on a regular and consistent basis.<br>7.  Develop schedule for distribution.<br>8.  Develop a system for prewashing clothing (i.e. undergarments etc.) |
| Evidentiary Basis | Document review, observation, interviews, photographs |

## 11. Hygiene and Sanitation

| Provision 11.1 Hygiene and Sanitation | Residents shall be provided with the means to maintain appropriate hygiene, including soap and shampoo for showers, which will occur at least once daily, soap for washing hands after each time the residents uses the toilet, and toothpaste and a toothbrush for tooth brushing, which will occur at least twice daily, a comb and brush, that if shared, shall be sterilized between uses by residents. Girls must be provided with panty liners on a daily basis and other feminine products as needed. Residents will be issued a comb and brush upon entering the facility; however, if residents are issued a recycled comb or brush or a comb or brush that has been used by another residents, Henley-Young shall ensure that the comb and brush is sterilized and in good condition. | |
|---|---|---|
| Status | **Partial  Compliance** | |
| Discussion | The facility has remained at partial compliance on this provision.  I will review this area for substantial compliance at my next visit.  I would also recommend that a licensed barber and/or beautician be retained.<br><br> Based on my most recent review and observation, residents were receiving toothbrush, toothpaste and other hygiene products which were provided in individual hygiene kits. Residents still complained about not having combs to groom their hair. | |
| Recommendations | 1.  Ensure that hygiene kits are properly labeled and **residents are not** sharing each other's hygiene products or items.<br>2.  Ensure items such as hair brushes, if shared, are sterilized and in good condition.<br>3.  Provide training for staff on these policies and procedures.<br>4.  Ensure that clean face towels are available for residents.<br>5.  Develop a schedule for distribution of hygiene kits.<br>6.  Retain a licensed barber and/or beautician. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 11.2 Hygiene and Sanitation | Residents shall be provided with sleeping mats and blankets that are clean and odorless sleeping mats shall be sanitized between uses by residents, and residents shall receive clean blankets weekly. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The status of this provision remains as partial compliance. Based on my review of documents and observation, the facility needs to continue to ensure that mattresses and blankets are discarded properly.  If this continues, during my next visit the facility should move to substantial compliance. | |

| | Policies and procedures have been developed. The facility has provided training to ensure that the process outlined in the policies and procedures is followed. The facility needs to continue to monitor the condition of the blankets and mattresses for signs of holes and tattering The facility needs now to follow the recommendations below. |
|---|---|
| Recommendations | 1. Continue to discard all blankets and mattresses that are tattered and have holes in them. <br> 2. Clean and maintain laundry area in orderly fashion. <br> 3. Develop forms or system of documentation for distribution and inventory <br> 4. Label and designate an area for towels, sheets, clothing etc. |
| Evidentiary Basis | Document review, observation |

| Provision 11.3 <br> Hygiene and Sanitation | Under no circumstances shall residents be deprived of mats and blankets. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility has moved to substantial compliance.  I found no indication that residents have been deprived of mats and blankets. <br><br> The facility administration needs to continue to be vigilant regarding staff adhering to the process outlined in the policy and procedures regarding the issuing and maintenance of mats and blankets. | |
| Recommendations | 1. Provide training to staff on policy and procedures. <br> 2. Develop system for inventory and distribution | |
| Evidence | Observation, and document review | |

| Provision 11.4 <br> Hygiene and Sanitation | Henley-Young shall maintain a sufficient number of clean, sanitary mats and blankets that correspond with the facility's maximum capacity. |
|---|---|
| Status | **Substantial  Compliance** |
| Discussion | The facility remains at substantial compliance, as I found no indication based on my observation and documents review that residents were being denied of mattresses and blankets.  There were enough blankets and mattresses.  As stated in provision 11.3, the facility administration needs to continue to be vigilant regarding staff adhering to the process outlined in the policy and procedures regarding the issuing and maintenance of mats and blankets. |

| Recommendations | 1. Develop policies and procedures for this provision. (executed)<br>2. Provide training to staff on policy and procedure.<br>3. Provide an inventory of mats and blankets. |
|---|---|
| Evidentiary Basis | Observation and document review |

| Provision 11.5 Hygiene and Sanitation | Residents shall be provided with a clean, sanitary environment. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance. During this visit, I found that the facility continues to be in need of major physical plant maintenance; showers needed repair, toilets were filthy, blankets are being used in place of showers doors, soap scum was in all of the showers, the shower heads were leaking, there was mold in showers, the units smelled of urine and shower stalls were rusting.  In addition, there were holes in several of the shower stall walls.<br><br>Therefore my statements below still stand.<br><br>Building maintenance is an ongoing and continuous process. **Please review the introduction.** | |
| Recommendations | 1. Develop policies and procedures for this provision. (executed)<br>2. See areas in discussion that should be addressed.<br>3. Develop housekeeping and cleaning schedule.<br>4. Develop checklist or inspection report for each unit and area of building.<br>5. Develop work order system to ensure that when problem arise they are addressed.<br>6. Develop corrective action plans as needed.<br>7. Provide training for staff on policy and procedures.<br>8. Ensure delivered food items are dated and rotated from old to new. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 11.6 Hygiene and Sanitation | Hinds County shall ensure that Henley-Young complies with relevant law regarding fire safety, weather emergencies, sanitation practices, food safety, and the elimination and management of environmental toxins. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance. | |

