# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION
## HONORABLE DANIEL P. JORDAN III, U.S. DISTRICT JUDGE

## J.H., ET AL, VS HINDS COUNTY MISSISSIPPI
## 3:11-CV00327 DPJ-FKB

**Monitoring Compliance Report:**

**Report Draft Date JANUARY 13, 2016**
**Report Date JANUARY 24 2016**

**Submitted by**
**Leonard B. Dixon, MSPA**
**24420 Crescent Drive**
**Woodhaven, MI  48183**
**734 642-7412**
**Email home: lbdixon1@comcast.net**
**Email work: leonard.dixon@cookcountyil.gov**

# The
# Ninth Monitor's Report
# Henley-Young Juvenile Justice
# Leonard B. Dixon

**Background**

On March, 28, 2012, Hinds County, Mississippi entered into a settlement agreement ordained and adjudged by Judge Daniel P. Jordan III, for the United States District Court Southern District of Mississippi, Jackson Division, regarding conditions of confinement at the Henley-Young Juvenile Justice Center, located in Jackson, Mississippi. According to the order the settlement agreement and its specifics requirements "shall apply to Henley-Young and any contractor that may provide services to Henley-Young in the future. The term "youth" herein often refers to individuals confined at Henley-Young. "The parties" understand that the requirements contained herein will be implemented without undue delay as soon as practicable. Unless otherwise indicated herein, the parties will collaborate to make all reasonable efforts to ensure that within 90 days of the effective date of the agreement, policies, and procedures consistent with the agreement are drafted, in the process of being implemented, and that all detention staff received training on the requirements. The parties agree and understand that the implementation will be an ongoing process that extends beyond the initial 90 days of the agreement. As part of the settlement agreement the defendant shall contract with Leonard Dixon, within 30 days of the court entry of this settlement agreement to serve as an expert who will be responsible for documenting the defendant's compliance with the terms of the agreement and for providing and/or arranging technical assistance and training regarding compliance with this settlement agreement. I will have full and complete access to detained youth, institutional files, medical files, mental health files, education files, video tapes, and youth, staff records and all other information and other reports by staff, grievances, incident reports, and other relevant documents and files maintained by Henley-Young.

All non-public information obtained by the expert shall be kept confidential, except that on a quarterly basis the expert shall file a report with the court documenting the progress of compliance. Neither party, nor any employee or agent of either party, shall have any supervisory authority over the expert's activities, reports, findings, or recommendations. The expert shall file with the Court and provide the parties with reports describing the Defendant's steps to implement this Settlement Agreement and evaluate the extent to which the Defendant has complied with each substantive provision of this agreement. Such reports shall be issued quarterly, unless the parties agree otherwise. The reports shall be provided to the parties in draft form for comment at least two (2) weeks prior to their submission to the Court. These reports shall be written with due regard for the privacy interests of individual youth and staff and the interest of the Defendant in protecting against disclosure of non-public information. The expert shall have a budget sufficient to allow him to fulfill the responsibilities described in this Settlement Agreement. Mr. Dixon may consult other experts or consultants retained by either party. All parties shall receive copies of all draft reports from the other experts to Mr. Dixon prior to the issuance of Mr. Dixon's report, and shall have the option of being present at briefings from such experts to Mr. Dixon and Defendant. Mr. Dixon may initiate and receive ex parte

2

communications with the parties and their respective experts and consultants.  It should be noted that on April 25, 2014 the settlement agreement was extended as set forth by the court.

**Recommendations based on findings, observations and interviews**
Result of visit on November 4 – 6, 2015

**Documentation provided and reviewed**
Memo regarding budget allocation dated September 25, 2015
Letter from Southern Poverty Law Center dated June 12, 2015 re: J.H. v. Hinds County, MS
Letter from Southern Poverty Law Center dated September 15, 2015 re: Strip searches of
      Resident M.C and Resident J. P
Letter from Southern Poverty Law Center dated September 25, 2015 re: Allegations of
      misconduct by Supervisor M. Collins
Letter from Southern Poverty Law Center dated October 6, 2015 re: Allegations of inappropriate
      use of force by officers on September 11, 2015
Letter from Southern Poverty Law Center dated October 6, 2015 re: Allegations of sexual assault
      on September 25 or 26, 2015
Letter from Southern Poverty Law Center dated October 15, 2015 re: Concerns regarding proper
      security measures and protection from harm
Letter from Southern Poverty Law Center dated October 22, 2015 re: Concerns regarding proper
      security measures and protection from harm on October 17, 2015 and October 18, 2015
Letter from Southern Poverty Law Center dated October 22, 2015 re: Concerns regarding
      confidentiality of legal visits
Letter from Disability Rights Mississippi dated July 6, 2015 re: Resident S. T
Letter from Disability Rights Mississippi dated July 23, 2015 re: Allegations of inappropriate
      sexual conduct
Email from Johnnie McDaniels to Alexandra Copper re: HY Request on Resident M. C
Email from Johnnie McDaniels to Alexandra Copper re: HY Request on Resident J. N
Letter from the Eichelberger Law Firm re: preservation of document's and things relevant to the
      detention and assault of Resident M. B dated via fax October 1, 2015
Email from Johnnie McDaniels to Attorney J. Matthew Eichelberger re: Resident M. B
Email from Johnnie McDaniels to Alexandra Copper re: resident visitation
Letter from Johnnie McDaniels to Jody Owens & Alexandra Copper re: failure of production of
      documentation by Henley-Young
Health Service Manuals (cover only):
      NCCHC Correct Care Spring 2015 Volume 29 Issue 2
      Journal of Correctional Health Care
      Standards for Health Services in Juvenile Detention and Confinement Facility
Daily Summer Schedule for 4 Units
Daily In-School Schedule for 4 Units
Daily Rosters dated May 29, 2015 (missing all other sheets for month)
Daily Rosters for June 2015 (missing sheets for dates – 6, 7, 13, 14, 20, 21, 23, 27 and 28)
Daily Rosters for July 2015 (missing sheets for dates – 3, 4, 5, 11, 12, 18, 19, 25 and 26)
Daily Rosters for August 2015 (missing sheets for dates – 1, 2, 8, 9, 15, 16, 22, 23, 29 and 30)
Daily Rosters for September 2015 (missing sheets for dates – 5, 6, 7, 12, 13, 19, 20, 25, 28 and
      29)

3

Daily Rosters for October 2015 (missing sheets for dates – 3, 4, 17, 18, 24 and 25)
Daily Rosters for November 2015 (missing sheets for dates – 1 and 4)
List of vacant positions, employees resigned and staff on leave of absence
Food service menus for 4 weeks approved October 19, 2015
Inspection Reports:
      Metro Fire Systems Invoice dated October 6, 2015
      Metro Fire Systems Pre-Engineered Restaurant Fire Suppression Systems Report
          Dated October 6, 2015
      Fire Inspection Report dated November 10, 2015
Grievance Report Graph from July 2015 to October 2015
HYJJJ Monthly Grievances submitted:
      July -24 grievances submitted by residents with only 2 resolution reports completed
      August -22 grievances submitted by residents with only 1 resolution report completed
      September -30 grievances submitted by residents with 3 resolution reports completed
      October -29 grievances submitted by residents with 3 resolution reports completed
Training Documentation:
      New employee orientation schedules and sign in sheets for various weeks
      Annual Refresher Training Schedule dated July 14, 2015 – July 15, 2015
      Training sign in sheets dated from July 3, 2015 to October 31, 2015
      Various memos dated from June 1, 2015 to October 26, 2015 listing staff to attend
          training
Policies:
      Special Health Needs Program (draft)
      DVD/RW with policies and procedures listed by chapters (none signed or approved)  –
          1.  General Administration
          2.  Fiscal Management
          3.  Personnel
          4.  Training & Staff Development
          5.  Citizen Involvement
          6.  Emergency
          7.  Security & Control
          8.  Safety Procedures
          9.  Rules & Discipline
          10. Juvenile Rights
          11. Food Services
          12. Sanitation & Hygiene
          13. Health Care
          14. Reception & Orientation
          15. Recreation & Activities
          16. Mail, Telephone & Visitation
          17. Mental Health
Henley Young Juvenile Justice Center Organization Chart
QA Reports:

October 2015 Analysis Data Report
Yearly Incident Count from November 2014 to October 2015
Graphs showing use of force incidents and incidents by shifts for months of February
  2015 to July 2015
Graphs showing use of force incidents and incidents by shifts for months of August 2015
  to September 2015
Monthly log detailing incidents for months of June 2015 to October 2015
Monthly log detailing use of force incidents for months of June 2015 to October 2015
Due Process Isolation Logs for months of June 2015 to October 2015
QA Audit Reports:
  HYJJC Monthly QA report dated June 29, 2015
  HYJJC Monthly QA report dated August 31, 2015
  HYJJC Monthly QA report dated September 30, 2015
  HYJJC Monthly QA report no date listed
Purchase Requisition for clothing/inventory dated May 6, 2015
Purchase Orders for clothing/inventory dated from August 13, 2015 to October 21, 2015
Purchase Orders for youth hygiene/sanitation dated from June 8, 2015 to October 5, 2015
Listing of residents placed on suicide precaution dated from June 2015 to October 2015
HYJJC Resident Incident Report/Use of Force/Unusual Incident Reports
  June 2015 – 38 Residents (including some witness statements, medical
    reporting forms and a strip search forms)
  July 2015 – 48 Residents (including some witness statements and medical
    reporting forms)
  August 2015 – 46 Residents (including some witness statements and medical
    reporting forms)
  September 2015 – 70 Residents (including some witness statements and medical
    reporting forms)
  October 2015 – 115 Residents (including some witness statements and medical
    reporting forms)
File on Resident A. M.
File on Resident M. J.
File on Resident B. D.
Video on October 17, 2015 re: disturbance of youth
Video on October 20, 2015 re: lock manipulation


**Staff Interviewed**
Pieter Teeuwissen, County Attorney
Anthony Simon, County Attorney
Johnny McDaniels, Director
Eddie Burnside, Operations Manager
Brandon Dorsey, Public Defender
Tanecka Moore, Esq.
Janet McCoy, Training Coordinator 1 year
Emma Harris, 2nd Shift Detention Officer Intake 1 year 5 months
Jeanette Davis, Detention Officer/Laundry Worker

5

Marry Street, Detention Officer Intake Aide 16 years
Ferniece Galloway, Detention Officer Intake Aide 3 years
Fantoya Carter, RN
Thomas Cole Jr., Detention Officer 5 years
Thomas Petreit, LPN works with corporate office
Sandra Wilson, Family Nurse Practitioner
Tisha McClendon, Officer 2 years
Jacqueline Rhodes, Detention Officer 5 months
Carmen Davis, County Administrator
Peggy Hobson Calhoun, Hinds County Board of Supervisors

**Youth Interviewed**
Resident Q. T. 16 years old
Resident A. M. 13 years old
Resident D. J. 15 years old
Resident R. W. 16 years old
Resident B. D. 16 years old
Resident Q. P. 17 years old
Resident A. C. 15 years old

**Introduction**
This report is the result of my ninth official visit to the Henley-Young Juvenile Justice Center
and the progress made since my previous visit.  On November 4, through November 6, 2015, I
conducted an official inspection/review of the facility.  In this report I detail my findings from
my visit which are based on the following criteria: 1) observations, 2) interviews, 3) SPLC
reports 4) subject matter expertise in operating juvenile institutions, 5) best practices in juvenile
justice, 6) document reviews, and 7) video and audio reviews.  I would like to again thank the
staff, facility administration, and the Hinds County attorneys for their continued cooperation in
this process.

**It should be noted that the facility has progressed since my last visit, specifically 2
provisions have moved to beginning compliance, 3 provisions moved to partial compliance,
4 provisions have moved to substantial compliance. However, 1 provision changed from
substantial back to partial compliance.**

The facility staff should be commended for their continued progress made by putting a new
administration in place despite the political stress it has had to endure. This I will discuss later in
the report.  Since the last report, the County has put in place a new leadership team.  This team
appears to be the team that can move this facility forward.  The new director, Johnnie
McDaniels, appears to bring a sense of equilibrium in managing staff, engaging youth, and
working with the county administration.  It should be noted the new facility team had only been
in place approximately six months, at the time of my review. This is a very short time as it
relates to changing a culture.  Although the county has been under this **consent decree** for a little
over three years, this is the first time that an adequate and stable management team has been in
place.  It has been well known in our field that kids change their behaviors based on the demands
of the environment and their perception and experiences in the juvenile justice system.  That is

why facility culture is so important. A positive culture at Henley –Young is needed to create a community of people working under a set of policies and procedures that will bring the facility into compliance.  A positive, stable culture gives the facility identity and meaning, which again, takes time to develop.  The facilty is moving in the right direction. It should be noted that the new team in addition to Hind's County attorneys did visit detention facilities in Michigan and Illinois to get an enhanced understanding of juvenile detention operation.

As stated above, the facility has made progress in this review, in spite of the challenges inherent in operating a juvenile facility (i.e. increases in resident population, Juvenile Court personalities, inadequate staffing, inadequate funding, and lack of collaboration by other entities) and external road blocks.  At some point, when one entity changes and others don't, one must examine the external barriers and their impact on the facility's success.  Since my last report, several experts in the juvenile justice field have visited the facility and provided feedback for the various provisions (i.e. Mental Health, Medical, Education, and Training).  These juvenile justice experts were contracted to give a subject matter review and the status of those aforementioned provisions.  The experts were: Dr. Lisa Boesky (Mental Health) Ngozi Ezike, MD (Medical), Carol Cramer Brooks (Education), as well as Mr. Gerald Gay and Mr.Felton Satterfield (Training).  Each consultant provided a report (see exhibits/attachments) on their reviews and recommendations, which I provided to the county and federal court. A 360 degree review of the facility will enable the new administration to identify the needs of the facility and will also provide the county with direction on the resources required to obtain full compliance with the settlement agreement.

As stated in my last report, there is still the political atmosphere at this facility that continues to create a toxic environment for staff and kids.  Dr. Boesky's report and the report provided by Mrs. Brooks are quite revealing, as I indicated in my November email to all parties.  This was also evident through my observation and review of documentation during my visit (see exhibit).  For example, utilization of the video and camera system is controlled by the Juvenile Court, placed within the Juvenile Detention Center and owned by the County.  The Juvenile Detention Center is not authorized to view video footage of its own cameras without prior approval of the Juvenile Court.  This causes some concern and alarm because the delay and bureaucratic red tape involved in accessing the video system prevents the director from efficiently and effectively carrying out his responsibility to protect the well-being of the children housed within the facility.  Additionally, the Juvenile Court can and does deny access to video and camera footage for review by the Juvenile Detention Center.  I was denied access to review video footage for a specific incident (cell check, etc.) because the staff from the detention side had no access to the system to review incidents.  This type of disruption will inhibit any director from carrying out his responsibilities in a thorough and professional manner. In addition the facility staff must be able to train in an environment conducive to learning.  These are areas that should be remedied immediately by the county.  These barriers and unbecoming actions are petty at best.  I understand this is harsh language however I have discussed this in my previous reports, repeatedly.  I would recommend that the County Board of Supervisors address this situation head on.  How does the county expect the detention facility administration to do their job with the juvenile court controlling major tools needed for their jobs?

Another important issue I need to raise is the lack of legal documents that direct the detention facility on the courts directives regarding the resident.  I reviewed 47 files seeking the court orders for the resident and only found these directives in four.  There were no court orders or court dispositions indicating the expected path of the resident, which again points to the great need for a system to assure that the court's directives are being followed and that the facility is executing those mandates.  An organized, data driven case management system is needed to assure that the resident is legally held in detention.  The juvenile court is the only authorizer of the path of residents in the detention facility.

### Facility and Operational Culture

Since the facility population has increased and is above the agreed upon 32 population cap, the county must provide the facility with the original staffing plan recommended to the court.  In addition, case managers should be immediately put in place at the facility to begin to meet this agreement.  Please see previous reports and Dr. Lisa Boesky's most recent attached report.

Based on my discussion with the new administration, to fully comply with the consent decree the need for consistency in all provisions is required.  This means ensuring the following:

(1)  Whether there are written policies covering this provision.
(2)  Whether there are written procedures to implement the policies.
(3)  Whether practices are consistent with the written policies and procedures.
(4)  Whether the policies, procedures, and practices meet constitutional and other local requirements.

As it relates to conditions in a facility, the broader the permissible reason for detention, the more difficult it is to address institutional inadequacies. And the more difficult it becomes to meet the needs of the youth at any facility.  For example the detention of mentally ill youth, requires special considerations in housing, staffing and mental health services.  Likewise at Henley-Young detained dependent residents and status offenders; youth committed to the facility for disturbing the family peace, or residents held without court orders etc. present immediate classification and housing issues. They create a range of problems with educational services programming, and access to the outside world.  Holding youth being transferred to the adult court may be good from a juvenile standpoint, but it too creates additional housing and programming issues for the detention facilty. Also, allowing the detention to be used for post disposition sanctions creates the need for additional counseling staff and rehabilitative programing.  This is not just my professional opinion but the opinion of the collective wisdom of the professionals within the juvenile justice community, i.e. Youth Law Center, the Annie E. Casey Foundation, the National Council on Crime and Juvenile Delinquency, the Department of Justice, JJ law suits, etc..  Therefore, it is incumbent on all entities to work together to ensure that policy decisions  are made with a practical understanding of how these policies affect the youth being placed in detention and the institution and staff.

## Staffing

The facility has brought in a new administration and is in the process of continuous staff hiring. In addition, to attract more qualified employees the county has increased salaries and has begun to pay overtime and shift differentials.  However, with the increase in population the facility must hire the agreed upon staffing recommended in the initial report.  In addition, the need for case managers within the facility ,is still required to meet the Provisions 4, 5.1, 5.2, 5.3, 5.4, 5.5, 13.1, 13.2, 13.3, 13.4, 13.5, 13.6, and 16.5.

