

# HENLEY – YOUNG

# JUVENILE JUSTICE CENTER

# DETENTION DIVISION

# HEALTH SERVICES REVIEW

Site Visit Dates: August 15  - 16, 2018

Submitted:  October 24, 2018

Prepared by Ngozi Ezike, MD, CCHP

P.O. Box 292

La Grange, IL  60525

Ngozi Ezike, MD, CCHP  10/24/18

## Background

On March 28, 2012, Hinds County, Mississippi entered into a settlement agreement ordained and adjudged by Judge Daniel P. Jordan III, for the United States District Court Southern District of Mississippi, Jackson Division, regarding conditions of confinement at the Henley-Young Juvenile Justice Center.  As part of the settlement agreement, the defendant contracted with National Juvenile Justice Expert Leonard Dixon to serve as a monitor of the agreement. He is responsible for documenting the defendant's compliance with the terms of the agreement and for providing and/or arranging technical assistance and training regarding compliance with the settlement agreement. I was asked to review the health services provided to the youth at the Henley-Young Juvenile Justice Center.  I performed an initial site visit to the Henley-Young Juvenile Center in September 2015.  Previous follow up visits took place in September 2016 and November 2017. The most recent visit occurred on August 15 and 16, 2018.

## Introduction

This report is the result of my 4th site visit to the Henley-Young Juvenile Justice Center—Detention Division on August 15 -16, 2018. For this visit, it was requested by the Federal monitor, Mr. Leonard Dixon, to include a review of psychiatric services as related to the psychiatry-related consent decree provisions. Currently, psychiatry services are contracted under the medical contract and are separate from the Behavioral Health department services.

My impressions, comments and recommendations are based on my observations during the site visit; interviews with staff, management, and youth; review of the health records of the detained youth; my medical education, training, and knowledge; my experience working in/with juvenile justice facilities; and my understanding of the standards and current best practices with regard to health services in juvenile justice facilities.

## Staff Interviewed

Ms. Anetra Burch-Leflore, Registered Nurse, Head Nurse
Malisha Simms, QCHC Director of Nursing  and Site Administrator
Dr. Al Haralson,  Mental Health Therapist
Brenda Frelix, Qualified Mental Health Professional (Henley Young)
Ms. Smith, Registered Nurse
Dr. Parveen Kumar, Psychiatrist
Kenyatta Robinson, Kitchen Staff Leader (Henley Young)

**Youth Interviewed (identities intentionally omitted)**

6 youths: 16y male, 16y male, 16y male, 14y male,13y female, and 14y female

Summary of interviews:

Three out of four chronic care patients (asthmatics, psychiatric diagnoses) reported timely and consistent access to their required medications.
The 4th youth with several psychiatric diagnoses reported that he was not "started on the meds that keep me calmed down."

All the interviewed youth that had the experience of writing a sick call reported that sick calls were dealt with on the same or next day.

None of the interviewed youth had experience with being transported off site to the emergency room/hospital.

Five out of six youth interviewed reported receiving recreation daily.
The 6th youth reported that recreation was missed on "very hot days."

All youth interviewed reported access to water as well as consistently receiving 3 meals and a bedtime sandwich  with juice.

Five out of the six youth interviewed rated food as "okay" or "good" while one of the interviewed youths described the food as "nasty".


**Healthcare Vendor**

Quality Correctional Health Care (QCHC) is the current vendor. This vendor has been in the adult correctional health care arena for 10 years. At the time of the visit, the vendor had been in place at Henley-Young nearly three years, since October 2015.

**Medical Staffing**

Administrator
There is a Health Services Administrator/ Site Administrator for the four sites in Hinds County: Henley-Young Juvenile Center, Jackson Jail, Raymond Jail, & Raymond Penal Farm. The Site Administrator is reportedly on site at the Juvenile Center once weekly. Currently, this Administrator  also serves as the Director of Nursing.

Nursing
During the weekdays, there is a registered nurse that works the day shift, approximately 8a-4p.  There is a 2nd nurse that works from 4p-8p. There is no nursing coverage from

8p-8a. On Saturday and Sundays, an RN works a 12 hour shift each day from 8a – 8p. There is a total of four nurses on staff that cover the facility from 8a -8p seven days per week.

