**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

J.H., et al.,

Plaintiffs,

v.

HINDS COUNTY, MISSSISSIPPI,

Defendant.

Civil Action No.
3:11-cv-327-DPJ-FKB

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR AN EXTENSION OF THE CONSENT DECREE AND A CORRECTIVE ACTION PLAN OR, IN THE ALTERNATIVE, CONTEMPT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ i

PRELIMINARY STATEMENT ........ 1

SUMMARY OF THE ARGUMENT ........ 3

ARGUMENT ........ 7

I. Plaintiffs Are Entitled to an Extension of the Consent Decree ........ 7

A. The Relief Ordered in the Consent Decree Meets the Requirements of the PLRA as Necessary to Correct Ongoing Violations of Federal Rights. ........ 8

B. A Two-Year Extension of the Consent Decree Is Necessary ........ 9

II. Plaintiffs Are Entitled to a Court Order Requiring that the County Develop a Corrective Action Plan with Input from the Plaintiffs Under Either This Court's Express and Inherent Powers to Order Discretionary or as Remedial Relief ........ 12

A. Ordering the CAP is Within the Court's Express Enforcement Powers Contained in the Consent Decree ........ 13

B. Ordering the CAP Would is Within the Court's Inherent Enforcement Powers Pursuant to a Finding of Contempt ........ 14

1. The Consent Decree is as Court Order. ........ 16
2. The County Engaged in Specific Conduct in Violation of the Consent Decree........ 16

3. The County Has Failed to Comply with the Court's Order. ........ 17

i. The County Has Failed to Comply with Court Orders Regarding Plaintiffs' Access to Records and Documents (Provision 18.1) ........ 19

ii. The County Has Ignored Repeated Recommendations Regarding the Need to Alter and Expand Facility Space to Comply with The Consent Decree ........ 22

iii. The County Has Failed to Comply with Key Provisions of the Consent Decree 24

ATTORNEYS' FEES AND COSTS ........ 28

CONCLUSION ........ 29

**TABLE OF AUTHORITIES**

**Federal Court Cases** **Page**

*American Airlines, Inc. v. Allied Pilots Ass'n.*,
228 F.3d 574 (5th Cir. 2000) ..... 15

*Chao v. Transocean Offshore, Inc.*,
276 F.3d 725 (5th Cir. 2002) ..... *15*

*Chisolm ex rel. CC v. Greenstein*,
876 F. Supp. 2d 709 (E.D. La. 2012) ..... 16

*Cook v. Oschsner Foundation Hosp.*,
559 F.2d 270 (5th Cir. 1977) ..... 16, 31

*Corner v. Housing Auth. New Orleans*,
No. 06-10751, 2014 WL 3908592 (E.D. La. Aug. 11, 2014) ..... 13

*Court Monitor in U.S. v. Hinds Cty., et al.*,
*No. 3:16cv489-WHB-JCG (S.D. Miss., Apr. 18, 2018)* ..... *3*

*Cowan ex rel. Johnson v. Bolivar County Bd. Of Educ.*,
914 F. Supp. 2d 801 (N.D. Miss. 2012) ..... 13

*DePriest, et al. v. Walnut Grove Correctional Auth., et al.*,
3:10-cv-663-CWR-FKB (S.D. Miss. May 1, 2018 ..... 7

*Frew v. Hawkins*,
401 F. Supp. 2d 619 (E.D. Tex. 2005) ..... 18

*Groome Resources Ltd., L.L.C. v. Parish of Jefferson*,
234 F.3d 192 (5th Cir. 2000) ..... 19

*Hornbeck Offshore Servs., L.L.C. v. Salazar*,
713 F.3d 787 (5th Cir. 2013) ..... 17

*Jackson v. Whitman*,
642 F. Supp. 186 (W.D. La. 1986) ..... 16

*M.T., et al. v. Forrest Cty., Miss.*,
2:11-cv-91-KS-MTP (S.D. Miss. May 25, 2016) ..... 7

*Rouser v. White*,
825 F.3d 1076 (9th Cir. 2016)........................................................................ 18, 19

*Rowe v. Jones*,
483 F.3d 791 (11th Cir. 2007)............................................................................. 17

*Ruiz v. McCotter*,
661 F. Supp. 112, 143 (S.D. Tex. 1986) .............................................................. 19

*Sizzler Family Steakhouses v. Western Sizzlin Steak House, Inc.*,
793 F.2d 1529, 1534, n. 5, *reh. denied*, 797 F.2d 982 (11th Cir. 1986)) .................................. 18

*Test Masters Educ. Servs., Inc. v. Singh*,
428 F.3d 559 (5th Cir. 2005)............................................................................... 16

*U.S. v. Alcoa, Inc.*,
55 F.3d 278 (5th Cir. 2008)........................................................................ 13, 14, 16

*U.S. v. City of Jackson, Miss.*,
318 F. Supp. 2d 395 (S.D. Miss. 2002)................................................................ 15

*U.S. v. City of Jackson, Miss.*,
359 F.3d 727 (5th Cir. 2004)............................................................................... 15

*U.S. v. Hinds Cty., et al.*,
No. 3:16cv489-WHB-JCG (S.D. Miss., Apr. 18, 2018) ........................................ 3, 4

*U.S. v. Jackson*,
359 F.3d 727 (5th Cir. 2004)........................................................................ 15, 18, 30

*Whitfield v. Pennington*,
832 F.2d 909 (5th Cir. 1987)............................................................................... 15

**State Court Cases**

*Carr v. Town of Shubuta*,
733 So.2d 261 (Miss. 1999) ............................................................................... 19

**Federal Statutory Authorities**

18 U.S.C. § 3626(b)(1)(A) .......... 8
18 U.S.C. § 3626(b)(3) .......... 8
18 U.S.C. § 3626(g) .......... 17
42 U.S.C. § 1997e(d)(1)(A) .......... 30, 31
42 U.S.C. 1983 .......... 30
42 U.S.C. 1988(b) .......... 30

**State Rules and Regulations**

Local Rule 7(b)(6)(A) .......... 1

The Plaintiffs, children confined at Henley-Young Juvenile Justice Center ("Henley-Young"),[1] respectfully submit this memorandum of law in support of their Memorandum of Law In Support Of Plaintiffs' Motion For An Extension of the Consent Decree and a Corrective Action Plan or, in the Alternative, Contempt ("the Motion"). Pursuant to Local Rule 7(b)(6)(A), the Plaintiffs respectfully request oral argument on this motion.

**PRELIMINARY STATEMENT**

Hinds County (the "County") for nearly seven years has failed to comply with key substantive provisions of the court-ordered consent decrees in this case,[2] including in the areas of suicide prevention, rehabilitative programming, and medical care, resulting in ongoing violations of the federal rights of vulnerable and disabled children.[3] Plaintiffs respectfully move this Court for relief to address the County's continued failure to achieve substantial compliance with fourteen key Consent Decree provisions in six critical areas ("Key Provisions"). These are in structured and rehabilitative programming (Provisions 3.1, 4.1); medical care (Provisions 12.1, 12.2); individualized treatment plans (Provisions 5.1, 5.2, 5.3, 5.4); mental health care (Provisions, 13.3, 13.4, 13.5, 13.6); suicide prevention (14.4); and Plaintiffs' access to records (18.1). As relief, Plaintiffs request a court order extending the consent decree and requiring that the County develop a corrective action plan with input from the Plaintiffs to ensure that the resources required to

---

[1] Agreed Order Granting Approval of Settlement Agreement and Certifying a Settlement Class 2, Mar. 28, 2012, ECF No. 32 (defining the settlement class as comprised of all children who are now, or who will in the future be, confined at Henley-Young).

