# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

J.H. AND
DISABILITY RIGHTS MISSISSIPPI,

    Plaintiffs,

       v.

HINDS COUNTY, MISSISSIPPI,

    Defendant.

Civil Action No.
3:11-cv-327-DPJ-FKB

## PLAINTIFFS' REPLY TO DEFENDANT'S MOTION TO TERMINATE, OR, ALTERNATIVELY, MODIFY CONSENT DECREE

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 5

LEGAL STANDARD.......................................................................................................... 9

THE COURT SHOULD DENY DEFENDANT'S MOTION ..................................................... 11

I.    The Consent Decree is an Unexpired Current Court Order ............................................. 11

II.   The Consent Decree Remains Necessary to Remedy Ongoing Constitutional  Violations12

A.   Defendant Permits Direct Care Staff to Use Force Without Adequate Supervisory
Oversight and Training.................................................................................................... 13

B.   Defendant Fails to Offer Required Structured, Rehabilitative, Recreational and
Educational Programs to Reduce Cell Confinement. ............................................................ 16

C.   Defendant Fails to Integrate Structured/Rehabilitative Programming with Coordinated
Medical/Mental Health Services. ...................................................................................... 18

III.  Hinds County's Longstanding, Current, and Ongoing Violations of Plaintiffs' Federal
Rights Have Consequences. ................................................................................................ 19

A.   Defendant's Violations of Plaintiffs' Federal Rights is Longstanding, Current, and
Ongoing. ....................................................................................................................... 19

B.   Defendant's Failures Increase the Substantial Risk of Serious Harm to Vulnerable and
Disabled Children. .......................................................................................................... 20

CONCLUSION.................................................................................................................... 25

# INTRODUCTION

Plaintiffs J.H. and Disability Rights Mississippi ("Henley-Young Plaintiffs") respectfully submit this memorandum of law in opposition to Defendant's, Hinds County Board of Supervisors ("Hinds County"), Motion to Terminate, or, Alternatively, Modify, the Extended Third Amended Consent Decree[1] ("Defendant's Motion") pursuant to the termination provision of the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626(b)(1). Defendant's Motion, ECF No. 173.

This class action concerns the denial of the rights of children confined in Hinds County's youth detention facility, many of whom have disabilities and serious mental health care needs.[2] Henley-Young Plaintiffs are (1) a class of all children confined at Henley-Young Juvenile Justice Center ("Facility");[3] and (2) Disability Rights Mississippi.[4]

In 2011, Henley-Young Plaintiffs sued Hinds County alleging violations of residents' Eighth and Fourteenth Amendment rights and of federal laws protecting persons with disabilities.[5] Henley-Young Plaintiffs and Hinds County agreed to enter a Consent Decree in March of 2012. It was extended in April of 2014; amended and extended in March of 2016; amended and extended in March of 2018; amended and extended in April of 2019; and most recently extended by agreement of the parties in April 2021 for two years (*i.e.*, up to and including March 28, 2023).[6]

---

[1] *See* Order Extending Third Amended Consent Decree ("Order"), Apr. 2, 2021, ECF No. 160; Ext. Third Am. Consent Decree ("Consent Decree"), Apr. 2, 2021, ECF No. 161.

[2] *See* Am. Compl., Jun. 6, 2011, ECF No. 6 at 14 (alleging that "[a] significant number" of facility residents "live with disabilities," and that "60–70% of youth in [] Henley-Young require mental health services").

[3] *See* Agreed Order Granting Approval of Settlement Agreement and Certifying a Settlement Class, Mar. 28, 2012, ECF No. 32 at 2 (defining the settlement class as "all children who are currently, or who will in the future be, confined" at Henley-Young).

[4] *See* Am. Compl., Jun. 6, 2011, ECF No. 6 at 12-14. Disability Rights Mississippi ("DRMS") is Mississippi's federally-designated Protection and Advocacy system and Henley-Young is a covered facility. 42 U.S.C. §§ 10801 *et seq.*; 42 U.S.C. §§ 15001 *et seq.*

[5] *Id.* at 19-21 (providing the causes of action, Counts I through V).

[6] The Extended Third Amended Consent Decree "includes a Corrective Action Plan ("CAP") that requires

Each time this agreement between the parties was extended, and/or amended and extended, Henley-Young Plaintiffs and Hinds County stipulated that (1) "the remedies contained in this document are necessary to correct an ongoing violation of a federal right, extend no further than necessary to correct the violation of federal right, and that the prospective relief is narrowly drawn and is the least intrusive means to correct the violations;" and (2) "the Court will retain ongoing jurisdiction over this [agreement] for purposes of enforcement, pursuant to the terms of the Prison Litigation Reform Act."[7] Consent Decree at ¶¶ 3-4. In 2021, the parties again agreed that "[a]ll provisions of this Extended Third Amended Consent Decree shall be interpreted to be consistent with this intent." *Id*. at ¶ 3.

The parties agreed to an extension of the Third Amended Consent Decree after the October 2020 Joint Expert Report to the Court ("Report")[8] revealed that 35 out of 39 Consent Decree Provisions (nearly 90%) require corrective action where the Facility was "[w]ithout a fully functioning, comprehensive juvenile justice pre-and in-service training program" in violation of Provision 16.5.[9] Since the extension of the Consent Decree in April 2021, continued understaffing and chronic staff turnover[10] has adversely impacted Hinds County's progress in implementing

Defendants to engage Expert Anne Nelsen to provide technical assistance and verify implementation of all Consent Decree provisions at Henley-Young Juvenile Justice Center." Order, Apr. 2, 2021, ECF No. 161 at 1.

[7] Consent decrees which remedy constitutional violations in conditions cases must comply with the Prison Litigation Reform Act (PLRA). *See* 18 U.S.C. § 3626 (a)(1)(A); *see also Ruiz v. Estelle*, 161 F.3d 814, 817 (5th Cir. 1998). The Consent Decree's provisions comply with the PLRA because they remain necessary to remedy ongoing violations of the federal rights of vulnerable and disabled children detained at the Facility.

[8] Joint Expert Anne Nelsen's Report (Dated 10/21/2020), was submitted to the Court on Oct. 21, 2020.

[9] Third Am. Consent Decree, Apr. 3, 2019, ECF No. 145 at 18-19.

[10] Facility Director Fernandeis Frazier resigned on January 3, 2022, following a weekend in which several residents attempted self-harm (according to Facility incident reports). Former Interim Hinds County Sheriff Marshand Crisler was appointed Interim Director of the Facility by the Hinds County on January 4, 2022. *See* Anthony Warren, *Former sheriff to be interim director of Henley-Young Juvenile Justice Center*, WLBT (Jan. 4, 2022); https://www.wlbt.com/2022/01/04/former-sheriff-be-interim-director-henley-

training mandated by the Consent Decree for new and veteran staff. As a result, Hinds County has yet to complete all required training for each Consent Decree provision.[11] Additionally, the internal Quality Assurance review process for the Facility's written and revised policies, procedures and tools remains incomplete because training is incomplete.[12]

In addition to the lack of required staff training, continued understaffing and chronic staff turnover adversely limit both structured/rehabilitative programming and coordinated medical/mental health services[13] which results in Plaintiffs being subjected to cell confinement[14] and substantial risk of serious harm[15] in violation of the Consent Decree.