| | |
|---|---|
| | In my review of documents, I learned that the facility has had a fire inspection with violations.  Even though a fire inspection was completed by Fire Marshall on 9/17/2014 and violations were found there is no indication that the violations were corrected and a re-inspection was done by the Fire Marshall.  In addition, in my previous report I discussed the possibility of a fire in the facility and that the sprinkler system did not work in a resident's room.  In addition, during this review another resident attempted to set a mattress on fire (i.e. lighters coming into secured area).  This is a serious safety issue which must be addressed immediately. |
| | Additionally, the facility must have operational fire extinguishers available throughout the facility.  I am reiterating there be internal monthly checks and maintenance annually and in the event when the fire extinguisher is used it must be replaced or recharged by a certified company. Again, the facility needs to have another full review of the fire and sprinkler system to ensure that all violations were corrected. |
| | Again, with the above being said there are no indications that the sprinkler or fire systems are working adequately.  As stated before the sprinkler system must comply with national fire protection standards.  Again, although the facility has policies or procedures regarding fire safety it begs the question, "Has the facility been evaluated by a Fire Marshall that is licensed and certified by the State of Mississippi?" |
| Recommendations | 1. Develop policies and procedures and plans for fire safety, evacuation etc. (executed) |
| | 2. Develop adequate staff training regarding fire safety. |
| | 3. Properly maintain and repair fire equipment. |
| | 4. Ensure intercom systems are operating properly. |
| | 5. Ensure all mattresses used by residents are fire resistant. |
| | 6. Routinely test all fire equipment and system. |
| | 7. Ensure that all electrical outlets, wires and equipment (lights) are properly working. |
| | 8. Develop work order system to ensure items are repaired. |
| | 9. Ensure that all areas in this provision are addressed by a certified professional. |
| | 10. Review entire fire safety program/system |
| | 11. Facility needs to develop corrective action plan. |
| Evidentiary Basis | Document review, observation |

| Provision 11.7 Hygiene and Sanitation | Residents shall be provided with clean drinking glasses and eating utensils. | |
|---|---|---|
| Status | **Partial Compliance** | |

| Discussion | The status of this provision remains as partial compliance. Based on review of documents and interviews with residents, I found no indication that drinking glasses and eating utensils were not cleaned. However, in my review of the kitchen, the kitchen equipment is in need of a major cleaning, (see Exhibit A-1 to A-4) as stated in my previous report (7th). |
|---|---|
| Recommendations | 1. Develop policies and procedures for this provision. (executed)<br>2. Provide a thorough cleaning of the kitchen and all equipment and Utensils |
| Evidentiary Basis | Document review, observation and interviews |

### 12.  Medical Care

| Provision 12.1 Medical Care | The parties agree, however, that henceforth, Henley-Young shall provide residents with adequate medical care, including: prompt screenings; a full physical exam within 72 hours after their detention hearing or disposition order, as applicable; access to medical professionals and/or prescription medications when needed; and prompt transportation to a local hospital in the case of a medical emergency.  Hinds County is responsible for procuring and/or paying for all medications provided to residents. |
|---|---|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on interviews and observations and document reviews, the County has hired two contract Registered Nurses who cover the facility from 6 a.m. to 8 p.m. Monday through Friday and for four hours on Saturdays and Sundays. However there is still a need for policies, procedures, or protocols in place for the facility. The County has the responsibility to maintain medical care and provide medication and all other needs for residents. On this provision, I am still reiterating that the actions and recommendations from my previous report should be reviewed and followed. The County must look at the medical filing system in place at this point and change it to meet contemporary medical standards. See additional discussion in the sections 1.2 and 1.3. |
| Recommendations | 1.  Develop policies, procedures and protocols for this provision.<br>2.  Develop policies and procedures and protocols based on standards for Health Services in Juvenile Detention and Confinement facilities.<br>3.  Provide training for staff members who administer medication to residents on proper usage and possible side effects. Also, train the staff on emergency protocols if side effects occur. |

| | |
|---|---|
| | 4. Have a licensed medical professional review and sign off on policy, procedures and protocols.<br>5. Have a licensed health professional periodically review and provide supervision to the nurse at facility.<br>6. Develop forms to coincide with provision.<br>7. Remove medication from bags and place them in secure, organized areas and develop forms to determine what medications are present in the facility at all times.<br>8. Hire or have on contract a physician to review medical area.<br>9. Ensure that residents receive vision exams, dental screenings, mental health screenings, hearing tests, etc.<br>10. Order folders with 2 dividers, end tab, classification folders in letter size with 2 prongs for medical charts. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 12.2 Medical Care | Henley-Young shall ensure that a medical professional is available to examine residents confined at the facility to identify and treat medical needs, when necessary. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance. Based on my review of documents and observation, the provision states, "Henley-Young shall ensure that a medical professional is available to examine residents confined at the facility to identify and treat medical needs, when necessary", is not in place and is still not being provided for this provision. The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. (**See the Introduction**.) | |
| Recommendations | 1. Hire qualified medical professional for nights and weekend care.<br>2. Develop policies, procedures and protocols for this provision.<br>3. Provide training for staff on this provision. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 12.3 Medical Care | Henley-Young shall implement its sick call policy and practice which ensures that confined residents who request non-emergency medical attention are examined by a medical professional within 24 hours of a residents placing him or herself on sick call, excepting weekends and holidays. | |
|---|---|---|
| Status | **Non-Compliance** | |