## Building Cleanliness/Environmental Issues/Maintenance

The facility has hired an additional maintenance worker.  However, the building is still in need of repair.  Please see last report and most recent exhibits.  The facility needs to enact a facility-wide maintenance schedule, as stated in my previous reports.  **The shower stalls, electrical outlets, kitchen, painting and lighting are still in need of repair.**

## Professional standards of care/Sustainability

One of the major goals of this process is to create a sustainable system that will last after the conclusion of the consent decree.  The development of good policy and procedures that create professional standards is a major aspect of creating a sustainable system that protects constitutional rights of the residents housed within the facility.  Therefore, a good management information and quality assurance program is essential to making evidence based decisions. These programs will ensure ongoing accurate and reliable indicators of the detention process and operations.

Good quality assurance (QA) processes allow staff, supervisors, facility administration and County administration to make evidence based decisions on the needs of the facility and the children housed within its walls.  These systems once developed will give all parties data from routine 15 minute checks to capturing medical and mental health services that are being provided. These systems will also look at confinements, fights, incidents of youth- on -youth violence, staff on youth violence and the reductions in youth confinement periods. QA processes also allow in-depth auditing capabilities that ensure the facility is in compliances with State and Federal laws.  These are some examples that relates to sustainability. I discuss this because in my experience once court intervention leaves everyone returns to the old way of doing business, which got the institution into trouble in the first place, which must be avoided.  QA processes provide that data needed not only to sustain compliance but to meet a variety of grant and other funding reporting requirements.

## Mental Health

Please see Dr. Boesky's Mental Health report and recommendations, in addition to my last report, which is still relevant as only the names have changed.

## Suicide Prevention

Please see Dr. Boesky's report and recommendations, in addition to my last report.

9

## Behavior Management/Isolation

During this review, I found that the facility has begun to implement a behavior management system; however, it is still in its infancy stage (see last report). The facility should continue to fully implement the behavior management program.

The facility must, however, continue to work on its inappropriate isolations of youth. During this visit, I found and observed girls are being left in their rooms for several hours after there was a shift change. Staff must follow the facility schedule as required. Also, I still found youth left on units alone without any supervision or staff engagement. This speaks to the October incident involving the fire sprinkler system being activated by youth. Because staff did not engage the residents, they were able to trigger the unit's sprinklers heads, break lights, break the television and flooded the unit. Because the officers failed to engage the residents the Jackson police (JPD) was called to restore order. Had the staff members engaged the youth properly the likelihood of the incident occurring would have been minor. Additionally, had the officers engaged the residents with proper use of force techniques the Jackson police would not have been needed (see provision 8.1). This is an area the new administration must address as it relates to continuous supervision, use of force, and de-escalation training becoming central to the operation of the facility.

Staff is still in the towers and not in the immediate proximity of youth. I also witnessed several youth in their room for no reason without supervision. Because there is no consistent behavioral management isolation rules in place, youth and staff are still in flux regarding what they're to do at this point. There is also a need to have the facilty rules permanently posted throughout the facility and on each unit.

During this visit no sanctions were posted. This should be addressed before my next official visit by posting and orientating youth entering the facility on the rules, creating an acknowledgement form that a youth has received, reviewed and understood them, as discussed in previous reports and discussions.

## Activities/Recreation/Programming

Please see last report. During this visit, I found that the facility continues in the development of activities, recreation, and programming. In addition, I am recommending that the facility purchase frames that can be seamed to the wall that are clear and tamper proof so they cannot be torn down or discarded as the taped sheets that are currently being used (see exhibits). The frames I am recommending are used in other facilities including my own. They give a sense of order and they are very difficult to damage or deface. In addition, changes to schedules and activities can be updated easily by the facility (see exhibit).

**Medical, Medication Review & Disposal**
Please see Dr. Ezike's report and recommendations (Attachments).  Also, please see my previous report.  At the time of this review, the county has hired a new medical company, Quality Correctional Healthcare, to provide service for youth at Henley-Young.


**Food Service**
Based on my review and observations, the food was served in a timely manner.  However, youth complained of not having enough food and that it was cold.  Please see last report.

Based on this visit and my review of documents, the food service program is still in need of improvement, although some improvements have been made.  However, residents still continue to complain about not having enough food and that the food is tasteless.  In addition, there were still numerous complaints about the food being cold and not appealing (see exhibit).  I again observed the food process during this visit and found that serving sizes were below the federal food standard requirements, and the temperature of the food was unacceptable.

However, during this visit, I found that food was being served in a timely manner and that the cooks were preparing food onsite.

I am still recommending that a major cleaning of the kitchen be done for sanitation purposes (see Exhibits 1 thru 6).

I am again reiterating that food service is an important part of institutional life (see previous report #7and #8).


**89 day program/Juvenile Court**
There has been no change since my last report, except it's not called the 89 day program. Now it's called the **secure intervention unit**, which does not change the program. While it has a new name, it still continues to be the same program as I have discussed in my previous reports.  There are no case managers at the facility and no programming for these youth.  Also please see Dr. Boesky's report.  My statements from my previous report stand.

During this visit, I again interviewed staff and residents as it relates to this program.  From a detention perspective, treatment perspective and correctional perspective "this program" serves very little purpose other than holding youths in detention for 89 days.  Please see my facility update/technical assistance report submitted to the Court on November 24, 2014, where I explained the differences between juvenile detention and juvenile correctional facilities. Additionally, the resolution passed by the Hinds County Board, de facto eliminates the 89 day program in statement and this should be adhered to. With this in mind, please see previous reports.

Again as discussed in my previous reports, the 89 day concept is a very admirable idea. But, I reiterate, for this court program to function or to operate successfully, there are major changes needed as it relates to programming and staffing. At this point, the program is more a revocation

program than the therapeutic, treatment program that was intended. As I have stated in my previous reports, for this program to be effective and successful, the following areas must be incorporated in the program:

- Sufficient staff
- Target appropriate juveniles for the program (i.e. medium to high-risk)
- Target risk factors for delinquent behavior that are responsive to intervention
- ensure they are individualized and family based, and delivered in community settings when discharged
- Programming based on a particular treatment model
- well-trained staff and a program director who strongly supports the program outside of the facility's director
- Deliver a sufficient amount of treatment
- Adhere to a program design
- Monitor juveniles' progress on an ongoing basis and modify the program as needed
- Provide aftercare services
- Individual treatment plan (ITP) that reflects why the juvenile is in the program and what goals juvenile should accomplish during his stay. Also mentioned in the ITP is the juvenile's individual education plan (IEP), which specifies how to accomplish the juvenile's educational goals.
- Develop cognitive behavioral programs that confront juvenile's thinking errors and teach juveniles to overcome their thinking errors as a means of behavioral change.
- Develop positive peer culture (PPC) that teaches juveniles to assume responsibility for helping one another. It is based on the belief that the most powerful influence on a resident's behavior is peer pressure. PPC's goal is to teach basic values related to caring for others. PPC is centered on frequent meetings of small groups of juveniles (6-12) and one or two staff leaders. The juveniles are encouraged to help each other.
- Develop strength based practices that help juveniles to become accountable for their actions and responsible for their behaviors. Accountability is realized when a juvenile admits to the wrong and changes his/her behavior. When juveniles get into trouble, the care worker will initiate more behavior changes in juveniles by having them focus on how to solve their problems.

To ensure that there is an accountability case management in the 89 day program, I am recommending the following model be implemented:

- specifying troublesome behaviors
- identifying need(s)
- setting goal(s)
- evaluation

| | |
|---|---|
| **Need** | physiological, social, psychological requirement(s) for the well-being of an individual |
| **Goal** | behavioral statement of how the individual will be at the end of a specified period of time |
| **Service Action** | behavioral statement of what the case manager plans and does to assist the individual(s) in achieving the goal |
| **Evaluation** | systematic collection of information on goal indicators and/or service action(s) for the purpose of decision making and planning |

In addition, the court has to determine what therapeutic programs they will be using. An example of these programs would be psychoanalytic therapy, behavioral therapy, rationale emotive therapy, persons centered therapy, reality therapy, etc. It should be noted that I found in my review of documents, observations, and discussion with staff and residents no difference in the 89 day program than in the general detention program. One staff put it quite profoundly by stating, "When these youths get a long term sentence through the 89 day program they don't care and they are causing most of the problems. "**Detention is a short termed program and they are getting long term sentences."**

<u>School</u>
Please see Mrs. Brooks' report submitted 11/19/15, and please see my previous report.  I am still concerned regarding the road blocks put up by the school.  I must reiterate that the school is a major component of facility programming.

It is clear that the new facility administration is committed to making progress. However, they must be supported to continue in the direction they are moving by resources, political will, and support from all parties involved in this process to work cooperatively with Henley-Young and its staff and youth (See Brooks report).

Working in juvenile facilities is extremely stressful. These young people typically display hostility, defiance, and other resistances.  They present considerable challenges.  Therefore, it is important that facilities are not upset and damaged by nonproductive political trespassing, (the school not working with director, youth court dictation of who should attend school, etc.).

The school has a site leader.  This is the fourth leader since this agreement started.  However during this visit as stated in previous reports, youths continue to be placed out of school for behavioral issues, and they do not receive educational services during those times.  Moreover, as stated in previous reports, youths who attend court hearings are not placed back in school after their return to the facility. They are taken to their units without any educational services being provided and an improper use of staff. It is very clear through research and basic common sense that these youths are behind in their educational progress for the most part and are in need of every educational opportunity available.  In my previous reports it was recommended that the school be evaluated.  This was a simple task which was not and has not been done to determine the needs in the areas laid out below.

For this report Carol Brooks a JJ educational expert reviewed the school program with some push back from the school administration. According to Mrs. Brooks there was hesitancy, foot

13

dragging and apprehension by the school as stated in her report and in her discussion with me in her goal to evaluate the school.  I continue to recommend that the school follow the system developed by Rankin County where students being tested are tested away from the regular school programming and all other students are still in class receiving educational programming.

There are many conflicts between the mandates of the court, the school and the facility. Students who have court are not allowed to return to the classroom after their appearances, teachers suspend students from school based on their needs rather than the parameter of the detention facility and an already stretched staff becomes more stretched. These types of issues create problems that the line staff cannot surmount. There has to be one set of rules that are all encompassing for the facility that makes for a safe and secure environment and complies with the need for order within the facility.

The school should review their staffing to ensure that it is meeting the needs of the educational program (i.e. need physical educational, staff and an additional GED teacher).

I am still recommending that the school and the facility review the policy of not allowing residents to return to school after court.  Further, the following areas should be addressed based on my interviews from my previous report with school staff:

      A.      "policy and procedure"
      B.      "everyone needs to know what to do"
      C.      "the expectations should be written even kids should know them"
      D.      "policy and procedure should be based on detention standards"
      E.      "everyone should have the tools to do their job"
      F.      "proper staffing is needed"
      G.      "staff should be well trained to deal with this population"

These are areas that should also be addressed as I have discussed in my previous reports. The school should use small portable classrooms (which can be placed on the grounds of the facility within the security fencing) to help alleviate the congestion for students and teachers who are now forced to teach class in a storage closet. This is below any standard, educationally or detention and is not conducive to learning. Again below are my recommendations from my previous reports.

Recommended School Plan:
    A. The Henley-Young Facility will create and implement a plan to provide all of the following services and programs within their control related to the aspects of residents' education:
        a. maintain an adequate physical facility for education,
        b. provide adequate security and support in the classroom,
        c. establish an in-school points system based on rewards and consequences for behavior,
        d. establish and implement a schedule for transporting residents to and from school that assures that residents will have the opportunity to receive the required hours of educational services mandated by law.

B. Develop policies and procedures for all of the areas discussed above.

Solution/Plan

1. The Henley-Young Facility will make every effort to develop and formalize an interagency agreement between the Jackson Public School System and the HYC that:
   a. Provides adequate security within the school premises (including classrooms) for all residents including those residents requiring protective services or other special needs.
   b. Residents requiring protective services or other special needs shall have the same or equivalent educational services as other residents.
   c. Create an alternative educational plans for residents removed from the classroom for medical or behavioral issues.
   d. Provides a schedule for transporting residents to and from school that ensures that residents will have the opportunity to receive the hours of educational services mandated by law.
   e. Outline a cross training curriculum for HYC school employees and detention employees, which include an orientation and a safety curriculum and mandatory annual refreshment training for employees of the school.
   f. Ensure trainings will provide educational staff with appropriate facility policies that relate to or overlap with the school's operations to include the policies regarding rules, discipline and the behavior management program.
   g. Include development of a plan and appropriate materials for various educational levels, to be distributed and explained to residents in the health care unit, in room confinement or otherwise unable to participate in normal school classroom activities.
   h. Ensure the class schedules are driven by the security of the facility and that the school looks toward developing individual learning plans for each student in the school.

2. The Facility Director or designee shall review the circumstances surrounding the placement of all residents who are in isolation or seclusion, or residents who do not attend school for medical reasons and other behavioral maintenance processes to assess the feasibility of an early release to attend school each day.
   a. A list of the residents that are not allowed to attend school and the reasons for the administrative restriction shall be documented and distributed to the Principal of the HYC School.
   b. The Facility Director shall designate a liaison to interact with school daily and the JPS Administration should create a position for Compliance Administrator to review the progress of the school on a weekly basis.
   c. All instances in which school activities are suspended by the facility due to incidents or other extraordinary circumstances shall be reported to the Compliance Administrator within 24 hours.

When the School Principal or designee is having issues, whether of a safety nature or any other problems, they should be reported to the compliance administrator and the facility Director or designee immediately. **I am recommending again that the Jackson Public School system**

**(JPS) hire a compliance officer to ensure that the school educational standards are being met (Is the new principal the compliance officer?).**

Below are the compliance ratings and summary of ratings that will be used in this report. Please be reminded that though most are in Non-Compliance, policy development is most important and the start of this process. However, as stated above the facility has made progress on some provisions which moved them from Non-Compliance to beginning compliance.

**Please note that many of the comments and recommendations in the provisions are restatements of previous reports because in those areas little movement has been made. The new Director should use these comments as a road map to developing a successful facility plan. He must also develop a comprehensive corrective action plan for guidance. That plan should have the following:**

     **A. Clearly state the problem or weakness, including the root cause**

     **B. List the individuals who will be accountable for the results of the corrective action plan**

     **C. Create simple, measurable solutions that address the root cause**

     **D. Each solution should have a person that is accountable for it**

     **E. Set achievable deadlines**

     **F. Monitor the progress of the plan**

**The graph has been included to show the progress made thus far on the 71 provisions:**



**Compliance Code Measurements**

**Substantial Compliance (SC)**: Practices follow the county-approved policies, training materials or other documents; practices follow policy with rare exception and exceptions lead to corrective action; trained staff fill all positions and vacancies are filled within 3 months; the County has completed work in an acceptable manner; policies, procedures and practice and training are fully operational and quality-assurance audited and audit exceptions lead to corrective action; outcomes meet or exceed agreement requirements.

**Partial Compliance (PC)**: Policy and procedure is implemented in some but not all locations or times; staff are hired but not trained; the County is working on implementation but tasks are not completed; system implemented at some but not all locations or times, outcomes meet or exceed agreement requirements some of the time and in certain area.

**Beginning Compliance (BC)**: Policy and procedure is written by the county but has not been implemented; funding and hiring authority are approved by the County but positions are not filled; training materials prepared and approved by the county but training has not started.

**Non-Compliance (NC)**: No action taken and immediate steps needed to maintain schedule or prevent further delay. A policy may exist, but the policy may need significant revision or modifications and rarely translates into practice.

| Provision | Intake | 6th Report | 7th Report | 8th Report | 9th Report |
|---|---|---|---|---|---|
| 1.(1) | All Residents Admitted to Henley Young | NC | NC | NC | NC |
| 1.(2) | MAYSI-2 Mental Health Screening | NC | NC | NC | NC |
| 1.(3) | Prescription Medications | NC | NC | NC | NC |
| 1.(4) | Meal Compliance | BC | PC | SC | SC |
| 1.(5) | Telephone Usage | BC | PC | SC | SC |
| 1.(6) | Strip Search Policy | BC | BC | BC | PC |
| | | | | | |
| **Provision** | **Staffing and Overcrowding** | | | | |
| 2.(1) | Direct Care Staff Ratio | NC | NC | NC | NC |
| 2.(2) | Maximum Capacity Adjustment | PC | SC | SC | SC |
| 2.(3) | One-Person Cell | PC | SC | SC | SC |
| | | | | | |
| **Provision** | **Cell Confinement** | | | | |
| 3.(1) | Structured, Rehabilitative & Educational Programming | NC | NC | BC | BC |
| 3.(2) | Appropriate Access to Living Unit | NC | NC | NC | NC |
| 3.(3) | Dangerous Residents | NC | NC | NC | NC |
| 3.(4) | Isolation | NC | NC | NC | BC |
| 3.(5) | Direct Care Staff on Units | BC | BC | BC | BC |