Advanced Practice (Midlevel) Provider
A Nurse Practitioner is on site at the facility for approximately 4 hours per week.

Therapist
A mental health specialist is on site at the  facility once weekly for 1-1.5 hours. The therapist reported seeing 2-4 patients per week.

Psychiatrist
A psychiatrist is at the facility once weekly, usually on Wednesdays, for 1- 2 hours.

**Findings**

- Only registered nurses (RN's) are working at the facility.
- Nursing coverage is 8a - 8p every day.
- The Nurse Practitioner is at the facility about 4 hours weekly.  She does not see and examine all the admitted youth. She sees only the patients referred to her by the nurses.
- In my chart review, 60% (6 out of 10 charts) of the youth were admitted between 8p and 8a when there was no medical staff on site.
- As noted previously, the transition to Quality Correctional Health Care, a vendor with experience delivering healthcare in correctional settings, has provided a stable framework for creating an effective health care delivery system.
- Major improvements that have been implemented and maintained:
  - A more organized pharmacy delivery system with bubble and/or foil packaged medication with computer labeled patient identifiers.
  - The institution of standardized tuberculosis screening
  - The institution of standardized pregnancy screening in females
  - Nursing protocols for standard sick call complaints

**Recommendations**

- The new vendor has imported a good framework for correctional health care delivery to the facility. However, it is noted again that it is very critical that the vendor make necessary changes to the policies, procedure, and protocols to be adapted for care of adolescents. Chronic diseases of adults are NOT the same as those in the adolescent population.  Forms were taken directly from the vendor's adult facilities and include questions and terms that require amendments to

properly serve the adolescent patient population at Henley Young. At this visit, I again note that forms have not been adapted for the juvenile population.

- All forms refer to "inmates" as is typical in adult corrections. This term is not used in juvenile justice.
-  The sick call request form asks for the inmate ID number, the inmate's signature, etc.
- In addition to the term "inmate", the Special Needs Communication Form also has references to "lower bunks" and "isolation cells" which are not applicable to the Henley -Young facility.
- Chronic Care forms include diagnoses that are NOT typically associated with juvenile populations, i.e. Chronic Obstructive Pulmonary Disease (COPD), Liver disease, Hepatitis C infection and Cardiovascular Disease.
- Likewise, the medical provider for this adolescent population should be a clinician with expertise in pediatrics and/or adolescents.  The current physician is an adult medicine specialist.

•      More coordination  is needed between Henley Young management and QCHC's Head nurse at the site to review the status of the medical operations and identify needed coordination.

•      The nurse practitioner should be given more hours to give more timely visits.

•      Nursing coverage hours for the facility should be expanded to decrease the total hours without any medical coverage.

•      It is imperative that security staff receive routine and recurring training on assessing new intakes and identifying youths that need acute medical attention for the 12hours daily that are absent medical staff.

**Intake Screening/History and Physical**

**Findings**

•      Nursing staff continue to consistently perform assessments within 24 hours of admission.  Nurses complete the Juvenile Intake and Physical Assessment.  The Nurse Practitioner sees patient referred by the nurses but does not perform a physical on all admitted youth.

•      Youth admitted when no nurse is on duty are brought to the clinic the following day to be assessed.

•      Youth deemed by detention center staff to need medical attention are sent to the Emergency room for evaluation.

•      Tuberculosis screening survey is consistently performed at admission. Positive screens result in Mantoux skin test.

•      Pregnancy tests are consistently performed for admitted females.

- Urine drug screens are performed on admitted youth as part of the admission protocol. The drug screen tests for 10 different substances and gives results in 4-7 minutes.
- Per my chart audits, urine drug screens were consistently performed., However, there is no further action to address the positive drug screen results. Four out of 8 audited charts with a documented urine drug screen revealed a positive screen.
- Cursory physical exams are performed by the nurses which can result in missed health diagnoses.
- BMI is neither calculated nor recorded to screen for obesity.