[2] The Second Amended Consent Decree is referred to as the "consent decree" and cited to as "Consent Decree." Second Am. Consent Decree ("Consent Decree"), Mar. 20, 2018, ECF No. 120. The Settlement Agreement in this case is referred to as the "original consent decree" and cited to as "Settlement Agreement." Settlement Agreement, Mar. 28, 2012, ECF No. 33. The Federal Court Monitor, Mr. Leonard Dixon, is referred to as the "Monitor."

[3] Am. Compl., June 6, 2011, ECF No. 6 (alleging that "[a] significant number of the youth who are detained at Henley-Young live with disabilities—including various forms of mental illness and learning disabilities," and citing research finding that "60-70% of youth in [] Henley-Young require mental health services").

achieve consent decree compliance are timely identified. Such relief is warranted at this time, and ordering it would be an appropriate exercise of this Court's authority.[4]

***The relief requested is necessary.*** The County has still not achieved substantial compliance with any of the Key Provisions, resulting in actual and heightened risk of harm to members of the Plaintiff class. Relief is warranted at this time because the County has not achieved substantial compliance with any provision since the Court entered this consent decree seven months ago. No evidence in the experts' recently-filed reports support the conclusion that the County is likely, within the next five months, to achieve substantial compliance with the Key Provisions. According to the Federal Court Monitor's ("Monitor") most recent report, the County remains out of substantial compliance with 42 of 47 (89%) of all of the substantive provisions in the Consent Decree. Thirteen and ten provisions were eliminated from the consent decree for sustained substantial compliance in 2016 and 2018, respectively. At an average rate of five provisions per year since this Court's contempt holding, coupled with the subject matter experts' reports, no colorable argument can be made that the County is on track to comply with the Key Provisions, or all 42 remaining substantive provisions, before March 2019.

To the extent a lack of resources or facility space are to blame for lack of progress, which Plaintiffs believe to be the case, a remedy of developing a corrective action plan aimed at addressing limiting factors is critical at this stage. Plaintiffs' position regarding the need for space is based on the findings and recommendations of this Court's Monitor, his experts, and those of the court-appointed monitor in *U.S. v. Hinds County, et al.*, No. 3:16-cv-489-WHB-JCG (S.D.

---

[4] Plaintiffs have advised the County of its intentions to seek Court intervention. *See, e.g.*, Ex. 1, Letter from Pls.' Counsel re: *Request to Discuss Plans for Compliance with Second A. Consent Decree, to Defs.' Counsel* (Oct. 10, 2018); Ex.2, Letter from Pls.' Counsel re: Responding to Judge Jordan's Requests from Status Conf. of July 25, 2018, to Defs.' Counsel.

Miss., June 23, 2016) ("Hinds County Jail Case") (entering a federal court-ordered consent decree that applies to the conditions in which Hinds County detains children under adult court jurisdiction); *see, e.g.,* Ex. 3, Summary Chart III: Monitor and Expert Findings and Recommendations Re: Facility Space.

***The relief requested is appropriate.*** Plaintiffs request an extension of the consent decree until March 2021 and a court order directing the affirmative relief of corrective action plan development. As a threshold matter, the extension is authorized under the Prison Litigation Reform Act ("PLRA") as necessary to correct a current and ongoing violation of the Plaintiffs' federal rights. Also, the Court may grant the affirmative relief requested pursuant to two independent powers: (a) the Court's express enforcement powers contained within the consent decree ("discretionary relief"); and (b) the Court's inherent power to order coercive or compensatory remedies to effectuate a consent judgement pursuant to a finding of contempt ("remedial relief"). Whether discretionary or remedial in nature, the affirmative relief requested is narrowly drawn to fit within bounds of the PLRA.

## SUMMARY OF THE ARGUMENT

In 2012, this Court entered a consent judgment requiring that the County substantially comply with 71 provisions necessary to address ongoing violations of the federal rights of the children the County detains at Henley-Young. The consent decree settled the claims brought by the Plaintiffs against the County in 2011, alleging violations of the constitutional rights of children imprisoned at Henley-Young under the First, Eighth, and Fourteenth Amendments of the United States Constitution. *See generally* Am. Compl. The lawsuit resulted from an investigation initiated almost a decade ago, in 2009, which resulted in a failed Memorandum of Understanding between the County and Plaintiff, Disability Rights Mississippi. *Id.* at 19; Mem. of Understanding Between

Hinds Cty., Miss. and Mississippi's Protection and Advocacy System, Disability Rights Miss. (DRMS) 1, ECF No. 6-2.

The prospective relief in the consent decree was adjudged to conform with the PLRA as necessary to correct an ongoing violation of a federal right; it was held to extend no further than necessary to correct that violation; and it was found to be narrowly drawn and the least intrusive means to correct the violation. Settlement Agreement 2. The consent decree thus falls "within the range of possible relief" permitted by federal law and pursuant to the PLRA. Agreed Order Granting Approval of Settlement Agreement and Certifying a Settlement Class 2.

The original consent decree consisted of 71 remedial provisions,[5] and the Monitor assigns compliance ratings to 47 of these provisions in his quarterly reports. Twelfth Monitor's Report 13, 21-23 Mar. 22, 2018, ECF No. 118 (excluding from his report provisions relating to the Monitor's duties, Plaintiff counsel's access, court enforcement, and attorneys' fees).

The consent decree contains a three-pronged monitoring and enforcement mechanism to ensure effective assessment of compliance and the availability of Court intervention to address compliance-related issues. First, the consent decree contains a broad express enforcement provision empowering the Court to (1) maintain jurisdiction "to ensure that the parties fulfill the respective obligations" under the consent decree, and (2) to effectuate compliance with the court-ordered agreement: "[i]n the event that any matter related to this consent decree is brought to the Court, the Court may require briefing, and any remedy within the court's jurisdiction shall be available." Consent Decree 25 (regarding Provision 19.5). Further, the consent decree expressly

[5] The provisions are organized into 16 subject matter areas: Intake; Staffing and Overcrowding; Cell Confinement; Structured Programming; Individualized Treatment Plans/Treatment Program for Post-Disposition Youth; Disciplinary Practices and Procedures; Use of Restraints; Use of Force; Meals and Nutrition; Clothing; Hygiene and Sanitation; Medical Care; Mental Health Care; Suicide Prevention; Family Support and Interaction; and Miscellaneous Provisions.

provides that, "it is the intent of the parties that the Court will retain ongoing jurisdiction . . . for the purposes of enforcement." *Id*. at 3. Second, the consent decree contains extensive right-of-access provisions, empowering Plaintiffs' counsel to monitor consent decree compliance with broad access to "relevant documents and files maintained by Henley-Young relevant to assessing [the County's] compliance." Consent Decree 22-23 (regarding Provision 18.1). Third, the consent decree provides for the duties and obligations of the Monitor, including the requirement he file quarterly reports and provide parties with draft reports and access to his and his expert's debriefings. Consent Decree 21-22 (regarding Provisions 17.1-17.7).[6]

The Court extended the consent decree for two years and held the County in contempt for lack of compliance in 2014. Since then, the Consent Decree has been extended two more times—in March 2016 for two years and in March of 2018 for one year only, until March of 2019. Consent Decree; Am. Consent Decree, Mar. 9, 2016, ECF No. 64; Settlement Agreement. In 2016 and 2018, thirteen and ten provisions were eliminated, respectively, by agreement of the parties for sustained substantial compliance. Consent Decree; Am. Consent Decree.