---

young-juvenile-justice-center.

[11] *See* Provisions 20.4 (Measuring Progress) and 20.5 (Benchmark and Needs). Consent Decree at 23-24. Pursuant to the CAP, the last training update to Table 2 was submitted to the Court in January 2022. The extremely limited training offered by the Facility throughout 2020 and 2021 continues to be inadequate due to continued chronic vacancies and severe understaffing.

[12] *See id.* At the time Plaintiffs' filed its Motion for an Order to Show Cause in March 2022, ECF No. 170, only 3 of 39 Quality Assurance ("QA") reviews for Consent Decree Provisions had been completed since October 2021. Most QA reviews were out of date (16 reviews in early/mid 2021; 14 reviews had not been updated since 2020; 1 review had not been updated since 2019). Additionally, there were 7 Provisions for which no QA review had ever been completed (Provisions 1.3 (Prescription Medications), 5.1 (Residents Access to Adequate Rehabilitative Services), 5.3 and 5.4 (Treatment Plans), 13.2 (Residents and Psychotropic Medications), 13.3 (Within 72 Hrs. of Admittance Complete an Individualized MH Treatment Plan), and 13.6 (Sufficient Psychiatric Services)).

[13] Because of chronic staffing shortages, Defendant fails to "ensure that there are sufficient numbers of adequately trained direct care and supervisory staff to supervise youth safely, protect youth from harm, allow youth reasonable access to medical and mental health services, and allow youth adequate time to participate in out-of-cell activities" in clear violation of Provision 2.1 (Staffing and Overcrowding). Consent Decree at 5-6. *See generally* Facility Reports (redacted), ECF Nos. 170-1, 170-2, 170-3, 170-4, 170-5, 170-6, 170-7.

[14] *See id.* Hinds County has also failed to demonstrate progress toward unmet needs in programming, behavior management, medical treatment, and mental health treatment. Multiple Consent Decree provisions mandate daily, structured, rehabilitative, educational and/or recreational programming, including evening and weekend/holiday activities. *See id.* at 6-9, 17 (Provisions 3.1 (Cell Confinement), 4.1 (Structured Programming), 5.5 (Individualized Treatment Plans/Programs), 16.2 (Large Muscle Exercise)). As a result, there has been an increase in the use and misuse/overuse of Emergency Behavior Management Confinement.

[15] The substantial risk of serious harm to Plaintiffs increases where residents are not receiving the full scope of integrated support in violation of Provisions 5.1-5.6 (Individualized Treatment Plans/Treatment Program for Post-Disposition Youth), 12.1-12.6 (Medical Care), 13.1-13.6 (Mental Health Care), and 14.1-14.3

Defendant filed the instant Motion and accompanying Memorandum[16] pursuant to the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626, which makes the Consent Decree terminable unless the Court "makes written findings based on the record that [the] prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." *Id.* § 3626(b)(3). Defendant also argues, in the alternative, that two particular portions of the Consent Decree should be modified – the Corrective Action Plan ("CAP") and the 32-resident limit – pursuant to 18 U.S.C. §§ 3626(b)(3), 3626(b)(4) and Federal Rule of Civil Procedure 60(b)(5).

The Court should deny Defendant's Motion because Hinds County continues to expose vulnerable and disabled children to a substantial risk of serious harm in violation of their federal rights; and the Consent Decree's provisions designed to remedy these "current and ongoing" constitutional violations comply with the PLRA's requirement that they remain "necessary" and are "narrowly drawn and the least intrusive means" to protect the Plaintiffs. 18 U.S.C. § 3626(b)(3).

Additionally, where Hinds County seeks to modify the Consent Decree but cannot meet its burden of establishing a "change in fact or in law warranting modification" – and its "proposed modification" of eliminating both the CAP and the 32-resident limit is not "suitably tailored to the changed circumstance" where such a modification would "create or perpetuate a constitutional violation," *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 391 (1992) – Defendant's motion should be denied. *Id.* at 385 ("modification should not be granted where a party relies upon events

---

(Suicide Prevention). *See id.* at 8-9, 13-17.

[16] Defendant's Memorandum of Law in Support of Motion to Terminate, or, Alternatively, Modify, the Extended Third Amended Consent Decree ("Defendant's Memo"), ECF No. 174.

that actually were anticipated at the time it entered into a decree" (citing *Ruiz v. Lynaugh*, 811 F.2d 856, 862 (5th Cir. 1987) ("At the time it entered into the Crowding Stipulation TDC foresaw increased admissions and population; those events have occurred. It is clear that TDC cannot now successfully contend that those changes merit relief."))).

## **BACKGROUND**

It has been ten years since Henley-Young Plaintiffs and Defendant negotiated a "'Settlement Agreement' (later determined by the district court to be a consent decree)" in acknowledgment of "the best interests of all parties to resolve this matter amicably without further litigation and cost to the taxpayers of Hinds County, Mississippi." Consent Decree at 1. In 2021, the parties reaffirmed the Consent Decree's provisions as necessary to remedy ongoing violations of the federal rights of vulnerable and disabled children by extending all its terms for an additional two years. *Id*. Hinds County "acknowledge[d] that more time is necessary to reach substantial compliance in all areas governed by the Consent Decree." Order, Apr. 2, 2021, ECF No. 161 at 1.

When the Consent Decree was negotiated, the parties also agreed that its "implementation and interpretation" would be in alignment with the "primary purposes of Mississippi's juvenile justice system," which are "rehabilitation and individual treatment rather than retribution." Provision 19.1 (Compliance, Enforcement, Dismissal), Consent Decree at 21-22 (quoting *Buck v. State*, 838 So. 2d 256, 260 (Miss. 2003) (internal quotations and citation omitted)). The parties also reiterated their commitment to protecting the children of Hinds County by outlining in Provision 19.1 that "[t]he same principle that guides the interpretation of Mississippi's Youth Court Act shall guide the implementation of this Extended Third Amended Consent Decree." *Id*. (quoting Miss. Code Ann. § 43-21-103 ("when it is necessary that a child be removed from the control of such child's parents, the youth court shall secure proper care for such child")). The

parties likewise acknowledged Hinds County's responsibility for the safety of its young people where the Mississippi Supreme Court has held that "[i]nherent in [Mississippi's Youth Court Act] is the protection and care of children in trouble and the rehabilitation of those gone astray." *Id.* (quoting *Helmert v. Biffany*, 842 So.2d 1287, 1291 (Miss. 2003)).