| Discussion | The status of this provision remains as non-compliance based on my interviews, documents review and observation.<br><br>Therefore my below statements still stand.<br><br>Although the facility has 14 hour nursing service daily during the week and four hours on Saturday and Sunday there is still no policy, procedures and protocols as to how sick-calls should be administered to residents. The facility must develop the processes, and practices for this provision. The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (**see the Introduction**). |
|---|---|
| Recommendations | 1. Develop policies, procedures and protocols for this provision.<br>2. Place a kite box on each unit.<br>3. Provide training for staff on this provision.<br>4. Nurse or designated person, making daily rounds to retrieve kites (Request for Medical Service Forms). |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 12.4<br>Medical Care | Prescription medications shall only be distributed by licensed medical staff or Henley-Young staff who has been trained by licensed medical personnel. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance based on my interviews, document review and observation.<br><br>Therefore my statements below still stand.<br><br>The facility has two registered nurses who are licensed to distribute medications to the residents. The problem is that the facility has no policies, procedures or protocols in place to direct this distribution. The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (**see the Introduction**). | |
| Recommendations | 1. Develop policies, procedures and protocols to address this provision.<br>2. These policies, procedures and protocols must include the appointment of a medication administration protocol.<br>3. There must be a medication record of all medicines administered.<br>   a. One record to reflect all medicines leaving the pharmacy;<br>   b. An additional record kept in each resident's case file.<br>4. Ensure that the training is comprehensive make certain that all | |

|  | medical contingencies are considered.<br>5. The staff should be trained on what side effects to look for drugs commonly prescribed to residents with mental health needs.<br>6. Provide training to staff on the policy, procedures and protocols for this provision.<br>7. All training should be documented and conducted annually. |
|---|---|
| Evidentiary Basis | Document review, observation, interviews |

| Provision 12.5<br>Medical Care | Medical and mental health services shall be provided in a manner that ensures the confidentiality of resident's health information. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance based on my interviews, document review and observation.<br><br>Therefore my statements below still stand.<br><br>The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (**see the Introduction**). | |
| Recommendations | 1. Develop policies, procedures and protocols to address this provision.<br>2. Get HIPAA requirements and institute them the facility.<br>3. Designate the persons who have access to the resident's medical records within the facility and outside of the facility, but within the juvenile justice system.<br>4. Provide training to staff on policies, procedures and protocols.<br>5. Provide training to staff on HIPAA requirements, and document training.<br>6. Designate a HIPPA Privacy Officer. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 12.6<br>Medical Care | Henley-Young shall develop procedures for monitoring residents who require individualized attention because of medical issues that do not involve requiring the residents to sleep on a mat in the visitation room. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance based on my interviews, document review and observation. | |

| | |
|---|---|
| | The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (**see the Introduction**). |
| Recommendations | 1. Develop policies, procedures and protocols to address this provision.<br>2. Develop processes of continuous monitoring residents with stable medical issues, i.e. the care for diabetic residents who are on an insulin regiment.<br>   a. What are the medical requirements of the residents who need monitoring?<br>   b. Who is responsible for the monitoring?<br>   c. How are the records kept of the monitoring?<br>3. Provide training to staff on the policies, procedures and protocols for this provision.<br>4. Annual competency training. |
| Evidentiary Basis | Document review, observation and interviews |

### 13.   Mental Health Care

| | |
|---|---|
| Provision 13.1 Mental Health Care | Henley-Young's contractor, Hinds Behavioral Health Services, shall provide adequate mental health services to all confined residents with a mental health diagnosis or serious mental health need, as indicated by the MAYSI-2. This shall include, but is not limited to, the provision of individual and group counseling sessions upon the request of a residents or the resident's parent/guardian, access to a mental health professional at the detention center, and the distribution and medical monitoring of psychotropic medications by a medical professional. |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. The only changes to this provision, is the residents' names have changed.  I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. It is without question that there are residents entering this facility that need access to structured mental health services (i.e. resident S.T.–several suicide attempts, resident J.N. (suicidal behavior), resident J.C. (attempted suicide) and Resident L.T. – several suicide attempts).  See provision 1.2.<br> There are still inadequate mental health services at this facility. Generally accepted professional standards require that mental health counseling be provided frequently and consistently enough to provide meaningful intervention for residents. Although residents may be seen by Hinds |