18

| Provision | Structured Programming | 6th Report | 7th Report | 8th Report | 9th Report |
|---|---|---|---|---|---|
| 4 | Educational, Rehabilitative, and/or Recreational Programs | NC | NC | BC | BC |
| | | | | | |
| Provision | Individualized Treatment Plans/Treatment Program for Post-Disposition Residents | | | | |
| 5.(1) | Residents Access to Adequate Rehabilitative Services | NC | NC | NC | NC |
| 5.(2) | Health and/or Substance Abuse Treatment | NC | NC | NC | NC |
| 5.(3) | Treatment Plans | NC | NC | NC | NC |
| 5.(4) | Review of Individual Treatment Plans | NC | NC | NC | NC |
| 5.(5) | Evening and Weekend Programs and Activities | NC | NC | NC | NC |
| 5.(6) | Quality Assurance Program | BC | PC | PC | PC |
| | | | | | |
| Provision | Disciplinary Practices and Procedures | | | | |
| 6.(1) | Implement a Discipline Policy and Practice | NC | NC | NC | NC |
| 6.(2) | Policy for Residents Violations | NC | NC | NC | NC |
| | | | | | |
| Provision | Use of Restraints | | | | |
| 7.(1) | Mechanical Restraints | BC | BC | BC | PC |
| 7.(2) | Mechanical Restraints – Transportation | PC | BC | PC | SC |
| 7.(3) | Misuse of Mechanical Restraints | BC | PC | PC | SC |
| 7.(4) | Mental Health – Use of Mechanical Restraints | BC | BC | BC | BC |
| 7.(5) | No Restraint Chairs, Chemical Restraints and/or Tasers | SC | SC | SC | SC |
| 7.(6) | No Hogtying in Facility | SC | SC | SC | SC |
| 7.(7) | Mechanical Restraints – One-On-One Supervision | PC | PC | PC | SC |
| 7.(8) | Mechanical Restraints – Notice to Medical Professional | BC | BC | BC | PC |
| 7.(9) | No Electronic Restraints | PC | SC | SC | SC |
| 7.(10) | No Firearms in Facility | SC | SC | SC | SC |
| | | | | | |
| Provision | Use of Force | | | | |
| 8.(1) | No Misuse of Use of Force | NC | NC | NC | NC |
| 8.(2) | Notice to Medical Professional After Use of Force | BC | PC | PC | PC |
| | | | | | |
| Provision | Meals and Nutrition | | | | |
| 9.(1) | All Meals and Snacks Must Be Nutritional | PC | PC | PC | PC |
| 9.(2) | Comply with Nutrition Guidelines | BC | BC | BC | BC |
| 9.(3) | Provide Drinking Water Throughout the Day | BC | PC | SC | PC |
| | | | | | |
| Provision | Clothing | | | | |
| 10 | Provide Basic Clothing Items | BC | PC | PC | PC |

| Provision | Hygiene and Sanitation | 6th Report | 7th Report | 8th Report | 9th Report |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| 11.(1) | Provide Appropriate Hygiene Products | BC | PC | PC | PC |
| 11.(2) | Provide Sleeping Mats and Blankets | PC | PC | PC | SC |
| 11.(3) | No Deprivation of Mats and Blankets | PC | PC | SC | SC |
| 11.(4) | Sufficient Sanitary Mats and Blankets | PC | SC | SC | SC |
| 11.(5) | Clean and Sanitary Environment | BC | BC | BC | BC |
| 11.(6) | Fire Safety, Weather Emergencies, Sanitation Practices, Food Safety, and Provide Safe Environment | BC | BC | BC | BC |
| 11.(7) | Clean Drinking Glasses and Eating Utensils | PC | PC | PC | PC |
| | | | | | |
| **Provision** | **Medical Care** | | | | |
| 12.(1) | Provide Residents With Adequate Medical Care | NC | NC | NC | NC |
| 12.(2) | Provide Medical Professional When Needed | NC | NC | NC | NC |
| 12.(3) | Implement a Sick Call Policy to Ensure  24 Hour Services | NC | NC | NC | NC |
| 12.(4) | Prescription Medications Only Dispensed by Medical Staff | NC | NC | NC | NC |
| 12.(5) | Provide Medical and Mental Health Services | NC | NC | NC | NC |
| 12.(6) | Proper Monitoring Residents Who Require Individualized Attention | NC | NC | NC | BC |
| | | | | | |
| **Provision** | **Mental Health Care** | | | | |
| 13.(1) | Provide Adequate Mental Health Care | NC | NC | NC | NC |
| 13.(2) | Residents and Psychotropic Medications | NC | NC | NC | NC |
| 13.(3) | Within 72 Hours of Admittance Complete an Individual Mental Health Treatment Plan | NC | NC | NC | NC |
| 13.(4) | Implement Policies and Procedures for Referrals | NC | NC | NC | NC |
| 13.(5) | Sufficient Psychiatric Services | NC | NC | NC | NC |
| 13.(6) | Psychiatrist and/or Counselors to Record Review to Ensure Proper Care | NC | NC | NC | NC |
| | | | | | |
| **Provision** | **Suicide Prevention** | | | | |
| 14.(1) | Multi-tiered Suicide Prevention Policy | BC | BC | BC | BC |
| 14.(2) | Evaluate Highest Level of Suicide Watch Every 12 Hours by Medical Professional | BC | BC | BC | BC |
| 14.(3) | Closely Monitor Suicide Watch Residents During All Activities | BC | BC | BC | BC |
| 14.(4) | Court Shall be Notified Within 24 Hours of Any Residents on Suicide Watch | BC | BC | BC | BC |
| | | | | | |
| **Provision** | **Family Support and Interaction** | | | | |
| 15.(1) | Visitation Shall Not Be Restricted or Withheld | PC | PC | SC | SC |
| 15.(2) | Provide Accommodations for Contact Visits | PC | SC | SC | SC |

| Provision | Family Support and Interaction (cont.) | 6th Report | 7th Report | 8th Report | 9th Report |
|---|---|---|---|---|---|
| 15.(3) | Visitation Shall be Regularly Scheduled | PC | SC | SC | SC |
| 15.(4) | Phone Calls Shall be Allowed Based on Policy | BC | PC | PC | PC |
| | | | | | |
| Provision | Miscellaneous Provisions | | | | |
| 16.(1) | Provide Equal Access To All Services | BC | BC | BC | BC |
| 16.(2) | Provide the Opportunity To Participate In Large Muscle Exercise Every Day | NC | NC | NC | NC |
| 16.(3) | Prohibit the Use of Profanity in the Presence of Residents | BC | BC | BC | BC |
| 16.(4) | Provide Adequate Grievance Policy | BC | BC | BC | BC |
| 16.(5) | Provide Residents of All Ages With the Opportunity to See Their Attorney and/or Residents Court Counselor | BC | BC | BC | BC |

**The following are my observations and recommendations specific to the provisions of this agreement.**

### 1. Intake

| | |
|---|---|
| Provision1.1 Intake | All residents admitted to Henley-Young shall receive a health screening, within 1 hour of admission or as soon as possible as reasonably thereafter, by appropriately trained staff as required by Mississippi Code Annotated § 43-21-321. Information obtained during the screening shall include, but shall not be limited to, the juvenile's: (a) Mental health; (b) Suicide risk; (c) Alcohol and other drug use and abuse; (d) Physical health; (e) Aggressive behavior; (f) Family relations; (g) Peer relations; (h) Social skills; (i) Educational status; and (j) Vocational status." Mississippi Code Ann. § 43-21-321(1). During this screening, Henley-Young shall obtain information regarding the resident's educational status by having the residents or intake officer complete an education screening form developed and provided by the Jackson Public School District. |
| Status | **Non-Compliance** | |
| Discussion | During this visit and as with my previous visits, I find that the County still needs to comply with the above mentioned Intake provisions.  The facility has developed policies and procedure regarding this provision. I advise that the recommendations provided by Dr Boesky be used to fully develop these policies.  Further the staff should be trained and when needed retrained. The policies for this provision should be consistent for all youth entering the facility. Since this is a key provision, the facility, mental health and medical divisions should be involved in developing these policies, procedures and protocol.  The school should also develop a separate intake process.  For this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see attached XX). <br><br> There are still youth who are entering the facility who are identified based on the MAYSI-2 screening who have identified suicidal and mental health risks that are not being addressed. <br><br> Please see recommendations below: |
| Recommendations | 1. Fully develop admitting policies and procedures to reflect provision <br> 2. The court should provide staffing for intake purposes <br> 3. The facility should provide enough staff to fully cover the care and custody issues in the facility <br> 4. Ensure all staff who admit residents are properly trained <br> 5. Develop training records <br> 6. Provide documentation in an organized way on residents being screened/admitted (files) <br> 7. Ensure all residents' records are available for my review with all areas of the provisions placed in the resident's file |

| | |
|---|---|
| | 8.  See Dr. Boesky's report/recommendations. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 1.2 Intake | All residents shall receive a MAYSI-2 mental health screening upon admission, as required by Mississippi Code Annotated § 43-21-321. The screening will be conducted in private by appropriately trained staff of Henley-Young. If the screening indicates that the residents is in need of emergency medical care or mental health intervention including, but not limited to, major depression, suicidal ideation, withdrawal from drugs or alcohol, or trauma, the detention staff shall refer those juveniles to the proper health care facility or community mental health service provider for further evaluation immediately or as soon as reasonably possible. |
|---|---|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  As stated in my last report (8th), the facility needs first to answer the following questions below; then follow the recommendations.

    A.  What are the program objectives for mental health screening?

    B.  What are the characteristics or common traits the program wants to identify for emergency or follow-up clinical consultation?

    C.  What MAYSI-2 scores will the facility use as the signal for the program staff to obtain clinical consultation or services?

    D.  What mental health follow-up services are available when the resident's MAYSI-2 score indicates that they are needed?

    E.  In what way will the facility develop a database that creates a profile of mental health needs in the population and program \decisions and adjustments needed to improve mental health services for the residents?

In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit).

Develop and follow mental health plan. |
| Recommendations | 1.    Develop comprehensive policy and procedures for this provision.
2.    Develop resident files that are organized and arranged properly
3.    Develop training and provide documentation of training
4.    Identify person or person(s) whose responsibility is to score the instrument
5.    Provide documentation on who reviews the  instrument and note what services are provided for the residents in the facility and what services should continue when the residents leave the facility
6.    Develop process whereby facility staff and court employees develop a system for the sharing of information and reviewing of residents' |

| | |
|---|---|
| | files which are centrally located and accessible to detention staff.<br>7.    Develop plan<br>8.    See Dr. Boesky's report/recommendations. |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 1.3<br>Intake | Prescription medications will be secured for all residents who have a valid, current prescription within 8 hours of admission, if possible, but in no case, longer than 24 hours after admission, including weekends and holidays. If during a resident's detention, a medical professional either prescribes a new medication or renews a resident's previous prescription medication, Henley-Young will secure the prescription medication within 8 hours of receiving the prescription, if possible, but in no case, longer than 24 hours after receiving the new prescription, including weekends and holidays. Henley-Young shall procure and/or purchase all prescription medications prescribed to confined residents. |
| Status | **Non-Compliance** |
| Discussion | The facility should continue to follow the recommendations below which are the same as in the previous report. The initial intake/admission process is a critical part of residents' transition when they are entering the facility.<br><br>It should be noted, residents are not receiving physicals as required based on minimal juvenile detention standards and the Mississippi Youth Court code (43-21-321). In addition, there is no Pharm D to oversee medication administration and dosage. I saw no biomedical hazard receptacles, which implies that the facility has no contract with a waste removal company.<br><br>Again, based on my review of documents and observation, over the past two and a half years no doctor, physician's assistant or practitioner has been hired. Also, there are no policies, procedures or protocols to guide these nurses. Therefore I am reiterating that the suggested actions and recommendations from my previous report be reviewed and put into action. I did meet with the current medical providers and they are in agreement that policies, procedures and protocols are needed. In addition, it should be noted that the company that is providing the medical services is a temporary staffing agency therefore there is a strong need for a licensed medical doctor, physician's assistant or a practitioner must be involved in developing the medical department.<br><br>In addition to this report, Dr. Ngozi Ezike, an expert medical physician, with expertise in juvenile detention health services reviewed medical services within Henley-Young Juvenile Detention Facility.  Dr. Ezike's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit).<br>As stated in my introduction the county has hired a new medical management |

| | |
|---|---|
| | company (QCHC) to provide medical services to the facility. It should be noted that youth are not receiving physicals as required based on minimum juvenile detention standards and the Mississippi Youth Court Code (43-21-321). There is also no Pharm D to oversee medication administration and dosage. Again, there are no policies, procedures, or protocols to guide nurses and staff. Therefore, I am reiterating again that my suggested actions and recommendations from my previous report be reviewed and put into action (see ending statement Dr. Ezike). |
| Recommendations | 1. Hire a Medical Doctor, physician's assistant or a practitioner. This person must be involved in developing the medical department and to direct medical care. 2. Develop written policy and procedures or protocol for this provision 3. Document staff training on distribution and side effects of medication 4. Provide documentation on efforts to obtain prescription drugs 5. See Dr. Ezike report and recommendation. |
| Evidentiary Basis | Document review, observation, interviews |
| Provision 1.4 Intake | Upon admission to Henley-Young, all residents shall be offered a snack or meal in compliance with the United States Department of Agriculture's School Meals Program standards. |
| Status | **Substantial Compliance** |
| Discussion | The facility has maintained substantial compliance on this provision based on my observation, interviews and review. Therefore the facility must continue to follow the recommendations below. |
| Recommendations | 1. Continue in the development of policies and procedures for this provision. 2. Procedures should be part of intake/admission procedure. 3. Ensure there are snacks or sandwiches available for residents being admitted between 6 pm and 5 am. 4. Ensure enough staff members are available to fully comply with the policies and procedures. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 1.5 Intake | Upon admission to Henley-Young, all residents shall be permitted to telephone a parent or legal guardian free of charge and to take a shower before being placed on the pod. |
|---|---|
| Status | **Substantial Compliance** |
| Discussion | The facility has remained at substantial compliance on this provision, based on my observation and review.  Therefore the facility must continue to follow the recommendations below. |
| Recommendations | 1.  If officers have been trained on this policy, they may need retraining.<br>2.  Develop a consistent way to document the intake process that shows that a phone call and shower were completed.<br>3.  Develop policy and procedure for this provision.(executed)<br>4.  Train staff and document this training. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 1.6 Intake | Within 60 days of the date of this agreement, Henley-Young shall develop and implement policies that limit strip searches to instances where Henley-Young staff has an articulable suspicion that a resident may possess weapons or contraband. Anytime a strip search is conducted, Henley-Young staff must document, in writing, their suspicion, obtain permission from a supervisor, and conduct the search in a manner that minimizes the intrusion into the resident's privacy. |
|---|---|
| Status | **Partial Compliance** |
| Discussion | The status of this provision has moved to partial compliance.  Based on my interviews with residents and review of documentation, there is contraband still being brought into the facility. However, as stated below, the facility needs to continue to ensure that safety and security is first to control the level of contraband entering the facility as stated in my previous report.  I reiterate my statement below on ACA guidelines regarding contraband and my experience in institutional settings.  (It is always better to be safe.)<br><br>**It should be noted again that, there is contraband still entering the facility.**<br><br>Although there is an agreement between the Board and SPLC regarding strip searches, I disagree with this as does the ACA as stated below.<br>As it relates to proper intake and safety and security in a secured environment, the following must exist. Security (secured) is defined as "being free from danger or risk of loss: safe, fear from fear or doubt, anything that gives or assures safety".  Security is an intricate and essential component of a juvenile detention facility.  The process for admitting a resident to detention is extremely important. There is an art to getting residents fully and smoothly involved in the detention program.  The admission process is what is called the "critical hour" because it is the first encounter with the resident.  It is the first impression, sets the tone and it establishes the 'flavor' for the entire stay in detention.  Detention is a complex situation, placing troubled residents together in a confined environment with high levels of uncertainty.  The risk for problems is very high for both residents and staff. Good detention facilities supply staff with a substantial amount of information at admission. Since the first moments are critically important because it sets the tone it is important to have the best staff assigned to the admissions area. In addition, it is very important for staff to understand that youth are coming off the street based on being arrested and they are not  aware of the circumstances surrounding the arrest or if the youth  were properly searched by the arresting police officer. There are natural consequences when this process is not completed correctly. Therefore, to be clear the following should apply to residents being searched upon entering the facility.  When staff are authorized to conduct a strip search, these guidelines should be observed for the staff's protection:<br>• a strip search should occur only after staff have had training on how to conduct a strip search |

- strip searches should be conducted in a private area of the detention facility
- staff must maintain a professional demeanor throughout the process
- the resident should be asked to remove all of their clothing, and staff should refrain from inappropriate comments and staring
- staff should not touch a resident during a normal strip search
- staff are only permitted to conduct a strip search on a resident who is of the same sex

Drug-related offenses, violent offenses, and serious felony offenses do constitute a reasonable suspicion to conduct a strip search. Additionally, the frisk search at admission and the inventory search of property may uncover contraband that creates a reasonable suspicion to conduct a strip search. Staff should be advised to conduct a strip search on all juveniles at admission.[1] ACA recommends completing a strip search as part of the admission process. In the absence of case law on the subject, conducting a strip search as a routine part of the admission process is advisable. Body-cavity searches are to be conducted by a licensed health care provider with the authorization from the responsible physician and facility administrator; staff should never conduct a body-cavity search. Specific reference is made to a visual, manual, or instrument search of a residents' anus and/or vagina. (Desktop Guide for Good Juvenile Detention)

The facility has stabilized this area with permanent staffing on the day and afternoon shift. However, during my review of videos youth were left in this area unsupervised during the changing from evening to night shift, which must be addressed. A youth was able to obstruct the lock and leave the cell without staff being aware of what occurred.

Again, based on my observations and review, as stated in my last report, the facility does have policy and procedures for this provision. During my interview with residents I found no residents who acknowledged there was inappropriate intrusion during the search process upon their admission to the facility. Although this is an area of concern, strip searching is necessary to ensure no contraband enters the facility. As long as searches are conducted in a humane manner by an officer of the same sex as the resident, no resident's rights are being violated. My greatest concern is still that in my interviews I learned that some of the residents reported that they were not searched before being placed on a unit. The process I observed was very loose and not well structured. It is important that the officers follow the policies and procedures as they direct this process. Failure to follow these procedures presents the possibility of having a very dangerous situation in the facility. The facility must follow its policies and procedures to provide a safe and secure environment. Continue to comply with this provision.

| Recommendations | 1. Staff must be provided with the necessary training with information stating the trainer, name of the training class/course, time, date and location of training. |
| | 2. This documentation should be kept and logged in facility records |
| | 3. Continue to provide enough staff for adequate coverage 24/7. |
| Evidentiary Basis | Document review, observation, interviews |

[1]Although, this provision will  need modification, I understand that Hinds County has ceased its practice of strip searching residents during the admission process at Henley-Young unless there is an articulable suspicion that a resident possesses weapons, drugs, or contraband and is in the process of implementing a policy that complies with the consent decree.