**Recommendations (Provision 1.3 Intake, Provision 12.1 Medical Care)**

- The best practice would be for a clinical provider, specializing in children/adolescents, to perform complete assessments on every admitted youth within 72 hours. This would be in addition to the initial nurse assessment upon admission.  This would better ensure that subtle exam findings and clues obtained from the history and physical would not be missed, but instead, uncover medical diagnoses and/or necessary prevention strategies.
- Ideally, there should be medical staff on duty at the facility around the clock.  If that is not achievable, there should be formalized training for detention staff on the "intake screening procedure in the absence of medical staff".  The training should be explicit in establishing criteria for youth that will require medical evaluation overnight (through the emergency department) before the health staff is on site in the morning. This is imperative considering the decreased nursing coverage hours.
- There should be a physician available to consult by phone on the youth admitted if/when there is no medical staff on site.
- Complete physical exams should be performed on all youth including documentation of genital development (to ensure appropriate pubertal development and rule out physical signs of serious STI's).
- BMI's should be added to intake forms to screen for obesity.
- There should be an established care plan for youth who test positive on the urine drug screen. Consider referral to the QMHP for further evaluation to rule out dependence. Additional recommendation would be to show substance abuse prevention videos as an educational tool.

**Sexual/Reproductive Health**

**Findings**

- Female youth are being routinely screened for pregnancy on admission.
- Detained youth's urine samples are still picked up on Tuesday and Fridays and taken to the State Lab to test for Gonorrhea and Chlamydia.

- After the results are received, if there is a positive result and the youth is still in the facility, transportation is arranged for treatment at Crossroads Clinic.
- If the youth with a positive test has been released, the staff at Crossroads or from the Health Department is to follow up with the youth by phone.
- HIV testing is still not being routinely offered or performed.
- Of the charts reviewed, the average number of days to obtain gonorrhea /chlamydia results was 11 days. See "Summary of Chart Findings for Intake Procedures."
- No contraception is offered to female youth.
- Pregnant residents were given prenatal vitamins and referred for obstetric care.


**Recommendations**

- Again, I would recommend that protocols be developed and enacted to ensure more timely delivery of the urine samples to the State Lab for testing.  The sooner the samples are taken to the lab, the sooner a positive result can be detected, and the sooner treatment can be initiated. Consider having an additional day for transport of samples to the State Lab to promote expedited test results and treatment.
- Single dose treatments for gonorrhea and chlamydia should be kept on site to be administered to youths with positive STI results to avoid treatment delays.
- If the youth is released before Urine STI test results return, the staff from Henley-Young should follow up with the youth by phone to ensure notification occurs.
- Given the CDC's recommendation for routine HIV testing for all adolescents, a protocol should be developed and enacted to ensure all admitted youth have access to testing and counseling.  This could be achieved through partnerships with local community organizations whose focus is HIV testing and education.
- Consider offering contraceptive counseling and management to all the female patients at the facility.  Starting an effective contraceptive method before release from detention will help avert unwanted teen pregnancies.


**Off Site Care - Emergency Department, Hospitalizations**

**Findings**

- Per my chart review, youths are appropriately sent to the ER for services that cannot be provided at the facility but the issue of  hospital documents from the treating hospital/ Emergency Department not returning with the youth persists.

- Youth are sent to both the University Mississippi Medical Center Hospital (UMMC) and Merritt Hospital of Central Mississippi Medical Center (CMMC).
- There is now a Mobile X-ray service provided by Mobile X since Jun 2017.

**Recommendations**

- A formalized agreement, e.g. a Memorandum of Agreement, is still needed between the Detention Center and/ or the Health Care vendor and the University Mississippi Medical Center Hospital and Central Mississippi Medical Center.
- The agreement should delineate a standard protocol for sending physician notes, x-ray reports, and lab test results back to the facility with the patient after discharge.

**Medication Cart**

**Findings**

- The medication cart was organized with the majority of medications being clearly labeled from the supplying pharmacy. There were several  medications found on the cart that were expired (Cetirizine, Psyllium, Omeprazole).
- The 4th row of the medication cart contained many prescription medications that belonged to released youths.
- Medical staff reports that they are unaware when youth are being released from the facility, so they are unable to send the medications home with the youth.

**Recommendations**

- There should be better communication between medical and detention center staff to ensure that youth take their prescribed medication with them upon release. This will promote medication compliance and decrease the amount of medications that must be destroyed after dispensation.
- It should be possible to have all youth cleared by nursing before release. At that time, medications could be bagged and given to the youth in addition to any applicable discharge instructions.