In September of 2017, the County began housing long-term residents under adult court jurisdiction at Henley-Young to comply with the consent decree in the Hind County Jail Case. The

[6] The Monitor's lack of conformance with the requirements of the Consent Decree has created inefficiencies and hindered the ability of Plaintiffs to determine whether the County is complying with the consent decree. Plaintiffs respectfully request the Court require that the Monitor may not unilaterally modify the decree to alter the independent monitor's duties. *See, e.g.*, 18 U.S.C. 3626(b)(4) (regarding amending consent decrees). The independent monitor is required to conduct site visits on a quarterly basis and submit monitoring reports to this Court following each official visit. Consent Decree 22 (Provision 17.6). The Monitor was to have conducted 10 monitoring visits and submitted 10 monitoring reports since March 2016; he has only submitted three. He has not submitted any since the consent decree was extended in March of 2018. Tenth Monitor's Report, Feb. 27, 2017, ECF No. 112; Eleventh Monitor's Report, Sept. 25, 2017, ECF No. 113; Twelfth Monitor's Report, Mar. 22, 2018, ECF No. 118. Plaintiffs' counsel's request for the Monitor's filing schedule was not answered. Ex 4, E-Mail from Pls.' counsel re: Status Conf. of 7/25/18 & *Request for an A.M. Call, to Leonard Dixon, Fed. Ct. Monitor* (July 24, 2018). Plaintiffs' counsel's request to be provided with draft expert reports and be present at the Monitor and his expert's briefings was also unsuccessful. Consent Decree 22 (Provision 17.7).

Monitor, the Plaintiffs, and the County confirmed that these children were equal class members under the consent decree. *See, e.g.,* Ex.5, Status Conf. Tr. 4, 11, 16, Apr. 24, 2018. The Monitor advised during the April 2018 status conference that the children under adult court jurisdiction could reside in Henley-Young long-term and it would "have to modify [] programs to address" the needs of the long-term residents, and "one of the key components" to modify was education and programming, "because you have to have ways of ensuring that kids have a structured program daily." Ex. 5, Status Conf. Tr. 36-37, Apr. 24, 2018.

Five months remain until March 2019, and the County has not achieved substantial compliance with any of the Key Provisions or others since the March 2018 extension. Given the County's woeful rate of achieving substantial compliance with only a handful of consent decree provisions per year, and given the great difficulty of achieving substantial compliance with the remaining provisions, many of which require affirmative development and delivery of programs and services, Plaintiffs seek a two-year extension.[7] Plaintiffs also seek a court order requiring the County to develop a corrective action plan with input from the Plaintiffs to ensure that the resources required to achieve consent decree compliance by March 2021 are timely identified and prioritized.

Plaintiffs assert that the lack of delegated resources and long-term planning are currently insurmountable barriers to the County's achievement of substantial compliance with all provisions in the consent decree. Relief of the type requested is warranted at this time, and ordering it would

[7] Plaintiffs most recently served as class counsel in connection with two consent decrees with which Defendants achieved substantial compliance within approximately three to four years; the consent decrees contained substantially similar remedial terms and applied to children under both youth and adult court jurisdiction. *See, e.g., M.T., et al. v. Forrest Cty., Miss.*, 2:11-cv-91-KS-MTP (S.D. Miss. May 25, 2016); *DePriest, et al. v. Walnut Grove Correctional Auth., et al.*, 3:10-cv-663-CWR-FKB (S.D. Miss. May 1, 2018). Plaintiffs' counsel is not calculating into the two-year timeframe certain recommendations by the subject matter expert that "may go beyond what the consent decree requires." Ex. 5, Status Conf. Tr. 35, Apr. 24, 2018.

not only be an appropriate, but necessary, exercise of this Court's authority.

## ARGUMENT

The Plaintiffs are entitled to an extension of the consent decree because the County is not currently in compliance with the Key Provisions or with the consent decree as a whole, and no evidence suggests they will become so by March 2019. Plaintiffs are entitled to the affirmative relief of corrective action plan development because planning and transparency on the County's part regarding its plans to provide Henley-Young with the resources necessary to comply with the consent order is indispensable to prevent indefinite unjustified harm to Plaintiffs. This is especially important because it has been seven years since entry of the original consent decree and four years since this Court held the County in contempt for lack of progress. This Court should grant the relief sought pursuant to the PLRA and the Court's express and inherent powers to fashion remedies to enforce consent judgements.

### I. Plaintiffs Are Entitled to an Extension of the Consent Decree

This Court has the authority to extend the terms of the consent decree under both the plain language of the consent decree and § 3626(b)(3) of the PLRA. Order 2 n.1, Apr. 25, 2015, ECF No. 50. Consent decrees may be extended for two years after the date a court approves prospective relief if the relief ordered meets the requirements of the PLRA. 18 U.S.C. § 3626(b)(3).[8] Also, the express terms of the consent decree itself provide that it shall not terminate "[i]f the Court makes written findings based on the record that the prospective relief remains necessary after one year to

[8] Section 18 U.S.C. § 3626(b)(3) provides that a consent decree shall not terminate "if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." *See also* 18 U.S.C. § 3626(b)(1)(A) (providing that a consent decree may extend two years "after the date the court granted or approved the prospective relief").

correct a current and ongoing violation of federal rights." Consent Decree 2. No finding of contempt is necessary to extend the consent decree. *See, e.g.,* Order 6 n.2, ECF No. 50 (providing that Plaintiffs were entitled to seek an extension of the consent decree "without regard to [a] contempt finding").

**A. The Relief Ordered in the Consent Decree Meets the Requirements of the PLRA as Necessary to Correct Ongoing Violations of Federal Rights.**

The terms of the consent decree, which the Plaintiffs seek to extend, meet the requirements of the PLRA. When the parties jointly adopted each provision of the original consent decree in 2012, and most recently when they jointly moved for the Court to order the Second Amended Consent Decree, the parties and the Court provided that all provisions of the consent decree were (1) to be "necessary to correct an ongoing violation" of the "federal right[s]" of detained children; (2) to "extend no further than necessary to correct the violation"; and (3) to be "the least intrusive means" by which to remedy the violation. Consent Decree 2. When approving the original consent decree, the Court held that the relief ordered "falls within the range of possible relief" under the requirements of the PLRA. Agreed Order Granting Approval of Settlement Agreement and Certifying a Settlement Class 2.

Since that time, later versions of the original consent order subtracted provisions with which the County had achieved substantial compliance but added none. In all, the consent decree has been extended three times, in April 2014, March 2016, and March 2018. Second Am. Consent Decree; Consent Decree; Am. Consent Decree; Order 6, ECF No. 50 . In joint motions to extend the consent decree in 2016 and 2018, the parties reaffirmed that "the remaining provisions with which Hinds County is not in continued substantial compliance extend no further than necessary to correct the violations of [] federal rights, and [] the prospective relief is narrowly tailored and is

the least intrusive means to correct the violations." Am. Consent Decree 2; Joint Mot. to Extend Consent Decree 4, Mar. 28, 2018, ECF No. 119. There is no countervailing evidence that the consent decree Plaintiffs seek to extend does not meet the requirements of the PLRA.

**B. A Two-Year Extension of the Consent Decree Is Necessary**

This Court's decision to extend the consent decree by two years in 2014 was based on the Court's conclusion that the County "will not be in substantial compliance within the next 12 months." Order 3, ECF No. 50. At this juncture, the same conclusion is warranted. According to the Court Monitor's most recent report, the County remains out of substantial compliance with 42 of 47 (89%) of all of the substantive provisions in the Consent Decree. Twelfth Monitor's Report 13 (excluding as non-substantive the provisions relating to the Monitor's duties, Plaintiff counsel's access, enforcement, and attorneys' fees). According to the Monitor, the County, between 2011 and 2018, achieved substantial compliance with only 41% (29 of 71) of all provisions in the original consent decree. Twelfth Monitor's Report 13; Settlement Agreement 2.