In September 2017, to come into compliance with another settlement agreement, Defendant chose to house children who are members of the Plaintiffs' class in *United States v. Hinds Cnty. et al.,* No. 3:16-cv-489- CWR-RHWR (S.D. Miss., June 23, 2016) ("DOJ Case") at the Facility.[17] During an April 2018 status conference, Court Appointed Monitor Leonard Dixon and the parties confirmed these children as equal class members in this case.[18] Mr. Dixon also confirmed for the Court and the parties that because JCAs are detained long-term, Hinds County must modify its Facility programming to accommodate the long-term needs of vulnerable and disabled youth.[19] *See, e.g.*, Status Conf. Tr., Apr. 24, 2018, ECF No. 131-5 at 37:4-20.

In 2019, the parties agreed to suspend the independent oversight of Mr. Dixon in favor of *more targeted technical assistance* through a Corrective Action Plan ("CAP"), whereby Hinds County engaged Joint Expert Anne Nelsen[20] to verify implementation of all Consent Decree

---

[17] Plaintiffs in the DOJ Case are also referred to as juveniles charged as adults ("JCAs").

[18] *See, e.g.*, Status Conf. Tr., Apr. 24, 2018, ECF No. 131-5 at 4:5-17 ("[T]he [post-disposition] population is a proxy for long-term resident, and CTA is our long-term resident. They are anticipated to have a length of stay of between nine months to two years."), 11:1-7 ("[j]uveniles have access to structured education" and "medical care" and "case managers and mental health personnel"), 16:10-11 ("Speaking of the JCA population as equal class members, we absolutely agree they are equal class members.").

[19] In January 2019, Mr. Dixon's last and Thirteenth Monitoring Compliance Report to the Court ("Monitoring Report") reaffirmed the need to address "[t]hese [] living breathing individuals with a variety of multifaceted problems that were not addressed prior to them arriving at [the Facility]" by recommending that Hinds County "develop[] stronger mental health and education systems." Thirteenth Monitoring Rep., ECF No. 140 at 8. Two of Mr. Dixon's repeated suggestions included hiring a full-time clinical psychologist and working with the school district to incorporate all Plaintiffs (including the JCAs) into the Facility's daily education program. *See id.* at 8-10.

[20] In 2017, Mr. Dixon cited the *Desktop Guide for Good Juvenile Detention 2015* in his recommendations to Hinds County for the development and maintenance of a data collection system "to show that the facility is substantially meeting goals and identify areas for improvement." Eleventh Monitoring Rep., Sep. 25,

provisions in timed phases. *See* Provisions 17.1-17.7 (Independent Monitor), Consent Decree at

18-20; Provisions 20.1-20.10 (2019-2023 Corrective Action Plan), Consent Decree at 23-26. The

parties agreed to an extension of the Third Amended Consent Decree after the Report revealed that

35 out of 39 Consent Decree Provisions (nearly 90%) required corrective action before the Facility

could be deemed substantially compliant with the Consent Decree.[21] Ms. Nelsen's compliance

ratings offered three sets of proposed dates as potential end points for Hinds County to satisfy its

obligations and responsibilities to the Plaintiffs. Because the County made little progress in the

first year of the pandemic, the parties agreed to extend the CAP in April 2021. However, over the

last year, progress has stalled (again).[22]

      For example, where Defendant has written or revised policies, procedures, and tools for all

---

2017, ECF No. 140 at 12 ("a good quality assurance [QA] program" will "report on compliance trends for confinements, staffing and other detention standards"). QA review is incorporated in both Section V of the Consent Decree and the CAP (Provisions 20.5, 20.7). As outlined in Mr. Dixon's last two Monitoring Reports, as it specifically relates to Provision 5.6, the purpose of QA is to consistently assess the quality and adequacy of the services being provided in the Consent Decree; evaluate the performance of staffing or vendors providing such necessary services; and address any identified deficiencies which create a substantial risk of serious harm where those services needed to protect the federal rights of vulnerable and disabled children fall short. *See* Monitor's Thirteenth Rep., ECF No. 140 at 33-35; *see also* Monitor's Twelfth Rep., ECF No. 118 at 35-37. Incidentally, Ms. Nelsen is a content advisor and contributing author for the *Desktop Guide*. *See* Nat'l P'ship for Juv. Serv. and Off. of Juv. Just. and Delinq. Prev., *Desktop Guide to Quality Practice for Working with Youth in Confinement*, https://info.nicic.gov/dtg (last visited Apr. 18, 2022).

[21] *See* note 8, *supra*.

[22] As in 2019, Defendant continues to suggest that local political parameters should serve as limiting factors to its federal constitutional duties to vulnerable and disabled children where it argues that the 32-resident limit "place[s] an inordinate amount of pressure" on Hinds County, Defendant's Memo at 6, without offering any solutions specifically tailored to address its allegations. For example, nearly three years ago, Defendant argued in the DOJ case that "any JCA not tried within 270 days should have a hearing off the record as to why that youth should remain in custody" because "Henley Young has housed youth in excess of 365, 400 and 500 days." Hinds County's Response for an Order to Show Cause, DOJ Case, ECF No. 36 at 14 ("It is ridiculous to expect the County to feed, clothe, educate and provide counseling and healthcare for two to three or more years of an individual under the age of 18. Henley Young cannot be the social safety net for society's failings.") Now, in 2022, inside an ongoing pandemic, Hinds County is suggesting that the Facility – without citing anything more than bed capacity – can solve the issues of the "free world." Defendant's Memo at 6.

Consent Decree provisions pursuant to Phase One and Phase Two of the CAP,[23] but has yet to complete all required training for each Consent Decree provision as required by Phase Three[24] – and the internal review process for the written and revised policies, procedures and tools remains incomplete because training is incomplete[25] – Phase Four of the CAP has yet to begin.[26]

The Consent Decree is a current and valid court order which requires implementation and sustained substantial compliance for Defendant to fulfill its constitutional obligations to the youth of Hinds County. *See* Order, Apr. 2, 2021, ECF No. 161. The Consent Decree's provisions comply with the PLRA because they remain necessary to remedy ongoing violations of the federal rights of vulnerable and disabled children detained at the Facility. Defendant's Motion should be denied.

---

[23] Table 1 was submitted to the Court and incorporated by reference (Attach. 1) in the Consent Decree. *See also* Provisions 20.3 (Goals and Timeline), Consent Decree at 23.

[24] *See id.* Pursuant to Table 1, Defendant is not in compliance with Phase Three: Training and Internal Review Process (Oct. 2019 – Jun. 2021); *see also* Consent Decree at 23-24 (Provisions 20.4 (Measuring Progress) and 20.5 (Benchmarks and Needs)).

[25] *See* note 11 and note 12, *supra*.