|  | Behavioral Health Services, there is no documentation that indicates the needs of the residents or any planned strategies for the residents once they return to the facility. The Henley-Young mental health counseling is inadequate to the needs of mentally ill residents in both frequency and content. My review of records reveals no evidence of any counseling or use of any treatment plans or strategies. It should be noted that treatment planning, including identifying symptoms and behaviors is a critical part of effective treatment for residents with mental health illness or problems. An effective program should communicate treatment plans for mentally ill residents to all staff involved in the management of the residents in this detention facility and services should be coordinated prior to their implementation. Although some residents who are in need of mental health services are in the 89-day program and are assigned case managers, these individuals have no mental health training and they serve primarily as liaisons between the facility and the courts rather than focusing on coordinating care at the facility for mentally ill residents. |
|---|---|
| Recommendations | 1. Ensure that the facility has a Standardized Assessment Tool i.e. the MAYSI-2 to use during the intake process.<br>2. Develop policies and procedures to address this provision.<br>3. Provide training to staff on policies and procedures and provide documentation of training.<br>4. Develop documentation that will track resident's progress during their stay at facility.<br>5. Ensure there is communication between Hines Behavioral Health Services, Juvenile Court Case Managers and Facility Staff on residents receiving mental health services. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 13.2 Mental Health Care | Residents who are confined for longer than thirty (30) continuous days and who are prescribed psychotropic medications, shall be evaluated by a psychiatrist every thirty (30) days. Such evaluations may be performed by and through employees of Hinds Behavioral Health. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. **Please review the Introduction.** | |
| Recommendations | 1. Develop policies and procedures to address this provision.<br>2. Provide training to staff on policies and procedures. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 13.3 Mental Health Care | Within 72 hours of a resident's admission to the facility, staff shall develop individual mental health treatment plans for residents who are under the care of a mental health provider. Treatment plans shall emphasize continuity of care and shall ensure that whenever possible, residents are transported to appointments with their regular mental health provider, whether the appointments are standing or made after the resident's initial detention. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. **Please review the Introduction**. | |
| Recommendations | 1.  Develop policies and procedures to address this provision.<br>2.  Provide training to staff on policies and procedures.<br>3.  Policies and procedures shall be reviewed and signed by a licensed mental health professional (psychiatrist, etc.). | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 13.4 Mental Health Care | Henley-Young shall develop and implement policies and procedures for referring residents in need of psychiatric services to a licensed psychiatrist for a timely mental health evaluation. Such services may be provided by and through employees of Hinds Behavioral Health. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. **Please review the Introduction**. | |
| Recommendations | 1.  Develop policies and procedures to address this provision.<br>2.  Provide and document training to staff on policies and procedures. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 13.5 Mental Health Care | Hinds County shall employ or contract for sufficient psychiatric services to permit a psychiatrist to fulfill the following functions:<br>   a.  conduct needed psychiatric evaluations prior to placing residents on psychotropic medications;<br>   b.  Monitor, as appropriate, the efficacy and side effects of psychotropic medications;<br>   c.  Participate in treatment team meetings for residents under the psychiatrist's care;<br>   d.  Provide individual counseling and psychotherapy when needed;<br>   e.  Evaluate and treat in a timely manner all residents referred as possibly being in need of psychiatric services; and<br>   f.  Provide adequate documentation of treatment.<br>   g.  All evaluations and services outlined above may be performed and/or provided by and through employees of Hinds Behavioral Health or any other duly qualified Mental Health agency. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance. Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. **Please review the Introduction**. | |
| Recommendations | 1. Develop policies and procedures to address this provision.<br>2. Provide training to staff on policy and procedures and document training. | |
| Evidentiary Basis | Document review, observation | |

| Provision 13.6 Mental Health Care | The psychiatrist and/or counselors shall review, if necessary, incident reports, disciplinary reports, suicide watch logs, and lockdown logs of residents under their care to determine whether their treatment is working and, if not, how it should be modified. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance. Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. **Please review the Introduction**. | |
| Recommendations | 1. The mental health of the residents in the custody of the facility needs to be closely monitored at all times.<br>2. The facility needs to develop policies and procedures to address this provision.<br>3. Provide and document training to staff on policies and procedures | |

| | |
|---|---|
| | and document training. |
| | 4.  Facility needs documentation from a mental health organization on plan of action for residents receiving a mental health services. |
| Evidentiary Basis | Document review, observation |

## 14.  Suicide Prevention

| Provision 14.1 Suicide Prevention | Henley-Young shall develop a multi-tiered suicide prevention policy that has at least three stages of suicide watch. Suicide watch shall not be used as punishment. The "suicide cell" shall be reserved for residents for whom the "suicide cell" is deemed necessary in conjunction with this suicide prevention policy. |
|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.   The facility has developed policy and procedures for this provision. Now the facility must develop training programs to ensure that staff learn and adhere to the policy and procedures. Further, staff must become familiar with the process. Once the facility hires a new mental health provider, they must ensure that the suicide prevention policy is included in the overall mental health program. **Please review the Introduction**. |
| Recommendations | 1.  Develop policies and procedures to address this provision. (executed) <br> 2.  Provide and document training for staff on policy and procedure. <br> 3.  Facility needs to ensure that the suicide prevention policy is included in the overall mental health program. |
| Evidentiary Basis | Document review, observation |

| Provision 14.2 Suicide Prevention | Any residents placed on the highest level of suicide watch shall be evaluated by a mental health professional, ideally within 12 hours, but in no case longer than 24 hours of his or her placement on suicide watch. If a resident on the highest level of suicide watch is not evaluated by a mental health professional within 24 hours, the residents shall immediately be transported to a local mental health facility or emergency room for evaluation and/or treatment. |
|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  The facility has developed policy and procedures for this provision. Now, there must be training programs developed to ensure that staff members adhere to the policy and procedures and that they are familiar with the process. Once the |

| | facility hires a new mental health provider, they must ensure that the suicide prevention policy is included in the overall mental health program. **Please review the Introduction.** |
|---|---|
| Recommendations | 1. Develop policies and procedures to address this provision. (Executed)<br>2. The facility needs mental health professionals to help and enhance the development of these policies and procedures as they are the authorities in this area.<br>3. Provide training for staff on policies and procedures and document training.<br>4. Identify a mental health agency to help develop policies, procedures and protocols.<br>5. Facility needs to ensure that the suicide prevention policy is included in the overall mental health program. |
| Evidentiary Basis | Document review, observation |