## 2    Staffing and Overcrowding

| Provision 2.1 Staffing and Overcrowding | Within 90 days of the date of this agreement, Henley-Young shall operate with a direct care staff to resident ratio of 1:8 from the hours of 6:00 a.m. until 10:00 p.m. and a ratio of 1:10 from the hours of 10:00 p.m. to 6:00 a.m. |
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on document review, observation and interviews, the County has not complied with maintaining the resident population of 32. The population at times has moved to 50+ residents which means that the original 91 staff must be hired. The increase in population has created additional stress on the facility which has forced them to return to locking down residents because of staff deficiencies.  I am concerned that without the stabilizing of the population the facility will revert back to its original 'environment'. |
| | The question we should ask, does the staffing plan agreed upon in 2014(32 youth) meet constitutional standards as it relates to adequate staffing? However, based on the increase in youth being detained at Henley-Young, the original staffing plan is now required. Because of the apparent need for more staffing, the facility must have time to hire and train new staff. As professionals in the field have concluded "Crowding is not just a housekeeping problem that simply requires a facility administrator to put extra mattresses in the day room when lights are out. Years of research and court cases have concluded that overcrowding produces unsafe, unhealthy conditions for both staff and residents." When staffing ratios fail to keep pace with the populations, the prevalence of violence and suicidal behavior rises. In addition, the staff habitually resorts to increase control measures as lockdowns and mechanical restraints. As it relates to mechanical restraints the facility is doing a very good job not using them except for transportation. |
| | Again, as stated above there are still many conflicts between the mandates of the court, the school and the facility. Students who have court still are not |

allowed to return to the classroom after their appearances, teachers still suspend students from school based on their needs rather than the parameter of the detention facility and an already stretched staff becomes more stretched. These types of issues create problems that the line staff cannot surmount.

This is another indication that when there is not sufficient and appropriate staff available, officers have a tendency to not engage residents on their inappropriate behavior, which in turn affects any structured programming. Again, the Henley-Young officers are compelled to inappropriately react to minor misbehaviors, out of fear that small situations will become big ones. As stated in my last report, the facility continues locking down residents that present potential conduct issues so other residents will be safe. Further, the officers are not equipped to handle residents with mental health problems due to their lack training and not having enough mental health professionals or mental health services available. This lack of service only exacerbates a resident's misbehavior when they are outside their rooms. They have nothing to lose because their misbehavior only gets them a return to their rooms. This approach of locking residents down for minor inappropriate behavior (i.e. talking out of turn, being somewhat verbally disruptive etc.) or displaying suicide ideation's is counter-productive for the residents because it is equivalent to awarding the residents for their misbehavior. This not in line with good juvenile detention practices. Because there are no qualified mental health professionals, at Henley-Young, residents are isolated and their needs are not being met. This situation places direct care staff in a quandary on how to handle these residents. Without regular access to mental health professionals, these children often deteriorate and staff members become apprehensive regarding their next step, so isolation becomes the norm. This should be addressed by the new director.

Again, during this visit my observations and my record review revealed that because of the inadequate staffing levels there are no consistent security checks of residents who are placed on behavior management or isolation. There were residents placed on behavioral management and isolation without the appropriate documentation on the doors.  This indicates that the residents are not being properly observed during this period, and that no records are being made of the residents' behavior while in behavior management or isolation. Therefore, there is again a need for major training as it relates to behavior management and isolation of residents at Henley-Young.

| Recommendations | | | | | |
|---|---|---|---|---|---|
| | Units | Day Shift | Evening Shift | Night Shift | Total |
| | A officer | 3 | 3 | 2 | 8 |
| | B officer | 3 | 3 | 2 | 8 |
| | C officer | 3 | 3 | 2 | 8 |
| | D officer | 3 | 3 | 2 | 8 |
| | Intake | 1 | 1 | 1 | 3 |
| | Master Control | 1 | 1 | 1 | 3 |
| | Staff for Court Transportation | 2 | 2 | | 4 |
| | Internal Transportation | 2 | 2 | | 4 |
| | Laundry | 2 | 2 | | 4 |
| | *Director | 1 | | | |
| | *Deputy Director | 1 | | | |
| | *Operation Manager | 1 | | | |
| | Supervisors | 3 | 3 | 2 | 8 |
| | | 26 | 23 | 12 | 61 |

**Duty Post Staffing/Administration**

61 Direct care/supervisor/laundry staffing X 1.5 Relief Factor—Total staff
needed to effectively operate the facility—91.5
1 to 8 Awake—1 to 10 Sleep

<u>Misc. post coverage</u>
Medical/MH Hospital Runs
One on One MH/Medical
Visitation
*Administration
*Maintenance

| Evidentiary Basis | Document review, observation, interviews |
|---|---|

| Provision 2.2 Staffing and Overcrowding | If the staff-to-residents ratio falls below the requirements of section 2.1 for longer than two (2) days, the Director or his assignee shall immediately identify residents accused of nonviolent offenses who are eligible for less restrictive alternatives to secure detention and request an emergency release for eligible residents from the appropriate Residents Court. The maximum capacity of Henley-Young shall be calculated by determining how many direct care staff members can supervise residents in accordance with section 2.1. The current maximum capacity of Henley-Young is 84. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility continues to be in substantial compliance on this provision based on my review of documents, interviews and observations.  The facility does have policies and procedures in place signed by the Court Administrator; the youth court Judge, and the Executive Director.<br><br>Although the facility has not reached its maximum capacity of 84 and there is a procedure in place to ensure steps are taken for releasing of residents who meet the criteria there is a concern regarding facility staffing and it capacity .Even though the provision is in substantial compliance the County agreed that the population would be capped at 32 beds .It has now far succeed the 32 bed population agreed upon with the federal court. .Therefore, this provision may need  revision .This fluctuation creates a staffing and safety concern if there is not enough staff to maintain safety and security  which may be a constitutional violation. | |
| Recommendations | Continue to provide training to ensure that everyone is aware of the new policy and prepared for implementation should the need arise. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 2.3 Staffing and Overcrowding | No more than one resident shall be placed in a one-person cell. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility continues to be in substantial compliance on this provision. I found no indication that the facility had more than one resident in a room.<br><br>The facility has developed policies and procedures for this provision. | |
| Recommendations | 1. Develop and provide adequate training for this provision.<br>2. All training shall be documented. | |
| Evidentiary Basis | Document review, observation | |

### 3   Cell Confinement

| Provision 3.1 Cell Confinement | Residents shall be engaged in structured, rehabilitative, and educational programming outside of their cells during the hours of 7:00 a.m. to 9:00 p.m. each day, including weekends and holidays. | |
| --- | --- | --- |
| Status | **Beginning Compliance** | |
| Discussion | The facility remains at beginning compliance.  See comments below.<br><br>During this visit, I found that although the facility had a daily program, it was not being followed.  Again, as I discussed in my last report, youth placed out of school or on isolation must be provided with education and structured activities.  During this visit, there were youth who were out of school and on their units with no educational staff and in their rooms.  In addition, there was a youth placed in the intake area for safety issues not involved in school for several days (Youth A.M).  The facility is also in the process of hiring a new recreation position to assist in developing this programming.  As stated in my introduction, the facility needs to secure the frames I mentioned for security, structure, and to ensure schedules are not pulled down and discarded, which will provide a sense of order.  See attached.  It should be noted that the facility education program has been reviewed with **reluctance by** an outside juvenile education expert (see exhibit).  It should also be noted that the facility is developing a behavior management program.  The facility needs to maintain structure and consistency in daily schedules and routines.  Again, staff must be removed from the towers.  They should only be in towers as needed and not as a place for just gathering.  There is also a need to fully develop a facility-wide reward and incentive program.<br><br>Again, please review the introduction as it pertains to activities, recreation and programming. As to the school I direct you to read the introduction. <u>My review of the files showed that there is still no case management within the facility.</u> According to the residents, their basic recreation consists of playing cards and dominoes. They are allowed to go outside but there are no scheduled activities. Other than sitting on the bleachers and playing basketball for those who are engaged in that sport, there was nothing for residents to do. The facility continues to develop its positive behavioral management programs within the facility. | |
| Recommendations | 1. Develop policies and procedures for this provision.<br>2. Review the schedules to be sure that they adequately reflect all daily activities.<br>3. Develop positive behavior management systems with rewards and consequences.<br>4. Remove the dark film from the Plexiglas in towers on unit which would allow staff to view the unit without there being visual obstruction (when lights on).**Executed** | |

|  |  |
|---|---|
|  | 5. Develop monthly recreation schedule.<br>6. See all of the recommendations for recreation activities and programming and for the school in the introduction.<br>7. Purchase frames for facility activities and schedule<br>8. Hire recreation staff<br>9. Fully develop award and incentive program |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 3.2<br>Cell Confinement | Except when residents are in protective custody or confined subject to section 3.3 of this Settlement Agreement, residents placed in the Suicide or Booking cells shall be allowed to spend the hours of 7:00 a.m. to 9:00 p.m. on the appropriate living unit and to have the opportunity to engage in structured, rehabilitative, and educational programming, unless medically counter-indicated. |
|---|---|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance<br><br>Based on my review of documents and observation, there have been youth placed in the booking area who have not been involved in structured programming and were not supervised.  This was apparent during the visit. Youth (AM) was placed in a booking cell for several days at the request of SPLC according to the facility administration.  However, this youth was not involved in any structured programming. In addition, this youth was identified as having mental health issues because he was placed in a mental health smock during his time in the area.  Also, my reviewing of videos revealed youth unsupervised in the area.  As in my last report, there is a need for policy and procedures development, proper staffing, and supervision.<br><br>My review of documents and observations showed that the facility still has not developed policy and procedures for this provision. During my review, I found residents on the unit living area still not being supervised. Again, as stated in my introduction, there were residents who were not allowed to attend school for the remainder of the day after returning from court. This is an issue that needs to be addressed immediately. Again during this visit, I observed residents who wanted to return to school but were not allowed. As stated previously, I recommend that students who are disruptive in the classroom and are removed from the classroom receive either behavioral management or are written up and receive due process. However, they should continue to be a part of the educational process. The school needs to revise any policies they may have regarding suspension of students from a school within a controlled environment. A student cannot be suspended from school in a detention facility therefore |

| | the school needs to develop a better behavioral management system. If a resident is removed from school due to behavioral problems that resident should never be placed in the booking area.

The facility still needs to develop data collection tools to use to determine and identify who is placed on units, time, length etc. when they are placed out of school. The facility remains non-compliant with this provision, therefore I am reiterating that the suggested actions and recommendations from my previous report be reviewed and put into action. |
|---|---|
| Recommendations | 1. Follow recommendations as set forth in section 3.1.<br>2. Develop adequate policies and procedures for this provision.<br>3. Develop data collection for residents who are placed in protective custody or confinement.<br>4. Residents who are removed from school should be placed in a designated living area. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 3.3<br>Cell Confinement | Residents who pose an immediate, serious threat of bodily injury to others may be confined in their cells for no longer than 12 hours at a time without administrative approval. Residents who are placed on cell confinement for this reason shall be released from their cells daily to attend school, maintain appropriate personal hygiene and to engage in one hour of large muscle exercise. Staff must perform visual checks on residents who are subject to cell confinement every 15 minutes. Staff must document all instances of cell confinement in writing and must document the justification for determining that a resident poses an immediate, serious threat of bodily injury. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | During this review, I observed that youth were still being placed in their rooms without administrative or supervisory approval.  These were also youth who were in their cells that were not in school or structured programming.  During this visit I found the youth who were in their room had no review sheets on their doors.  It should be noted that staff are still stationing themselves in the tower and are not in the proximity of youth they are to supervise.  In my opinion with the increase in population, some kids not in school, youth not having proper mental health services, the staff is becoming overwhelmed again.  Please see last report, the facility has developed a due process system however, staff need to follow it.  In addition, there needs to be ongoing training and increased supervision by the administration or hire additional supervision.  The QA Department is developing good data, which should continue.  However, | |

|  | the data must be used to provide a greater understanding of the facility operations. |
|  | The status of this provision remains as non-compliance.  Based on my review of documents, interviews with residents and staff and observation, residents are still being confined in their cells for long periods of time without appropriate documentation.  During this visit, I again found residents, although they were not all locked in their rooms, they were on the units without being engaged in any meaningful programming or activities because they were placed out of school.  Staff was still in the towers and not interacting with the residents on the unit.  I have discussed this in my previous reports stressing that there must be enough staff in order for the staff and the residents to be engaged and for the  safety and security while residents are on their units.  Supervising residents from the tower fails in the face of good supervision and rehabilitation. |
|  | Therefore the statements below from my previous report (7th/8th) still stand. |
|  | During this visit, I did find that the facility has developed a system for procedural due process for facility violations. However, there are no supervisory checks to the process which are critical to ensure that staff are following the policies and procedures and not just placing residents in their rooms discriminately.  As stated in my previous reports the facility has developed policies and procedures and the QA department is still doing a good job. However, there is still a need for adequate training to ensure everyone is following the process. Again see my discussion of this matter in the introduction. Though processes on a few provisions have begun, it is vitally important that policy and procedures are developed to ensure a consistent, comprehensive, and standardized way of running the facility. |
| Recommendations | 1. Develop adequate policies and procedures for this provision. 2. For residents placed in their rooms, develop forms that indicate the time residents will be in their rooms and post it on their doors. 3. Ensure that supervisors sign off on the form in 15 minute staggered visual checks when residents are placed in their rooms. 4. Develop a system of major and minor consequences for behavior. 5. Develop form for 15 minute checks and include in policy. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 3.4 Cell Confinement | Residents shall not be automatically subjected to cell confinement and/or isolation upon their admission to Henley-Young unless he or she would be subject to cell confinement under section 3.3. |
|---|---|
| Status | **Beginning Compliance** |
| Discussion | This status of this provision has moved to beginning compliance.<br><br>This provision has moved to beginning compliance.  The facility has assigned two intake officers during the day to this area.  I found no indication that youth who were entering the facility during the first shift were locked down upon admittance.  However, in my review of video for the afternoon shift it was revealed that youth were being placed in the admission cells and left alone with no supervision.  This is an area that still needs to be addressed.  Part of operating a facility is to ensure staff is consistently following policy and procedure.  To follow on one shift and not the other is counterproductive.  Policy and procedure must comport with practice. |
| Recommendations | 1.  Develop adequate policies and procedures for this provision.<br>2.  Ensure all staff is trained and document training.<br>3.  See provision 3.3<br>4.  Ensure practice is consistent with policy and procedure.<br>5.  Ensure there is adequate staffing and supervision for this area |
| Evidentiary Basis | Document review, observation |

| Provision 3.5 Cell Confinement | At all times between the hours of 7:00 a.m. to 10:00 p.m., at least one direct care staff shall be stationed on any living unit where two or more residents are placed, and direct care staff shall be actively engaged with residents. From 10:00 p.m. to 7:00 a.m., staff shall conduct visual checks on residents every 15 minutes. Henley-Young shall ensure that every cell has an operating intercom that allows residents to communicate with staff at all times. |
|---|---|
| Status | **Beginning Compliance** |
| Discussion | This provision remains as beginning compliance.  Again, I found youth alone on units and in their cell without any staff supervision.  As stated in my Introduction, the staff continues to remain in towers.  There must be additional supervision.  See last report.<br><br>The status of this provision remains as beginning compliance, therefore my discussion below still stands. |

| | |
|---|---|
| | The facility has developed a policy and procedures regarding this provision. Again due to the lack of staff, or the deployment staff, it is very difficult for the facility to address this provision. During this visit I found residents were left unsupervised as stated in my previous reports and this continues to happen. Again, residents were on the unit without supervision although one staff was in the tower. There were doors opened on the unit which also allows for serious things to happen between residents. This is a major area of concern and must be addressed. It continues to make me uneasy as it has during my previous visits. Review of documentation and direct observation reveals that staffing continues to be a major problem at Henley-Young. The facility remains at beginning- compliance with this provision, therefore I am reiterating that the suggested actions and recommendations from my previous report be reviewed and put into action. Since a policy has been developed this provision remains in beginning compliance (**see Introduction).** |
| Recommendations | 1. Develop adequate policies and procedures for this provision.<br>2. Provide adequate staffing.<br>3. Provide adequate staff supervision.<br>4. See my last report<br>5. Review the deployment of staffing |
| Evidentiary Basis | Document review, observation, interviews |

### 4  Structured Programming

| | |
|---|---|
| Provision 4 Structured Programming | Henley-Young shall administer a daily program, including weekends and holidays, to provide structured educational, rehabilitative, and/or recreational programs for residents during all hours those residents shall be permitted out of their cells, pursuant to section 3.1. Programming shall include:<br><br>a. activities which are varied and appropriate to the ages of the residents;<br>b. structured and supervised activities which are intended to alleviate idleness and develop concepts of cooperation and sportsmanship; and<br>c. Supervised small group leisure activities, such as a wide variety of card and table games, arts and crafts, or book club discussions. |
| Status | **Beginning Compliance** |
| Discussion | The status of this provision remains at beginning compliance.<br><br>Based on my review of documents, staff and youth discussion and observation, the facility continues to struggle to develop an adequate structure program.  The facility is in the process of hiring another recreation staff to replace the previous one.  The facility needs to fully develop the program to have clear and consistent programming.  This should include proper programming for girls.  The facility does not have a posted schedule throughout the facility for staff and youth to follow.  Also during this visit I found that girls were still in their rooms although shifts had changed.  This indicates that there was no consistent programming. The programming must have the following;<br><br>A. Comprehensive policies and procedures<br>B. Reasonable rules and expectations<br>C. Order<br>D. Organization and clarity<br>F. Clear rewards and incentives<br>G. Reasonable and consistently implemented sanctions<br>H. Case management to ensure youth are there is a collaborative process that assesses, plans, implements, coordinates, monitors, and evaluates the options and progress youth are making during their stay.<br><br>In addition for this report, Carol Cramer Brooks a detention education expert reviewed educational services within Henley-Young Juvenile Detention Facility.  Ms Cramer Brooks report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). |
| Recommendations | 1. Continue to develop adequate policies and procedures for this |

| | |
|---|---|
| | provision.<br>2.  Provide adequate schedules for weekdays and weekend programming and act on it.<br>3.  Develop an adequate monthly recreation schedule with age appropriate games and programs.<br>4.  The facility need to hire an officer dedicated to developing and monitoring recreational programs.<br>5.  Hire case management staff. |
| Evidentiary Basis | Document review, observation, interviews |