**Organization of the Medical Chart**

**Findings**

- There was a chart for every youth for whom I requested to review the medical chart.
- Problem lists were present and filled out in 50% of the reviewed charts. For comparison, during last year's site visit, none of the charts reviewed included a completed problem list.
- Individual charts have papers in no established order. Charts are varied from one to another for additional lack of uniformity.  To look for a specific document, every section and page of the chart must be reviewed because of the lack of chart organization.


## Recommendations

- There should be a labeled problem list in every chart with important diagnoses listed.
- Charts should be set up with a consistent structure to promote access to required chart information in a timely manner.


## Sufficient Psychiatrist Services (Provision 13.5)

## Findings

- There is a single psychiatrist that covers the facility.  The currently assigned psychiatrist is present on site 1-2 hours maximum per week.
- There is a lack of coordination between the psychiatrist and counselors at the facility. Neither the psychiatrist nor the counselors are aware of the others' findings.
- The psychiatrist is apparently unaware of incident reports, lockdown logs, disciplinary reports, etc. of the patients as evidenced by charting.
- The contracted psychiatrist was wholly unaware of the provisions surrounding psychiatric care at the facility.

## Recommendations (Provision 1.3 Intake, Provision 12.1 Medical Care)

- More hours of psychiatric care are needed to comply with the provisions to review records, to see patients on psychotropic medications every 30 days, and to participate in treatment team meetings.
- The specific provisions of the federal agreement as related to psychiatric services should be shared directly with the medical director of the vendor and o/or with the psychiatry provider.

**Psychiatrist and/or Counselors to Review Records to Ensure Proper Care (Provision 13.6)**

**Findings**

- The same findings as per Provision 12.1
- There is a lack of coordination between the psychiatrist and counselors at the facility. The contracted psychiatrist and behavioral therapist have little to no contact with the facility behavioral health team workers.

**Recommendations (Provision 1.3 Intake, Provision 12.1 Medical Care)**

- Again, more hours of psychiatric care are needed to comply with the required provisions.
- As previously stated, the specific provisions of the federal agreement as related to psychiatric services should be shared directly with the medical director of the vendor and/or with the psychiatry provider.

**Summary of Psychiatric care (Provision 13.2; 13.4; 13.5: 13.6)**

**Findings**

- There is consistent attendance by a psychiatrist to the facility.
- A psychiatrist is contracted for 8 hours weekly to cover 4 sites – Downtown, Raymond, County Farm and Henley young. On site psychiatric coverage at Henley young is less than 2 hours per week.
- Psychiatry at Henley-Young is not part of the Behavioral Health Department. This separation creates some barrier structures. Coordination of care for the youth by the facility's Behavioral Health team and the psychiatrist is not optimal.
- From the chart review, psychotherapy seems to be accomplished for some patients by the contracted (QCHC) therapist.  It is not clear how patients are referred to the therapist.

- Current psychiatric provider was unaware of settlement agreement and the stipulations regarding psychiatric care.

- The onsite counselors have a multi-disciplinary staff meeting to discuss patients.  The psychiatrist and the therapist are not part of these meetings.

- In interviewing staff, it was reported that the three facility counselors  that make up the behavioral health department may refer as needed to psychiatry.

Additionally, all youth on medication and with suicidality are also referend to the psychiatrist.

• Apart from admitted youth on psychotropic medications and suicidal patients, it is not clearly identified which other youth are referred to see the psychiatrist.  .

• From chart reviews, referrals to psychiatry by the facility's QMHP did result in psychiatry visits.
• Medication management – There is evidence of follow up and management of side effects such as agranulocytosis, breast masses, metabolic syndrome related to psychotropic medications,
• Laboratory  testing is performed to follow for side effects of psychotropic medications.
• Psychiatric patients on medications were usually seen every month by the psychiatrist. Of the charts reviewed, there were 4 missed monthly visits  out of a total of 36 months of required visits
• Chart audit review identified a patient put on every 4 hours suicide watch. One entry was 19:24 and the following entry was 09:50 (> 14 hours lapse)

**Recommendations**

- Psychiatric hours should be increased to permit the psychiatrist to participate in multi-disciplinary meetings.
- The therapist offers additional services but those services should also be coordinated with the site behavioral health team.
- Additional psychiatric hours  will promote compliance with required monthly follow up visits and to see all referrals in a timely manner
- A new medical records system should be devised to permit the mental health specialists (psychologists, therapists, counselors) and the psychiatrist to see each other's notes.
- Psychiatrist needs to be made aware of the psychiatry-related consent decree provisions to promote compliance