To the extent the Monitor's most recent, seven month-old report is outdated,[9] the County has not come into substantial compliance with any consent decree provisions since this Court ordered it extended in March 2018.[10] The Monitor has retained three outside experts to provide observations and recommendations in specific subject matters. Dr. Ngozie Ezike provides expert reports on medical care, and her most recent report is her fourth.[11] Dr. Lisa Boesky provides expert

---

[9] *See supra* note 8, at 6 (highlighting that the Monitor has only submitted three monitoring reports during a timespan in which ten quarterly monitoring reports were due pursuant to the terms of the consent decree).

[10]

[11] Dr. Ezike conducted her most recent site visit on November 14-15, 2017. Henley-Young Juv. Just. Ctr. Detention Division – Health. Serv. Rev. 1, Oct. 26, 2018, ECF No. 112. Dr. Ezike found continued need for improvements and provided recommendations related to intake screening and access to medical care. *Id*. Specifically, Dr. Ezike noted that there is no licensed practice nurse on staff, and that the Nurse Practitioner is at the facility for approximately four hours weekly. *Id*. at 3. Youth are rarely admitted to Henley-Young when medical staff is on site. *Id*. ("In my chart review, 60% . . . of the youth were admitted

reports on mental health care, and her most recent report is her fourth.[12] Dr. Carol Cramer Brooks has provided four expert reports on educational programming.[13]

The County has averaged a rate of coming into compliance with four or five provisions per year even if counted from this Court's 2014 contempt holding. Moreover, in 2016 and 2018, the parties eliminated by agreement only thirteen and ten provisions, respectively, for sustained substantial compliance. Consent Decree; Am. Consent Decree. The overwhelming evidence in the record indicates that the County will not be in substantial compliance with all consent decree provisions within 12 months of March 2019.

This Court's decision to extend the consent decree by two years in 2014 was also based on evidence that "many of the requirements will take substantial time to achieve." Order 3, ECF No. 50. There is ample evidence to support that the remaining provisions will take as much or more time to achieve than those which have been satisfied thus far. Many of the provisions which have been satisfied thus far have been prohibitive ones, such as refraining from hogtying children, subjecting them to chemical and electronic restraints, depriving them of mats and blankets, and

---

between 8p and 8a when there was no medical staff on site.").

[12] Dr. Boesky conducted her most recent site visit on July 10-13, 2018. Mental Health Serv. Rev. Rep. 1, Aug. 13, 2018, ECF No. 124-1. In this report, Dr. Boesky assessed compliance with provisions using the "Not Compliant," "Beginning Compliance," "Partial Compliance," and "Substantial Compliance" rubric utilized by Mr. Dixon. *Id*. (Although Dr. Boesky's language is the same as Mr. Dixon's, she does not have the Court's authority to determine the Country's compliance with the SACD.) Dr. Boesky analyzed compliance with Individualized Treatment Plans and Mental Health Care provisions and did not find the County to be in substantial compliance with any of these provisions. *See id*.

[13] Ms. Brooks conducted her fourth review of Henley-Young on August 13-15, 2018. Educ. Program Rev. Rep. 2, Aug. 30, 2018, ECF. No. 126. Ms. Brooks indicated that she witnessed limited progress with her previous recommendations. See generally, id. (finding the school principal, Mr. DeVine, to lack the "positional power necessary to implement these changes;" inability to properly distribute or fund teaching staff; lacking appropriate education programs for JCAs who are housed at Henley-Young; inaccuracies between time reported and actual time spent in substantive classroom teaching; extensive inaccuracies and inconsistencies in incident reports; incomplete IEPs for exceptional education students; inconsistencies in classroom safety and set up due to facility failures to implement hardware and software properly). Ms. Brooks also found that "the current design and delivery of providing education isn't effective," and recommended that Hinds County explore alternatives to provide adequate educational services. *Id.* at 20.

forbidding firearms in the facility. Consent Decree 12, 13, 15 (listing provisions eliminated by agreement of the parties in March 2016 and March 2018). Provisions that remain require the systematic development of programs and services required to affirmatively prevent harm and to effectuate with the facility's constitutionally-relevant rehabilitative function.

Plaintiffs also assert that the County has failed to allocate adequate resources to Henley-Young to facilitate consent decree compliance, and that lack of adequate planning is a barrier to compliance. *See, e.g.*, Ex. 1, Letter from Pls.' Counsel re: Request to Discuss Plans for Compliance with Second A. Consent Decree (containing an unanswered request of the County to discuss its future plans regarding Henley-Young); Ex. 2, Letter from Pls.' Counsel re: Responding to Judge Jordan's Requests from Status Conf. of July 25, 2018 (containing the County counsel's suggestion that the County cannot comply with certain consent decree provisions); Ex. 6, *Why are Youths Charged with Murder & Other Violent Crime Housed at Juv. Ctr. in Jackson?* (containing county Counsel's suggestion that Henley-Young requires additional unallocated resources).

Plaintiffs have provided extensive evidence supporting that the remaining affirmative programmatic provisions in the consent decree would require of the County more resources and planning efforts than it has expended since the consent decree was extended in March 2018 and at the time of subsequent status conferences in April and July of 2018. Plaintiffs incorporate by reference these facts. *See, e.g.*, Ex. 5, Status Conf. Tr. 5-8, 33-37, Apr. 24, 2018; Ex. 7, Summary Chart I: Monitor and Expert Findings and Recommendations Re: 13 Key Provisions; Ex. 8 *Handout from Plfs.' Counsel, to Status Conf. Participants* (five documents).

The evidence overwhelmingly supports the conclusion that (1) the County will not be in substantial compliance by March of 2019; and (2) the remaining consent decree requirements will take a substantial time to achieve. *See generally* Order 3 ECF No. 50. Therefore, Plaintiffs are

entitled to a two-year extension of the consent decree as necessary to address ongoing violations of the federal rights of children confined at Henley-Young who cannot be made wait indefinitely for the County to plan for and invest in providing constitutionally compliant conditions.

## II. Plaintiffs Are Entitled to a Court Order Requiring that the County Develop a Corrective Action Plan with Input from the Plaintiffs Under Either This Court's Express and Inherent Powers to Order Discretionary or as Remedial Relief

A two-year extension of the consent decree by itself has not been, and will not be, enough to ensure the County's substantial compliance with all provisions of the consent decree, even by March of 2021. The additional affirmative relief requested—of an order requiring development of a corrective action plan ("CAP") with Plaintiffs' input—is also well within this Court's discretion to order pursuant to the Court's express enforcement powers contained within the consent decree and its inherent powers to issue remedial relief pursuant to a finding of contempt.

The relief requested is also necessary, narrow, and sufficiently tailored to comply with the PLRA.[14] Whether discretionary or remedial in nature, the affirmative relief requested is necessary and narrowly drawn. Courts in the Fifth Circuit have ordered Defendants to submit corrective action plans as a form of relief. *Cowan ex rel. Johnson v. Bolivar County Bd. Of Educ.*, 914 F. Supp. 2d 801, 827 (N.D. Miss. 2012) (the Court maintained judicial control over a school district under an order to integrate and ordered the district to submit proposed plans to integrate schools and achieve racial balance among faculty within 45 days); *Corner v. Housing Auth. New Orleans*,

[14] The CAP requested would be a remedial tool to assist in effectively identifying and enlisting resources for an articulable two-year plan of action to achieve substantial compliance with all provisions of the consent decree. The CAP would not be coextensive with or a proxy for consent decree compliance. Satisfaction as to one would not be the legal or factual equivalent of satisfaction with the other. Development of the Plan with Plaintiffs' input would create the potential in the County of doubling its provision compliance rate and closing out the Consent Decree by March 2021. The County, of course, would be entitled, under the PLRA, to move for termination at any point it believed it had achieved global substantial compliance.