[26] At the time the Consent Decree was extended in April 2021, it was Henley-Young Plaintiffs' understanding that former Facility Director Fernandeis Frazier was re-hired – following an extended period where the Facility was without executive leadership – to support Hinds County in achieving compliance by March 2023. In September 2021, in recognition of the Facility's sustained leadership, the hiring of a permanent and full-time Treatment Coordinator, and the CAP's express purpose to deprioritize (1) "the need for subject-matter monitoring" and (2) "the County's progress according to its implementation of recommendations made by the monitor or subject-matter experts in this case," Henley-Young Plaintiffs retained Dr. Monique Marrow Khumalo to support Ms. Nelsen and Hinds County with "conclusively finalizing: (a) all policies, procedures, and tools required to implement procedures; (b) a self-sustaining training program; and (c) an internal review program ("QA")." Consent Decree at 24-25 (Provision 20.7). Dr. Monique Khumalo is a clinical child psychologist and juvenile justice consultant who is one of the co-authors of the *Youth in Custody Practice Model*, a program of the Center for Juvenile Justice Reform at Georgetown University. *See* Center for Juvenile Justice Reform at Georgetown University, *Youth in Custody Practice Model*, https://cjjr.georgetown.edu/our-work/youth-in-custody-practice-model (last visited Apr. 18, 2022). Mr. Dixon repeatedly cited the need for the additional support of a clinical psychologist "to ensure the full development of the mental health program and the needs of the youth at Henley Young are being addressed appropriately and professionally." Eleventh Monitoring Rep., Sep. 25, 2017, ECF No. 140 at 13; *see also* Monitor's Twelfth Rep., ECF No. 118 at 9; Monitor's Thirteenth Rep., ECF No. 140 at 8-10.

## LEGAL STANDARD

The Fifth Circuit has confirmed that the "PLRA provides three methods for terminating such consent decrees: (1) the passage of time, 18 U.S.C. § 3626(b)(1)(A); (2) agreement by the parties, 18 U.S.C. § 3626(b)(1)(B); or (3) 'if the relief was approved or granted in the absence of a finding by the court that [it was] narrowly drawn, extend[ed] no further than necessary to correct the violation of the Federal right, and [was] the least intrusive means necessary to correct the violation', 18 U.S.C. § 3626(b)(2), *unless* 'the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation' of a federal right (ongoing violation), and that, consistent with subpart (b)(2) above, the relief is narrowly drawn, extends no further than necessary, and is the least intrusive means, 18 U.S.C. § 3626(b)(3)." *Guajardo v. Texas Dep't of Crim. Just.*, 363 F.3d 392, 394 (5th Cir. 2004).

A "current and ongoing" violation is one that "exists at the time the district court conducts the § 3626(b)(3) inquiry." *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 353 (5th Cir. 2001) (citations omitted). Nonetheless, the Court should consider more than a limited snapshot to provide an "appropriate factual foundation" and "reference point" to help establish "current and ongoing" constitutional violations at the Facility. *Depriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *8-9 (S.D. Miss. June 10, 2015) ("to get a complete picture of the prison's ability to demonstrate that it has and can substantially comply with the agreement it crafted jointly with the Plaintiffs and that no current and ongoing violations exist, evidence beyond the six-month period advocated by the Defendant is probative").

Hinds County has not demonstrated a commitment to achieving substantial compliance with all Consent Decree Provisions since ordered to do so by the Court in April 2021. Instead, it seeks to highlight (1) newly appointed leadership, still within its first quarter in 2022; (2) the

Facility's physical plant, which remains deficient to meet the structured/rehabilitative programming and coordinated medical/mental health needs of the Facility's current average daily population regardless of the Facility's bed capacity (which has not changed since the Consent Decree was first entered in 2012); (3) the 32-resident limit, which was both recommended and continued by the Court's monitor, Leonard Dixon, before (2014) and after (2017) Hinds County chose to house JCAs at the Facility; and (4) the existence of policies, procedures, and tools without having actually met any benchmarks or satisfied any needs as outlined in Provision 20.7 of the CAP as a basis for the instant Motion.[27]

For example, in November 2019, pursuant to Provision 20.7 of the CAP, the Court ordered Hinds County to "select an approach to address the need for additional programming space within 90 days" and "adequately address anticipated increased staffing needs, if any, associated with additional programming space." Order to Address the Need for Additional Space, ECF No. 147 at 1. In February 2020, Hinds County recognized its "institutional challenges and insufficient and improper personnel" to meet the educational and mental health needs of vulnerable and disabled children detained in the Facility. Hinds County's Response to Order to Address the Need for Additional Space, ECF No. 150 at 2-3. Specifically, Defendant cited hiring architectural and construction firms "to accommodate the directives of this Court and potential changes to

---

[27] Where Hinds County's "solution" to any increase in the JCA population (80-bed capacity), *see* Defendant's Memo at 6, would potentially result in more overcrowding and the use of the second tier at the Facility, Defendant increases the substantial risk of serious harm in an already understaffed and under-resourced environment. Recent Facility Reports demonstrate Defendant's ongoing violations of Provision 2.1, where required staffing ratios are woefully deficient given the current average resident populations. *See generally* Facility Reports (redacted), ECF Nos. 170-1, 170-2, 170-3, 170-4, 170-5, 170-6, 170-7. For example, where Defendant eliminated positions in 2021 to provide staff raises, Hinds County does not address Mr. Dixon's prior concerns for the need for more staffing if the Facility's population exceeds the 32-resident limit. *See generally* Ninth Monitor's Rep., Jan. 27, 2016, ECF No. 61 at 9 ("with the increase in population the facility must hire the agreed upon staffing recommended in the initial report"), 30-32 ("The population at times has moved to 50+ residents which means that the original 91 staff must be hired.").

programming at the [Facility]." *Id*. at 3. However, the fact that the modular units installed in July 2020 in response to the Court's 2019 Order remain inoperable in 2022 for lack of adequate and adequately trained staff belies Hinds County's assertions that it has "complied with requirements central to the CAP" in its brief, Defendant's Memo at 14, and clearly supports Henley-Young Plaintiffs' position that the Consent Decree remains necessary to remedy multiple current and ongoing violations of Plaintiffs' federal rights.[28] Defendant's Motion should be denied.

## THE COURT SHOULD DENY DEFENDANT'S MOTION

### I.  The Consent Decree is an Unexpired Current Court Order

In April 2021, with agreement of the parties, the Court entered an order *sua sponte*, extending the Third Amended Consent Decree for two years. *See* Order, Apr. 2, 2021, ECF No. 161. In August 2021, the Court reiterated the Consent Decree as an order and its authority to enforce it. *See* Order, Aug. 16, 2021, ECF No. 165. It is undisputed that the Consent Decree – which is in effect until March 28, 2023 – "remains the operative consent decree today." *See* Defendant's Memo at 7. As a result, Hinds County incorrectly asserts that the Consent Decree is terminable, pursuant to § 3626(b)(1)(A)(i), where, notwithstanding amendments to the parties' agreement – which eliminated provisions for which Defendant maintained and sustained compliance – Hinds County remains under an enforceable judicial order. *See United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998); *see also Frew ex rel. Frew v. Hawkins*,

---

[28] *See generally* Individuals with Disabilities Act, 20 U.S.C. §§ 1400, et seq.; Prison Rape Elimination Act, 34 U.S.C. §§ 30301, et seq.; Prison Rape Elimination Act Standards for Juvenile Facilities, 28 C.F.R. §§ 1153.311-115.393). Two regulations which govern required staffing are 28 C.F.R. § 1153.311(a): "The agency shall ensure that each facility it operates shall develop, implement, and document a staffing plan that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect residents against sexual abuse; and 28 C.F.R. § 1153.311(c): "Each secure juvenile facility shall maintain staff ratios of a minimum of 1:8 during resident waking hours and 1:16 during resident sleeping hours, except during limited and discrete exigent circumstances, which shall be fully documented. Only security staff shall be included in these ratios."