| Provision 14.3 Suicide Prevention | Residents on suicide watch shall participate in recreation, school, and any other structured programming. Residents shall not be required to wear a "suicide gown" unless locked in a cell. Staff shall closely monitor residents on suicide watch, which includes logging activities every 15 minutes. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance. A training program still needs to be developed to ensure that staff members adhere to the policy and procedures and that they are familiar with the process. Once the facility hires a new mental health provider, they must ensure that the suicide prevention policy is included in the overall mental health program. **Please review the Introduction.** | |
| Recommendations | 1. Develop policies and procedures to address this provision with the assistance of a mental professional. (executed)<br>2. Provide and document training for staff on policies and procedures.<br>3. Facility needs to ensure that the suicide prevention policy is included in the overall mental health program.<br>4. The facility needs mental health professionals to help and enhance the development of these policies and procedures as they are the authorities in this area. | |
| Evidentiary Basis | Document review, observation | |

| Provision 14.4 Suicide Prevention | When a resident is placed on any level of suicide watch, a report shall be made within 24 hours to the resident's court, as well as to the resident's guardian, and his or her defense attorney. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  A training program still needs to be developed to ensure that staff members adhere to the policy and procedures and that they are familiar with the process. Once the facility hires a new mental health provider, they must ensure that the suicide prevention policy is included in the overall mental health program. **Please review the Introduction.** | |
| Recommendations | 1. Develop policies and procedures for making and distributing the reports in this provision. (executed)<br>2. Provide training for staff on policies and procedures and document training.<br>3. Facility needs to ensure that the suicide prevention policy is included in the overall mental health program<br>4. The facility needs mental health professionals to help and enhance the development of these policies and procedures as they are the authorities in this area. | |
| Evidentiary Basis | Document review, observation | |

### 15.    Family Support and Interaction

| Provision 15.1 Family Support and Interaction | Visitation shall not be restricted or withheld from residents unless the detention center director determines that a visit will violate the security of Henley-Young or will endanger the safety of residents, visitors, or staff. Visitation should not be restricted as a form of punishment. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The status of this provision has moved to substantial compliance.  During this visit I found that visitation was still being conducted in the multi-purpose room. As stated in my previous report, the facility must ensure that there is proper staffing available to provide for the visitation process to maintain reliability in it. **Please review the staffing section of the Introduction.** | |
| Recommendations | 1. Provide and document training for staff on policies and procedures. (executed)<br>2. Provide and document training for staff on policies and procedures.<br>3. Ensure that there is proper staffing availability to maintain reliability. | |

| Evidentiary Basis | Document review, observation and interviews |
|---|---|

| Provision 15.2 Family Support and Interaction | Within 90 days of the effective date of this Settlement Agreement, Henley-Young shall provide accommodations that allow residents to have contact visits with their families. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility remains at substantial compliance. Based on my most recent visit. I found that the facility continues to allow contact visits. The facility should continue to ensure that proper staffing is available to make certain that this continues. The visitation program should be incorporated into the overall facility program that will help with providing a better structure. **Please review the Introduction**. | |
| Recommendations | 1. Develop policies and procedures to address this provision. (executed)<br>2. Identify area where contact visitation will take place.<br>3. Provide and document training for staff on policies and procedures.<br>4. Ensure that there is proper staffing availability to maintain reliability.<br>5. Ensure that visitation program is included in the overall facility program. | |
| Evidentiary Basis | Document review, observation  and interviews | |

| Provision 15.3 Family Support and Interaction | Visitation shall be regularly scheduled at least three times per week, which shall include evening and/or weekend visitation times in order to encourage family visitation. Henley-Young shall permit the minor siblings of confined residents to participate in visitation, as long as the minors' parent or guardian is present during the visit and the siblings are not harmful to the residents who are detained at Henley-Young. Henley-Young shall also permit a confined resident's own child (ren) to participate in visitation | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility remains at substantial compliance on this provision.   The facility must continue to follow the recommendations below. | |
| Recommendations | 1. Develop policies and procedures and practices to address this provision. (executed)<br>2. Provide and document training for staff on policies and procedures.<br>3. Ensure that there is proper staffing availability to maintain reliability.<br>4. Ensure that visitation program is included in the overall facility program. | |

81

| Evidentiary Basis | Document review, observation and interviews |
|---|---|

| Provision 15.4 Family Support and Interaction | Residents may receive phone calls from their attorneys. At the discretion of the Director or assignee, in emergency situations, residents may receive phone calls from parents, primary caretakers, or legal guardians. Emergency phone calls and phone calls from attorneys should not be restricted as a form of punishment. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The facility remains at partial compliance on this provision based on my most recent visit and document review. However, there is still no indication that residents are allowed to mail letters as part of access to supportive relationships that residents have with families and others in the community. This (mail) is a major part of the rehabilitative process. Staff now needs to be trained on policies and procedures and the facility should ensure that policy and procedures are being followed. | |
| Recommendations | 1. Develop policies and procedures and practices to address this provision. (Executed)<br>2. Provide and document training for staff on policies and procedures.<br>3. Ensure that there is proper staffing availability to maintain reliability.<br>4. Ensure that residents are allowed to mail letters.(County will pay for postage) | |
| Evidentiary Basis | Document review, observation and interviews | |