### 6.  Individualized Treatment Plans Treatment For Post-Disposition Residents

| | |
|---|---|
| Provision 5.1 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall ensure that residents have access to adequate rehabilitative services. Henley-Young shall ensure that children placed in the facility post-disposition will receive constitutionally compliant rehabilitative services. |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand.<br><br>See the discussion of the 89 day program in the Introduction.<br><br>Since there is no structured programming outside of individual counseling, the County needs to hire case managers to provide initial and ongoing case management services (i.e. treatment planning, family assessments, educational assessments, referrals for mental health or health services). Also the case manager will identify indicators of goals achieved, specify the person responsible for implementing the resident's and family's treatment goals; update treatment plans; and develop discharge plans with recommendations. In addition, the facility needs counselors who are responsible for a resident's safe adjustment to secure confinement.<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). |
| Recommendations | 1.  Develop adequate policy and procedures to meet this provision.<br>2.  Either fund properly or discontinue the 89 day program. |

|  |  |
|---|---|
|  | 3. Review light weight residents in program (i.e. disturbing the family peace) and find alternative placement for them.<br>4. Fund appropriate staffing to develop individualized treatment plans for residents in 89 day program.<br>5. Develop and fund alternative community programming for residents in 89 day program that can be serviced in community.<br>6. Hire 3 case managers who are assigned and work for the facility director.<br>7. Hire case management staff. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 5.2 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall ensure that residents in need of mental health and/or substance abuse treatment and/or who are in the facility post disposition shall have appropriate treatment plans developed and implemented in accordance with generally accepted professional standards of practice for mental health and rehabilitative services. |
|---|---|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Again, see the technical assistance provided to the court dated November, 2014. Also see introduction on 89 day program. There has only been a name change to the program. However, there is still the need to hire case managers to create a possible treatment program if the county intends to meet this provision.<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). |
| Recommendations | 1. Develop adequate policies and procedures for this provision.<br>2. See recommendations under (5.1).<br>3. Hire case management staff.<br>4. Purchase case management system |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 5.3 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall implement policies and procedures for the required content of treatment plans, which shall include; <br><br> a. That the treatment plan be individualized; <br> b. An identification of the mental and/or behavioral health and/or rehabilitative issues to be addressed; <br> c. A description of any mental health, medication or medical course of action to be pursued, including the initiation of psychotropic medication; <br> d. A description of planned activities to monitor the efficacy of any medication of the possibility of side effects; <br> e. A description of any behavioral management plan or strategies to be undertaken; <br> f. A description of any counseling or psychotherapy to be provided; <br> g. A determination of whether the type or level of treatment needed can be provided in the resident's current placement; and <br> h. A plan for monitoring the course of treatment, and if necessary, for revising the treatment plan. <br> i. A description of the precise terms the of the facility's long-term and short-term objectives for the residents, the full range of services to be provided, and procedures, and timetables and staff assignments for the implementation of such treatment plan; <br> j. A plan for regularly engaging the family in the resident's treatment plan; <br> k. A comprehensive re-entry plan that will assist the residents re-enroll in their home school and access medical, mental health, vocational and rehabilitative services based in the community. |
| Status | **Non-Compliance** |
| Discussion | In addition for this report, Dr. Ngozi Ezike, an expert medical physician, with expertise in juvenile detention health services reviewed medical services and Dr. Lisa Boesky, an expert mental health consultant, reviewed mental health services within Henley-Young Juvenile Detention Facility. Dr. Ezike's and Dr. Boesky's reports were submitted prior to this official report to give the facility an opportunity to begin implementation of their recommendations (see exhibit). |
| Recommendations | 1. Develop comprehensive policies and procedures for this provision that includes the contents (A-K). <br> 2. The County/Court shall define the criteria for the program <br>      a. It is important that post dispositional programs in other facilities be reviewed. <br>      b. Often seeing what is being done in other facilities provides insight into how to develop and operate these programs. <br> 3. Provide dedicated staff to manage program. <br> 4. Provide intensive training to these staff members. |

|  | |
|---|---|
|  | a. Train staff in various treatment modalities i.e. cognition, behavioral modification, modeling, psychotherapy, reality therapy, group therapy and group dynamics and other skills required to successfully facilitate the goals of the 89 day program.<br>b. Create treatment teams<br>c. Develop case planning and program development<br>d. Assessment of the program to determine if it meets the needs of the court placed residents.<br>e. Assessment tool to regularly monitor the success or lack of success of all residents in the program.<br>5. Provide auxiliary training to all other direct care staff.<br>6. Hire case management staff. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 5.4 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall institute a program of periodic staff reviews every three weeks and evaluations of each resident's progress under his/her individualized treatment plan and of the appropriateness of the plan itself and Henley-Young's plan for such review. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | In addition for this report, Dr. Ngozi Ezike, an expert medical physician, with expertise in juvenile detention health services reviewed medical services and Dr. Lisa Boesky, an expert mental health consultant, reviewed mental health services within Henley-Young Juvenile Detention Facility. Dr. Ezike's and Dr. Boesky's reports were submitted prior to this official report to give the facility an opportunity to begin implementation of their recommendations (see exhibit). | |
| Recommendations | 1. Develop comprehensive policies and procedures for this provision.<br>2. Provide training to all staff.<br>3. Identify roles and responsibilities of direct care, treatment and educational staff as it relates to the staffing for 89 day program through policies and procedures and adequate funding and staffing.<br>4. Hire case management staff. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 5.5 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall develop and implement a program that provides for evening and weekend programs and activities that allow residents to engage in meaningful activities. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance, therefore my statements below still stand. See the technical assistance provided to the court dated November, 2014.<br><br>Based on my review of documents and observation, services are not in place and are still not being provided for this provision. I am reiterating the actions and recommendations from my previous report below. The programming of the facility is at a standstill as it relates to this provision. There are very few activities on weekends therefore there is no meaningful programmatic, structured activities except for card playing and dominoes. Take note of the discussion of these issues in the introduction. | |
| Recommendations | 1. Develop comprehensive policies and procedures to meet the needs for this provision.<br>2. Provide adequate staffing for this program.<br>3. Develop a monthly recreational program with activities.<br>4. Keep records of activities provided and note those that were not provided and why.<br>5. Purchase board games etc.<br>6. Hire recreational staff. (executed)<br>7. Hire case management staff. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 5.6 Individualized Treatment Plans Treatment Program for Post-Disposition Residents | Henley-Young shall develop and implement an adequate quality assurance program. | |
|---|---|---|
| Status | **Partial  Compliance** | |
| Discussion | The QA department at Henley-Young continues to develop their data fields. There is significant improvement from no data to what is being developed | |

| | |
|---|---|
| | now.  The QA staff should be commended and encouraged to continue their effort.  Based on my discussion with the administration, the county's IT department will be working with the facility to create and develop data sets that will produce reports that will provide the facility with the system to evaluate the current operations and provide the facility with information that will help them make better decisions as administrators and as facility operators.<br><br>Now the following is needed:<br>• I will provide the facility with templates for assistance in the full development of this process.<br>• QA Data Collection Info<br>• See introduction<br><br> |
| Recommendations | 1. Develop comprehensive policies and procedures to meet the needs for this provision for the facility, school program and SICU program. |

|  | 2. Health Care: continuously assess the quality and adequacy of the health services provided, accurately evaluate the performance of staff providing health services and address identified deficiencies. 3. Recreation and Social programs: continuously assess the quality and adequacy of social and recreational programming provided; accurately evaluate the performance of staff in providing these programs. 4. Environmental Health and Safety: continuously assess the quality and adequacy of environmental health and safety, accurately evaluate the performance of staff in providing a safe and healthy environment and properly address identified deficiencies. 5. Discipline and order: continuously monitor use of discipline and promptly address misuse or over use of discipline and other identified deficiencies. 6. The facility must continue to develop monthly performance measures to indicate achievement in the desired area. 7. Review State of Florida Quality Assurance Model and for assistance in developing contact CJCA Performance Based Standard for Juvenile Detention Programs, also use ACA standards to establish policy guidelines. 8. Develop data collection system 9. See introduction |
| --- | --- |
| Evidentiary Basis | Document review, observation, interviews |

## 6   Due Process/Isolation/Disciplinary Practices and Procedures

| Provision 6.1 Disciplinary Practices and Procedures | Henley-Young shall implement a discipline policy and practice that incorporates positive behavior interventions and support. This policy shall include guidelines for imposing graduated sanctions for rule violations and positive incentives for good behavior. | |
| --- | --- | --- |
| Status | **Non-Compliance** | |
| Discussion | Although the facility has a due process policy in place, the facility still needs to train staff in how to carry out sanctions for rule violations and positive incentives.  In addition, youth are not aware of the sanctions and rules for the behavioral management system.  There were also no rules or sanctions posted in the facility.  Again in my discussion with youth and staff observation and document review, I found very little indication that positive behavior intervention or incentives for behavior modification were present (i.e. counseling, early bed, loss of privileges, mediation, etc.). Therefore, my statement below still stands._See last report.

Again, this is a critical component of the disciplinary and behavioral management process to ensure residents are treated fair, humane and that | |

| | |
|---|---|
| | there is no misuse of the isolation and disciplinary process (review the introduction regarding this matter). The facility is implementing a due process behavior system which is partially complete. Based on my review of the documents the facility has initiated due process hearings, however staff officers are not adequately trained and the residents are not aware of the infractions and consequences because they have not received proper orientation to the program. The bottom line is there is inadequate orientation for entering the facility. There is still no positive incentive program for good behavior and sanctions for rule violation. Based on my review of documents and observation, positive behavioral intervention and supports are not in place and are still being worked on for this provision. I reiterate, the suggested actions and recommendations from my previous report. The facility should continue to follow the recommendations from the previous report. The facility is making improvement on the due process isolation and practice procedures. Although processes on a few provisions have begun, it is vitally important that policy and procedures are developed to ensure a consistent, comprehensive, and standardized method of running the facility.

In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). |
| Recommendations | 1. Develop adequate policies and procedures for this provision.<br>2. Develop new resident handbook. Residents are to receive these handbooks during orientation and sign for it.<br>   a) They shall include resident's rights, major and minor rule violations and the grievance policy.<br>   b) The handbook will explain to residents in their own language the rules and shall also be explained by staff that will have them sign and date a form indicating that both processes have occurred.<br>   c) These rules shall be posted on each unit.<br>3. Due process rules shall be posted on each unit.<br>4. Develop positive behavior intervention programs.<br>5. Assign and train an independent person(s) to handle due process isolation hearings. The person(s) must be independent of the unit staff.<br>6. Ensure residents who are in isolation are provided recreation and education services. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 6.2 Disciplinary Practices and Procedures | Residents who violate major rules may be subject to cell confinement for up to 24 hours for a single rule violation. An occasion in which a resident is alleged to have contemporaneously violated multiple major rule violations shall count as a single rule violation for the purposes of this section. No residents shall be confined to a cell for longer than 8 hours for a single rule violation without receiving written notification of the alleged rule violation and the occurrence of a disciplinary review/due process hearing before an impartial staff member, which includes participation by the accused residents. Under no circumstances shall residents be subjected to involuntary cell confinement for longer than 24 hours for disciplinary purposes. Residents who are placed on cell confinement shall be released daily from their cells to attend school, maintain appropriate personal hygiene, and to engage in one hour of large muscle exercise. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The facility does have a due process system in place.  However, during this visit I found youth that were placed in their rooms without any hearings. There were also youth left in their rooms after shift change and during the day without staff supervision.  These youth were also not receiving any educational services during this time.  Since this is new to the new director I am reiterating my statement from my previous report.  (See Dr. Boesky's report) <br><br> Again, when residents are accused of a major rule violation, they should be provided with a notice of the violation and an explanation of their right to have a hearing in which they are able to present their side of the event to an unbiased party, call witnesses on their behalf and ask for staff representation if it is requested. The hearing officer is required to interview the resident and any parties that observed the incident. Residents who require a due process hearing who are on the mental health caseload should have a qualified mental health professional determine whether being placed in isolation could cause a decline in functioning or any other relapse. The hearing officer may impose a variety of sanctions including the loss of privileges, restrictions, or isolation. The hearing officer may credit the resident for any time served in behavior management isolation pending the hearing. The residents have the right to appeal the decision of the hearing officer to the Director. My review of documents and interviews with staff and residents revealed the need for additional training to take place regarding this process. The staff and residents were unfamiliar on how the process works; therefore it is critical for the facility administration to review their policy and procedure on due process. It should also be noted that residents must see the process as fair. | |
| Recommendations | 1.  Develop policies and procedures for this provision. <br> 2.  Develop sheets to place on door of any residents in confinement that identifies the reason for confinement and is review and signed by | |

|  | supervisor.<br>3. Ensure residents in confinement receive education and recreation services.<br>4. See 6.1 recommendations.<br>5. Provide training for all staff on these policies and procedures. |
|---|---|
| Evidentiary Basis | Document review, observation, interviews |

### 7. Use of Restraints

| Provision 7.1<br>Use of Restraints<br>Mechanical | Mechanical restraints shall not be used to punish residents or for the convenience of staff. Mechanical restraints shall only be used to prevent self-harm and/or harm to others, subject to section 7.4, and for transportation to and from court, subject to section 7.2. |
|---|---|
| Status | **Partial Compliance** | |
| Discussion | The status of this provision has moved to partial compliance. Based on my review of documents, interviews with youths and observations at this time I found no indication of overuse of mechanical restraints with the exception of transferring residents out of the facility.<br><br>Again, I reiterate it should be noted that well run facilities only use mechanical restraints for transportation or exigent circumstances which may arise at any facility under supervisory approval. |
| Recommendations | 1. Officers shall receive training on policy and procedures.<br>2. Officers shall be trained on when it is appropriate to use mechanical restraints.<br>3. All training shall be documented.<br>4. The policy will require the documentation of any use of mechanical restraint and use of force incidents.<br>5. Restraint log should be implemented.<br>6. Continue to follow policy |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 7.2<br>Use of Restraints<br>Mechanical | Nothing in this section shall prohibit mechanical restraints from being placed on residents who are being transported to and from court or out of the facility, if staff have reason to believe that a residents presents a flight risk or is an imminent danger to the residents or others, or will engage in violent behavior. However, mechanical restraints should be removed immediately after the resident is placed in a cell and at no time shall a resident be placed in a cell wearing mechanical restraints. |
|---|---|
| Status | **Substantial Compliance** | |

| Discussion | The facility has moved to substantial compliance on this provision.  Based on my review of documents, interviews with youths and observations at this time I found no indication of overuse of mechanical restraints with the exception of transferring residents out of the facility.  This should continue. |
|---|---|
| Recommendations | 1. Develop and provide remedial training for this provision.<br>2. All training shall continue to be documented.<br>3. The policy will require the documentation of any use of mechanical restraint and use of force incidents.<br>4. Operationalize the edicts of this provision.<br>5. Additional supervision needed to ensure mechanical restraints are not misused.<br>6. Continue to follow the process to remain at SC. |
| Evidentiary Basis | Document review, observation, video recordings and discussion with residents |

| Provision 7.3<br>Use of Restraints | Restraints shall not be used to secure residents to a fixed object such as a restraint chair, bed, post, or chair. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility has moved to substantial compliance on this provision. Based on my review of documents, interviews with youths and observations at this time I found no indication of overuse of mechanical restraints with the exception of transferring residents out of the facility.  However, to remain at substantial compliance the facility continues to follow the recommendations (2, 3 and 4) below. | |
| Recommendations | 1. Complete the comprehensive policies and procedures for this provision.<br>2. Provide training for staff within the facility as described above on this provision and provide documentation of training.<br>3. Develop and use a mechanical restraint log.<br>4. Provide training on de-escalation techniques to try to use mechanical restraints only as a regular part of facility transport.<br>5. Additional supervision needed to ensure mechanical restraints are not misused. | |
| Evidentiary Basis | Interviews, observation and document review | |

| | |
|---|---|
| Provision 7.4 Use of Restraints | No residents shall be restrained for longer than 15 minutes, unless restraints are approved by a mental health professional or if determined to be necessary under section 7.2 or as reasonably necessary to prevent the residents from engaging in acts of self-harm or harm to others. If a residents must be restrained for longer than 15 minutes in order to prevent self-harm, that residents shall, as quickly as possible, be evaluated by a mental health professional or transported to a mental health facility. |
| Status | **Beginning Compliance** |
| Discussion | In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations |
| Recommendations | 1. Continue to develop comprehensive policy and procedures for this provision with mental health professionals.<br>2. Provide training for staff on policy and procedures and document training.<br>3. Provide training on de-escalation techniques.<br>4. Develop Mental Health protocols for this provision.<br>5. Hire mental health professional or agency. |
| Evidentiary Basis | Document review |

| | |
|---|---|
| Provision 7.5 Use of Restraints | Henley-Young shall not use, or allow on the premises, restraint chairs, chemical restraints and/or tasers. |
| Status | **Substantial Compliance** |
| Discussion | I would like to continue to commend the facility on maintaining substantial compliance with this provision.  Based on my most recent visit and my observations and review of documents, the facility continues to stay in substantial compliance as it relates to this provision.  The facility should still ensure that below recommendations continues to be followed. |
| Recommendations | 1. Ensure staff is following policies and procedures as it relates to this provision.<br>2. Document all training provided to all staff.<br>3. Ensure firearms and tasers are secured in a lockbox prior to entering secured area.<br>4. Retrain staff when deemed necessary. |
| Evidentiary Basis | Document review, observation, video |

| Provision 7.6 Use of Restraints | Henley-Young shall not subject residents to "hogtying," which is the practice of placing a resident's face down on a bed, floor, or other surface, and securing the resident's hands to his feet. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | I would like to continue to commend the facility on maintaining substantial compliance with this provision. Based on my most recent visit and my observations and review of documents, the facility continues to stay in substantial compliance as it relates to this provision. The facility should still ensure that below recommendations continues to be followed. | |
| Recommendations | 1. Provide on-going training for staff on policies and procedures.<br>2. Continue to document all training provided to all staff. | |
| Evidentiary Basis | Observation, document review and interviews | |