- Additional work is needed to formalize in policy and procedure the criteria for psychiatric referral
- Training of security staff is needed to perform suicide watch when there is no medical staff on site

**Chronic Care (Provision 5.3 –Individualized Treatment Plans Treatment Program for Post-Disposition)**

**Findings**

- From the charts reviewed, youth with elevated blood pressures received regular blood pressure measurements and showed a trend of lowered blood pressure while in detention.
- An Asthmatic patient reported being able to ask for the rescue inhaler when needed.
- The three meals and a snack are 4 meals given that the "snack" consists of a sandwich, juice, and chips.
- The kitchen staff was aware of the youth with chronic conditions requiring special diets.

**Recommendations**

- There was chart evidence of appropriate follow-up for the diabetic, hypertensive and asthmatic patient charts reviewed.
- Obesity prevention should be a focus. The JCAA residents with their lengthier stays are at risk for obesity with the current food schedule of 4 meals daily. To identify obesity, it must be looked for, i.e. the intake documents should record the BMI.  Consider decreasing the amount of food given for  "bedtime snack"
- Rescue inhalers should be maintained on the patient (Keep on Person protocol – KOP) at all times to avoid even the briefest delay in accessing emergency treatment.

**Sick Call (Provision 12.3 – Medical Care, Provision 12.5 – Medical Care)**

**Findings**

- The nursing staff consistently address sick calls within 24 hours.
- Youth confirmed this in the majority of the interviews.
- There is no space or area allocated for closer monitoring of acutely ill or convalescing youth returning from the hospital. Youth with contagious illness, such as influenza or Strep throat, have no designated area to be separated from general population.

**Recommendations**

- A designated area separate from the general population is needed to maintain youth that are recovering from acute illness and/or are actively contagious.
- Problem Lists need not only be in the chart but labeled with the name and date and have important diagnoses listed to assist in effective sick call triage.

**Access to Daily Large Muscle activity**

**Findings**

- Most of the youth interviewed (83%) reported that outdoor recreation occurred daily. One interviewed youth reported skipped recreation during weather extremes.

**Recommendations**

- One hour of large muscle activity should be offered to all youth daily.  If the youth cannot go outdoors, alternative indoor accommodations must be made.

**Meals and Nutrition (Provision 9.1—Meals and Nutrition)**

**Findings**
- The youth interviewed all reported that they received three meals daily and a bedtime snack.
- The snack consists of a sandwich, juice, and chips.
- All interviewed youth reported having access to drink from water coolers.

**Recommendations**

- Excessive caloric intake in the form of four meals daily should be adjusted.
- Consider adjusting the bedtime snack content.

**Licensing, Certification, and Background Checks**

**Findings**

- Licensing and certification documents are maintained for the medical staff per the Site Administrator, but it was not readily obtainable during the site visit. The Administrator had to look on line to search for evidence of each nurse's active license status.
- Although the information was not centralized in a set location, the administrator was eventually to show that the four nurses on staff had valid CPR certification.  There was evidence of TB screening and an active nursing license for 3 out of the 4 nurses.

**Recommendations**

- Continue to maintain a formal process to ensure medical staff's license, certification, and Continuing Education (CE) hours are maintained and up to date.
- Proof of background checks is also recommended.

**Policies and Procedure Manual**

**Findings**

- Draft copy of QCHC.s Juvenile Policy and Procedure Manual dated august 6, 2018 was shared electronically
- Draft manual as related to intake procedures poorly reflects the actual process that takes place
- 
- Review of the draft manual suggests that there have been little modifications or policy adjustments for the juvenile population.
- Examples of draft policy and procedure manual statements that are not borne out in the facility's practice:
  - Per the draft manual, the "Health Services Administrator or Coordinator is at the site is responsible for drafting site-specific procedures" and "submitted to the corporate office within 90 days of contract onset" Number Y-A-05 Page 1.
  - No place for medical isolation was established as per draft policy on Medical Isolation Y-B-01.2 Page 1.
  - No breast rectal or genital urinary Initial health Evaluation Y-E-04 Page 1
  - Nursing screening and initial health evaluation done at the same time by RN. No evidence of training to RN's that was approved by the responsible provider as per Initial health Evaluation Y-E-04 Page 1
  - There is no provision of oral care (screening or examination) as described in draft policy Oral Care Y-E-06 page 1

**Recommendations**

- QCHC's Juvenile Policy and Procedure Manual needs to be updated and finalized.