No. 06-10751, 2014 WL 3908592, at *5 (E.D. La. Aug. 11, 2014) (ordering parties to meet and confer to submit a development schedule after holding that seven years of non-compliance was too long to "simply think" about complying). The Fifth Circuit also stated that "remedies need not match those requested by a party or originally provided by the court's earlier judgment." *U.S. v. Alcoa, Inc.*, 55 F.3d 278, 288 (5th Cir. 2008).

**A. Ordering the CAP is Within the Court's Express Enforcement Powers Contained in the Consent Decree**

In order for the Court to order the CAP as within the Court's express enforcement powers, the matter must be "brought to the Court, the Court may require briefing, and any remedy within the court's jurisdiction shall be available." Consent Decree 25 (regarding Provision 19.5). The purpose of the Court's express enforcement power is "to ensure that the parties fulfill the respective obligations" under the consent decree. *Id.*

In this case, Plaintiffs have brought the issue of the need for Court intervention to ensure the County's compliance with the consent decree multiple times since the decree was extended in March 2018. *See, e.g.,* Ex. 5, Status Conf. Tr. 5-8, Apr. 24, 2018 (requesting the Court "provide concrete ways for the parties to continue progress," particularly in the areas of mental health, medical, and education compliance; also requesting a schedule of status conferences and concrete dates for production of policies); *id.* at 7-8 (requesting to be provided with updated policies); *id.* at 21 (verification provided by the County's counsel that updated policies exist); Ex. 8, *Handout from Pls.' Counsel, to Status Conf. Participants* (July 25, 2018) (re: Requests for Assistance with Compliance) (outlining "Requests for Assistance with Compliance," consisting of requests for dates and plans required to achieve compliance with specific consent decree provisions, including for psychiatric care and compliance with discipline and confinement procedures, recommendations

to update and provide Plaintiffs with policies, and a timeframe within which the County would comply with Plaintiffs outstanding records requested pursuant to its Provision 18.1 access authority). All of these "Requests for Assistance" and others have been made directly to the County, and very few have been answered, evidencing the necessity of Court remedial action at this juncture.

The need for development of the County's specific plans to comply have thus been "brought to the Court" many times since March 2018. Consent Decree 25 (regarding Provision 19.5). The court under its express enforcement powers "may require briefing," and then "any remedy," including development of a CAP, "within the court's jurisdiction *shall* be available." *Id.* (regarding Provision 19.5) (emphasis added). The purpose of the Court's express enforcement power, "to ensure that the parties fulfill the respective obligations" under the consent decree, would be satisfied. *Id.*

### B. Ordering the CAP Would is Within the Court's Inherent Enforcement Powers Pursuant to a Finding of Contempt

The Court's authority to order the CAP is within the Court's inherent authority to design remedies aimed at achieving consent decree compliance, Plaintiffs must establish by "clear and convincing evidence" that: "(1) a court order was in effect, (2) the order required specified conduct by the respondent, and (3) the respondent failed to comply with the court's order." *U.S. v. Jackson*, 359 F.3d 727, 731 (5th Cir. 2004) (citing *American Airlines, Inc. v. Allied Pilots Ass'n.*, 228 F.3d 574, 581 (5th Cir. 2000) (finding that a district court had the authority under a consent decree to award attorney's fees following the district court's finding of contempt by defendants). Conduct violating provisions of a consent decree is specific conduct establishing the third prong of the contempt analysis. *U.S. v. City of Jackson, Miss.*, 318 F. Supp. 2d 395, 410 (S.D. Miss. 2002).

Plaintiffs are not required to demonstrate that that the County's contempt was willful or in bad faith. *See* Order 6, ECF No. 50. Furthermore, the Fifth Circuit "has consistently held that good faith is not a defense to a finding of civil contempt." *U.S. v. City of Jackson, Miss.*, 359 F.3d 727, 735 n.25 (5th Cir. 2004), *aff'g* 318 F. Supp. 2d 395 (S.D. Miss. 2002); *see also Chao v. Transocean Offshore, Inc.,* 276 F.3d 725, 729 (5th Cir. 2002) ("Good faith is not a defense to civil contempt; the question is whether the alleged contemnor complied with the court's order."); *Whitfield v. Pennington,* 832 F.2d 909, 913 (5th Cir. 1987) ("Intent is not an issue in civil contempt proceedings; rather, the question is whether the alleged contemnors have complied with the court's order.").

The consent decree does not bind this Court to impose a specific form of relief. The Fifth Circuit has established that, "district courts have wide discretion to enforce decrees and to implement remedies for decree violations.'" *Alcoa*, 55 F.3d at 286 (interpreting the consent decree at issue's provision "to take any action necessary or appropriate for its enforcement," to mean that the district court could impose the remedies it suggested); *see also Chisolm ex rel. CC v. Greenstein*, 876 F. Supp. 2d 709, 713 (E.D. La. 2012) (citing the Court's holding in *Alcoa* to grant the court wide discretion in consent decree enforcement).

The Fifth Circuit grants district courts "the inherent authority to enforce their judicial orders and decrees in cases of civil contempt" emphasizing that "[d]iscretion . . . . must be left to a court in the enforcement of its decrees." *Cook v. Oschsner Foundation Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977). The Fifth Circuit has also held that "[c]onsent decrees are judgments despite their contractual nature, and district courts may fashion remedies [which] need not match those requested by a party or originally provided by the court's earlier judgment." *Alcoa*, 55 F.3d at 288. (citing *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 577-79 (5th Cir. 2005)) (finding a

district court's decision to issue an injunction to prevent Defendant from pursuing a trademark to be "within the court's discretionary power" and a necessary part of its enforcement power). In fashioning remedial relief for violation of a consent decree, the Court should enter relief that is coercive or remedial in nature. *Jackson v. Whitman,* 642 F. Supp. 186 (W.D. La. 1986) (holding that the applicable jurisprudence "is clear 'that the standard to be employed in deciding whether or not to impose a compliance fine is whether such fine is necessary to "coerce the contemnor into compliance with [the] court's order.").

**1. The Consent Decree is as Court Order.**

In April 2014, this Court held the "[Settlement] Agreement . . . fully satisfies the definition of a consent decree." Order 5, 7, Apr. 25, 2014, ECF No. 50 (citing, among other sources, the consent decree itself, the plain language of 18 U.S.C. § 3626(g), and *Rowe v. Jones*, 483 F.3d 791, 795-96 (11th Cir. 2007)). Plaintiffs have satisfied this element.

**2. The County Engaged in Specific Conduct in Violation of the Consent Decree.**

To establish this prong, Plaintiffs must demonstrate specific conduct by the County in violation of the consent decree. Provisions of district court orders must be "clear in what conduct they [have] mandated and prohibited." *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 793 (5th Cir. 2013) (citing *Am. Airlines, Inc.,* 228 F.3d at 578-79) (reversing the district court's finding of contempt because defendant's actions "did not violate the injunction as drafted and reasonably interpreted"). However, a court "need not anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated." *Id.* at 792.

In this case, the parties negotiated a joint agreement with every provision of the consent

decree and re-affirmed the validity of the required remedial provisions in two subsequent joint motions to extend the consent decree. *See generally* Consent Decree 1; Am. Consent Decree 1; Settlement Agreement 1. Additionally the remedial provisions were adjudged upon the Court's initial order and thereafter upon each extension (1) to be "necessary to correct an ongoing violation" of the "federal right[s]" of detained children; (2) to "extend no further than necessary to correct the violation"; and (3) to be "the least intrusive means" by which to remedy the violation. Settlement Agreement 2; *see also* Agreed Order Granting Approval of Settlement Agreement and Certifying a Settlement Class 2 (providing that the relief ordered "falls within the range of possible relief").