540 U.S. 431, 437 (2004).

## II.     The Consent Decree Remains Necessary to Remedy Ongoing Constitutional Violations

The Eighth Amendment prohibits "cruel and unusual" conditions of confinement which place prisoners at excessive risk illness or injury. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *see also Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). Pre-trial detainees are entitled to even greater constitutional protections where, under the Fourteenth Amendment, he/she/they "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Specifically, where detention center conditions are imposed with an intent to punish its residents or are not reasonably related to a "legitimate governmental purpose" (such as excessive use of force or cell confinement solely for staff convenience), such detention violates residents' due process rights. *Bell*, 441 U.S. at 538-40. Additionally, where "pretrial detainees' rights" under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner," *Hare v. City of Corinth*, 74 F.3d 633, 649 (5th Cir. 1996) (en banc) (citation omitted), Hinds County must comply with the Eighth Amendment. Therefore, the United States Constitution requires Defendant to "provide humane conditions of confinement" and to "take reasonable measures to guarantee the safety of the [children in their custody]." *Farmer*, 511 U.S. at 832 (citation omitted).

Defendant violates the Eighth Amendment Constitution when (1) facility conditions subject youth to a "substantial risk of serious harm," and (2) Defendant is deliberately indifferent to that risk. *Id.* at 511 U.S. 825, 834 (1994); *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

Regarding the first element, the court determines whether objectively serious conditions pose a substantial risk of serious harm. *Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294,

298 (1991). The Fifth Circuit's test requires "extreme deprivation" of the "minimal civilized measure of life's necessities." *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (citations omitted). The court measures "extreme deprivation" against "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958); *see also Wilson v. Lynaugh*, 878 F.2d 846, 848 (5th Cir. 1989). In the Fifth Circuit, courts should consider the "totality of conditions" in making this determination. *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986) (citing *Ruiz v. Estelle*, 679 F.2d 1115, 1139 (5th Cir. 1982)).

For the second element, Defendant must also act with "deliberate indifference" toward those conditions. *Farmer*, 511 U.S. at 834. Deliberate indifference requires a showing that detention center officials: (1) are actually aware of "an excessive risk to inmate health or safety" or should have noticed a risk that was obvious, *Farmer*, 511 U.S. at 837; *see also Blackmon v. Garza*, 484 F. App'x 866, 873 (5th Cir. 2012); and (2) disregard that risk, *Farmer*, 511 U.S. at 837; *accord Williams v. Hampton*, 797 F.3d 276, 280-82 (5th Cir. 2015) (en banc). Conditions may result in a constitutional violation "'in combination' when each would not do so alone" where they have a "mutually enforcing effect" that results in the deprivation of a basic human need. *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (quoting *Wilson*, 501 U.S. at 304).

A.    **Defendant Permits Direct Care Staff to Use Force Without Adequate Supervisory Oversight and Training.**

Inadequate training can lead to the inappropriate use of force. Although the Eighth Amendment "does not mandate comfortable prisons," *Farmer*, 511 U.S. at 832, appropriate training is essential to ensure that Facility staff do not subject vulnerable and disabled children to excessive force, where "pretrial detainees (unlike convicted prisoners) cannot be punished at all." *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2014) (internal quotations and citations omitted).

13

In addition to chronic understaffing[29] and chronic staff turnover,[30] Hinds County continues to allow new employees to work with Plaintiffs without "ensur[ing] that there are sufficient numbers of adequately trained direct care and supervisory staff to supervise youth safely, protect youth from harm, allow youth reasonable access to medical and mental health services, and allow youth adequate time to participate in out-of-cell activities" in clear violation of Provision 2.1 (Staffing and Overcrowding).[31]   Joint Expert Anne Nelsen has repeatedly cited Defendant's pattern and practice of placing new staff into direct contact with vulnerable and disabled children without training and/or supervision as the primary cause of recent serious incident reports:[32]

- On February 19, 2022, a JCA was subjected to use of force (CPI holds[33] and hand/leg restraints) after he was observed smoking marijuana on the recreation yard.

- On February 3, 2022, another JCA was subjected to use of force (CPI holds and hand/leg restraints) in the midst of his attempt to use the grievance process to report that direct care staff had supplied him with marijuana (which was later surrendered to mental health staff when requested).

---

[29] During a Progress Call on September 9, 2021, the Facility announced the elimination of 7 direct care positions and Hinds County's intent to redirect those expenses to provide pay increases to remaining staff.

[30] *See* note 10, *supra*.

[31] Consent Decree at 5.

[32] The Facility emails a roster with weekly incident reports to Henley-Young Plaintiffs and Anne Nelsen on Monday mornings. The Facility began adding shift reports to those weekly emails in April 2021. These functions of the CAP are necessary to apprise the Court of constitutional violations, and to facilitate effective oversight of the Consent Decree. *See Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1283 (M.D. Ala. 2019).

[33] Upon information and belief, the Facility uses Crisis Prevention Institute ("CPI") control position escorts/holds when verbal de-escalation is unsuccessful.

- On January 7, 2022, in an incident involving several residents, it is documented that at least two untrained direct care male staff physically restrained youth.[34] Additionally, a responding Hinds County Sheriff's Deputy struck a child in his cell.

- In December 2021 and January 2022, direct care staff used keys, a belt, and a chair in applying force against residents which resulted in serious harm and physical injury.

- Over New Year's weekend 2021, direct care staff distributed medication without knowledge of the Nurse and placed residents on Precautionary Status (suicide watch requiring constant supervision) without knowledge of the Treatment Coordinator.

- In November 2021, direct care staff intentionally left female residents alone on the unit to engage in sexual activity together.

- In October 2021, a male resident reported being sexually assaulted by another resident hours after it happened because direct care staff on the unit at the time of the incident failed to either stop or promptly report the abuse.

- In Spring 2021, during an interview, Henley-Young Plaintiffs learned the details of a January 27, 2021, incident involving pornographic contraband introduced into the Facility by direct care staff. Upon information and belief, that staff member was terminated. However, it remains unclear over a year later whether a full investigation was ever completed. This incident was also especially troubling where Henley-Young Plaintiffs subsequently received documentation of an incident reported on June 4, 2021, which involved two male JCAs reporting inappropriate remarks of a sexual nature directed towards them by female direct care staff.

---

[34] Upon information and belief, a CPI training log provided to Anne Nelsen on January 11, 2022, indicated that 15 of 38 direct care staff (including 1 supervisor) were uncertified, including two male staff cited in the incident report.