## 16.    Miscellaneous Provisions

| Provision 16.1 Miscellaneous Provisions | Male and female residents shall be provided with equal access to educational and rehabilitative services, medical care, and indoor and outdoor recreation. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  During my most recent visit, the basketball courts have been resurfaced and repaired. In addition, according to the female residents I interviewed, they rarely participate in outside activities and, when they do, it consists mostly of sitting on the bleachers because the male residents were using the basketball court and they are not allowed on the court while the males were outside using it. However, there were still no schedules posted or documents showing equal programming for male and female residents. | |
| Recommendations | 1. Develop policies and procedures and practices for this provision. (Executed) | |

|  | 2. Cease in the designation of female residents as being solely responsible for laundry; this is a duty male residents can perform as well as females. (executed)<br>3. Develop monthly recreational schedules.<br>4. Develop comprehensive facility schedules.<br>5. Provide training for staff on policies and procedures and document training.<br>6. Ensure that there is proper staffing availability to maintain reliability.<br>7. Repair court and goal area.<br>8. Posting of schedule on units. |
|---|---|
| Evidentiary Basis | Document review, observation, interviews |

| Provision 16.2 Miscellaneous Provisions | The parties agree, however, that henceforth:  All residents shall have the opportunity to engage in at least one hour of large muscle exercise a day. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on my most recent review of documents, interviews with the residents and observation, residents are still not engaging in 1 hour of large muscle exercise daily. As stated previously, residents are placed in their rooms when there is not enough staff available. In addition, on the weekends, residents are still only allowed out when there is enough staff available. There still is no schedule of recreational or program activities, and when residents were allowed out, it was random with no schedule being followed.  This should be rectified once the new staff are hired and trained.  There must be a schedule in place and adhered to which will ensure that residents are receiving the required time out of their units and rooms and that structured activities are available, unless a resident has been placed on behavior management or isolation. However, even residents who are placed in a behavior management program must be allowed the required time out of the unit and room for recreational and large muscle exercise. | |
| Recommendations | 1. Develop policies and procedures and implement practices to address the needs of this provision.<br>2. Develop and implement programming and recreational schedules.<br>3. Provide and document training for staff on policies and procedures.<br>4. Ensure that there is proper staffing availability so that residents are not unnecessarily "locked" in their cells. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 16.3 Miscellaneous Provisions | Henley-Young shall implement a policy which prohibits staff from insulting residents or calling them names, and using profanity in the presence of residents | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  This provision applies to all persons moving throughout the facility and does not exempt administrators, courts or outside professionals from adhering to this provision. Based on my recent document review, video and audio review (**see the Introduction**), I must reiterate no person is exempt. | |
| Recommendations | 1. Develop policies and procedures and practices to address the needs of this provision. (Executed)<br>2. Provide training to staff in the proper de-escalation techniques of residents.<br>3. Administration must provide enough supervision to reduce or eliminate insulting behavior by staff.<br>4. Discipline and retrain staff as needed.<br>5. Provide training for staff on policies and procedures and document training.<br>6. Hire an independent person to investigate allegations of abuse or complaints regarding staff by residents. (Executed) | |
| Evidentiary Basis | Document review, observation and interviews | |

| Provision 16.4 Miscellaneous Provisions | Henley-Young shall implement an adequate grievance policy that is accessible to all residents regardless of literacy levels, and that provides residents with the opportunity to appeal facility level determinations. Residents shall obtain the grievance forms from the school liaison. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  Based on my most recent review of documents and my interviews with residents, residents still do not have confidence in the grievance process. Most residents said they were not aware of the grievance process and some residents advised that they never file a grievance. As stated in my previous reports, the mark of a good grievance system is that residents do file grievances. Most juvenile facilities have a grievance system in place to allow residents to seek a resolution to problems that they may be having while at the facility. Typically, juveniles use the grievance system to attempt to resolve issues they may have with the application of facility rules, concerns about living conditions or food, problems with missing property, conflicts with other residents or staff, or seeking some sort of other assistance. All grievances should be tracked by the grievance coordinator to assure that a response is given. The nature, topic or | |