| Provision 7.7 Use of Restraints | When a resident is placed in mechanical restraints, staff must provide one-on-one supervision for the duration of the restraint, except when mechanical restraints are deemed to be necessary for the reasons specified in section 7.2. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The status of this provision has been moved to substantial compliance.<br><br>The facility should continue with following the recommendations listed below. | |
| Recommendations | 1. Provide on-going training for staff on policies and procedures.<br>2. Continue to document all training provided to all staff.<br>3. Ensure that residents who are placed in mechanical restraints are seen by a medical professional.<br>4. Restraint log should be implemented<br>5. Additional supervision needed to ensure mechanical restraints are not misused. | |
| Evidentiary Basis | Document review | |

| Provision 7.8 Use of Restraints | Henley-Young shall notify a medical professional whenever a resident is placed in mechanical restraints for reasons other than those specified in section 7.2. A medical professional shall examine the residents as soon as possible after restraints are removed, except when the residents was restrained for the reasons specified in section 7.2. | |
|---|---|---|
| Status | **Partial Compliance** | |

| Discussion | The status of this provision has moved to partial compliance.<br><br>My review of documents again reveals that youths are being seen by medical professionals after the use of mechanical restraints. However, based on my observations and review of documents, I am reiterating that although policies and procedures are developed, there must still be adequate training and instruction to ensure that staff complies with policies and 8procedures. During this visit and my discussion with the new medical staff, there were indications that not all incidents youth were involved in were being reported. Therefore, the facility administration must ensure that supervisor are monitoring the facilty and very visible throughout the facility during their shifts. There is a strong need for accurate and consistent reporting of incidents. When incidents are not reported correctly, the integrity of the reporting system falls into question. This is also a training issue. As I have stated previously in my reports there must be a single matching reporting system used by all facility staff including the school. My review shows, the school still uses a different reporting system than the facility. This must be addressed to ensure consistency in the process. |
|---|---|
| Recommendations | 1. Develop comprehensive policies and procedures for this provision.(Executed)<br>2. Provide training on policies and procedures.<br>3. Document all training provided to all staff.<br>4. Ensure that residents who are placed in mechanical restraints are seen by a medical professional.<br>5. Ensure that information being reported is accurate and consistent.<br>6. A single matching reporting system for the entire facility. |
| Evidentiary Basis | Document review |

| Provision 7.9<br>Use of Restraints | Hinds County does not currently and shall not in the future allow officers to enter the secure detention area of the facility with any electronic restraints, including, but not limited to tasers. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility has remained at substantial compliance on this provision based on my most recent visit and my observations and review of documents. The facility should still ensure that below recommendations continues to be followed. | |
| Recommendations | 1. Provide training for staff on policy.<br>2. Document all training provided to all staff. | |
| Evidentiary Basis | Document review | |

| Provision 7.10 Use of Restraints | Henley-Young is required to ensure that no officer enters the secure detention area of the facility with a firearm. | |
| --- | --- | --- |
| Status | **Substantial Compliance** | |
| Discussion | I would like to continue to commend the facility on maintaining substantial compliance with this provision.  Based on my most recent visit and my observations and review of documents, the facility continues to stay in substantial compliance as it relates to this provision.  The facility should still ensure that the recommendations below should continue to be followed. Also see provision 7.9 as it relates to tasers.  I would also reiterate under no circumstances should any staff, anyone connected to the facility, and law enforcement etc. have firearms on the premises especially in secure areas. All weapons must be secured in appropriate locked areas of the building. | |
| Recommendations | 1. Provide on-going training for staff on these policies and procedures. 2. Continue to document all training provided to all staff. 3. Have signs displayed at all entrances for securing firearms and tasers. 4. Staff needs to remain vigilant in ensuring this provision is followed and ensure that all **persons** entering the facility are screened and no firearms on their person entering a secured area of the building. | |
| Evidentiary Basis | Document review, Observation | |

**Use of Force**

| Provision 8.1 Use of Force | Physical force shall not be used to punish residents. Staff shall only use physical force to stop residents from causing serious physical injury to self or others or to prevent an escape. If physical force is necessary, staff must use the minimum amount required to safely contain the residents. Whenever possible, staff shall avoid the use of force by first attempting verbal de-escalation techniques. Staff shall be required to fully document in writing every instance of use of force. | |
| --- | --- | --- |
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance. Based on this review, I found that staff has been reluctant to engage youth and reduce the level of facility destruction (i.e. television, water sprinklers, locks etc.)  This was made evident by watching several videos of incidents.

Again, the facility still needs to develop policies and procedures for this provision. Based on my review of documents, I found very little de- | |

escalation used and/or documented in incident reports.  Due to the lack of structured programming, inadequate mental health services, behavioral modification (level or token economy systems) there is an increase in youth destruction at this time, which is a reversal from staff use of force as discussed in my previous report.  In reviewing documents and video recordings, staff is still making decisions regarding use of force based on instinct and without proper or procedural training. During this visit I reviewed a video where a youth caused major destruction (breaking sprinkler heads which caused the unit doors to unlock, breaking lights and flooding) in the unit and several other youth helped. However, staff never engaged and the destruction did not end until law enforcement arrived. This could have ceased to happen if the staff would have deescalated the situation in the beginning.

Therefore my statements below still stand.

Based on my review of documents, the facility still needs to develop policies and procedures for this provision. In my review of incident reports, I found that there have been incidents of use of force. However I found no indication that any de-escalation techniques were used. Although officers are doing reports, they are not accurately recording information. When officers are captioning information, it should be truthful, accurate and detailed enough so they can testify on their observations two years from now if needed. It still appears from reviewing documents that report writing training is needed. Also there is a major need for de-escalation and proper restraint training and accurate documentation of incidents. In addition, reports must be legible, in plain English, and specific behavioral terms should be used.

Regardless of how accurate and useful an observation may be, it has no value to others unless it is recorded legibly. Police and other juvenile detention facilities have addressed the legibility problem by typing their reports. Most agencies are completely computerized, and some are experimenting with laptop computers. Computerized records may eliminate legibility problems for this facility. Some reports are still written in flowing script (cursive) and on various forms. There should be one facility wide form used to capture information. This has been stated in my previous reports. In addition, there is a major need for data collection as it relates to use of force. This was also stated in my previous reports. There is a need for good data collection keeping regarding, medical and mental health, education, social services and all other operational services provided to the resident. Good data will assist the facility in determining answers to some of the following examples:
    A.  The location of use of force
    B.  The number of use of force incidents

|  |  |
|---|---|
|  | C. The number of use of force requiring mechanical restraints<br>D. The type of restraint used<br>E. Grievances<br>F. The number of incidents requiring chemical agents<br>G. The number of incidents involving non-lethal security devices (i.e. batons, tasers, etc.)<br>H. The number of use of force incidents resulting in injury to residents or staff<br>I. Plan of action to address each incident (i.e. disciplinary action, staff training or remedial training, resident's isolation, resident's behavior management, resident's mental health screening or evaluation etc.)<br><br>It should be noted that the facility data has improved.  Therefore, it is becoming easier to pin point areas for improvement. |
| Recommendations | 1. Develop policy and procedures for this provision.<br>2. Provide training for on policies and procedures<br>3. Document all training provided to all staff.<br>4. Adapt an appropriate curriculum for training staff on the use of verbal de-escalation skill and safe use of physical restraints or mechanical restraints.<br>5. Revise form to distinguish between physical and mechanical restraints.<br>6. Contact the National Partnership for Juvenile Justice for recommendations on training program in this area.<br>7. Document and file report when there is use of force.<br>8. Ensure any time use of force is used residents are seen by a medical professional<br>9. Follow the facility's chain of command which will reduce staff confusion. |
| Evidentiary Basis | Document review, interviews |

| Provision 8.2<br>Use of Force | Henley-Young shall notify a medical professional, including but not limited to the licensed practical nurse on duty whenever physical force is used against a resident. A medical professional shall examine a resident immediately after the use of physical force. |
|---|---|
| Status | **Partial Compliance** |
| Discussion | The facility has hired a new medical company to handle medical service at Henley-Young.  However, there is still a need for the development of medical protocol. The facility has remained at partial compliance on this provision based on my review of documents, interviews with residents and observations. |

| | |
|---|---|
| | Based on my interviews with nursing staff, I found that some youth were not being seen by medical personnel in a timely manner or when they were involved in physical altercations.<br><br>Please see the report of Dr. Ngozi Ezike, an expert medical physician, with expertise in juvenile detention health services reviewed medical services within Henley-Young Juvenile Detention Facility.  Dr. Ezike's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). |
| Recommendations | 1. Complete procurement of services as quickly as possible.<br>2. Continue to develop comprehensive policies and procedures for this provision.<br>3. Provide on-going training to staff on policies and procedures.<br>4. Continue to document all training provided to all staff.<br>5. Review nursing schedule and provide more hours at facility.<br>6. Provide written documentation of examination of residents by medical professional in every instance.<br>7. Provide additional medical services after hours and on weekends. (executed)<br>8. Document and file in resident's records when there is use of force. |
| Evidentiary Basis | Document review, interviews, observation |

### 9.  Meals and Nutrition

| | |
|---|---|
| Provision 9.1 Meals and Nutrition | Residents shall be provided three meals and a snack daily. If a residents misses a meal because he or she is attending court, or some other appointment, he or she shall receive the missed meal upon his or her return to detention. |
| Status | **Partial Compliance** |
| Discussion | The status of this provision remains as partial compliance.<br><br>It should be noted that during this visit food is being prepared at the facility and served in a timelier manner.  However, residents still complain about the portions they are receiving and the presentation.  As stated in my last report, the food service area is in need of maintenance, repair and cleanliness.<br><br>Again, as stated in my previous reports, food service is an important part of institutional life. A comprehensive food service program must be developed if the facility is to meet the unique needs of its juvenile population. Juvenile health, nutrition, and morale in this environment are all directly related to |

|  | the effectiveness of the food service program. Meals served to incarcerated juveniles must be nutritionally balanced and calorically adequate. They must be tasty, appealing, and served in an aesthetically acceptable manner to avoid conduct and behavior problems. If juveniles believe the facility's staff and management have maximized their efforts to provide a healthy and appealing food program, conduct can and will improve. |
|---|---|
| Recommendations | 1. Continue to review portions to ensure residents receive enough food during meals.<br>2. Develop policy and procedures for this provision.(executed)<br>3. Continue to provide training for kitchen staff and all other staff members involved with handling food and preparing meals.<br>4. Continue to document compliance with this provision.<br>5. Food should be served in a timely manner and consistent with facility schedule once developed.<br>6. Review the National Food Service Management Institute from the University of Mississippi that details "Food Safety Facts".<br>7. Food service area is in need for maintenance, repair and cleanliness. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 9.2 Meals and Nutrition | All meals and snacks served to residents at Henley-Young shall, at a minimum, comply with the nutrition guidelines set forth in the United States Department of Agriculture's School Meals Program standards. |
|---|---|
| Status | **Beginning Compliance** |
| Discussion | The status of this provision remains as beginning compliance.  As stated provision 9.1 and in my introduction, residents continue to complain that they are not receiving enough to eat and that the food is still cold when it arrives on the units.<br><br>Therefore my statements below still stand.<br><br>It should be noted that I have not seen any training records or had the opportunity to meet with the nutritionist. The nutritionist should be made available upon my next visit. |
| Recommendations | 1. Develop policy and procedures for this provision(executed)<br>2. Provide training for kitchen staff and all other staff members involved with handling food and preparing meals. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 9.3 Meals and Nutrition | Residents shall be provided access to drinking water throughout the day. | |
|---|---|---|
| Status | **Partial Compliance** | |
| Discussion | The facility has been downgraded to partial compliance on this provision. Due to the removal of water coolers on the units specifically the girls units.  Because of the fear of staff to engage youths and the lack of supervision along with the increase in youths, this has created a level of reluctance on staff to perform their duties.  Therefore, staff has removed the coolers from the units.  If the coolers are to be removed, the water fountains on the units must be operable.<br><br>Based on my discussion with residents, documentation review, observations, and interviews the facility has been providing water during the day.  Although the facility had moved to substantial compliance in this provision the recommendations below that the County should repair the water fountains should continue.  This would allow the facility to discard the use of water coolers.<br><br>Therefore my below statements from my previous report (8th) should still be addressed. | |
| Recommendations | 1. Contact County or State Environmental office to conduct test on water system. (executed)<br>2. Ensure residents receive water during school and recreational periods and at night.<br>3. Develop a policy for incidents regarding water quality and procedures to address them.<br>4. Repair inoperable drinking fountains. | |
| Evidentiary Basis | Document review, observation, interviews | |

### 10. Clothing

| Provision 10 Clothing | Henley-Young shall provide basic clothing items for residents at all times. These items must include, at a minimum, socks, underwear, uniform, shoes, and undershirts. For girls, these items must also include a brassiere. When appropriate, Henley-Young shall also provide residents with a coat, hat, and gloves. Residents must be provided with a clean uniform, socks, undershirt, underwear, and brassiere, if applicable, upon intake and at least once per day. No residents shall be deprived of these basic clothing items for any reason, including, but not limited to, as a punishment, because these items are being washed, or due to overcrowding. | |
|---|---|---|
| Status | **Partial Compliance** | |

| | |
|---|---|
| Discussion | The facility has remained in partial compliance on this provision. Based on my recent review and observation, I did find socks and underwear that should be discarded.  I did meet with the laundry staff and the operational manager to work on a protocol for discarding tattered and ragged clothing.  See attached.<br><br>Based on my most recent review and observation, the area I reviewed continues to be more organized and functional than before.  The laundry staff I interviewed only required minimum technical assistance and were amenable to the recommendations I made regarding organizing certain items by size and are still complying.  The facility still needs to develop a system for replacing tattered or damaged clothing on a regular and consistent basis. I will review this area for substantial compliance.<br><br>I am still recommending the facility to order non colored underwear and undergarments.  This would allow the facility to sanitize the under clothing and sheets by using a more potent cleaner. |
| Recommendation | 1. Check washer and dryer to ensure they are working properly.<br>2. Ensure that girls and boys are equally involved in cleaning and folding clothes.<br>3. Hire 2 laundry staff to ensure clothing is handled properly. (executed)<br>4. Ensure that all staff and residents wear protective material (smocks and gloves) when handling chemicals and clothing.<br>5. Discard clothing that is torn, dingy and in poor condition.<br>6. Develop a system for replacing clothing on a regular and consistent basis.<br>7. Develop schedule for distribution.<br>8. Develop a system for prewashing clothing (i.e. undergarments etc.) |
| Evidentiary Basis | Document review, observation, interviews, photographs |

### 11. Hygiene and Sanitation

| | |
|---|---|
| Provision 11.1 Hygiene and Sanitation | Residents shall be provided with the means to maintain appropriate hygiene, including soap and shampoo for showers, which will occur at least once daily, soap for washing hands after each time the residents uses the toilet, and toothpaste and a toothbrush for tooth brushing, which will occur at least twice daily, a comb and brush, that if shared, shall be sterilized between uses by residents. Girls must be provided with panty liners on a daily basis and other feminine products as needed. Residents will be issued a comb and brush upon entering the facility; however, if residents are issued a recycled comb or brush or a comb or brush that has been used by another residents, Henley-Young shall ensure that the comb and brush is sterilized and in good condition. |
| Status | **Partial Compliance** |
| Discussion | The facility has remained at partial compliance on this provision.  I will again review this area for substantial compliance at my next visit.  I would also recommend that a licensed barber and/or beautician be retained.<br><br>Based on my most recent review and observation, residents were receiving toothbrush, toothpaste and other hygiene products which were provided in individual hygiene kits. Residents still complained about not having combs to groom their hair. |
| Recommendations | 1. Ensure that hygiene kits are properly labeled and **residents are not** sharing each other's hygiene products or items.<br>2. Ensure items such as hair brushes, if shared, are sterilized and in good condition.<br>3. Provide training for staff on these policies and procedures.<br>4. Ensure that clean face towels are available for residents.<br>5. Develop a schedule for distribution of hygiene kits.<br>6. Retain a licensed barber and/or beautician. |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 11.2 Hygiene and Sanitation | Residents shall be provided with sleeping mats and blankets that are clean and odorless sleeping mats shall be sanitized between uses by residents, and residents shall receive clean blankets weekly. |
| Status | **Substantial Compliance** |
| Discussion | The status of this provision has moved to substantial compliance. Based on my review of documents and observation, the facility needs to continue to ensure that mattresses and blankets are discarded properly |

|  | Policies and procedures have been developed. The facility has provided training to ensure that the process outlined in the policies and procedures is followed. The facility needs to continue to monitor the condition of the blankets and mattresses for signs of holes and tattering The facility needs now to follow the recommendations below. |
|---|---|
| Recommendations | 1. Continue to discard all blankets and mattresses that are tattered and have holes in them.<br>2. Clean and maintain laundry area in orderly fashion.<br>3. Develop forms or system of documentation for distribution and inventory<br>4. Label and designate an area for towels, sheets, clothing etc. |
| Evidentiary Basis | Document review, observation |

| Provision 11.3<br>Hygiene and Sanitation | Under no circumstances shall residents be deprived of mats and blankets. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility remains at substantial compliance. I found no indication that residents have been deprived of mats and blankets.<br><br>The facility administration needs to continue to be vigilant regarding staff adhering to the process outlined in the policy and procedures regarding the issuing and maintenance of mats and blankets. | |
| Recommendations | 1. Provide training to staff on policy and procedures.<br>2. Develop system for inventory and distribution | |
| Evidence | Observation, and document review | |

| Provision 11.4<br>Hygiene and Sanitation | Henley-Young shall maintain a sufficient number of clean, sanitary mats and blankets that correspond with the facility's maximum capacity. | |
|---|---|---|
| Status | **Substantial  Compliance** | |
| Discussion | The facility remains at substantial compliance, as I found no indication based on my observation and documents review that residents were being denied mattresses and blankets.  There were enough blankets and mattresses.  As stated in provision 11.3, the facility administration needs to continue to be vigilant regarding staff adhering to the process outlined in the policy and procedures regarding the issuing and maintenance of mats and blankets. | |

| Recommendations | 1. Develop policies and procedures for this provision. (executed)<br>2. Provide training to staff on policy and procedure.<br>3. Provide an inventory of mats and blankets. |
|---|---|
| Evidentiary Basis | Observation and document review |