- The Manual needs to reflect the processes that actually take place at the facility or the processes need to be adjusted to be in line with the stated policy and procedure.
- Staff need to be trained on the final policy manual to encourage compliance and consistency.

**Internal Review/ Quality Review of Services**

**Findings**

- Unannounced pharmacy audits are performed quarterly by the Board of Pharmacy.
- Quality control logs that are consistently maintained include refrigerator temperature logs and sharps counts.
- Clinical Laboratory Improvement Amendments (CLIA) licensure or waiver in the area where labs are collected is valid and up to date (12/28/17 – 12/27/19)
- HSA reported that nursing evaluations were currently underway.
- There is no evidence of chart review of the work of the advanced practice provider (nurse practitioner) by the supervising physician.

**Recommendations**

- Quality Improvement studies for self-evaluation of the health care program should be an ongoing process to identify and address problem areas.
- In addition to annual evaluations for each of the medical staff, there should be chart audits by the physician to review the work of the advanced practice provider.

### Summary of Chart Findings for Intake Procedures

|     | ID CODE | JI & PA | Day of JI & PA | Urine STI Coll Date | STI results | UDS done | TB screen | Prob List | MAY SI -2 |
|-----|---------|---------|----------------|---------------------|-------------|----------|-----------|-----------|-----------|
| #1  | MM15 | yes | Day 1 | Day 1 | Day 7 | yes* | Yes | 3 | yes |
| #2  | XT27 | yes | Day 1 | Day 1 | Day 6 | yes* | Yes | 3 | yes |
| #3  | SS30 transfer | yes | Day 12 | ? not found | ? | ? not found | Yes | 0 | yes |
| #4  | LH06 transfer | yes | Day 2 | ? not found | ? | yes | Yes | 0 | yes |
| #5  | KL21 | yes | Day 1 | Day 8 | Day 8 | Yes* | Yes | 2 | Yes* |
| #6  | SE15 | yes | Day 2 | Day 2 | Day 30 | Yes* | Yes | 3 | Yes* |
| #7  | CM05 | Yes | Day 2 | Day 2 | Day 7 | Yes | Yes | 0 | ?? |
| #8  | TL08 | yes | Day 1 | Day 1 | Day 6 | yes | Yes | 0 | yes |
| #9  | NT27 | yes | Day 3 | Day 3 | Day 4 | Yes | yes | 2 | Yes* |
| #10 | CS31 | yes | Day 2 | Day 2 | Pending Day 2 | yes | yes | 1 | yes |

10 charts were reviewed. Charts were selected from the list of 19 youths on the August 15, 2018 daily roster and from specifically solicited charts of patients with chronic care issues such as hypertension, diabetes, asthma, and psychiatric illnesses. I reviewed the entire chart in each instance, including documents from the current admission and those from previous admissions since last site visit .

The chart above summarizes the review on compliance with Intake procedures:

**Juvenile Intake and Physical Assessment (JI&PA):** Was it performed and how soon after admission was it performed?

**Urine STI collection Date and STI results:** Was the urine for gonorrhea/chlamydia screening collected? What day? When were the results received?

(Day 1 is the same day that the patient was admitted, Day 2 would be the day after admission, etc. "Pending Day X" indicates that at the time of the review, it had been X days from admission and the results were not yet received.)

**UDS (Urine Drug Screen):**  Was it done – yes or no?

**TB Screen (Tuberculosis screening questions):** Was it performed – yes or no?

**Prob List (Problem List):**  0- No problem list sheet in chart; 1- Sheet present but not filled out; 2-Name and Date of Birth filled out but no other information listed; 3- Name and Date of Birth filled and Patient problems identified on sheet

**MAYSI -2 (Massachusetts Youth Screening Instrument):** Was it performed – yes or no?

(MAYSI -2 is a brief screening instrument designed to identify potential mental health needs of adolescents involved in the juvenile justice system.)