The County's failure to comply substantially with the Key Provisions, including Provision 18.1 governing Plaintiffs' access to records, therefore constitutes specific conduct in violation of the Consent Decree as outlined below and summarized in Exhibit 14. Ex. 14, Summary Chart II: Rec. of Correspondence between Pls.' Counsel and the County (compiling outstanding requests for policies, procedures, and records Plaintiffs have sought pursuant to Provision 18.1).

**3. The County Has Failed to Comply with the Court's Order.**

Individual provisions of consent decrees are "independent obligations, each of which must be satisfied before there can be a finding of substantial compliance" with the entire consent decree. *Rouser v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016) (finding that the district court wrongly terminated a consent decree because the district court did not consider defendants' lack of compliance with individual provisions of the consent decree).

"'[T]he mere fact that a party may have taken steps toward achieving compliance is not a defense to a contempt charge.'" *U.S. v. City of Jackson, Miss.*, 318 F. Supp. 2d at 417 (citing *Sizzler Family Steakhouses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1534, n. 5, *reh.*

*denied*, 797 F.2d 982 (11th Cir. 1986)). A finding of substantial compliance requires more than "significant steps." *Rouser*, 825 F.3d at 1080. The "obligations contained in the Consent Decree are binding and enforceable, and Defendants may not choose to disregard them after unilaterally determining that a provision is unnecessary or undesirable." *Frew v. Hawkins*, 401 F. Supp. 2d 619, 654 (E.D. Tex. 2005).

In determining whether a party has failed to comply with a Court order so as to render it in contempt, Courts may consider whether defendants "fail[ed] to accomplish what was ordered in meaningful respects," including the scope of violations, the level of effort made to comply with the order, and the time taken to attempt to follow the order. *Ruiz v. McCotter*, 661 F. Supp. 112, 143, 144, 145, 117 (S.D. Tex. 1986) (finding Defendant in contempt for violating various provisions because (1) Defendants use of two years to comply with a provision demonstrated lack of diligence; (2) finding Defendant "procrastinated in obeying a court order requiring immediate action, a finding of contempt in this regard is compelled;"(3) taking Defendant's "tardy response to the improper housing of prisoners… coupled with its failure to address the female housing problem," as sufficient proof of "a failure to achieve substantial compliance with the relevant orders;" and (4) determining that repetition of violations indicate a lack of diligence" despite Defendant's promulgation of plan, which the Court found "lamentably defective."

Courts additionally rely on state law definitions of substantial compliance as an analogy. *Rouser*, 825 F.3d at 1082. Mississippi state courts determine whether a party is in "substantial compliance" as a "legal, though fact-sensitive, question [that] is, therefore, necessarily decided on an *ad hoc* basis." *Carr v. Town of Shubuta*, 733 So.2d 261, 265 (Miss. 1999) (interpreting the "substantial compliance" provisions of the Mississippi Tort Claims Act).

The Fifth Circuit has also held that lack of compliance occurs at the first instance of denial,

and that "an indeterminate delay has the same effect as an outright denial." *See Groome Resources Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000) (holding that a Fair Housing Act violation occurs when an individual is first denied accommodation).

While the County has failed to achieve substantial compliance with the vast majority of consent decree provisions, Plaintiffs outline the Court's power to grant the CAP relief via its contempt powers by demonstrating the County's lack of substantial compliance with the Key Provisions. The violations outlined below have continued for years despite repeated recommendations from the Monitor and his experts to implement ignored recommendations. If established, such a finding would entitle Plaintiffs to a finding of contempt and the coercive CAP remedy requested.

**i. The County Has Failed to Comply with Court Orders Regarding Plaintiffs' Access to Records and Documents (Provision 18.1)**

The consent decree contains extensive right-of-access provisions, empowering Plaintiffs' counsel to monitor consent decree compliance with broad access to "relevant documents and files maintained by Henley-Young relevant to assessing [the County's] compliance." Consent Decree 22-23 (regarding Provision 18.1). The Plaintiffs have unsuccessfully requested, at least fifteen times, revised and updated policies they are entitled to receive under this provision, which are critical to monitoring consent decree compliance. Plaintiffs requested these at the have been denied these important records more than a dozen times and denied others in aggregate as much or more. Ex. 14, Summary Chart II: Non-Compliance with Access Provision; *see* also Exhibits 15-17 and Exhibits 22-25. Plaintiffs also requested these revised and updated policies at the April and July 2018 status conferences. *See, e.g.,* Ex. 5, Status Conf. Tr. 8, Apr. 24, 2018; Ex.8, Handout from Counsel re: Requests for Assistance with Compliance, to Status Conf. Participants.

Plaintiffs were provided in October of 2017 with a current set of the facility's policies and procedures. The Monitor conducted a monitoring visit two months later, in December 2017, and in his follow-up report made recommendations for **57** substantive additions or revisions to the facility's policies and procedures. Ex. 9, Handout from Counsel re: Attachment 1: Outstanding Facility Policies, Staffing, and Training Issues; Twelfth Monitor's Report. During the April 2017 status conference, the County acknowledged updated and/or revised policies existed that Plaintiffs had not been given. Ex. 5 Status Conf. Tr. 21, Apr. 24, 2018. At the Court's request the Monitor filed a document reflecting policies under development, which covered a fraction of the recommendations made in his March 2018 report. Educ. Programming Status, May 8, 2018, ECF No. 123; Ex. 9, Handout from Counsel re: Attachment 1: Outstanding Facility Policies, Staffing, and Training Issues.

During the July 2018 status conference, Plaintiffs requested the policies again and requested weekly production of outstanding records requested under 18.1, and the Court directed the parties to confer and resolve. The County has not complied with this Court's order during the July 2018 status conference to confer and resolve outstanding policy and records requests with Plaintiffs. Ex. 18, E-Mail from Defs.' Counsel re: Responding to Judge Jordan's Requests from Status Conf. of July 25, 2018, to Defs.' Counsel (July 27, 2018). On April 24, 2018, Henley-Young advised that they had identified two policies that had been either revised or created after October 2017. In May of 2018, the Monitor filed a status report referencing new and updated policies. Educ. Programming Status, ECF No. 123, But in September 2018 the County re- forwarded a screen shot of their October 31, 2017 email to Plaintiffs regarding provision of their October 2017 policies in response to Plaintiffs' requests for the updates to the October 2017 policies, as referenced in the Monitor and experts court filing of March 2018. *See e.g.,* Ex.20, E-Mail from

Henley-Young re: Policies and Procedure Manual, to Pls.' Counsel (Sept. 18, 2018). On August 6, 2018 Plaintiffs visited the facility and offered to scan the policies and procedures on site. While able to do so for outstanding requests for class members' institutional files and records, Plaintiffs were told the County did not have any updated policies and procedures in their custody. *See, e.g.*, Ex. 19, E-Mail from Pls.' Counsel re: Pls' Counsel's Attempts to Copy Resident Files.