Hinds County has not provided Ms. Nelsen with all specifically requested information regarding the above referenced incidents – including full investigations. Instead, Defendant has stated that, in some cases, notifying law enforcement and Child Protective Services absolves Hinds County of the need to take any further action. Henley-Young Plaintiffs have no verification of the initiation and/or results of any investigation(s) involving these serious incidents (which include issues governed by the Prison Rape Elimination Act (PREA)) and information received to date primarily continues to only be revealed through other sources.[35] These events continue to raise ongoing concerns where leadership changes and severe understaffing endanger the safety and security of Plaintiffs.

**B.     Defendant Fails to Offer Required Structured, Rehabilitative, Recreational and Educational Programs to Reduce Cell Confinement.**

Children in detention are entitled to adequate programs, protection, and educational services. *See, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) (right to rehabilitation for institutionalized persons protected by the Fourteenth Amendment); *Morgan v. Sproat*, 432 F. Supp. 1130, 1134-37 (S.D. Miss. 1977) (juveniles have right to individualized treatment); Individuals with Disabilities Education Act, 20 U.S.C. § 1401 (requiring individualized programs and services for children with disabilities including those housed in public institutions).

Multiple Consent Decree provisions mandate daily, structured, rehabilitative, educational and/or recreational programming, including evening and weekend/holiday activities.[36]  The recent

---

[35] In October 2021, Plaintiffs learned of an incident involving a JCA from a news report about the teacher's arrest and detention. *See* Maggie Wade, *JPS teacher at Henley, Young Youth Court School arrested: Wade Jackson is charged with gratification of lust and contraband in a penal institution*, WLBT (Oct. 27, 2021), https://www.wlbt.com/2021/10/28/jps-teacher-henley-young-youth-court-school-arrested.

[36] *See* Consent Decree at 6-9, 17 (Provisions 3.1 (Cell Confinement), 4.1 (Structured Programming), 5.5 (Individualized Treatment Plans/Treatment Program for Post-dispositional Youth), 16.2 (Large Muscle Exercise).

month-long quarantine which spanned the months of December 2021 and January 2022 denied vulnerable and disabled children access to mental health care, school, and family contacts (including over the holidays).[37]

Even before this most recent COVID-19 outbreak, in response to conflicts between Plaintiffs on two male units, Hinds County alternates classroom attendance for state-mandated education[38] with completing worksheets without academic instruction on the housing units for 1-2 hours (then games the rest of the day).[39]

Even before this most recent COVID-19 outbreak, and despite the continued frequency of suicide threats or attempts throughout 2021, the provision of individual and group treatment, as required in Plaintiffs' treatment plans was not being provided.[40]

---

[37] The same unnecessary overuse of cell confinement in violation of the Consent Decree occurred in November 2020, when, upon information and belief, during the week of the Thanksgiving holiday, residents were not offered access to school, daily large muscle exercise, or time outside in violation of the Third Amended Consent Decree. Plaintiffs were not even offered additional telephone calls with their families.

[38] *See* Miss. Code Ann. § 43-21-321. Upon information and belief, since 2020, male JCA pods alternate days for school with teachers, prohibiting the 5.5 hours of mandated instruction per weekday, in accordance with the agreement between Hinds County and the Jackson Public School District.

[39] Not only is this significant deficiency in educational programming a violation of the Consent Decree and the laws of Mississippi, the "[Individuals with Disabilities Education Act (IDEA)] requires states and local educational agencies receiving federal IDEA funds to make a [Free and Public Education (FAPE)] available to children with certain disabilities." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005) (en banc). A FAPE includes both "special education" and "related services." 20 U.S.C. § 1401(9). "Special education" is "specially designed instruction ... to meet the unique needs of a child with a disability." *Id*. at § 1401(29). "Related services" are services "required to assist a child to benefit from" instruction. *Id*. at § 1401(26).

[40] *See* Provisions 20.4 (Measuring Progress) and 20.5 (Benchmark and Needs), which references Table 2 (dated Jan. 11, 2022, and submitted to the Court). Consent Decree at 23-24. Because of the ongoing treatment planning/programming and mental health care deficiencies outlined in Table 2, at 20-32, 60-63 (Provisions 5.1, 5.2, 5.3, 5.4, 5.5, 13.3)), in October 2021, Henley-Young Plaintiffs offered the Facility Dr. Khumalo's on-site and virtual technical assistance. Henley-Young Plaintiffs anticipate improved outcomes for residents in 2022 and acknowledge Hinds County's willingness to accept Dr. Khumalo's guidance and support.

**C.    Defendant Fails to Integrate Structured/Rehabilitative Programming with Coordinated Medical/Mental Health Services.**

The Parties have not commenced Phase Four of the CAP[41] because Hinds County has failed to demonstrate progress toward unmet needs in programming, behavior management, medical treatment, and mental health treatment. Facility staff resist the need for programming to keep residents engaged to alleviate boredom and reduce inappropriate acting-out which too often results in the use of mechanical restraints and cell confinement.[42]

Notably, most Plaintiffs – as vulnerable and disabled children – have written treatment plans which require access to mental health care.[43] Interviews with both residents and staff have repeatedly revealed that the individual resident "check-ins" usually held in the pod dayrooms do not comply with Consent Decree Section V, Individualized Treatment Plans/Treatment Program for Post-dispositional Youth,[44] or Consent Decree Section XIII, Mental Health Care.[45]

Additionally, the increased use of mechanical restraints over the past year – as cited in incident report after incident report in response to the behavior of residents with chronic unmet mental health needs – has dangerously highlighted the absence of adequate training, communication and coordination between direct care staff and mental health staff (who are usually only notified once the restraints are already in use or after they have been removed). This is not therapy.

---

[41] *See* note 21, *supra*.

[42] *See* note 14, *supra*.

[43] *See* note 2, *supra*.

[44] *See* Consent Decree at 8-9.

[45] *See id*. at 14-16.

III.    **Hinds County's Longstanding, Current, and Ongoing Violations of Plaintiffs'**
        **Federal Rights Have Consequences.**

    A.    **Defendant's Violations of Plaintiffs' Federal Rights is Longstanding, Current,**
        **and Ongoing.**

From early December 2021 until days before the January 20, 2022, settlement conference,

the Facility detained two children under Youth Court jurisdiction well beyond 21 days,[46] despite

the Order of the Court clarifying that to do so violates the Consent Decree.[47]

Additionally, even more concerning is the fact that Henley-Young Plaintiffs continue to

raise serious concerns where the Facility's failing physical plant precludes its ability to maintain

basic, critical sanitation and security practices, thereby creating a sustained dangerous environment

inside a global pandemic. For example, access to running water is often limited (causing Plaintiffs

and laundry to be transported to the county jail for showers and cleaning; toilets must be flushed

with buckets); the roof and electronic locking mechanisms continue to be in need of repair and/or

replacement; and the modular units necessary for required additional programming space per the

Court's Order, *see* ECF No. 147 at 1, remain inoperable for lack of adequately trained staff.[48]

The lack of proper and consistent COVID-19 protocols resulted in several outbreaks in

---

[46] The January 10, 2022, Facility Roster provided to Henley-Young Plaintiffs and Anne Nelsen, identified one Youth Court resident at 59 days, and another Youth Court resident at 39 days. The Defendant's response to Plaintiffs' inquiries on the January 6, 2022, Progress Call did not include a plan to release these children or offer a higher level of care in the interim.