| | |
|---|---|
| | presenting problem should be categorized and tabulated. The grievance coordinator should provide his/her supervisor, the facility director and other key staff, a summary grievance report each month. The report should include, at a minimum, the number of grievances filed, the living units from which the grievances were filed, the nature and final outcome of the grievances. A system should also be established to ensure that grievance resolutions are actually implemented. The grievance system should be viewed as an important tool for staff to communicate with the residents. The system should enhance the regular programming activities and not be viewed as an impediment. The administration should use cumulative data gathered from grievances as a tool to assist in monitoring what is going on within the institution. Such data can indicate where the program is functioning well and where there may be potential problems. In addition, in my review of some grievances, one resident filed a grievance then later retracted the grievance. As a part of the grievance process, there must be a component that allows the residents to retract his/her grievance without being coerced by staff. The facility must now make certain that staff is trained properly and that residents are made fully aware of the grievance process. |
| Recommendations | 1. Place grievance boxes on each unit and school, residents should not be required to request a grievance form.<br>2. Provide training for staff on policies and procedures and document training.<br>3. Provide training for residents on policies and procedures and document training.<br>4. Ensure that residents are adequately familiarized with the grievance process during their orientation into the facility<br>5. Add a place on the Resident's Grievance Resolution Report for a resident to request an appeal and place for the Director's resolution.<br>6.  Ensure Resident's Grievance Resolution Reports are provided to the resident for their signature and their response to the outcome. If the resident disagrees with the resolution the resident has the right to appeal the decision to the director.<br>7. Any retractions of grievances should be done by residents and not by staff. |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 16.5 Miscellaneous Provisions | Hinds County denies that Henley-Young does not currently have an adequate policy whereby residents can request to see their attorney and/or Residents Court counselor. The parties agree, however, that henceforth: Henley-Young shall develop and implement an adequate policy that allows residents of all ages and literacy levels with the opportunity to request to see their attorney and/or Residents Court counselor. Residents shall obtain the form requesting a visit from his/her counselor from the school liaison. Henley-Young agrees to collaborate with the Plaintiffs to design and implement a comprehensive juvenile justice pre-service and in-service training program for detention center staff. Training shall include, but is not limited to, the mandatory reporting requirements for direct care workers, the requirements of the Prison Rape Elimination Act, verbal de-escalation techniques, adolescent brain development and developmental issues, effective communication with adolescents, effective documentation, appropriate use of force and restraint, and best practices for detention center administration. |
| Status | **Beginning Compliance** |
| Discussion | The status of this provision remains as beginning compliance.  Based on my most recent visit and review of documents, residents are still complaining that they have not had the opportunity to speak with their attorneys.  Also, in my review of the records, there was no indication that attorneys had been visiting. However, court counselors were present in the facility and seeing the residents. Additionally, I found no forms for requesting visits from counselors, attorneys or school liaisons. And I found no training on the mandatory reporting requirements for direct care workers, the requirements of the Prison Rape Elimination Act, verbal de-escalation techniques, adolescent brain development and developmental issues, effective communication with adolescents, effective documentation, appropriate use of force and restraint, and best practices for detention center administration. Even though facility has developed a policy and procedures for this provision. (**See the Introduction**) |
| Recommendations | 1. Develop policies and procedures and practices for this provision. (Executed)<br>2. Provide and document training for staff on policies and procedures.<br>3. Develop single form and system for incident reporting.<br>4. Develop system for receiving and mailing privileged and non privileged mail for residents. |
| Evidentiary Basis | Observation, interviews |

**Conclusion**

This is my eighth official visit to the Henley-Young Juvenile Justice Facility.  The facility continues to make gradual improvements and should continue moving in the direction it's going. The hiring of a permanent leadership team is extremely important at this point. Also, the education, mental health and medical areas are still of major concern due to the lack of policies, procedures and protocols for those areas.  As stated in my introduction, the County has increased funding for the facility and at this point once staff are hired, maintained and properly trained the facility would move much closer to compliance with more provisions.

In addition, the County should follow the recommendations based on the technical assistance report that was provided on November 19, 2014.  The County should also hire effective leadership and follow the resolution the County enacted by the Board of Supervisors. With enacting the above mentioned recommendations, the County will be able to reduce the number of direct care staff and the budget that was allocated could be sufficient.

It should be noted that five provisions have moved to substantial compliance, the facility continues to move in the right direction.  Again, as stated in previous reports the juvenile court, the facility, administration, the school and the Hinds County Board must work together to ensure that the political aspects do interfere with the operational needs of the facility.

Again, it is commendable that eight (8) additional provisions have moved forward (**see introduction**).

I would like to again thank the Hinds County Board, the County's Attorneys Anthony Simon and Pieter Teeuwissen, County Administrator Carmen Davis, and the facility Acting Director Frank Bluntson for their assistance and cooperation.

LEONARD DIXON

Henley Young Juvenile Justice Center
Eighth Monitoring Compliance Report
January 28, 2015

**Exhibit A - 1**



Henley Young Juvenile Justice Center
Eighth Monitoring Compliance Report
January 28, 2015

**Exhibit A – 2**



**Exhibit A – 3**



**Exhibit A – 4**



**Exhibit B - 1**



**Exhibit B – 2**



Henley Young Juvenile Justice Center
Eighth Monitoring Compliance Report
January 28, 2015

**Exhibit B – 3**



**Exhibit B – 4**



**Exhibit C - 1**



Henley Young Juvenile Justice Center
Eighth Monitoring Compliance Report
January 28, 2015

**Exhibit C – 2**



Henley Young Juvenile Justice Center
Eighth Monitoring Compliance Report
January 28, 2015

**Exhibit C – 3**



**Exhibit D**

# POD CONDITION REPORT

Pod:                Date:                Time completed (Military Time HHMM):

Shift:              Supervisor:

JDS:                          relieved JDS:                          of pod keys and logs.

JDS                           relieved JDS:

Radio #              received from:

Radio #              received from:

Pod count                    Current census:          Comments:

Activity at time of relief:

Condition of Resident Area:

Condition of JDS Workstation:

Check:

Pod door:                    Staff restroom:

Gym Doors:                   Janitor's closet:

Counselor Office:            Linen closet:

                             Staff computer:

Fire Equipment:              Shower:

Safety Scissors:             Pod furniture:

Work Orders:  ○ Yes  ◉ No  If yes, comments:

**CONDITION OF RESIDENT ROOM**

| # 2241 | # 2242 |
|---|---|
| # 2243 | # 2244 |
| # 2245 | # 2246 |
| # 2247 | # 2248 |
| # 2249 | # 2250 |
| # | # |
| # | # |
| # | # |
| # | # |
| # | # |

Signature (no initials) Desk                    Signature (no initials) Floor

Supervisor's (Time Received/Reviewed, Comments, Initials):