| Provision 11.5<br>Hygiene and<br>Sanitation | Residents shall be provided with a clean, sanitary environment. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance. During this visit, I found that the facility continues to need of major physical plant maintenance; showers needed repair, toilets were filthy, mold and mildew in the showers, several showers did not have hot water, soap scum was in all of the showers, the shower heads were leaking, the units smelled of urine and shower stalls were rusting along with adequate lighting being an issue. In addition, there were holes in several of the shower stall walls. See exhibits.<br><br>Therefore my statements below still stand. Building maintenance is an ongoing and continuous process. **Please review the introduction.** | |
| Recommendations | 1. Develop policies and procedures for this provision. (executed)<br>2. See areas in discussion that should be addressed.<br>3. Develop housekeeping and cleaning schedule.<br>4. Develop checklist or inspection report for each unit and area of building.<br>5. Develop work order system to ensure that when problem arise they are addressed.<br>6. Develop corrective action plans as needed.<br>7. Provide training for staff on policy and procedures.<br>8. Ensure delivered food items are dated and rotated from old to new. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 11.6<br>Hygiene and<br>Sanitation | Hinds County shall ensure that Henley-Young complies with relevant law regarding fire safety, weather emergencies, sanitation practices, food safety, and the elimination and management of environmental toxins. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.<br><br>In my review of documents, I have not seen any updates from my | |

| | previous visits therefore my statement below stands. |
|---|---|
| | I am reiterating there be internal monthly checks and maintenance annually and in the event when the fire extinguisher is used it must be replaced or recharged by a certified company. Again, the facility needs to have another full review of the fire and sprinkler system to ensure that all violations were corrected. |
| | Again, with the above being said there are no indications that the sprinkler or fire systems are working adequately. However during the facility disturbance were youth flooded the unit, there were no records of the fire marshal reviewing the system to determine its operation and or functionality.  As stated before the sprinkler system must comply with national fire protection standards. Again, although the facility has policies or procedures regarding fire safety it begs the question, "Has the facility been evaluated by a Fire Marshall that is licensed and certified by the State of Mississippi?" In addition, the kitchen is in need of a major cleaning and sanitizing. |
| Recommendations | 1. Develop policies and procedures and plans for fire safety, evacuation etc. (executed)<br>2. Develop adequate staff training regarding fire safety.<br>3. Properly maintain and repair fire equipment.<br>4. Ensure intercom systems are operating properly.<br>5. Ensure all mattresses used by residents are fire resistant.<br>6. Routinely test all fire equipment and system.<br>7. Ensure that all electrical outlets, wires and equipment (lights) are properly working.<br>8. Develop work order system to ensure items are repaired.<br><br>9. Ensure that all areas in this provision are addressed by a certified professional.<br>10. Review entire fire safety program/system<br>11. Facility needs to develop corrective action plan.<br>12. Clean and Sanitize kitchen<br>13. Develop cleaning procedures |
| Evidentiary Basis | Document review, observation |

| Provision 11.7 Hygiene and Sanitation | Residents shall be provided with clean drinking glasses and eating utensils. |
|---|---|
| Status | **Partial Compliance** | |
| Discussion | The status of this provision remains as partial compliance. Based on review of documents and interviews with residents, I found no indication that |

| | drinking glasses and eating utensils were not cleaned. However, in my review of the kitchen, the kitchen equipment is in need of a major cleaning. Therefore, my statement above stands.  The kitchen is in need of major cleaning. |
|---|---|
| Recommendations | 1. Develop policies and procedures for this provision. (executed)<br>2. Provide a thorough cleaning of the kitchen and all equipment and Utensils |
| Evidentiary Basis | Document review, observation and interviews |

### 12. Medical Care

| Provision 12.1 Medical Care | The parties agree, however, that henceforth, Henley-Young shall provide residents with adequate medical care, including: prompt screenings; a full physical exam within 72 hours after their detention hearing or disposition order, as applicable; access to medical professionals and/or prescription medications when needed; and prompt transportation to a local hospital in the case of a medical emergency.  Hinds County is responsible for procuring and/or paying for all medications provided to residents. |
|---|---|
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on interviews and observations and document reviews, the County has hired a new medical company at Henley-Young. However, there is still a need for policies, procedures, or protocols in place for the facility. The County has the responsibility to maintain medical care and provide medication and all other needs for residents. On this provision, I am still reiterating that the actions and recommendations from my previous report should be reviewed and followed. The County must look at the medical filing system in place at this point and change it to meet contemporary medical standards. See additional discussion in the sections 1.2 and 1.3.<br><br>Please see medical report from Dr. Ngozi Ezike, an expert medical physician, with expertise in juvenile detention health services reviewed medical services within Henley-Young Juvenile Detention Facility.  Dr. Ezike's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit) |
| Recommendations | 1. Develop policies, procedures and protocols for this provision.<br>2. Develop policies and procedures and protocols based on standards for Health Services in Juvenile Detention and Confinement facilities.<br>3. Provide training for staff members who administer medication to residents on proper usage and possible side effects. Also, train the |

|  | staff on emergency protocols if side effects occur.<br>4. Have a licensed medical professional review and sign off on policy, procedures and protocols.<br>5. Have a licensed health professional periodically review and provide supervision to the nurse at facility.<br>6. Develop forms to coincide with provision.<br>7. Remove medication from bags and place them in secure, organized areas and develop forms to determine what medications are present in the facility at all times.<br>8. Hire or have on contract a physician to review medical area.<br>9. Ensure that residents receive vision exams, dental screenings, mental health screenings, hearing tests, etc.<br>10. Order folders with 2 dividers, end tab, classification folders in letter size with 2 prongs for medical charts. |
|---|---|
| Evidentiary Basis | Document review, observation, interviews |

| Provision 12.2<br>Medical Care | Henley-Young shall ensure that a medical professional is available to examine residents confined at the facility to identify and treat medical needs, when necessary. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance. Based on my review of documents and observation. The facility still needs to develop policies, procedures, and protocols. The facility has hired a new medical company to provide services to Henley-Young. (**See the Introduction**.)<br><br>In addition for this report, Dr. Ngozi Ezike, an expert medical physician, with expertise in juvenile detention health services reviewed medical services within Henley-Young Juvenile Detention Facility. Dr. Ezike's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit) | |
| Recommendations | 1. Hire qualified medical professional for nights and weekend care.<br>2. Develop policies, procedures and protocols for this provision.<br>3. Provide training for staff on this provision. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 12.3 Medical Care | Henley-Young shall implement its sick call policy and practice which ensures that confined residents who request non-emergency medical attention are examined by a medical professional within 24 hours of a residents placing him or herself on sick call, excepting weekends and holidays. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance based on my interviews, documents review and observation.<br><br>Therefore my below statements still stand.<br><br>Although the facility has 14 hour nursing service daily during the week and four hours on Saturday and Sunday there is still no policy, procedures and protocols as to how sick-calls should be administered to residents. The facility must develop the processes, and practices for this provision. The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (**see the Introduction**).<br><br>In addition for this report, Dr. Ngozi Ezike, an expert medical physician, with expertise in juvenile detention health services reviewed medical services within Henley-Young Juvenile Detention Facility.  Dr. Ezike's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). | |
| Recommendations | 1. Develop policies, procedures and protocols for this provision.<br>2. Place a kite box on each unit.<br>3. Provide training for staff on this provision.<br>4. Nurse or designated person, making daily rounds to retrieve kites (Request for Medical Service Forms). | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 12.4 Medical Care | Prescription medications shall only be distributed by licensed medical staff or Henley-Young staff who has been trained by licensed medical personnel. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance based on my interviews, document review and observation.<br><br>Therefore my statements below still stand.<br><br>The facility has two registered nurses who are licensed to distribute | |

| | |
|---|---|
| | medications to the residents. The problem is that the facility has no policies, procedures or protocols in place to direct this distribution. The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (**see the Introduction**). |
| Recommendations | 1. Develop policies, procedures and protocols to address this provision. <br> 2. These policies, procedures and protocols must include the appointment of a medication administration protocol. <br> 3. There must be a medication record of all medicines administered. <br>     a. One record to reflect all medicines leaving the pharmacy; <br>     b. An additional record kept in each resident's case file. <br> 4. Ensure that the training is comprehensive make certain that all medical contingencies are considered. <br> 5. The staff should be trained on what side effects to look for drugs commonly prescribed to residents with mental health needs. <br> 6. Provide training to staff on the policy, procedures and protocols for this provision. <br> 7. All training should be documented and conducted annually. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 12.5 Medical Care | Medical and mental health services shall be provided in a manner that ensures the confidentiality of resident's health information. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance based on my interviews, document review and observation. <br><br> Therefore my statements below still stand. <br><br> The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (**see the Introduction**). <br><br> In addition for this report, Dr. Ngozi Ezike an expert medical physician, with expertise in juvenile detention health services reviewed medical services within Henley-Young Juvenile Detention Facility.  Dr. Ezike's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). | |
| Recommendations | 1. Develop policies, procedures and protocols to address this provision. <br> 2. Get HIPAA requirements and institute them the facility. <br> 3. Designate the persons who have access to the resident's medical | |

|  | records within the facility and outside of the facility, but within the juvenile justice system.<br>4. Provide training to staff on policies, procedures and protocols.<br>5. Provide training to staff on HIPAA requirements, and document training.<br>6. Designate a HIPPA Privacy Officer. |
|---|---|
| Evidentiary Basis | Document review, observation, interviews |

| Provision 12.6<br>Medical Care | Henley-Young shall develop procedures for monitoring residents who require individualized attention because of medical issues that do not involve requiring the residents to sleep on a mat in the visitation room. |
|---|---|
| Status | **Beginning Compliance** |
| Discussion | Based on my review of documents and observations, this provision is being moved to beginning compliance.  There has been no consistent youth sleeping in the intake area with the exception of Resident A.M. who was requested by SPLC to be moved because youth was not feeling safe.  It should be noted that this youth had serious mental health issues, and because of the increase in the facility's population, this was the only space available to house this youth.<br><br>The facility still has the responsibility of maintaining medical care and medication for all of the health needs of the residents. On this provision, I am reiterating that the actions and recommendations from my previous report should be reviewed and followed (**see the Introduction**). |
| Recommendations | 1. Develop policies, procedures and protocols to address this provision.<br>2. Develop processes of continuous monitoring residents with stable medical issues, i.e. the care for diabetic residents who are on an insulin regiment.<br>    a. What are the medical requirements of the residents who need monitoring?<br>    b. Who is responsible for the monitoring?<br>    c. How are the records kept of the monitoring?<br>3. Provide training to staff on the policies, procedures and protocols for this provision.<br>4. Annual competency training. |
| Evidentiary Basis | Document review, observation and interviews |

### 13. Mental Health Care

| | |
|---|---|
| Provision 13.1 Mental Health Care | Henley-Young's contractor, Hinds Behavioral Health Services, shall provide adequate mental health services to all confined residents with a mental health diagnosis or serious mental health need, as indicated by the MAYSI-2. This shall include, but is not limited to, the provision of individual and group counseling sessions upon the request of a residents or the resident's parent/guardian, access to a mental health professional at the detention center, and the distribution and medical monitoring of psychotropic medications by a medical professional. |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided. The only changes to this provision, is the residents' names have changed.  I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. It is without question that there are residents entering this facility that need access to structured mental health services (i.e. resident J.N.–several suicide attempts, resident L.M. (suicidal behavior), resident M.C. (attempted suicide), Resident S.T. (attempted suicide), Resident L.G. (attempted suicide), Resident A.M. (attempted suicide), Resident K.M. (self-injury), and Resident Q.H. (attempting to self-harm)  See provision 1.2.

There are still inadequate mental health services at this facility. Generally accepted professional standards require that mental health counseling be provided frequently and consistently enough to provide meaningful intervention for residents. Although residents may be seen by Hinds Behavioral Health Services, there is no documentation that indicates the needs of the residents or any planned strategies for the residents once they return to the facility. The Henley-Young mental health counseling is inadequate to the needs of mentally ill residents in both frequency and content. My review of records reveals no evidence of any counseling or use of any treatment plans or strategies. It should be noted that treatment planning, including identifying symptoms and behaviors is a critical part of effective treatment for residents with mental health illness or problems. An effective program should communicate treatment plans for mentally ill residents to all staff involved in the management of the residents in this detention facility and services should be coordinated prior to their implementation. Although some residents who are in need of mental health services are in the 89-day program and are assigned case managers, these individuals have no mental health training and they serve primarily as liaisons between the facility and the courts rather than focusing on coordinating care at the facility for mentally ill residents.

In addition for this report, Dr. Lisa Boesky, an expert mental health |

| | |
|---|---|
| | consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). |
| Recommendations | 1. Ensure that the facility has a Standardized Assessment Tool i.e. the MAYSI-2 to use during the intake process.<br>2. Develop policies and procedures to address this provision.<br>3. Provide training to staff on policies and procedures and provide documentation of training.<br>4. Develop documentation that will track resident's progress during their stay at facility.<br>5. Ensure there is communication between Hines Behavioral Health Services, Juvenile Court Case Managers and Facility Staff on residents receiving mental health services.<br>6. Hire case management staff. |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 13.2 Mental Health Care | Residents who are confined for longer than thirty (30) continuous days and who are prescribed psychotropic medications, shall be evaluated by a psychiatrist every thirty (30) days. Such evaluations may be performed by and through employees of Hinds Behavioral Health. |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. **Please review the Introduction.**<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). |
| Recommendations | 1. Develop policies and procedures to address this provision.<br>2. Provide training to staff on policies and procedures.<br>3. Hire case management staff. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 13.3 Mental Health Care | Within 72 hours of a resident's admission to the facility, staff shall develop individual mental health treatment plans for residents who are under the care of a mental health provider. Treatment plans shall emphasize continuity of care and shall ensure that whenever possible, residents are transported to appointments with their regular mental health provider, whether the appointments are standing or made after the resident's initial detention. | |
| --- | --- | --- |
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. **Please review the Introduction**.<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). | |
| Recommendations | 1. Develop policies and procedures to address this provision.<br>2. Provide training to staff on policies and procedures.<br>3. Policies and procedures shall be reviewed and signed by a licensed mental health professional (psychiatrist, etc.).<br>4. Hire case management staff. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 13.4 Mental Health Care | Henley-Young shall develop and implement policies and procedures for referring residents in need of psychiatric services to a licensed psychiatrist for a timely mental health evaluation. Such services may be provided by and through employees of Hinds Behavioral Health. | |
| --- | --- | --- |
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. **Please review the Introduction**.<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this | |

| | |
|---|---|
| | official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). |
| Recommendations | 1.  Develop policies and procedures to address this provision.<br>2.  Provide and document training to staff on policies and procedures.<br>3.  Hire case management staff.<br>4. Policies and procedures shall be reviewed and signed by a licensed mental health professional (psychiatrist, etc.). |
| Evidentiary Basis | Document review, observation, interviews |

| | |
|---|---|
| Provision 13.5 Mental Health Care | Hinds County shall employ or contract for sufficient psychiatric services to permit a psychiatrist to fulfill the following functions:<br>    a.  conduct needed psychiatric evaluations prior to placing residents on psychotropic medications;<br>    b.  Monitor, as appropriate, the efficacy and side effects of psychotropic medications;<br>    c.  Participate in treatment team meetings for residents under the psychiatrist's care;<br>    d.  Provide individual counseling and psychotherapy when needed;<br>    e.  Evaluate and treat in a timely manner all residents referred as possibly being in need of psychiatric services; and<br>    f.  Provide adequate documentation of treatment.<br>    g.  All evaluations and services outlined above may be performed and/or provided by and through employees of Hinds Behavioral Health or any other duly qualified Mental Health agency. |
| Status | **Non-Compliance** |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. **Please review the Introduction**.<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). |
| Recommendations | 1.  Develop policies and procedures to address this provision.<br>2.  Provide training to staff on policy and procedures and document training.<br>3.  Hire case management staff.<br>4.  Policies and procedures shall be reviewed and signed by a licensed |

|  | mental health professional (psychiatrist, etc.). |
|---|---|
| Evidentiary Basis | Document review, observation |

| Provision 13.6 Mental Health Care | The psychiatrist and/or counselors shall review, if necessary, incident reports, disciplinary reports, suicide watch logs, and lockdown logs of residents under their care to determine whether their treatment is working and, if not, how it should be modified. | |
|---|---|---|
| Status | **Non-Compliance** | |
| Discussion | The status of this provision remains as non-compliance.  Based on my review of documents and observation, services are still not in place and are still not being provided for this provision. I am reiterating that the actions and recommendations from my previous report should be reviewed and followed. **Please review the Introduction**. | |
| Recommendations | 1. The mental health of the residents in the custody of the facility needs to be closely monitored at all times.<br>2. The facility needs to develop policies and procedures to address this provision.<br>3. Provide and document training to staff on policies and procedures and document training.<br>4. Facility needs documentation from a mental health organization on plan of action for residents receiving a mental health services.<br>5. Hire case management staff.<br>6. Policies and procedures shall be reviewed and signed by a licensed mental health professional (psychiatrist, etc.). | |
| Evidentiary Basis | Document review, observation | |