Plaintiffs' multiple requests for other monitoring-critical records they are entitled to under Provision 18.1 have likewise not been answered despite multiple requests. *See, e.g.,* Ex. 14, Summary Chart II: Non-Compliance with Access Provision. To remedy chronic non-compliance with Provision 18.1, Plaintiffs request a court order that the County comply with the records' compliance approach Plaintiffs outlined in its July 27, 2018, letter to the County responding to this Court's direction that the parties meet and confer to resolve the access issues, which were at the heart of the original litigation in this case. Ex. 2, Letter from Pls.' Counsel re: Responding to Judge Jordan's Requests from Status Conf. of July 25, 2018; A. Compl. Specifically, we request the following:

1. The County to provide Plaintiffs' counsel with documents, records, and files requested pursuant to Provision 18.1 within five business days.
2. The County to provide Plaintiffs' counsel by email on a weekly basis the following documents created in the regular course of business:
   a. Mental health records produced as a follow-up to incident reports.
   b. Confinement records for any type of confinement (including for events at school).
   c. Staff disciplinary records produced as a follow-up to incident reports.
   c. Files created during intake for new admits.
   d. Programming schedule for weekdays, weekends, and any variable schedule for CTAs.
   e. The psychiatrists' actual work hours (if no record is kept, then their schedule).
   f. QMHP staff members' actual work hours (if no record is kept, then their schedule).
   g. Medical staff members' actual work hours (if no record is kept, then their schedule).
   h. Any document(s) kept in the regular course indicating staff positions filled and vacant.
   i. Current roster.
   j. Current list of policies and procedures.

### ii. The County Has Ignored Repeated Recommendations Regarding the Need to Alter and Expand Facility Space to Comply with The Consent Decree

The Monitor, his experts, and the Hinds County Jail Case Monitor have identified the lack of facility space as a barrier to compliance. For more complete compilation of relevant findings and recommendations, please see Exhibit 3. Ex. 3, Summary Chart III: Monitor and Expert Findings and Recommendations re: Facility Space. Regarding the need to achieve general consent decree compliance, the Monitor has repeatedly advised that the County must "[r]enovate and redesign" the facility, and that "[b]ased on [his] review the county has made no in roads or provided any support for changes in this area." Twelfth Monitor's Report 10, Mar. 22, 2018, ECF No. 118. In March of 2018 there were only a few children tried as adults (or JCAs) at the facility, whereas now they comprise 50-75% of the facility's census. Even in March 2018, the Monitor advised, "I still continue to recommend the County proceed with the proposed renovations and additions to the existing juvenile facility." Twelfth Monitor's Report 69, Mar. 22, 2018, ECF No. 118; Eleventh Monitor's Report 11, Sept. 25, 2017, ECF No. 113 (reviewing "plans for a redesign of the existing Henley Young complex building"); *id*. at 71 ("I would also recommend that the County proceed with the proposed renovations and additions to the existing facility.").

The Monitor's education expert advises that existing facility space is "definitely inadequate," that she has "continue[d] to stress this point especially as it relates to the social studies classroom and the EES rooms." Educ. Prog. Rev. Rep. 18, ECF No. 126. The Monitor's mental health expert has advised for the "immediate" need to "[c]reate at least one 'suicide-resistant' room/cell on each unit." Mental Health Serv. Rev. Rep. 4, ECF No. 124-1. She has also reported on the lack of space for individual and group treatment, going so far as to suggesting use of "outside spaces" for individual and psychoeducational group treatment to guarantee

confidentiality. *Id*. At 13. The Monitor's medical expert has advised regarding the need for appropriate allocation of space. Henley-Young Juv. Just. Ctr. Detention Division – Med. Serv. Rev. 9, Mar. 19, 2018, ECF No. 117 (directing that "[a] designated area separate from the general population is needed to maintain youth that are recovering from acute illness and/or are actively contagious").

In her December 2017 report, the Hinds County Jail Monitor, advised with regards to the transfer of children tried as adults to Henley-Young that, compliance was "dependent" on "creation of additional program space(s)," Ex. 26, Court-Appointed Monitor's Third Monitoring Rep. at 55, *U.S. v. Hinds Cty., et al*., No. 3:16-cv-489-WHB-JCG (S.D. Miss., Dec. 11, 2017). Specifically, the Hinds County Jail monitor provided that "[c]onstructing … additional classroom, multi-purpose, and recreational programming space(s). . . will permit proper programming, classification, and supervision for all youth at Henley Young," and that "proper planning (including needed funding) for/implementation of these changes should be done as soon as possible." Ex. 26, Court-Appointed Monitor's Third Monitoring Rep. at 50-51, 55, *U.S. v. Hinds Cty., et al*., No. 3:16-cv-489-WHB-JCG (S.D. Miss., Dec. 11, 2017).

In her April 2018 report, the Hinds County Monitor advised that the County had not "address[ed] previous recommendations," including making security-related plant modifications and "constructing additional classroom, multi-purpose, and recreational programming space(s) that will permit proper programming, classification, and supervision for all youth at Henley-Young." Ex. 27, Court-Appointed Monitor's Fourth Monitoring Rep. at 48-49, *U.S. v. Hinds Cty., et al*., No. 3:16-cv-489-WHB-JCG (S.D. Miss., Apr. 18, 2018). In her August 2018 report, the Hinds County Monitor noted, "most of these recommendations were not implemented, and some projected problems that have arisen since." Ex. 28, Court-Appointed Monitor's Fifth Monitoring

Rep. at 54, *U.S. v. Hinds Cty., et al*., No. 3:16-cv-489-WHB-JCG (S.D. Miss., Aug. 1, 2018). At the most recent status conference, the Hinds County Jail Monitor provided priority recommendations to the County, including to "as soon as possible" make physical plant modifications to Henley-Young, including to "follow [through] with stated plan to add temporary/portable classroom/program space," and to "[m]ake modifications to . . . living units." Ex. 29, Handout from Elizabeth Simpson, Court-Appointed Monitor in *U.S. v. Hinds Cty., et al*. at 5, June 2018.

### iii. The County Has Failed to Comply with Key Provisions of the Consent Decree

The list below contains highlights of findings and recommendations by the Monitor and his expert which support that the County is not in substantial compliance with the 13 substantive Key Provisions. For a more complete compilation of relevant findings and recommendations, please see Exhibit 7. Ex.7, Summary Chart I: Monitor and Expert Findings and Recommendations re: 13 Key Provisions.

1. ***Provision 3.1 (Structured Programming):*** The Monitor's education expert advised the County to develop and implement an appropriate education program for all youth including the JCA population. Educ. Prog. Rev. Rep. 12, ECF No. 126. In his past three reports, the Monitor has repeated substantive recommendations to the County, including to create and update policies and procedures, to create adequate schedules, develop positive behavior management systems, and hire additional recreation staff. Twelfth Monitor's Report 25; Eleventh Monitor's Report 30; Tenth Monitor's Report 31.

2. ***Provision 4.1 (Structured Programming):*** The Monitor advised that compliance requires programming that includes the JCA population. Twelfth Monitor's Report 31. In his last

three monitoring reports, the Monitor has recommended that the County hire case management staff for compliance with this Provision. Twelfth Monitor's Report 30; Eleventh Monitor's Report 30; Tenth Monitor's Report 35.

3. ***Provision 5.1 (Individualized Treatment Plans):*** The County has not implemented the Monitor's recommendation in his last two reports that the County review "light weight residents" and "find alternative placement for them," Twelfth Monitor's Report 31; Eleventh Monitor's Report 30, nor is it "communicat[ing] with Hinds Behavioral Health and Marion Counseling to determine whether additional assistance or referrals are required." Mental Health Serv. Rev. Rep. 5, ECF No. 124-1.

4. ***Provision 5.2 (Individualized Treatment Plans):*** The Monitor's mental health expert advised that the Clinical Psychologist's hours be increased to full-time and advised that "[n]o treatment plans have yet been developed for youth to address Mental Health or Substance Use treatment at the Detention Center." Mental Health Serv. Rev. Rep. 6, ECF No. 124-1.