[47] *See* Order, Aug. 16, 2021, ECF No. 165. "And Defendant is in violation of the Extended Third Amended Consent Decree if and when it houses children under Youth Court jurisdiction beyond the 21-day limit set forth in paragraph 2.1." *Id.* at 3.

[48] Where the modular units installed in July 2020 remain inoperable and water damage in the classrooms – and other key facility areas such as the kitchen – resulting from a failing roof have further limited already strained programming space (*i.e.*, the Facility lacks any indoor area large enough to accommodate large muscle exercise), it is alarming that residents have reported that access to the classrooms for state-mandated education and time outside for large muscle exercise is sometimes withheld as punishment (much like access to televisions on the housing units). Such reports reveal clear violations of Provisions 3.1 (Cell Confinement), 4.1 (Structured Programming), 5.5 (Individualized Treatment Plans/Treatment Program for Post-dispositional Youth), 16.2 (Large Muscle Exercise). *See* Consent Decree at 6-9, 17.

2020 and 2021 which forced the Facility into quarantine – most recently for nearly the entire month of December. Even in quarantine, when resident activity was severely limited and cell confinement was the norm (instead of the exception), the few critical life safety training topics which were being covered in the first few months of 2021 were not even proffered at the end of the year to direct care staff working daily with youth.[49] Joint Expert Anne Nelsen has repeatedly recommended that that 40-hour new employee orientation training address several key areas – including, but not limited to, basic security practices, intake procedures, security searches, the Consent Decree, use of mechanical restraints, adolescent behavior, communication skills, adolescent mental health issues, resident rights (including legal visits and phone calls), report writing, and sexual abuse.

### B.  Defendant's Failures Increase the Substantial Risk of Serious Harm to Vulnerable and Disabled Children.

Since the early 2000s, the United States Supreme Court has expanded the constitutional rights of children. *See Roper v. Simmons*, 543 U.S. 551, 569 (2005) ("juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," where "juveniles have less control, or less experience with control, over their own environment"); *see also Graham v. Florida*, 560 U.S. 48, 68 (2010) ("developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds" where "parts of the brain involved in behavior control continue to mature through late adolescence; *Miller v. Alabama*, 567 U.S. 460, 477 (2012) ("[m]andatory life without parole for a juvenile precludes consideration

---

[49] Upon information and belief, there exists no formal official, or unofficial, training for contractors and vendors who interact daily with Plaintiffs, such as staff employed by Hinds Behavioral Health Services, Jackson Public Schools, and Quality Correctional Health Care. This increases the substantial risk of serious harm to Plaintiffs – *see* note 35, *supra* – and violates the Consent Decree, whose "specific requirements shall apply fully to Henley-Young and to any contractors that may provide services to Henley-Young in the future." *Id*. at 2.

of his chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences.”). Ongoing events – as revealed through Facility incident reports – demonstrate the elevated risk of serious harm to vulnerable and disabled children in Defendant's custody:

- On February 3, 2022, a Youth Court resident was not offered an assessment until after orientation, despite being discovered in his cell at the time of the initial escort with a blanket tied around his neck. The documentation provided by the Facility did not include the time which elapsed between the discovery of the child in his cell (during normal programming hours) actively engaging in self-harm and his placement on Precautionary Status (suicide watch requiring constant supervision).

- On New Year's Eve 2021, a JCA had to be transported to the University of Mississippi Medical Center after he was found unresponsive in his cell following a suicide attempt.

- On the evening of November 1, 2021, a Youth Court resident was taken from the Facility by AMR after use of force, mechanical restraints, and a chemical injection were applied as calming techniques following her placement on Precautionary Status during intake.

- Over the course of a weekend during programming hours in September 2021, a JCA was twice discovered threatening self-harm in his room during cell checks.

- One resident had to be transported to the University of Mississippi Medical Center on December 15, 2020, after being injured by other residents the first day he arrived, and the incident was not fully or properly documented. It was not until a subsequent interview that Henley-Young Plaintiffs learned the details of that incident, along with another one on January 2, 2021, involving another serious injury to this same resident by Facility staff who then purposefully failed to report it.

Additionally, the increasing frequency of incidents involving contraband from 2020 to 2021 continues in 2022 – including smoking paraphernalia/marijuana and weapons (*e.g.* "shanks"). Hinds County fails to conduct investigations of the source of contraband unless repeatedly prompted by Ms. Nelsen, and, even then, those "investigations" have generally been cursory as opposed to comprehensive. Given the recent reintroduction of weekend non-contact visitation, it is concerning that the presence of contraband may continue to rise where its prevalence already seemed unabated despite Plaintiffs not having had physical contact with adults outside of the Facility since the start of the pandemic.

Additionally, the increasing frequency of serious suicide attempts from 2020 to 2021 are also likely to continue in 2022. The contract negotiations for medical and mental health services which Hinds County started in 2020 – as reported on multiple Progress Calls between the parties (December 3, 2020 (PC 28); January 28, 2021 (PC 30); February 18, 2021 (PC 31); April 1, 2021 (PC33); December 9, 2021 (PC 44); January 6, 2022 (PC 45)) – only recently resulted in an executed agreement.[50]

In 2020, from September 1 – December 31, based on documentation requested by Ms. Nelsen,[51] residents were placed on Precautionary Status (suicide watch requiring constant supervision) over 20 times with 1 suicide attempt, 2 self-harm incidents, and 4 documented reports of suicide ideation. One incident was especially alarming.

On November 30, 2020, Henley-Young Plaintiffs received a report that a resident attempted suicide on November 27, 2020. Upon information and belief, he remained in the care of

---

[50] Hinds County supplied Henley-Young Plaintiffs and Anne Nelsen a copy of the contract on February 4, 2022.

[51] Upon information and belief, the QMHP Mental Health log documenting this Precautionary Status information (*i.e.*, suicide watch requiring constant supervision) did not actually include data for December 2020.

University of Mississippi Medical Center for nearly a week. Prior to the November 27 incident, this same child was involved in multiple serious incidents on October 8, 17, 18, 22, 26, 30, and November 6.[52] He continued to actively engage in self-harming behaviors throughout the first half of 2021, and was eventually transferred from the Facility to the Raymond Detention Center[53] – in violation of the settlement agreement in the DOJ Case – following a June 2021 hospitalization for another serious suicide attempt.