**To be completed by the departing shift:**

Keys given to:                         Time:

Medical watch:

Constant watch:

Close watch:

Gym excused:

Hospital:

Court:

Seclusion:

End Summary:

     Admissions:

     Releases:

     Isolations:

     Transferred on Pod:                    from

     Transferred on Pod:                    from

     Transferred on Pod:                    from

     Transferred off Pod:                   to

     Transferred off Pod:                   to

     Transferred off Pod:                   to

                Final Census:

                Comments:

Signature: _____   Date:

          JDF 500                                    03/23/00

**Exhibit E**



Henley Young Juvenile Justice Center
Eighth Monitoring Compliance Report
January 28, 2015

**Exhibit F**



JUVENILE JUSTICE CENTER
RESIDENT OBSERVATION SHEET

INSTRUCTION: 1) PRINT LEGIBLE AND 2) ALL LINES MUST BE COMPLETED (write 'NA' if not applicable)

Check appropriate shift ☐ 7am-3pm ☑ 3pm-11pm ☐ 11pm-7am

Officer Name (Print): ▓▓▓▓▓▓
Resident's Name: ▓▓▓▓▓▓        Supervisor: Byrd        Date: 12-4-14
Brief Description of Incident: Suicide    Unit: A Pod    Cell: A111

Seclusion/Personal Restraint at _____    **MENTAL HEALTH**    Ended at _____

Suicide Isolation Started 12/4/14 at 1500    **GENERAL POPULATION**    Ended __/__/__ at _____
Behavior Management Started __/__/__ at _____    Ended __/__/__ at _____
Due Process Isolation Started __/__/__ at _____    Ended __/__/__ at _____
Result of Due Process _____

**NOTE: Times must be staggered with a max of 15 mins intervals between observations and 5 mins. for suicide isolation. (Please p**

| Time | Initials | Supv. | Beh Key | Time | Initials | Supv. | Beh Key | Time | Initials | Supv. | Beh Key | Time | Initials | Supv. |
|------|----------|-------|---------|------|----------|-------|---------|------|----------|-------|---------|------|----------|-------|
| 1500 | KH | | 2 | 1520 | KH | | 2 | 1540 | VT | | 10 | 1605 | KH | |
| 1505 | JM | | 2 | 1525 | KH | | 2 | 1545 | VT | | 10 | 1610 | KH | |
| 1510 | EH | | 2 | 1530 | VT | | 10 | 1550 | VT | | 10 | 1615 | VT | |
| 1515 | KH | | 2 | 1535 | VT | | 10 | 1600 | KH | | 10 | 1630 | VT | |

| Time | Initials | Supv. | Beh Key | Time | Initials | Supv. | Beh Key | Time | Initials | Supv. | Beh Key | Time | Initials | Supv. |
|------|----------|-------|---------|------|----------|-------|---------|------|----------|-------|---------|------|----------|-------|
| 1625 | VT | | 10 | 1645 | VT | | 10 | 1705 | VT | | 10 | 1725 | KH | |
| 1630 | VT | | 10 | 1650 | KH | | 10 | 1710 | LH | | 10 | | | |
| 1635 | KH | | 10 | 1655 | VT | | 9 | 1715 | LH | | 10 | | | |
| 1640 | KH | | 10 | 1700 | VT | | 10 | 1720 | LH | | 10 | | | |

Behavior Key:  1= Resident is asleep   4=Resident is shouting/cursing   7= Resident is flooding cell   10= other: (please explain)
2= Resident is quiet/composed   5=Resident is banging on door/wall   8=Resident is trying to harm self
6=Resident is destroying property   9=Resident is eating

Henley Young Juvenile Justice Center
Eighth Monitoring Compliance Report
January 28, 2015

**Exhibit G**



# Exhibit H

### DUE PROCESS HEARINGS MONTHLY REPORT

To:

From:

Date:  _____

Total number of Incident reports requesting Due Process during  _____:      _____
Total number of hearings conducted:  _____

Major Infractions:                                                      Sanctions:

Escape/plan/attempt                          __             ½ Day  Isolation        __
Attempted assault on resident                __              1  Day  Isolation        __
Attempted assault on staff                   __             1 ½ Days Isolation      __
Assault on resident                          __              2  Days Isolation       __
Assault on staff                             __             2 ½ Days Isolation      __
Sexual Misconduct                                            3  Days Isolation       __
Fighting                                     __
Physical altercation                         __
Possession of weapon /alcohol/ drugs         __             Counsel and Warn        __
Contraband (security related)                __             Early bed               __
Theft                                        __             Loss of privileges      __
Tampering with safety / security device      __             No charge               __
Destruction / defacing of county property    __             Mediation
Racial or ethnic intimidation/slurs          __             Denied                  __
Gang activity                                __
Threats towards staff                        __
Threats towards resident                     __
Conspiracy                                   __

Minor Infractions:

Attempted assault                            __
Unauthorized absence/presence                __
Failure to follow directives                 __             **Resident released**
Non-security related contraband              __                a.  Prior to hearing      __
Disruptive behavior**                        __                b.  Prior to sanction     __
Use of profanity                             __
Verbal assault/disrespect towards staff      __
Disorderly conduct                           __             **Reports Remanded**        __
Pattern of negative behavior                 __
Physical Confrontation                       __             **Time Served**             __

Attempt to fight                                    __

OTHER**:_____
_____
_____
_____