## 14.  Suicide Prevention

| Provision 14.1 Suicide Prevention | Henley-Young shall develop a multi-tiered suicide prevention policy that has at least three stages of suicide watch. Suicide watch shall not be used as punishment. The "suicide cell" shall be reserved for residents for whom the "suicide cell" is deemed necessary in conjunction with this suicide prevention policy. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance. The facility has developed policy and procedures for this provision. Now the facility must develop training programs to ensure that staff learn and adhere to the policy and procedures. Further, staff must become familiar with the process. Once the facility hires a new mental health provider, they must ensure that | |

| | the suicide prevention policy is included in the overall mental health program. **Please review the Introduction**.<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). |
|---|---|
| Recommendations | 1. Develop policies and procedures to address this provision. (executed)<br>2. Provide and document training for staff on policy and procedure.<br>3. Facility needs to ensure that the suicide prevention policy is included in the overall mental health program.<br>4. Policies and procedures shall be reviewed and signed by a licensed mental health professional (psychiatrist, etc.). |
| Evidentiary Basis | Document review, observation |

| Provision 14.2 Suicide Prevention | Any residents placed on the highest level of suicide watch shall be evaluated by a mental health professional, ideally within 12 hours, but in no case longer than 24 hours of his or her placement on suicide watch. If a resident on the highest level of suicide watch is not evaluated by a mental health professional within 24 hours, the residents shall immediately be transported to a local mental health facility or emergency room for evaluation and/or treatment. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  The facility has developed policy and procedures for this provision. Now, there must be training programs developed to ensure that staff members adhere to the policy and procedures and that they are familiar with the process. Once the facility hires a new mental health provider, they must ensure that the suicide prevention policy is included in the overall mental health program. **Please review the Introduction.**<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibits) | |
| Recommendations | 1. Develop policies and procedures to address this provision. (Executed)<br>2. The facility needs mental health professionals to help and enhance the development of these policies and procedures as they are the | |

| | |
|---|---|
| | authorities in this area.<br>3. Provide training for staff on policies and procedures and document training.<br>4. Identify a mental health agency to help develop policies, procedures and protocols.<br>5. Facility needs to ensure that the suicide prevention policy is included in the overall mental health program.<br>6. Policies and procedures shall be reviewed and signed by a licensed mental health professional (psychiatrist, etc.). |
| Evidentiary Basis | Document review, observation |

| | | |
|---|---|---|
| Provision 14.3<br>Suicide Prevention | Residents on suicide watch shall participate in recreation, school, and any other structured programming. Residents shall not be required to wear a "suicide gown" unless locked in a cell. Staff shall closely monitor residents on suicide watch, which includes logging activities every 15 minutes. | |
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  A training program still needs to be developed to ensure that staff members adhere to the policy and procedures and that they are familiar with the process. Once the facility hires a new mental health provider, they must ensure that the suicide prevention policy is included in the overall mental health program. **Please review the Introduction.**<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibits) | |
| Recommendations | 1. Develop policies and procedures to address this provision with the assistance of a mental professional. (executed)<br>2. Provide and document training for staff on policies and procedures.<br>3. Facility needs to ensure that the suicide prevention policy is included in the overall mental health program.<br>4. The facility needs mental health professionals to help and enhance the development of these policies and procedures as they are the authorities in this area.<br>5. Policies and procedures shall be reviewed and signed by a licensed mental health professional (psychiatrist, etc.). | |
| Evidentiary Basis | Document review, observation | |

| Provision 14.4 Suicide Prevention | When a resident is placed on any level of suicide watch, a report shall be made within 24 hours to the resident's court, as well as to the resident's guardian, and his or her defense attorney. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  A training program still needs to be developed to ensure that staff members adhere to the policy and procedures and that they are familiar with the process. Once the facility hires a new mental health provider, they must ensure that the suicide prevention policy is included in the overall mental health program. **Please review the Introduction.**<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibits) | |
| Recommendations | 1.  Develop policies and procedures for making and distributing the reports in this provision. (executed)<br>2.  Provide training for staff on policies and procedures and document training.<br>3.  Facility needs to ensure that the suicide prevention policy is included in the overall mental health program<br>4.  The facility needs mental health professionals to help and enhance the development of these policies and procedures as they are the authorities in this area.<br>5.  Policies and procedures shall be reviewed and signed by a licensed mental health professional (psychiatrist, etc.). | |
| Evidentiary Basis | Document review, observation | |

### 15.   Family Support and Interaction

| Provision 15.1 Family Support and Interaction | Visitation shall not be restricted or withheld from residents unless the detention center director determines that a visit will violate the security of Henley-Young or will endanger the safety of residents, visitors, or staff. Visitation should not be restricted as a form of punishment. | |
|---|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The status of this provision remains at substantial compliance.  During this visit I found that visitation was still being conducted in the multi-purpose room. As stated in my previous report, the facility must ensure that there is proper staffing available to provide for the visitation process to maintain reliability in it**. Please review the staffing section of the Introduction.** | |

| Recommendations | 1. Provide and document training for staff on policies and procedures. (executed)<br>2. Provide and document training for staff on policies and procedures.<br>3. Ensure that there is proper staffing availability to maintain reliability. |
|---|---|
| Evidentiary Basis | Document review, observation and interviews |

| Provision 15.2 Family Support and Interaction | Within 90 days of the effective date of this Settlement Agreement, Henley-Young shall provide accommodations that allow residents to have contact visits with their families. |
|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility remains at substantial compliance. Based on my most recent visit.  I found that the facility continues to allow contact visits. The facility should continue to ensure that proper staffing is available to make certain that this continues. The visitation program should be incorporated into the overall facility program that will help with providing a better structure. **Please review the Introduction**. |
| Recommendations | 1. Develop policies and procedures to address this provision. (executed)<br>2. Identify area where contact visitation will take place.<br>3. Provide and document training for staff on policies and procedures.<br>4. Ensure that there is proper staffing availability to maintain reliability.<br>5. Ensure that visitation program is included in the overall facility program. |
| Evidentiary Basis | Document review, observation  and interviews |

| Provision 15.3 Family Support and Interaction | Visitation shall be regularly scheduled at least three times per week, which shall include evening and/or weekend visitation times in order to encourage family visitation. Henley-Young shall permit the minor siblings of confined residents to participate in visitation, as long as the minors' parent or guardian is present during the visit and the siblings are not harmful to the residents who are detained at Henley-Young. Henley-Young shall also permit a confined resident's own child (ren) to participate in visitation |
|---|---|
| Status | **Substantial Compliance** | |
| Discussion | The facility remains at substantial compliance on this provision. The facility must continue to follow the recommendations below. |
| Recommendations | 1. Develop policies and procedures and practices to address this provision. (executed) |

|  |  |
|---|---|
|  | 2. Provide and document training for staff on policies and procedures. <br> 3. Ensure that there is proper staffing availability to maintain reliability. <br> 4. Ensure that visitation program is included in the overall facility program. |
| Evidentiary Basis | Document review, observation and interviews |

| Provision 15.4 Family Support and Interaction | Residents may receive phone calls from their attorneys. At the discretion of the Director or assignee, in emergency situations, residents may receive phone calls from parents, primary caretakers, or legal guardians. Emergency phone calls and phone calls from attorneys should not be restricted as a form of punishment. |
|---|---|
| Status | **Partial Compliance** |
| Discussion | The facility remains at partial compliance on this provision based on my most recent visit and document review. However, there is still no indication that residents are allowed to mail letters as part of access to supportive relationships that residents have with families and others in the community. This (mail) is a major part of the rehabilitative process. Staff now needs to be trained on policies and procedures and the facility should ensure that policy and procedures are being followed.  During this visit and review of documents, I found no indication that youth receive any contact from their attorneys until they enter court.  Because there is no case management, youth are left to wonder about their case or its status. This provision has not been moved to substantial compliance because the residents still do not have full access to their legal team. I found no evidence that the residents have visits from their lawyers within the facility as established by best practices and professional standards within juvenile detention facilities: <br>    1) Privileged mail from court, attorney, <br>    2) Visits from lawyers, paralegals or any legal support staff, <br>    3) Provide a private place for confidential discussions, and <br>    4) Have policies, procedures and protocols incorporated in resident's right to counsel. |
| Recommendations | 1. Develop policies and procedures and practices to address this provision. (Executed) <br> 2. Provide and document training for staff on policies and procedures. <br> 3. Ensure that there is proper staffing availability to maintain reliability. <br> 4. Ensure that residents are allowed to mail letters.(County will pay for postage) <br> 5. Hire case managers <br> 6. Develop form for attorney to signed indicating their visits, for placement into youth files |

| Evidentiary Basis | Document review, observation and interviews |
|---|---|

### 16.   Miscellaneous Provisions

| Provision 16.1 Miscellaneous Provisions | Male and female residents shall be provided with equal access to educational and rehabilitative services, medical care, and indoor and outdoor recreation. | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  During my most recent visit, the basketball courts have been resurfaced and repaired.  In addition, according to the female residents I interviewed, they rarely participate in outside activities and, when they do, it consists mostly of sitting on the bleachers because the male residents were using the basketball court and they are not allowed on the court while the males were outside using it. However, there were still no schedules posted or documents showing equal programming for male and female residents.<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). | |
| Recommendations | 1. Develop policies and procedures and practices for this provision. (Executed)<br>2. Cease in the designation of female residents as being solely responsible for laundry; this is a duty male residents can perform as well as females. (executed)<br>3. Develop monthly recreational schedules.<br>4. Develop comprehensive facility schedules.<br>5. Provide training for staff on policies and procedures and document training.<br>6. Ensure that there is proper staffing availability to maintain reliability.<br>7. Repair court and goal area.<br>8. Posting of schedule on units. | |
| Evidentiary Basis | Document review, observation, interviews | |

| Provision 16.2 Miscellaneous Provisions | The parties agree, however, that henceforth:  All residents shall have the opportunity to engage in at least one hour of large muscle exercise a day. | |
|---|---|---|
| Status | **Non-Compliance** | |

| Discussion | The status of this provision remains as non-compliance.  Based on my most recent review of documents, interviews with the residents and observation, residents are still not consistently engaging in 1 hour of large muscle exercise daily. As stated previously, residents are placed in their rooms when there is not enough staff available. In addition, on the weekends, residents are still only allowed out when there is enough staff available. There still is no schedule of recreational or program activities, and when residents were allowed out, it was random with no schedule being followed. This should be rectified once the new staff are hired and trained.  There must be a schedule in place and adhered to which will ensure that residents are receiving the required time out of their units and rooms and that structured activities are available, unless a resident has been placed on behavior management or isolation. However, even residents who are placed in a behavior management program must be allowed the required time out of the unit and room for recreational and large muscle exercise. (See resident A.M)  In addition, because there was an attempted escape, all youth were held inside for several days.  In a situation like this, the youth who were the offenders are the ones who should be monitored closely. |
|---|---|
| Recommendations | 1. Develop policies and procedures and implement practices to address the needs of this provision. <br> 2. Develop and implement programming and recreational schedules. <br> 3. Provide and document training for staff on policies and procedures. <br> 4. Ensure that there is proper staffing availability so that residents are not unnecessarily "locked" in their cells. |
| Evidentiary Basis | Document review, observation, interviews |

| Provision 16.3 Miscellaneous Provisions | Henley-Young shall implement a policy which prohibits staff from insulting residents or calling them names, and using profanity in the presence of residents | |
|---|---|---|
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  Based on my review of the videos, staff needs to refrain from threatening and intimating behavior.  Training should be implemented based on the training facilitated by Gerald Gay and Felton Satterfield, consultants from the National Partnership of Juvenile Services Detention and Corrections. The training was a" train the trainer" to be implemented throughout the facility. Their report was submitted prior to this report that would give the facility an understanding of the various training techniques as it relates to juvenile detention care. (see exhibits) | |
| Recommendations | 1. Develop policies and procedures and practices to address the needs of this provision. (Executed) <br> 2. Provide training to staff in the proper de-escalation techniques of | |

| | |
|---|---|
| | residents. |
| | 3. Administration must provide enough supervision to reduce or eliminate insulting behavior by staff. |
| | 4. Discipline and retrain staff as needed. |
| | 5. Provide training for staff on policies and procedures and document training. |
| | 6. Hire an independent person to investigate allegations of abuse or complaints regarding staff by residents. (Executed) |
| Evidentiary Basis | Document review, observation and interviews |

| | |
|---|---|
| Provision 16.4 Miscellaneous Provisions | Henley-Young shall implement an adequate grievance policy that is accessible to all residents regardless of literacy levels, and that provides residents with the opportunity to appeal facility level determinations. Residents shall obtain the grievance forms from the school liaison. |
| Status | **Partial Compliance** |
| *Discussion | This provision has moved to partial compliance.  I reviewed grievance from June-October 2015.  I also reviewed data collection from this period.  The facility does have a grievance process in place and working at times.  Some youth still are not aware of the system and some lack confidence in it.  However, some feel it is okay.  At this point, the QA department has done a good job in collecting data and responding to youth grievances.  However, there is still a need for grievance boxes on each unit.  In addition, there needs to be ongoing training for staff since there are new employees being hired. Also, new youth entering the facility should be oriented on the grievance system.

The facility should ensure that all youth are adequately familiar with the grievance process.  The data collection system should also track grievances to determine who, what, and where the administration will place its efforts for corrective action purposes.  The facility should now continue to evolve this process so it becomes consistent throughout the facility.  Please see previous report (#8).

The facility must now make certain that staff is trained properly and that residents are made fully aware of the grievance process. There must now also be consistency in the system to move to substantial compliance. |
| Recommendations | 1. Place grievance boxes on each unit and school, residents should not be required to request a grievance form. |
| | 2. Provide training for staff on policies and procedures and document training. |
| | 3. Provide training for residents on policies and procedures and document training. |

|  |  |
|---|---|
|  | 4. Ensure that residents are adequately familiarized with the grievance process during their orientation into the facility<br>5. Add a place on the Resident's Grievance Resolution Report for a resident to request an appeal and place for the Director's resolution.<br>6.  Ensure Resident's Grievance Resolution Reports are provided to the resident for their signature and their response to the outcome. If the resident disagrees with the resolution the resident has the right to appeal the decision to the director.<br>7. Any retractions of grievances should be done by residents and not by staff. |
| Evidentiary Basis | Document review, observation, interviews |

|  |  |  |
|---|---|---|
| Provision 16.5<br>Miscellaneous<br>Provisions | Hinds County denies that Henley-Young does not currently have an adequate policy whereby residents can request to see their attorney and/or Residents Court counselor. The parties agree, however, that henceforth: Henley-Young shall develop and implement an adequate policy that allows residents of all ages and literacy levels with the opportunity to request to see their attorney and/or Residents Court counselor. Residents shall obtain the form requesting a visit from his/her counselor from the school liaison. Henley-Young agrees to collaborate with the Plaintiffs to design and implement a comprehensive juvenile justice pre-service and in-service training program for detention center staff. Training shall include, but is not limited to, the mandatory reporting requirements for direct care workers, the requirements of the Prison Rape Elimination Act, verbal de-escalation techniques, adolescent brain development and developmental issues, effective communication with adolescents, effective documentation, appropriate use of force and restraint, and best practices for detention center administration. | |
| Status | **Beginning Compliance** | |
| Discussion | The status of this provision remains as beginning compliance.  Based on my interviews with residents, there is still no indication they had the opportunity to meet with their public defender prior to or after their court hearings.  I did meet with the public defender along with the County counsel and the director of the facility to discuss options to implement a procedure for contacts.  In addition because the facility has no case management, it has become very difficult for residents to be updated on their case or the ability to discuss their case.  As recommending in other provisions and in my introduction, I am reiterating again that case managers are needed to ensure that residents are not falling through the cracks.<br><br>Again, based on my most recent visit and review of documents, residents | |

| | |
|---|---|
| | are still complaining that they have not had the opportunity to speak with their attorneys. Also, in my review of the records, there was no indication that attorneys had been visiting. However, court counselors were seen during visit, present in the facility and seeing the residents. However, the counselor's presence does not represent my discussion with youth that they don't see their counselors and don't know what is happening with them or their case. Additionally, I found no forms for requesting visits from counselors, attorneys or school liaisons. And I found no training on the mandatory reporting requirements for direct care workers, the requirements of the Prison Rape Elimination Act, verbal de-escalation techniques, adolescent brain development and developmental issues, effective communication with adolescents, effective documentation, appropriate use of force and restraint, and best practices for detention center administration. Even though the facility has developed a policy and procedures for this provision, it has to ensure there is consistency and follow through not just a document developed.<br><br>In addition for this report, Dr. Lisa Boesky, an expert mental health consultant, reviewed the mental health services within Henley-Young Juvenile Detention Facility.  Dr. Boesky's report was submitted prior to this official report to give the facility an opportunity to begin implementation of her recommendations (see exhibit). |
| Recommendations | 1. Develop policies and procedures and practices for this provision.<br>2. Provide and document training for staff on policies and procedures.<br>3. Develop single form and system for incident reporting.<br>4. Develop system for receiving and mailing privileged and non-privileged mail for residents.<br>5. Hire case management staff.<br>6.  Policies and procedures shall be reviewed and signed by a licensed mental health professional (psychiatrist, etc.). |
| Evidentiary Basis | Observation, interviews and Document reviews |

**Conclusion**

This is my ninth official visit to the Henley-Young Juvenile Justice Facility.  The facility continues to make gradual improvements and should continue moving in a positive direction. Since my last report I have had several technical assistance visits.  However, there are still other provisions that have made no movement such as the physical plant and which is again deteriorating and must be addressed by the county. The new administration has been in place for six months and appears to be developing an understanding of the facility and its needs. Also, having staff in the kitchen and laundry room  area has shown improvement .With the increase in population the facility needs to reevaluate the youth to staff ratio and hire the additional staff needed to address this issue. Because education, mental health and medical care continue to be of major concern due to the lack of policies, procedures and protocols, it is incumbent upon the county to assist the facilty with the resources needed.

During September and October, four experts in juvenile justice produced evaluations and recommendations to the Hinds County Juvenile Justice Facility. These experts reviewed the education, medical, mental health, training and culture of the facility. Their reports have been attached. These reports have been submitted as expert opinions of the needs of the facility.

The County should continue to support the new administration and provide them with the staff and equipment needed to meet the provisions of this consent decree. As I have stated above, for the facility to be successful all entities must work together and support this facility.

I appreciate the work of Dr. Linda Boesky, Dr. Ngozi Ezike Carol Cramer Brooks and Gerald Gray and Felton Satterfield for their assistance through the insightful observations and reports. I would also like to thank the Hinds County Board, the County's Attorneys Anthony Simon and Pieter Teeuwissen, County Administrator Carmen Davis, facility staff and the facility Director Johnnie McDaniels for their assistance and cooperation.

LEONARD DIXON

Attachments;

Dr.Boesky, mental health report
Brooks, education report
Dr. Ezike's, medical report
Gray and Satterfield, training and programming report

# Exhibits 1-6













Henley Young Juvenile Justice Center
Ninth Monitoring Compliance Report
JANUARY 24, 2016







# 4 Attachments