5. ***Provision 5.3 (Individualized Treatment Plans):*** The Monitor's mental health expert advised that she did not indicate any signs of compliance other than the existence of a policy. Mental Health Serv. Rev. Rep. 7, ECF No. 124-1. In his last three reports, the Monitor recommended that the County provide intensive training to all staff members. Twelfth Monitor's Report 33; Eleventh Monitor's Report 36; Tenth Monitor's Report 38.

6. ***Provision 5.4 (Individualized Treatment Plans):*** The Monitor's mental health expert advised that "here are no individualized treatment plans under Provision 5.2, so there are no plans to review under Provision 5.3, regarding "Multi-Disciplinary Treatment Team[s] (MTT)" meant to "discuss residents' Individualized Treatment Plan, including treatment

goals and objective, and to assess youths' progress." Mental Health Serv. Rev. Rep. 8, ECF No. 124-1.

7. ***Provision 12.1 (Medical Care):*** The Monitor and his medical expert advise that, "medical staff remain on duty at all times and that physical exams be performed on all youth within 72 hours." Twelfth Monitor's Report 53; Eleventh Monitor's Report 55; Henley-Young Juv. Just. Ctr. Detention Division – Health. Serv. Rev. 5, ECF No. 127. According to the Monitor's mental health expert, "only cursory physical exams are performed by the nurses which can result in missed health diagnoses" and the Nurse Practitioner does not perform a physical on admitted youth. Henley-Young Juv. Just. Ctr. Detention Division –Health Serv. Rev. 4-5, ECF No. 127. The Monitor advised that increased training on medication administration, and that licensed professionals review and supervise the nurses at the facility. Twelfth Monitor's Report 53; Eleventh Monitor's Report 55.

8. ***Provision 12.2 (Medical Care):*** The Monitor and his medical expert in multiple recent reports have repeated the recommendation that the County hire a qualified medical professional for nights and weekend care. Twelfth Monitor's Report 54; Eleventh Monitor's Report 56; Tenth Monitor's Report 57; Henley-Young Juv. Just. Ctr. Detention Division – Health Serv. Rev. 3, 5, ECF No. 127 (providing that "60% of youth were admitted between 8 PM and 8 AM when there was no medical staff on site; that "only registered nurses work at the facility and their hours have decreased from 8 AM – 12 AM to 8 AM – 8 PM"; and that a Nurse Practitioner is at the facility "about 4 hours weekly and only sees patients referred to her by the nurses."). The expert advises that overall nursing coverage hours be expanded rather than limited. Henley-Young Juv. Just. Ctr. Detention Division – Health. Serv. Rev. 4, ECF No. 127.

9. ***Provision 13.4 (Mental Health Care):*** The Monitor's mental health expert found that policies and procedures have been developed and implemented regarding referral services and processes, but there is no additional information regarding the extent of implementation and the County must "ensure all youth that need to be referred to the Psychiatrist for issues related to psychotropic medication are being referred in a timely manner." Mental Health Serv. Rev. Rep. 15, ECF No. 124-1.

10. ***Provision 13.5 (Mental Health Care):*** The psychiatrist is at Henley-Young for less than two hours per week, which is insufficient, and is unaware that there is a consent decree in place. Health Serv. Rev. 9, Oct. 24, 2018, ECF No. 127. The psychiatrist does not have specialized training in children or adolescents and referrals to psychiatry by the facility's Mental Health Professionals do not consistently result in psychiatry visits. Health Serv. Rev. 10, ECF No. 127; Mental Health Serv. Rev. Rep. 16, ECF No. 124-1. The psychiatrist does not communicate or collaborate with other staff, including mental health professionals, at the facility, and he is not participating in the weekly Multi-Disciplinary Treatment Team meeting. Health Serv. Rev. 9, Oct. 24, 2018, ECF No. 127.

11. ***Provision 13.6 (Mental Health Care):*** The Monitor's medical experts found there to be "a lack of coordination between the psychiatrist and counselors at the facility" and that the "contracted psychiatrist and behavioral therapist have little to no contact with the facility behavioral team workers." Henley-Young Juv. Just. Ctr. Detention Division – Health. Serv. Rev. 9, ECF No. 127. The Monitor has made repeated recommendations for development of policies and procedures, training, to obtain documentation from a mental health organization on plan of action for residents receiving mental health services, and to hire

case management staff. Twelfth Monitor's Report 57; Eleventh Monitor's Report 59; Tenth Monitor's Report 60.

12. ***Provision 14.4 (Suicide Prevention):*** The Monitor's mental health expert found that there are no "suicide-resistant rooms" on any living unit, Mental Health Serv. Rev. Rep. 19-20, ECF No. 124-1, and the Monitor advised these must be built immediately. The Monitor has recommended that the suicide prevention policy be included in the overall mental health program, and that mental health professionals assist in the development of these policies. Twelfth Monitor's Report 62; Eleventh Monitor's Report 64.

## ATTORNEYS' FEES AND COSTS

At this time, Plaintiffs seek attorneys' fees and costs necessary to compensate it for non-compliance with the records access provision of the Consent Decree, as diligent attempts to obtain basic monitoring-critical documents, such as policies, programming schedules, and records of clinicians' qualifications has been excessively burdensome. Attorneys have the authority to seek fees under 42 U.S.C. 1983 and 42 U.S.C. 1988(b), as well as under local precedent. The plain language of a consent decree also guides a Court in deciding whether or not to award attorneys' fees to a prevailing party. *U.S. v. Jackson*, 359 F. Supp.3d at 732 (awarding attorneys' fees to plaintiffs due to the consent decree's explicit remedial provision empowering the court to "impose *any remedy authorized by law or equity, including* but not limited to an order … awarding any damages, *costs and/or attorneys' fees*) (emphasis in the original). Fees must be "directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title . . . ." 42 U.S.C. § 1997e(d)(1)(A). The fees must also be "directly and reasonably incurred in enforcing the relief

ordered for the violation." *Id*. at (d)(1)(B)(ii). Additionally, Courts have the discretion to award attorneys' fees in order to enforce its own decrees. *Oschsner Foundation Hosp.*, 559 F.2d at 272 (holding that granting attorneys' fees in civil contempt hearings is reasonable to enforce compliance with a court order or to compensate for losses or damages incurred due to non-compliance).

Should the Court determine an award of attorneys' fees and costs are an appropriate remedy, Plaintiffs will submit a motion for fees and affidavits forthwith, including after any hearing on this motion. This Court ordered at the close of the 2014 contempt proceedings that, if "the County fails to make adequate progress, then Plaintiffs may file a properly supported motion seeking their attorneys' fees associated with efforts to enforce the Agreement." Order at 7, ECF No. 50.

## **CONCLUSION**

The weight of evidence supports that this Court can and should grant Plaintiffs' request for (1) a two-year extension of the consent decree; (2) an order regarding compliance with 18.1; and (3) an order requiring the necessary, narrow, and tailored affirmative relief of CAP development, with Plaintiffs' input, pursuant to (a) the Court's express enforcement powers contained within the consent decree; and/or (b) the Court's inherent power to order coercive remedies to effectuate a consent judgement pursuant to a finding of contempt.

Respectfully submitted, this the October 31, 2018.

By: /s/ Paloma Wu

SOUTHERN POVERTY LAW CENTER
Jody E. Owens, II (Miss. Bar No. 102333)
Paloma Wu (Miss. Bar No. 105464)
111 East Capitol Street, Suite 280
Jackson, MS 39201
(601) 948-8882
Jody.Owens@splcenter.org
Paloma.Wu@splcenter.org

*Attorneys for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Paloma Wu, hereby certify that a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all parties by the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

SO CERTIFIED, this 31st day of October, 2018.

/s/ Paloma Wu
Paloma Wu (Miss. Bar No. 105464)