In January 2021, Henley-Young Plaintiffs received a report that another resident attempted suicide after being tased by staff of the Hinds County Sheriff's Department,  in violation of Provision 7.5 (No Restraint Chairs, Chemical Restraints and/ or Tasers; Eliminated by agreement of the parties in March 2016)[54]. Upon information and belief, Hinds County admitted to the Juvenile Monitor for the DOJ Case that the housing unit was insufficiently staffed at the time of the November 2020 suicide attempt. Based on the initial reports from the suicide attempt of January 30, 2021, Henley-Young Plaintiffs believe staffing shortages played a similar role.[55]

---

[52] According to the Facility-provided incident reports (*see* note 32, *supra*): on October 8, this resident faked taking medication in the nurse's office; on October 17, he provided direct care staff with a "shank" (sharpened-down toothbrush), reporting another resident had threatened to use it on him; on October 18, he was assaulted by five others, and then involved in a conflict with another resident on October 22; on October 26, this resident again "cheeked" his medication in the nurse's office; on October 30, this same child was in another altercation with several residents; on November 6 (just 20 days before requiring hospitalization), a "metal object with a sharp point wrapped with tape approximately 10 inches long" was found in his cell, heightening Henley-Young Plaintiffs' concerns regarding the substantial risk of serious harm given his then-recent history with multiple peer conflicts and ongoing/severe mental health issues.

[53] *See* First Order of Contempt, DOJ Case, Feb. 4, 2022, ECF No. 100 at 23 (finding the situation involving this vulnerable child "illustrative" of the "the lack of appropriate mental health supports" offered by Defendant).

[54] Third Am. Consent Decree, Apr. 3, 2019, ECF No. 145 at 11.

[55] According to the Facility's Roster, this JCA had been detained by Hinds County for approximately 383 days at the time of the January 30, 2021, serious suicide attempt. He had reported in mid-January 2021 that Facility programming alternates between school/worksheets on the pods, limited time outside, and playing games/watching television. Anne Nelsen's review of the video captured the day of the November 27, 2020, suicide attempt showed that no structured/rehabilitative programming was taking place in clear violation of Provisions 3.1 (Cell Confinement), 4.1 (Structured Programming), 5.5 (Individualized Treatment Plans/Treatment Program for Post-dispositional Youth), 16.2 (Large Muscle Exercise). *See id.* at 7-8, 10,

Over New Year's Eve weekend 2021, Henley-Young Plaintiffs received several alarming reports, and it was confirmed during a Progress Call between the parties on January 6, 2022, that direct care staff distributed medication without knowledge of the Nurse and placed multiple residents on Precautionary Status without knowledge of the Treatment Coordinator.

In a similar incident involving an inexcusable lack of integration between structured/rehabilitative programming and coordinated medical/mental health services, in November 2020, Henley-Young Plaintiffs received a report that two male residents were being isolated away from the other male residents on the female pod.[56] For one of those male residents, Ms. Nelsen requested his treatment plan as required by Provisions 5.2-5.4 (Individualized Treatment Plans/Treatment Program for Post-dispositional Youth) and 13.2 (Mental Health Care).[57] Upon review of his records, that resident has been referred for mental health services two months prior but had not yet been seen, in violation of Provision 13.5(e)[58] – despite his treatment history (diagnoses and prior prescriptions for psychotropic medications) and then-recent isolation. At that time, the Treatment Coordinator had recently resigned, causing Henley-Young Plaintiffs to question the quality and substance of mental health services offered by Hinds County. Henley-Young Plaintiffs continue to be concerned.

Furthermore, where incident reports cite the use of Crisis Prevention Institute ("CPI") control position escorts/holds – and staff had either never been trained or were long overdue for

---

18. It was anticipated that the same was true for the January 30, 2021, incident; however, upon information and belief, the investigative reports requested for both incidents continue to remain outstanding.

[56] Hinds County housed female residents in the Facility during that time in intake, in clear violation of Provision 16.1 (Provide Equal Access to All Services; Eliminated by agreement of the parties in March 2018). *See id.* at 18.

[57] *Id.* at 8-10, 15.

[58] *Id.* at 16.

their annual CPI update – the risk of serious harm to vulnerable and disabled children increases where residents are not receiving the full scope of integrated support in violation of Provisions 5.1-5.6 (Individualized Treatment Plans/Treatment Program for Post-dispositional Youth), 12.1-12.6 (Medical Care), 13.1-13.6 (Mental Health Care), and 14.1-14.3 (Suicide Prevention).[59]

## **CONCLUSION**

The Consent Decree in this case was extended a year after the start of the pandemic in 2021 when both parties agreed that Facility operations (and compliance progress) had been impacted by COVID-19. Given the recent change in leadership and the continued challenges with staffing (including the elimination of 7 direct care positions) which adversely impact the Facility's available resources and services for the current population limited to 32 residents, the need to protect the federal rights of vulnerable and disabled children presently in the care and custody of Hinds County continues. Additionally, where the current lack of required staff training, continued understaffing and chronic staff turnover – which adversely limits both structured/rehabilitative programming and coordinated medical/mental health services resulting in Plaintiffs being subjected to the increased use and misuse/overuse of Emergency Behavior Management Confinement – mirrors previous compliance issues as outlined above in the history of this case, it is Henley-Young Plaintiffs' position that the parties should be moving forward – not backwards – to cross the Consent Decree finish line. Therefore, Hinds County's motion should be denied.

Simply put, Defendant cannot have it both ways. Hinds County cannot argue that it has fulfilled its obligations to the youth of Hinds County while also failing to comply with the Court's Orders. The parties agreed in April 2021 that crossing the Consent Decree finish line was in the

---

[59] *See* Consent Decree at 8-9, 13-17.

interests of the Plaintiffs and Hinds County. If Defendant seeks to "[get] out of the consent decree for good," Defendant's Memo at 15, instead of requesting termination or unsupported modification, Defendant should be offering the Court its plan (including the resources and transparency necessary) to achieve sustained progress in addressing and remedying the substantial risk of serious harm to vulnerable and disabled children in violation of their federal rights.

Henley-Young Plaintiffs request that the Court deny Defendant's Motion to Terminate, or, Alternatively, Modify, the Extended Third Amended Consent Decree, and for any additional relief the Court deems necessary and proper.

Dated: April 18, 2022

Respectfully Submitted,

/s/ Leslie Faith Jones
Leslie Faith Jones, MSB No. 106092
Keisha Stokes-Hough, MSB No. 103717
Counsel for the Plaintiffs
Southern Poverty Law Center
111 East Capitol Street, Suite 280
Jackson, Mississippi 39201
Phone: (601) 948-8882
Facsimile: (601) 948-8885
E-mail: leslie.jones@splcenter.org
Email: keisha.stokeshough@splcenter.org

/s/ Greta Kemp Martin
Greta Kemp Martin
Counsel for the Plaintiffs
Mississippi Bar No. 103672
Disability Rights Mississippi
5 Old River Place, Suite 101
Jackson, Mississippi 39202
Phone: (601) 968-0600
Facsimile: (601) 968-0665
E-mail: gmartin@drms.ms

## CERTIFICATE OF SERVICE

I, Leslie Faith Jones, hereby certify that a true and correct copy of the foregoing document was filed electronically.  Notice of this filing will be sent by email to all parties by the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

This the 18th day of April, 2022.

/s/ Leslie Faith Jones
Leslie Faith Jones, MSB #106092

!